Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
(208) 336-8980 | Phone
(208) 342-2561 | Fax

Tulin Ozdeger, # 476548 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington, DC 20005
(202) 638-2535 | Phone
(202) 628-2737 | Fax

Marguerite M. Sullivan, # 497894 (DC)
Kristi N. O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington, DC 20004-1304
(202) 637-2200 | Phone
(202) 637-2201 | Fax

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

_____

JANET F. BELL, BRIAN S. CARSON,       )
CRAIG FOX, ROBERT MARTIN, LAWRENCE    )
LEE SMITH, ROBERT ANDERSON,           )    Civ. No. 1:09-CV-00540-REB
PAMELA S. HAWKES, JONATHAN LEIGH      )
MILLER, JAMES M. GODFREY, BASIL E.    )
HUMPHREY, and KIRK ROSS,              )
                                      )
                    Plaintiffs,       )    **PLAINTIFFS' STATEMENT**
            v.                        )    **OF DISPUTED MATERIAL**
                                      )    **FACTS**
CITY OF BOISE; BOISE POLICE           )
DEPARTMENT; and MICHAEL MASTERSON,    )
in his official capacity as Chief of Police, )
                                      )
                    Defendants.       )
_____ )

## PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS

Pursuant to Dist. Idaho Loc. Civil R. 7.1(c)(2), Plaintiffs submit their Statement of Disputed Material Facts in support of their Response to Defendants' Motion for Summary Judgment filed contemporaneously herewith.

**Defendants' Enforcement of Boise City Code §§ 9-10-02 and 6-01-05(A)**

1.   The Bike Patrol Unit of the Boise Police Department issues more citations than other officers under § 9-10-02 and also issues multiple citations under § 6-01-05(A).  Homeless individuals are the primary recipients of citations that the Bike Patrol officers issue under these ordinances.  (Ex. 33 at 55:12-15, 57:6-9; Ex. 35 at 67:17-20, 74:6-7.)

2.   Bike Patrol officers start work early in the morning, up to two hours before their scheduled shift, to look for individuals sleeping outside to whom they can issue citations.  The officers know that they are most likely to find individuals sleeping at very early hours of the morning.  (Ex. 32 at 17:22-18:15, 102:4-19, 109:3-9; Ex. 34 at 12:19-13:9, 59:3-7, 60:25-61:9, 64:17-19, 74:3-5; Ex. 35 at 28:19-21, 35:22-36:6, 112:15-23; Ex. 60, 67, 69-82)

3.   Bike Patrol officers cite individuals for sleeping in public even when the individuals only have a sleeping bag or blanket and no tent or other temporary structure.  (Ex. 27 at 37:8-14; Ex. 24 at 65:24-66:2; Ex. 23 at 56:6-10; Ex. 26 at 26:17-22.)

4.   Bike Patrol officers also wake and threaten individuals who have attempted to sleep in the parks during the day.  (Ex. 24 at 50:16-25; Ex. 23 at 63:9-64:1, 72:7-73:9.)

5.   In 2007, BPD changed the shift hours for the Bike Patrol Unit in order to respond to complaints about homeless individuals sleeping outside.  (Ex. 3.)  This resulted in a 440% increase in camping citations issued in 2007 – from 30 in 2006 to 162 in 2007.  (*Id.*)  In 2008, the BPD issued 67 camping citations. (Ex. 4.)

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 1

6.   In June 2009, in light of this litigation, Captain Peter Ritter instructed officers to discontinue citing individuals for camping in public under § 9-10-02. and to instead use §6-01-05(A), the disorderly conduct statute.  (Ex. 16.)

7.   The Bike Patrol officers write daily emails ("Daily Reports") in which they detail events that occurred during their shifts, including who they encountered and what citations they issued.  (Ex. 35 at 27:2-11; Ex. 33 at 78:16-79:7.)   They send these emails to the BPD NST Greenbelt Listserv, which includes officers in the Bike Patrol Unit and their superiors, including Sergeant Walker, Captain Ritter and Chief Masterson.  (Ex. 58; Ex. 36 at 87:12-19, 116:13-117:1; Ex. 33 at 83:6-9; Ex. 34 at 49:10-24; Ex. 38 at 23:1-4; Ex. 37 at 54:9-24.)  In the emails, the Bike Patrol officers discuss their interactions with and citations that they give to homeless individuals.  The officers refer to homeless persons in their reports as "transients" or "TAs," short for "transient Americans."  (Ex. 63, 84-93.)  Chief Masterson is aware that the officers use this language to describe homeless persons.  (Ex. 38 at 93:25-94:3.)  In one Daily Report, Officer Shuler created "a new game to rival fantasy football, poker, and American Idol. This involves our regular transients and ranks them by average BAC and # of cites in their past."  (Ex. 59.)   Sergeant Walker did not see a problem with the contents of this Daily Report.  (Ex. 36 134:4-7.)

**Lack of Training on Enforcement of §§ 9-10-02 and 6-01-05(A)**

8.   Prior to the implementation of the new camping ordinance, the Bike Patrol officers did not receive any training regarding proper enforcement of §§ 9-10-02 and 6-01-05(A) or interacting with homeless persons.   The Department did not maintain written guidance regarding enforcement of these ordinances.   There was also no formal or in-field training regarding the ordinances or how to interact with homeless persons or those suffering from mental illness.  (Ex.

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 2

33 at 38:15-18, 39:11-25, 40:1-12; Ex. 34 at 18:15-19:8, 20:14-21:2, 23:22-25; Ex. 32 at 35:14-36:8; Ex. 35 at 46:1-10, 49:1-23; Ex. 38 at 40:1-4, 46:6-17.)

9.   In late 2009, Bike Patrol officers conducted training for their fellow officers on the amended camping ordinance and the Special Order.  The training did not provide any guidance on what it means for a shelter to be "full."  It did not provide instruction on how to determine whether a shelter can accommodate a person with a disability or how to determine whether a shelter has indicated that a particular individual cannot stay at the shelter before issuing a citation.  The training also did not provide any instruction on the definition of "camping."  (Ex. 36 at 102:25-103:18; Ex. 34 at 92:5-11, 93:19-94:2,106:17-107:9; Ex. 35 at 65:6-8, 79:18-20, 94:7-13.)

**Insufficient Shelter Space in Boise**

10. On any given night, there are a maximum of 349 beds at shelters that are "available" for homeless persons.  As of August 2010, City Light has 95 beds.  (Ex. 39 at 49:1-49:7.)  Fifty-eight of those beds have only been available since late November 2009.  (Ex. 9-10.)  As of that same month, River of Life has had 138 beds (110 in Dorm A and 28 in Dorm B, typically reserved for physically and mentally disabled).  (Ex. 40 at 32:18-34:10.)  Last year alone, more than 1,300 new homeless persons sought shelter at River of Life.  (Ex. 40 at 34:2-3.)  Finally, as of April 2009, Sanctuary has 116 beds.  Pettet Aff. ¶ 15.

11. Studies estimate that the number of homeless persons in Boise ranges from 1,500-4,500 individuals.  (Ex. 1 at 12-13; Ex. 2 at 8).

12. On multiple occasions, Interfaith Sanctuary has reported to the police that it is full and has no beds available.  (Pettet Aff. ¶ 11 (explaining that Sanctuary informed the police on November 13, 2007 – a mere two weeks after opening – that it had reached capacity for bed and floor spaces available for men and could not even accept new applications); Ex. 133; Ex. 134; Ex. 135; Ex.

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 3

136; Ex. 137.))  Sanctuary has turned Plaintiffs away because it has not had beds available for them.  (Exs. 133-137; Ex. 34 at 92:12-17; Ex. 36 at 107:21-25; Ex. 57 (No. 12); Pettet Aff. ¶ 17.)  Sanctuary has a wait list for beds every night.  The wait list for men usually has between 10-15 men on it and the wait list for women has 3-5 women on it.  (Pettet Aff. ¶ 19.)  Boise Rescue Mission ("BRM") has also turned homeless persons away.  (Ex. 23 at 60:14-21.)  Plaintiffs Bell and Smith have never been able to obtain beds at BRM; they have had to sleep on mats in the dining room.  (Ex. 41 (No. 14); Ex. 23 at 37:24-38:6; Ex. 54 (No. 3); Ex. 28 at 21:13-17.)

13. Each of the three emergency shelters has restrictions based on gender and/or familial status.  (Pettet Aff. ¶¶ 10-16.)  River of Life and City Light have maximum allowable time of stay policies that allow homeless persons to stay in those shelters for only 17 days or 30 days, respectively, without enrolling in specific shelter programming.  If individuals do not enroll in those programs, they must leave the shelter for a period of 30 days.  (Ex. 39 at 91:2-15; Ex. 40 at 43:6-20; Ex. 17; Ex. 24 at 68:4-5.)  The shelters also experience health problems, such as lice and influenza.  (Pettet Aff. ¶ 34; Ex. 32 at 151:11-15; Ex. 30 at 45:17-46:2; Ex. 99.)

14. Under the Overnight Shelter Capacity Advisory Protocol, it is voluntary for shelters to report to the Police Department whether they are full.  Police officers do not monitor to confirm whether or not the shelters are actually full on a given night.  (Ex. 34 at 102:17-103:21; Ex. 36 at 105:10-11; Ex. 35 at 81:6-9.)  There have been times that Sanctuary was full and did not contact the BSU dispatch.  Pettet Aff. ¶ 37.

15. Officers are only required to check their e-mails once during a shift.  (Ex. 35 at 82:1-4; Ex. 36 at 106:16-18.)  They do not have to recheck their e-mail before they issue a citation to determine whether the shelters have reported being full.  (Ex. 36 at 106:4-14; Ex. 35 at 82:5-8.)

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 4

The officers stated that they would cite individuals without checking on the status of the shelters. (Ex. 33 at 48:7-14; Ex. 36 at 106:4-15; Ex. 35 at 81:6-25, 82:5-8; Ex. 32 at 178:15-19.)

**Involuntary Nature of Homelessness and Inability to Access Shelter Space**

16. People do not choose to be homeless.  (Ex. 21 at 3.)  Homelessness is almost always the result of factors beyond an individual's control, including poverty, mental and physical illness and disability, substance abuse issues, inability to access government benefits, medical treatment, and social services, and social isolation.  (*Id.*)

17. The nature of homeless individuals' mental illness makes it difficult for them to live in shelters for limited or sustained periods of time.  (*Id.* at 2.)  People who are schizophrenics or suffer from bipolar disorder, post-traumatic stress syndrome, anxiety or compulsive disorders have difficulty adjusting their behaviors to the shelter environment.  (*Id.*)  They may experience fear, inability to tolerate loud and chaotic crowds, or anxiety aroused by crowds.  (Ex. 22 at 6.) Shelters that have rigid and strict policies without accommodations for mentally ill persons pose a particularly difficult situation for homeless persons who suffer from mental illnesses because those individuals have difficulty complying with rules and policies that they perceive to be arbitrary, unfair or conflict with their own beliefs and viewpoints.  (Ex. 21 at 3.)  Even if these persons know the consequences of their behavior, they simply cannot adjust it to comply with the rules and policies.  (*Id.*)  These persons also may have difficulties falling asleep or waking up at the shelters' designated times.  (*Id.*)

**Robert Anderson**

18. Robert Anderson is a homeless individual who lives in Boise, Idaho.  ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████ (Ex. 48 (No. 6).)  Since April 2007, Anderson

has sought work as a day laborer and a dishwasher.  (Ex. 47 (No. 9).)

19. On September 1, 2007, Anderson received a citation off the 8th Street Extension for camping.

(Ex. 106.)  Anderson had only been at that location for one night. (Ex. 25 at 31:20.)  When he

decided to sleep there, he believed that he was outside of the city limits.  (*Id.* at 32:8.)  Anderson

was sleeping outside because he was unable to obtain a bed at a homeless shelter within the city

limits of Boise.  (Ex. 46 (No. 6).)  He had exceeded his maximum 17-day limit for staying at

BRM.  (Ex. 25 at 30:17; Ex. 47 (No. 12).)  Anderson does not share BRM's religious beliefs or

philosophies, nor does he believe in what Mission members preach.  (Ex. 47 (No. 15).)

**Janet Bell**

20. Janet Bell used to be homeless in Boise, Idaho.  ██████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ (*Id.*)   Since April 2007, Bell's

disabilities have rendered her unable to work.  (Ex. 41 (No. 9).)

21. Bell received citations for camping on April 28, 2007 and  May 22, 2007. (Ex. 107-108.)  On

May 22, 2007, Bell had only been at the tent for a few minutes when Officer Dotson arrived.

(Ex. 23 at 55:25-56:1).  On April 28, 2007, Bell was sleeping outside because there were no

available beds at the shelters.  Sanctuary was not open, and Bell knew from experience that City

Light did not have any available beds. (Ex. 23 at 61:8; Ex. 41 (No. 14).)  On previous occasions,

she has had to sleep on a mat on the floor in an overcrowded dining area at Sanctuary because

the number of homeless women and children exceeded the total number of beds.  (Ex. 41 (No.

14).)  ████████████████████████████████████████ (Ex. 23 at

38:22.)  Bell also could not stay at City Light because she does not agree with their religious philosophies or polices.  (Ex. 41 (No. 15).)

22. Bell also needed to stay with her husband because of her disabilities and health problems. (Ex. 41 (No. 13).)  BRM does not allow married couples to stay at its shelters.  (*Id.*)

**Brian S. Carson**

23. Brian Carson is a homeless individual who lives in Boise, Idaho.  He received a citation for disorderly conduct on May 6, 2009.  (Ex. 109.)  Carson slept on the loading dock of the Idaho Linen Building because there were no beds available to him at any of the shelters.  (Ex. 30 at 41:14.)  Carson had searched for a shelter to sleep at, but has been unsuccessful.  (Ex. 57 (No. 19).)  Carson had past experience with the shelters not having any beds available.  (Ex. 30 at 41:14.)  He had been turned away from Interfaith Sanctuary more than a dozen times because it was full.  (Ex. 57 (No. 12).)  He could not stay at River of Life because he was turned away, and because he does not subscribe to their policies and procedures which required him to enter into one of their religious programs.  (*Id.*)

24. Carson suffered a broken pelvis in the late spring of 2010 and, after being released from the hospital, was able to stay with a friend (at 10503 Rifleman Street, in Boise) for a short period of time while he recovered.  This living situation was only temporary.  (*Id.* (No. 13).)

**Basil Humphrey**

25. Basil Humphrey is a homeless individual who lives in Boise, Idaho.  ████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████  (Ex. 56 (No. 6).)  Since he has lived in Boise, Humphrey has performed day labor jobs such as

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 7

construction cleanup and landscaping.  (*Id.* (No. 7).)  Due to health problems, Humphrey is no longer able to work and is seeking disability benefits. (*Id.* (No. 10).)

26. Humphrey received a camping citation on August 2, 2007 and was arrested for a separate alleged camping violation of September 18, 2007. (Ex. 111; Ex. 29 at 71:13-73:1, 78:3-24.)  He was sleeping outside because he had nowhere else to go.  (Ex. 29 at 62:15.)  On August 1, 2007, he was turned away from River of Life.  (*Id.* at 63:1.)  He had been in its alcohol program but was kicked out for struggling to stay sober.  (Ex. 56 (No. 12).)  Humphrey also did not agree with the religious aspects of staying at River of Life.  (Ex. 29 at 40:21-22.)  At the time, Sanctuary was not operating as a shelter.  Fawn Aff. ¶ 7.

**Robert Martin**

27. Robert Martin is a homeless individual who lives in Boise, Idaho.  ██████████████ ████████████████████████████████████████████████████████ (Ex. 51.)

28. Martin received a citation for camping on March 21, 2009. (Ex. 112.)  Officer Shuler found him sleeping in the bushes with only a sleeping bag.  (Ex. 49 (No. 10).)  Martin was sleeping outside because he was not allowed to stay at any of the shelters in Boise.  (*Id.*; Ex. 27 at 37:3-5, 38:6-9.)  Sanctuary had asked Martin and his family to leave because they had too many belongings.  (Ex. 49 (No. 12); Rx. 27 at 14:14-15:14.)  Martin was not welcome at BRM because he was unable to wake up at the assigned time in the morning due to insomnia.  (Ex. 50 (No. 19); Ex. 27 at 25:12-26:7.)  He also could not stay there because he did not agree with their religious beliefs and policies.  (Ex. 27 at 26:8-10.)  BRM also does not allow married couples to stay together.  (Ex. 49 (No. 15).)

29. Martin received a citation for disorderly conduct on April 24, 2009.  (Ex. 113.)  Officer Shuler found Martin behind Corpus Christi day shelter.  (Ex. 27 at 55:2-3.)  Martin had been

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 8

wandering around all night looking for some place to sleep because he could not stay at any of the shelters.  (*Id.* at 52:20-24, 55:7.)  At four or five in the morning he decided to sit down by Corpus Christi day shelter and wait for it to open at 7:00 A.M.  (*Id.* at 53:3-16.)  He dozed off while waiting and was cited.  (*Id.* at 54:25-55:6, 52:11-18.)

**Lawrence Lee Smith**

30. Lawrence Lee Smith was previously homeless in Boise, Idaho.  He became disabled in 2007 and is unable to work.  (Ex. 55 (No. 7, 9).)

31. Smith received citations for camping on April 28, 2007 and May 12, 2007.  (Exs. 114-115.) On both occasions, Smith was sleeping outside because he knew from his experience that there were no shelter beds available.  (Ex. 54 (No. 3).)  BRM and Sanctuary had turned him away many times in the past.  (Ex. 28 at 22:15; 23:11.)  Smith had never received a bed at BRM.  (Ex. 28 at 21:13-14.)  The few times he stayed at BRM, he had to sleep on a mat on the floor in an overcrowded office area that was packed wall to wall with people.  (Ex. 54 (No. 3).)  Also, when he had gone to BRM in the past he had not been allowed to stay on the second or third floor because the Mission only provides beds on those floors to people who fulfill the Mission's religious and work program requirements.  (Ex. 55 (No. 13).)  Because there had previously been no beds available, Smith had no reason to believe there would be beds available on either of the nights when he received citations.  (Ex. 54 (No. 3).)

**James Godfrey**

32. James Godfrey is a homeless individual who lives in Boise, Idaho.  He has been diagnosed with and received treatment for alcoholism, pneumonia, a broken hip, numbness in his feet, and difficult walking, and a bad back.  (Ex. 53 (No. 6).)  Godfrey's medical conditions render him unable to work.  (*Id.* (No. 7).)

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 9

33. Godfrey received a citation for camping by the river on June 18, 2009. (Ex. 110.)  Godfrey was sleeping with only a blanket.  (Ex. 26 at 26:17-22.)  On the night before his citation, Godfrey was unable to get to a shelter.  (Ex. 52 (Nos. 1, 3, 5, 6).)  Godfrey does not share BRM's religious beliefs or philosophies and does not want to participate in its religious programs.  (Ex. 53 (No. 15).)

**Pamela Hawkes**

34. Plaintiff Hawkes was a homeless individual who lived in Boise, Idaho.  She has been employed as a day laborer.  (Ex. 44 (No. 7).)  Hawkes has been diagnosed with and received treatment for anxiety, depression, and post-traumatic stress disorder.  (Ex. 45 (No. 6).)

35. Hawkes received citations on July 12, 2006, September 4, 2006, May 19, 2007, June 10, 2007, July 8, 2007, July 21, 2007, July 23, 2007, July 25, 2007, August 2, 2007, August 14, 2007, August 18, 2007 for camping.  (Ex. 116-122, 124-126, 139.)

36. On July 24, 2007 Hawkes was cited by Officer Dotson for disorderly conduct.  (Ex. 123.)  At the time, she had just finished using the restroom and was exiting the building when she got the citation.  (Ex. 24 at 62:8-9.)  She had not slept in the restroom all night.  (*Id.* at 62:10.)

37.  During the periods when she received the citations, there were no available shelters at which Hawkes could stay.  (*Id.* at 67:13-15, 22-23.)

38. Hawkes had stayed at both BRM's City Light shelter and at Sanctuary prior to receiving the citations.  (Ex. 44 (No. 12).)  On many occasions, she was not allowed to stay at either shelter because they were full and all beds were occupied.  (*Id.* (No. 7).)  There were also instances when BRM told Hawkes that she was not allowed to stay there for a period of time.  (*Id.* (No. 12); Ex. 43 (No. 3).)  Additionally, Hawkes could not stay at BRM because she did not want to participate in its religious activities.  (Ex. 44 (No. 15); Ex. 24 at 45:4-5.)

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 10

Respectfully submitted this 25th day of October, 2010.

_____ /s/  Marguerite M. Sullivan_____

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
(208) 336-8980 ⎪ Phone
(208) 342-2561 ⎪ Fax

Tulin Ozdeger, # 476548 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness
     & Poverty
1411 K Street, Suite 1400
Washington, DC 20005
(202) 638-2535 ⎪ Phone
(202) 628-2737 ⎪ Fax

Marguerite M. Sullivan, # 497894 (DC)
Kristi N. O'Malley, # 498584 (DC)
Heather Maria Johnson # 986281 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington, DC 20004-1304
(202) 637-2200 ⎪ Phone
(202) 637-2201 ⎪ Fax

## CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of October, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

| | |
|---|---|
| Scott Muir | BoiseCityAttorney@cityofboise.org |
| Valencia Bilyeu | BoiseCityAttorney@cityofboise.org |
| Howard Belodoff | howardbelodoff@idaholegalaid.org |
| Tulin Ozdeger | tozdeger@nlchp.org |
| Karen Cunningham | kcunningham@nlchp.org |
| Marguerite Sullivan | Maggy.Sullivan@lw.com |
| Kristi O'Malley | Kristi.O'Malley@lw.com |
| Heather Johnson | Heather.Johnson@lw.com |

/s/   Marguerite M. Sullivan

PLAINTIFFS' STATEMENT OF DISPUTED MATERIAL FACTS – Page 11