

# OMBUDSMAN'S SPECIAL REPORT
## Policy Review and Recommendations

# Interactions Between the Boise Police Department and the Homeless

Issued December 20, 2006
by
Pierce Murphy
Community Ombudsman

THIRD FLOOR CITY HALL ● 150 N CAPITOL BLVD ● PO BOX 500 ● BOISE, IDAHO 83701-0500
Phone: 208/395-7859 ● FAX: 208/395-7878 ● TDD/TTY 800/377-3529
www.boiseombudsman.org

EXHIBIT #1-1

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report - Policy Review and Recommendations*
*December 20, 2006*

Police officers are tasked with preventing and detecting crime. The word, "crime," is a word that encompasses behavior that is seen to threaten the social order. Many of the local ordinances and state statutes that are enforced with respect to the homeless are laws that have been specifically enacted by state or local policy makers to protect the quality of life enjoyed and expected by the people of Boise and the residents of Idaho. The officers of the Boise Police Department are not in a position to substitute their judgment for that of elected officials by enforcing some laws, but not others. One writer observed that, "[m]any cities and courts have responded to homelessness by thoroughly criminalizing homeless people's basic life activities and arbitrarily depriving them of their personal belongings."[1] This course of action is often referred to as the "criminalization of homelessness."[2] To the extent that law enforcement action regarding minor ordinance violations criminalizes the state of being homeless, the underlying decisions regarding whether these laws should exist must come from those elected to make such public policy decisions.

Police officers are not trained to perform social work functions; yet, persons experiencing homelessness often become the responsibility of law enforcement agencies because of the minor misdemeanors they commit. Without adequate social services to support law enforcement efforts, and without training to help police officers gain timely access to the services that exist, it becomes an exercise in futility to rely on the police department to solve the problem of homelessness. Not only is it futile, it is costly.

Police officers are highly trained professionals. Our society depends on them to protect innocent people from the dangers of criminal activity. The resolution of concerns regarding the criminalization of homelessness cannot come from law enforcement alone; it must come through a broadly inclusive coordinated community response to the issue. However, as responders on the forefront, the officers of the Boise Police Department should be involved in this issue. With respect to many facets of this issue, the Boise Police Department could easily become a leader in helping to define how our community should respond to issues surrounding the criminalization of homelessness.

**B.      The Issues.**

The issues presented to this office came through the door as concerns regarding the number of enforcement actions taken by the Boise Police Department against homeless persons. The police were issuing citations to homeless people for violation of laws concerning "loitering, camping, and disturbing the peace." As one concerned citizen put it, "Threats of arrest and/or arrest for minor ordinance violations 'criminalize' the poor and homeless, adding to their misery without accomplishing any significant public policy goal." Other citizens raised concerns that can be summarized in the following manner: 1) that the rights to privacy of homeless persons were not being respected; 2) that there exists an inequitable enforcement of laws against persons who are homeless; 3) that the police engage in the unlawful disposal of the identification papers and other

---

[1] Bundy, Kevin, "*Officer, Where's My Stuff?*" 1 Hastings Race and Poverty L.J. 57, 57-58 (Fall 2003)(hereafter referred to as "*Officer, Where's My Stuff?*")

[2] *A Dream Denied: The Criminalization of Homelessness in U.S. Cities*, A Report by the National Coalition for the Homeless and the National Center on Homelessness and Poverty, January 2006, pp.8-9 (hereafter referred to as "*A Dream Denied.*")

EXHIBIT #1-2

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report - Policy Review and Recommendations*
*December 20, 2006*

Service providers also refer to persons who are temporarily homeless. This group includes persons who suffer life events such as loss of employment, hospitalization, domestic violence, or disability, and subsequently lose their home or apartment. Generally, these are people who are more accustomed to living in a fixed residence; and, generally, they are in need of temporary assistance while they reestablish a level of financial security. One service provider observed that another situation that can result in temporary homelessness is a situation in which people who are low income become stranded while they are traveling. They have no place to stay when a vehicle breaks down and must be repaired.

An additional subpopulation that is identified by HUD is homeless youth.[18] One service provider also specifically mentioned a fourth group, the "aged-out" foster youth, the subpopulation of the homeless who are young adults recently released from foster care. Foster care programs do not provide financial assistance to foster care providers after the child turns eighteen. As a result, some foster care children are evicted from their homes when their foster parents no longer receive remuneration for the children's care. In other cases, "aged-out" foster youth voluntarily leave their foster home to assert their independence. The "aged-out" foster youth is a growing population. This group exhibits a significant amount of chemical dependency and a great deal of substance abuse. This group also exhibits a lack of education and a lack of job experience. A city official in Seattle noted that the area around the University of Washington campus draws many of these homeless young adults, in part, because, they are the same age as the university students. While there is no indication that this situation exists in Boise, the city is home to a university that could eventually become a draw for this subpopulation.

**D.     The Homeless Population in the City and the State.**

One of the first questions that arose in looking at the general issue of police interaction with the homeless was the size of the homeless population in Boise. In order to get a grasp of the problem, it is important to know its size. The answer to the question of the number of homeless persons in Boise has been surprisingly elusive.

The website for the Idaho Food Bank states, "On any given night, there are approximately 2,000 homeless people in Boise. (Boise City, 2005)."[19] The point-in-time count of homeless persons in Boise that was conducted on March 15, 2006, indicated that there were 179 responses.[20] This number includes persons who were in shelters; and each response may include a single person or a family. The number does not include persons who were "camping."[21]

A supervisor in the Boise Police Department estimated that there are approximately 1,500 to 2,000 homeless persons in Boise. This figure includes people who bounce from shelter to shelter or from shelter to residence with no permanent address. The supervisor stated that the police see people who are seasonally homeless. These are people who have some place to live for a part of the year. The police also see the transient homeless who are only passing through Boise and are

---

[18] 24 CFR 91.5.
[19] www.idahofoodbank.org/hunger.htm
[20] Conversation with Melanie Curtis, Executive Director of SHIP, October 5, 2006.
[21] *Id.*

EXHIBIT #1-3

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

here temporarily. Finally, they see the chronically resident homeless. The latter group is comprised of homeless people who are permanent residents of Boise. This group may or may not meet the definition set forth by HUD.

Another way of approaching the question of the number of homeless persons in Boise is to extrapolate from the statewide numbers. The Idaho Housing and Finance Agency (IHFA) administers the statewide homeless program. Each year, the IHFA provides information concerning its statewide homeless count to HUD. Boise and Ada County are their own enterprise zone and are not required to report information regarding their homeless count to IHFA; however, Boise and Ada County are required to provide this information separately to HUD.

In 2005, there were 32,000 people statewide who requested some type of homeless services.[22] Between 32,000 and 36,000 unique services were provided to 12,000 unique or unduplicated clients.[23] IHFA documented 9,700 unduplicated clients in shelters in the current year through February 2006.[24] There were also 1,300 people who were unsheltered.[25] Adding these figures together, the total homeless population in the state would be approximately 11,000.

People who are homeless tend to hover around the outskirts of population centers.[26] IHFA's report on the homeless estimated the number of homeless people that could be found in the following cities[27]:

| | | |
|---|---|---|
| Coeur d'Alene | 32 % | 3,520 |
| Lewiston | 7 % | 770 |
| Canyon County | 25 % | 2,750 |
| Boise City area | 22 % | 2,420 |
| Twin Falls | 7 % | 770 |
| Pocatello | 4 % | 440 |
| Idaho Falls | 3 % | 330 |

These numbers give a loose idea of how many people who are experiencing homelessness are living in or around the City of Boise.

In Boise, the Homeless Management Information System (HMIS) data does not reflect the actual population served. One of the largest service providers in Boise receives no federal support, and due to cost constraints, does not participate in the HMIS. Their unreported results are estimated to be significant. The City of Boise receives a count from this service provider, but is unable to determine if the numbers are duplicated when compared to IHFA reports. This service provider serves 1,800 to 2,000 people annually. By many accounts, the underreporting of the numbers of homeless persons in the Boise area would increase the population level to between 4,000 and

---

[22] Conversation with Mike Dittenber, Idaho Housing and Finance Agency, July 26, 2006.
[23] *Id.*
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] This assumes a total statewide homeless population of approximately 11,000.

EXHIBIT #1-4

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

4,500. The Mayor's Ten Year Plan to address Homelessness Committee is using a national estimate formula, which is based on population, that puts Boise's homeless population at around 4,500. This estimate does have some correlation with other service provider anecdotal estimates that the homeless population exceeds 3,000 to 3,500.

Assuming that the number of homeless people in Boise is somewhere around 4,000, and taking the City of Boise's population statement from its website, which is approximately 181,711,[28] a simple calculation indicates that the homeless population constitutes about 2.2% of our population.[29]

**E.      Interaction Between the Police and the Homeless.**

Defining the segment of the homeless population that has frequent interaction with the police, and then defining the size of that population is a critical component of analyzing any problem that may exist. Thus, the next question is whether all homeless persons or only subgroups of the homeless are having interaction with the police. One BPD supervisor estimated that there are between thirty and forty chronically homeless persons in Boise with whom his division has frequent contact.[30] He further observed that, generally, he and his officers do not see homeless families or those who are temporarily homeless. A different service provider made a similar assessment. Working primarily with the temporarily homeless, she rarely sees interaction between her clients and the police, unless it is regarding activities for which any citizen would be criminally liable, such as drug use, driving without a license, or driving while suspended.

Based on lay observation, one service provider estimated that 20% of Boise's homeless population is mentally ill and chemically dependent or alcoholic. This group creates the greatest need for police involvement. The next 20% of the homeless are the chronically homeless who are chemically dependent or alcoholic but not mentally ill. This group creates the second greatest need for police involvement.

With respect to the general homeless population, most service providers estimate these numbers to be higher. They estimate that homeless individuals in shelters that exhibit dual addictions or co-occurring mental health and substance abuse disorders are estimated to be around 70% of the population. These numbers are supported by the fact that approximately 50% of the renters in the City of Boise's Single Room Occupancy (SRO) units are persons exhibiting addictions or mental illness. Whether this segment is as low as 40% or as high as 70% of the homeless population, it is a significant number.

Based on the assessment of police supervisors and homeless service providers, the chronically homeless, and specifically those with substance abuse disorders, or co-occurring mental health and substance abuse disorders, create the greatest need for police intervention. While the police supervisor estimated that there are thirty to forty chronically homeless persons with whom his

---

[28] www.cityofboise.org/public_information/index.aspx?id=about_boise
[29] Applying the same calculation with respect to the data from the City of Seattle yields a percentage of 1.0%.
[30] Anecdotal estimates by service providers place chronic homeless numbers between 75 and 100.

EXHIBIT #1-5

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

issues.  However, when there is a non-emergency situation involving a person suffering from mental illness, the police are often called to work with the same people over and over again.  The supervisor further explained that there are people who need acute mental health care but have no ability to pay for it.  While there is some indigent mental health care available, it is designed to get people out of the system as fast as possible.  If someone is placed on an emergency mental hold, they can be held for a short period of time; but usually the problem cannot be solved in a matter of a few days.

**I.       Service Coordination and Open Contact.**

The need for open and frequent contact between law enforcement and service providers was another important theme of the interviews.  One supervisor emphasized the need for education for both police officers and service providers.  He also discussed the need for pre-planning in the event that the police are called to respond to a homeless shelter facility.  He noted that it would help to have training for both officers and shelter staff.  It would be helpful to work together.

The supervisors noted that it would help officers in the police department to have a referral system for people who are homeless.  One supervisor posed the question of how the police could get a homeless person in touch with social services.  The process needs to be quick and simple because the police department is already understaffed.  He would like to see an easily accessible process to connect homeless people with the entities providing services.  He noted that this would have to be a process that is accessible at all times of the day or night.

**J.       The Possibility of an Advocacy Program.**

With respect to the effect of citations on a person's ability to exit the state of being homeless, one supervisor noted that it is very easy for these citations to go away.  He mentioned one particular homeless person who had a severe problem with alcohol and had received numerous citations.  Just after the person was released from Intermountain Hospital, he was required to appear in court with regard to the citations.  The prosecutor asked that the tickets be dismissed, and the officer agreed.  The supervisor suggested that it might be possible to have an advocacy program in which citations could be dismissed if a person were able to show that he had entered some type of program or had entered public housing.  The supervisor commented that pursuing an action that would put someone who is making an effort to curb his or her behaviors back in the position of being homeless doesn't make any sense.

**INTERVIEWS WITH THE SERVICE PROVIDERS**

**A.       Introduction.**

One phase of the research on this project involved interviewing persons who are involved in different entities that provide services to the homeless.  The persons interviewed provided invaluable background information concerning the problems facing the homeless.  The persons interviewed do not represent the entirety of the social service community; however they

EXHIBIT #1-6

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report - Policy Review and Recommendations*
*December 20, 2006*

wondered if the police would give the property to one of the homeless facilities to hold items for people until they get out of jail or can otherwise retrieve it. He further observed, "the homeless lose everything daily: it's no longer a tragedy; it's a lifestyle."

**D.   Police Interaction with the Temporarily Homeless.**

One of the service providers works primarily with homeless families and people who are temporarily homeless. She emphasized that the subpopulations of the homeless are very different from each other. The homeless population with which she works does not typically have a great deal of interaction with the police with respect to issues of camping, disorderly conduct, or other issues that arise with the chronically homeless. She has neither seen nor heard of problem interactions between the police and the homeless persons with whom she works. This was corroborated by the fact that, when the clients at her facility were given the opportunity to come forward, only one person wished to be interviewed.

The homeless with whom this service provider works have issues with law enforcement that are not necessarily related to being homeless, including petty theft, drugs and paraphernalia, driving with a suspended driver's license, and driving under the influence. The homeless enter a cycle when they lose their driver's licenses. One of the problems that arises frequently is maintaining automobile insurance.

**E.   The Perception of Injustice.**

When the homeless are issued citations for "disturbing the peace" or camping, it raises concerns regarding the unequal application of the law. One service provider mentioned a federal law that states that if a city does not provide shelter to homeless people, then people without homes can camp on public property.[40] He also mentioned that there are hearsay reports that the homeless are cited for disturbing the peace when they are camping.[41]

The service provider observed that the perceived injustice has the potential to result in litigation. As the homeless are becoming more educated regarding their rights, there is some discussion of a class action lawsuit. The homeless feel that some of the Boise Police Department's citations are wrong and that the injustice comes from the rules. Though the homeless are sometimes engaged in conduct that results in minor violations of the law, the service provider suggested that, rather than issuing a citation for having an open container, a police officer could talk the homeless person into getting rid of the beer and moving on.

One facet of this issue involves the interaction between the police and the service providers. Sometimes an officer will come into the shelter looking for a specific person. Some of the homeless facilities will turn the person in and some will not. The request from law enforcement that facilities turn in the homeless who are seeking shelter has not been universally well received.

---

[40] This appears to be a reference to *Jones v. City of Los Angeles.*
[41] This appears to be a reference to citations for disorderly conduct.

EXHIBIT #1-7

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

**F.      Outreach to People Who Are Homeless.**

One service provider talked about attempts to make an outreach effort to the homeless. One of the homeless facilities attempted to do patrols along the Greenbelt but did not have enough personnel to continue. People from the facility would try to find homeless people and bring them back to the facility. In response to a question regarding where they would go to find homeless persons, the third service provider was able to identify locations along the Greenbelt where the homeless could be found. He also noted that another method of outreach would be to work with the corrections facilities to try to provide services to people who are exiting jail or prison.

**G.      Cross Training Between Police and Service Providers.**

One of the service providers observed that a person cannot get too much training in dealing with the homeless. He noted that his program does not always know how to deal with the mentally ill homeless. In the past, the Boise chapter of the National Association for the Mentally Ill, (NAMI), had started a training program for police dealing with mentally ill. He suggested that this is an issue that should be addressed by the Boise City Council. He noted that the police should go and observe different shifts at the homeless facilities. It would also be helpful if the police knew what the facilities can and cannot do. He also felt it might be helpful for new hires in the Boise Police Department to meet the directors and staff members of the facilities, see the actual physical facility, and see the recovery program.

**H.      Supervisory Support and Professionalism.**

The same service provider has been very impressed with the degree of professionalism shown by the Boise Police Department. He stated that he very much appreciates the response of the Boise Police Department when a man is down. The police assist the emergency medical services personnel; and no officer has ever behaved in a cynical manner. A second service provider also said that supervisory support from the Boise Police Department has created some positive interactions between volunteers, the police, and the community. He noted that two police supervisors had come down to talk to the volunteers at one of the homeless facilities. The supervisors had talked to the volunteers and given good, positive advice. The second service provider also noted that the duty officers and the sergeants have a lot to do with how the patrol officers act.

## NARRATIVES FROM THE HOMELESS

**A.      Introduction.**

Consideration of the effects of law enforcement actions on the lives of the homeless helps illustrate the effects of criminal enforcement on those experiencing homelessness. Though several homeless persons were interviewed, only four narratives were chosen to be included in this report. The names of the persons interviewed have been changed to protect their privacy.

EXHIBIT #1-8

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

Looking at the broader picture, half the citations for possession of an open container were issued to persons who constitute approximately 1% of the population. However, this does not necessarily lead to the conclusion that the ordinances are selectively enforced against the homeless. Persons who are homeless and who are addicted to the use of alcohol have fewer places to go to than someone who has a residence. If homeless persons have open containers in public more often than other segments of the population, then they will receive more citations. This does not lead to the inevitable conclusion that the laws are being selectively enforced. As one supervisor noted, there are places where it is legal for people to drink in the parks, but the homeless choose not to go there.

Another factor that figures into this is the apparent misunderstanding by some homeless people that consuming alcohol in the sidewalk dining areas of restaurants and at licensed events such as Alive after Five is illegal. Thus, the alleged inequity may be perceived rather than actual. Nonetheless, the statistics regarding open container violations indicate that the ordinance is being vigorously enforced. This undoubtedly reflects the value placed by the community on having a safe and lively downtown core and park system. At the same time, the statistics neither support nor refute a claim that the open container laws are being selectively enforced against the homeless.

The final issue raised by the persons who initially came to this office was whether police officers had other options for dealing with the homeless. Again, this was characterized as a law enforcement issue; and again, the more relevant inquiry is whether the community has provided law enforcement with other options for dealing with the homeless. The interviews with the police supervisors indicate that law enforcement would very much like to have other options available.

As one supervisor stated, the police department is already short-staffed and at its minimum staffing levels with respect to its regularly assigned tasks. The additional burden posed by requiring a law enforcement agency to fill gaps in the social safety net would be substantially eased by the creation of a detox center or a sobering station where officers could deliver an intoxicated person to a safe haven while that person recovered. With the idea that the crux of this issue is providing additional options to law enforcement for dealing with the homeless, the analysis can turn to the question of what steps can be taken to accomplish this.

**B.    Recommendations.**

      **1.    Introduction.**

This study began as a review of law enforcement practices as they relate to the homeless population in Boise. The practices of the Boise Police Department were found to be reasonable and adequate within their mission to enforce quality of life laws and ordinances in the city's parks and downtown core. What was initially presented as a law enforcement problem reveals itself to be a problem caused by defaults in the social safety net rather than a problem caused by defective police policies or practices. The gaps in services to the homeless population present policy issues that are far outside the purview of the authority granted to this office. Nonetheless, the research conducted by this office has revealed potential solutions that could be implemented

EXHIBIT #1-9

*Interaction Between the Boise Police Department and the Homeless*
*Ombudsman's Special Report – Policy Review and Recommendations*
*December 20, 2006*

by the Boise Police Department and by the community.  Many of the potential solutions require the political and financial commitment of other areas of government as well as the private sector. Nevertheless, the Boise Police Department can be the catalyst for change.

### 2.  Police Protocol for Interacting with the Homeless.

Written, binding documents ensure the continuity of policy.  I recommend that the Boise Police Department create a written police protocol overseeing interaction between police officers and persons experiencing homelessness.  The protocol should also govern the relationship between police officers and homeless shelters.  The protocol should include the creation of a training program to familiarize officers with the services available, the location of facilities, and the staff of those facilities.  Officers in the programs should tour the facilities and meet the staff.  Through a training program, officers can become familiar with the capabilities and limitations of the organizations.  The training program should be made available primarily to those officers who have the most frequent contact with the homeless.

As a piece of this policy, I recommend that the Boise Police Department create a pamphlet outlining the social services available, the locations of facilities and service providers, and their hours of operation.  Police officers should distribute this information to the homeless persons they encounter who are in a condition to read it.  The Boise Police Department should develop a formal and ongoing process of information exchange between its officers and homeless service providers.  A process for exchanging information should be included in the protocol.

The exchange of information should be reciprocal.  Service providers underscored the value of having police supervisors provide information and training to leaders at the shelter facilities and their staff.  This may be particularly important for facilities that are staffed by volunteers.

### 3.  Outreach Program.

Throughout the country, local law enforcement agencies have applied for and obtained block grants or grants through the Department of Justice to develop Crisis Intervention Teams and/or Homeless Outreach Teams.  I recommend that the Boise Police Department seek funding for and create an outreach program to identify persons experiencing homelessness and connect them to services.  The development of an outreach program to get people to services before law enforcement action become necessary is a step that many communities have taken.

The police department is generally the primary responder when someone who is inebriated or is under the influence of drugs needs assistance or needs to be relocated to a safe environment. Police officers are also the primary responders when someone is seeking shelter on private property or simply has no place to go.  Police officers also fill the human function of checking to see whether someone needs medical help or is simply still breathing.  By defining the need, creating the partnerships, and leading the way, the Boise Police Department can ensure that intervention replaces incarceration in the City of Boise's response to homelessness.

EXHIBIT #1-10

# Boise's 10 Year Plan
# to Reduce and Prevent
# Chronic Homelessness



*November 2007*

EXHIBIT #2-1

experiencing homelessness in our community is to use the methodology applied in the 1996 National Survey of Homeless Assistance Providers and Clients conducted by the U.S. Census Bureau. This methodology takes into account the dynamic nature of homelessness: while there are very visible long term people who are experiencing chronic homelessness, most of those who are experiencing homelessness are actually people with very low income that cycle in and out of homelessness over time (about five years). This methodology uses evidence that the number of people experiencing homelessness changes throughout the year (due to availability of seasonal jobs, weather, etc.), and represents a range of 6.3% (in October) to 9.6% (in February) of those in poverty experiencing homelessness in a year.

Thus, in Ada County, with a population of 344,727 (U.S. Census Bureau, 2005 estimate) and a poverty rate of 9.3% (U.S. Census Bureau, 2003), there are 32,060 people living in poverty. Using this methodology (based upon the 6.3% of those in poverty in October and 9.6% in February), the number of people experiencing homelessness in Ada County ranges from 2,020 to 3,078 throughout the year.

Local service provider data lends support to this estimate of 2,000 to 3,000 people who are experiencing homelessness. The Boise Clinic provides medical and related services to those who are experiencing homelessness, and has consistently served 1,100 to 1,200 unduplicated homeless patients per year for many years (with the number of homeless patients capped by funding constraints rather than the size of the homeless population).

Annual "point in time surveys" seek to determine the number of people who are experiencing chronic homelessness in the city. Volunteers count the number of people who are experiencing homelessness in shelters, on the street, and in frequented locations. The largest number of people who are experiencing homelessness, those "doubling-up" with friends and family, are excluded from this count. Despite the best efforts of volunteers, some of the largest shelters and agencies are not included in the count, so the 224 people who are experiencing homelessness reported in the most recent survey represent a serious undercount of the chronically homeless subpopulation in Boise.

Military veterans are overrepresented among the chronic homeless population, and the Boise Veterans Affairs (V.A.) has a long history of

EXHIBIT #2-2



# Boise Police Bike Patrol
# Annual Report 2007

Through 2007, the Bike Patrol Unit worked with one sergeant and five assigned officers. This group issued a total of 1,630 citations this year as compared to 1,302 citations issued in 2006 and 1,092 citations in 2005.

The Greenbelt and Boise Park System continues to be our primary focus, and as in the last two years Greenbelt Zone 2 proves to be our area of most citations issued. This area of river corridor starts at the Americana Bridge and runs down stream to Veterans Memorial Parkway. This area draws a large number of park users during the summer months and the ponds are especially popular when the temps rise. Boise Parks and Recreation added two additional floating docks and a surveillance camera system to Quinn's pond which have helped to reduce the level of conflict and calls for service.

When reviewing the attached charts, it is clear that open container citations are still our primary citation issued. 680 citations were issued in 2007 and 670 citations were issued in 2006. There was a big increase in camping in public citations with 30 issued in 2006 and 162 issued in 2007. I attribute this to a change in our hours of deployment. We implemented that change due to complaints from park users and requests from Boise Parks and Recreation. This effort proved to be very successful in curbing the numbers of campers.

As in years past, our enforcement statistics are affected to an extent by the presence of the Greenbelt Volunteers and the Greenbelt Ranger Patrols. These highly visible patrols have greatly increased the law enforcement presence throughout the Boise Park System, freeing officers to pursue more enforcement contacts in the down town area.

The Bike Patrol Unit continues to conduct Bike Safety classes around the Valley. With this effort we greatly increase our positive interaction with the youth in our community while promoting safer bike operation.

The Bike Patrol Unit is an integral part of the mission of the Boise Police Department. Our efforts with Parks and Recreation and Greenbelt Volunteers create a safe and fun environment for all to enjoy.

BC009839

EXHIBIT #3-1

2008 Boise Police Department Bike Patrol Annual Report

The BPD Bike Patrol Unit (BPU) continued operations in 2008 with 5 officers and a sergeant, although Officer Dave Leavitt moved from BPU to the Gang Intel Unit and Officer Luis Gutierrez came onto the Bike Unit from Patrol in the early Spring.

The Bike Patrol Unit issued a total of 1244 citations in 2008, with the largest single violation being for Possession of an Open Container of Alcohol (532 cites). The next highest number of cites was issued for Dog Off Leash in the parks (105 cites). Other notable violations include Camping in Public (55 cites) and Disorderly Conduct (18 cites). Disorderly Conduct is used when a subject is on private property without the permission of the owner. This usually would indicate the subject was sleeping there when the officer found him/her.

Greenbelt/Parks – Although these areas are usually our main patrol emphasis, 2008 saw no notable increases in violations and no major incidents to respond to.

Of particular note was the Boise River Float activity, which continues to be less of a problem than in years before our enforcement of the Open Container law on the River. BPD School Resource Officers patrolled in rafts (when available) and the Greenbelt Volunteer/Ranger Unit assisted in being the eyes and ears for the Bike Patrol Unit along the River. This has resulted in a more family-friendly environment on the "Float", with less fighting, exposure and other problems caused by excessive alcohol consumption by floaters. Several Boise residents made comments noting the improvements to officers and volunteers.

Outlying (away from the River) parks that got BPU attention included Rhodes Park (15/Front), Elm Grove Park (21/Ellis), and Military Reserve Park (Fort/Reserve). Rhodes Park produced a large number of the Open Container violations due to it's close proximity to The Sanctuary Shelter and the Corpus Christi House Day Shelter. This continues to be a problem that Parks/Rec and the BPU are trying to resolve.

Elm Grove and Military Reserve Parks had Dog Off Leash problems brought to our attention by citizen complaints. Additional signage was erected in Elm Grove and several citations were issued there until complaints decreased significantly. Military Reserve Park's problem was addressed by patrol from Idaho State Animal Control, as the park's distance from our normal patrol areas made it difficult to spend much time there.

The BPU also assisted with special events such as the Art In The Park event and the Ironman 70.3 Triathlon.

BC009848

EXHIBIT #4-1



# CITY OF BOISE, IDAHO

## PLANNING AND DEVELOPMENT SERVICES DEPARTMENT

## HOUSING AND COMMUNITY DEVELOPMENT DIVISION

## 2008
## ANNUAL ACTION PLAN

**1025 South Capitol Boulevard**
**Boise, ID 83706-3000**
**(208) 384-4158**



THIS DOCUMENT CAN BE PROVIDED IN A FORMAT ACCESSIBLE TO PERSONS WITH
DISABILITIES AND/OR PERSONS WITH LIMITED ENGLISH PROFICIENCY UPON REQUEST.



*The City of Boise prohibits discrimination on the basis of race,*
*color, national origin, religion, sex, family status, disability or age.*

BC001387

EXHIBIT #5-1

CPMP Version 1.3

# Continuum of Care Homeless Population and Subpopulations Chart

**Boise City**

## Part 1: Homeless Population

| | Sheltered | | Un-sheltered | Total | Data Quality |
|---|---|---|---|---|---|
| | Emergency | Transitional | | | |
| 1. Homeless Individuals | 236 | 9 | 115 | 360 | (A) administrative records ▶ |
| 2. Homeless Families with Children | 18 | 77 | 99 | 194 | |
| 2a. Persons in Homeless with Children Families | 53 | 266 | 188 | 507 | |
| Total (lines 1 + 2a) | 289 | 275 | 303 | 867 | |

## Part 2: Homeless Subpopulations

| | Sheltered | Un-sheltered | Total | Data Quality |
|---|---|---|---|---|
| 1. Chronically Homeless | 103 | 93 | 196 | (E) estimates ▶ |
| 2. Severely Mentally Ill | 85 | | 146 | |
| 3. Chronic Substance Abuse | 170 | | 260 | |
| 4. Veterans | 112 | | 171 | |
| 5. Persons with HIV/AIDS | 0 | | 0 | |
| 6. Victims of Domestic Violence | 73 | | 73 | |
| 7. Youth (Under 18 years of age) | 21 | | 21 | |

## Part 3: Homeless Needs Table: Individuals

5-Year Quantities

| | Needs | Currently Available | Gap | Year 1 Goal | Year 1 Comp lete | Year 2 Goal | Year 2 Comp lete | Year 3 Goal | Year 3 Comp lete | Year 4 Goal | Year 4 Comp lete | Year 5 Goal | Year 5 Comp lete | Total Goal | Total Actua l | Total % of Goal | Priority H, M, L | Plan to Fund? | Fund Source: CDBG, HOME, HOPWA, ESG or Other |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Emergency Shelters | 301 | 236 | 65 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | #### | L | N | |
| Transitional Housing | 59 | 9 | 50 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | #### | L | N | |
| Permanent Supportive Housing | 208 | 93 | 115 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | #### | L | N | |
| Total | 568 | 338 | 230 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | #### | | | |
| Chronically Homeless | 196 | 103 | | | | | | | | | | | | | | | | | |

Homeless

1

CPMP
BC001475

EXHIBIT #5-2

| Boise/Ada County CoC | COC_REG_v10_000006 |
|---|---|

# 2I. Continuum of Care (CoC) Point-in-Time Homeless Population

## Instructions:

This section must be completed using statistically reliable, unduplicated counts or estimates of homeless persons in sheltered and unsheltered locations on a single night. HUD requires CoCs to conduct a point-in-time count at least every two years during the last 10 days of January - January 22nd to 31st - and requests that CoCs conduct a count annually if resources allow. The last required count was in January 2007. Data entered in this chart must reflect a point-in-time count that took place during the last 10 days of January in 2007 or 2008, unless a waiver was received by HUD.

There are six (6) categories of homeless populations on this form. They are:

Households with Dependent Children - Sheltered Emergency
Households with Dependent Children - Sheltered Transitional
Households with Dependent Children - Unsheltered

Households without Dependent Children - Sheltered Emergency
Households without Dependent Children - Sheltered Transitional
Households without Dependent Children - Unsheltered

For each category, the number of households must be less than or equal to the number of persons. For example, in Households with Dependent Children - Sheltered Emergency, the number entered for ?Number of Households? must be less than or equal to the number entered for ?Number of Persons (adults with children).?

For additional instructions, refer to the detailed instructions available on the left menu bar.

**Indicate the date of the last PIT count:  01/30/2008**

### For each homeless population category, the number of households must be less than or equal to the number of persons.

| | Households with Dependent Children | | | |
|---|---|---|---|---|
| | **Sheltered** | | **Unsheltered** | **Total** |
| | **Emergency** | **Transitional** | | |
| **Number of Households** | 17 | 45 | 0 | 62 |
| **Number of Persons (adults and children)** | 48 | 143 | 0 | 191 |

| | Households without Dependent Children | | | |
|---|---|---|---|---|
| | **Sheltered** | | **Unsheltered** | **Total** |
| | **Emergency** | **Transitional** | | |
| **Number of Households** | 336 | 19 | 58 | 413 |
| **Number of Persons (adults and unaccompanied youth)** | 341 | 21 | 58 | 420 |

| | All Households/ All Persons | | | |
|---|---|---|---|---|
| | **Sheltered** | | **Unsheltered** | **Total** |
| | **Emergency** | **Transitional** | | |
| **Total Households** | 353 | 64 | 58 | 475 |

| Exhibit 1 | Page 28 | 10/03/2008 |
|---|---|---|

BC002047

EXHIBIT #6-1

| Boise/Ada County CoC | | | | COC_REG_v10_000006 |
|---|---|---|---|---|
| Total Persons | 389 | 164 | 58 | 611 |

| Exhibit 1 | Page 29 | 10/03/2008 |

**BC002048**

EXHIBIT #6-2

| Boise/Ada County CoC | COC_REG_v10_000006 |
|---|---|

# 2J. Continuum of Care (CoC) Point-in-Time Homeless Subpopulations

## Instructions:

Enter the number of sheltered and unsheltered adults who belong in each subpopulation category. As in the Homeless Populations chart, this chart must be completed using data from a point-in-time count conducted during the last ten days of January 2007 or January 2008. Only adults should be included in the counts for this chart, except for the Unaccompanied Youth (those under age 18) category. Subpopulation data is required for sheltered persons and optional for unsheltered persons, with the exception of Chronically Homeless.

**Complete the following information for the most recent point-in-time (PIT) count conducted using statistically reliable, unduplicated counts or estimates of homeless persons. Completion of the "Unsheltered" column is optional for all subpopulations, except for Chronically Homeless.**

|  | Sheltered | Unsheltered | Total |
|---|---|---|---|
| * Chronically Homeless (Federal definition) | 0 | 10 | 10 |
| * Severely Mentally Ill | 52 | 4 | 56 |
| * Chronic Substance Abuse | 108 | 7 | 115 |
| * Veterans | 51 | 15 | 66 |
| * Persons with HIV/AIDS |  |  | 0 |
| * Victims of Domestic Violence | 53 | 6 | 59 |
| * Unaccompanied Youth (under 18) | 0 | 0 | 0 |

| Exhibit 1 | Page 30 | 10/03/2008 |
|---|---|---|

BC002049

EXHIBIT #6-3

# 2I. Continuum of Care (CoC) Point-in-Time Homeless Population

**Instructions:**

This section must be completed using statistically reliable, unduplicated counts or estimates of homeless persons in sheltered and unsheltered locations on a single night. Because 2009 was a required point-in-time count year, CoCs were required to conduct a one day, point-in-time count during the last 10 days of January--January 22nd to 31st. Although point-in-time counts are only required every other year, HUD requests that CoCs conduct a count annually if resources allow. Data entered in this chart must reflect a point-in-time count that took place during the last 10 days of January 2009, unless a waiver was received by HUD.

Additional instructions on conducting the point-in-time count can be found in the detailed instructions, located on the left hand menu.

**Indicate the date of the most recent point-in-time count (mm/dd/yyyy):**   01/28/2009

**For each homeless population category, the number of households must be less than or equal to the number of persons.**

| Households with Dependent Children | | | | |
| --- | --- | --- | --- | --- |
| Sheltered | | | Unsheltered | Total |
| Emergency | Transitional | | | |
| **Number of Households** | 24 | 34 | 10 | 68 |
| **Number of Persons (adults and children)** | 74 | 104 | 22 | 200 |

| Households without Dependent Children | | | | |
| --- | --- | --- | --- | --- |
| Sheltered | | | Unsheltered | Total |
| Emergency | Transitional | | | |
| **Number of Households** | 298 | 168 | 120 | 586 |
| **Number of Persons (adults and unaccompanied youth)** | 298 | 168 | 120 | 586 |

| All Households/ All Persons | | | | |
| --- | --- | --- | --- | --- |
| Sheltered | | | Unsheltered | Total |
| Emergency | Transitional | | | |
| **Total Households** | 322 | 202 | 130 | 654 |
| **Total Persons** | 372 | 272 | 142 | 786 |

| Exhibit 1 2009 | Page 24 | 11/23/2009 |
| --- | --- | --- |

BC002115

EXHIBIT #7-1

**Applicant:** Boise/Ada County CoC

**Project:** ID-500 CoC Registration 2009

ID-500

COC_REG_2009_009384

# 2J. Continuum of Care (CoC) Point-in-Time Homeless Subpopulations

## Instructions:

Enter the number of sheltered and unsheltered adults who belong in each subpopulation category. As in the Homeless Populations chart, this chart must be completed using statistically reliable and unduplicated counts or estimates of homeless persons based on the point-in-time count conducted during the last ten days of January 2009. Only adults should be included in the counts for this chart, except for the Unaccompanied Youth (those under age 18) category. Subpopulation data is required for sheltered persons and optional for unsheltered persons, with the exception of Chronically Homeless.

|  | Sheltered | Unsheltered | Total |
|---|---|---|---|
| * Chronically Homeless (Federal definition) | 97 | 14 | 111 |
| * Severely Mentally Ill | 53 | 15 | 68 |
| * Chronic Substance Abuse | 62 | 10 | 72 |
| * Veterans | 111 | 28 | 139 |
| * Persons with HIV/AIDS |  |  |  |
| * Victims of Domestic Violence | 63 | 13 | 76 |
| * Unaccompanied Youth (under 18) | 0 | 0 | 0 |

| Exhibit 1 2009 | Page 25 | 11/23/2009 |

**BC002116**

EXHIBIT #7-2




# The Third Annual Homeless Assessment Report to Congress

## July 2008

U.S. Department of Housing and Urban Development
Office of Community Planning and Development



EXHIBIT #8-1

## Appendix C-3: Continuum of Care Point-in-Time Homeless Counts, 2006 and 2007

| CoC Number | Sheltered PIT Counts | | | | Unsheltered PIT Counts | | | | Total PIT Counts | | | | State | Percentage of Statewide PIT Count | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | Change | Percent Change | 2006 | 2007 | Change | Percent Change | 2006 | 2007 | Change | Percent Change | | 2007 Statewide Total PIT Count | Percentage of Statewide PIT Count |
| FL-510 | 1462 | 1585 | 123 | 8.4% | 1263 | 1158 | -105 | -8.3% | 2725 | 2743 | 18 | 0.7% | FL | 48069 | 5.7% |
| FL-511 | 294 | 347 | 53 | 18.0% | 894 | 282 | -612 | -68.5% | 1188 | 629 | -559 | -47.1% | FL | 48069 | 1.3% |
| FL-512 | 163 | 106 | -57 | -35.0% | 834 | 1132 | 298 | 35.7% | 997 | 1238 | 241 | 24.2% | FL | 48069 | 2.6% |
| FL-513 | 1002 | 502 | -500 | -49.9% | 663 | 1397 | 734 | 110.7% | 1665 | 1899 | 234 | 14.1% | FL | 48069 | 4.0% |
| FL-514 | 331 | 312 | -19 | -5.7% | 1079 | 168 | -911 | -84.4% | 1410 | 480 | -930 | -66.0% | FL | 48069 | 1.0% |
| FL-515 | 226 | 211 | -15 | -6.6% | 833 | 102 | -731 | -87.8% | 1059 | 313 | -746 | -70.4% | FL | 48069 | 0.7% |
| FL-517 | 2531 | 664 | -1867 | -73.8% | 546 | 240 | -306 | -56.0% | 3077 | 904 | -2173 | -70.6% | FL | 48069 | 1.9% |
| FL-518 | 110 | 85 | -25 | -22.7% | 82 | 165 | 83 | 101.2% | 192 | 250 | 58 | 30.2% | FL | 48069 | 0.5% |
| FL-519 | 2499 | 1379 | -1120 | -44.8% | 1178 | 881 | -297 | -25.2% | 3677 | 2260 | -1417 | -38.5% | FL | 48069 | 4.7% |
| FL-520 | 411 | 192 | -219 | -53.3% | 1001 | 1827 | 826 | 82.5% | 1412 | 2019 | 607 | 43.0% | FL | 48069 | 4.2% |
| FL-600 | 2955 | 3012 | 57 | 1.9% | 1754 | 1380 | -374 | -21.3% | 4709 | 4392 | -317 | -6.7% | FL | 48069 | 9.1% |
| FL-601 | 2672 | 2453 | -219 | -8.2% | 442 | 701 | 259 | 58.6% | 3114 | 3154 | 40 | 1.3% | FL | 48069 | 6.6% |
| FL-602 | 123 | 450 | 327 | 265.9% | 3191 | 280 | -2911 | -91.2% | 3314 | 730 | -2584 | -78.0% | FL | 48069 | 1.5% |
| FL-603 | 706 | 433 | -273 | -38.7% | 1372 | 1949 | 577 | 42.1% | 2078 | 2382 | 304 | 14.6% | FL | 48069 | 5.0% |
| FL-604 | 437 | 477 | 40 | 9.2% | 544 | 644 | 100 | 18.4% | 981 | 1121 | 140 | 14.3% | FL | 48069 | 2.3% |
| FL-605 | 860 | 727 | -133 | -15.5% | 714 | 1039 | 325 | 45.5% | 1574 | 1766 | 192 | 12.2% | FL | 48069 | 3.7% |
| FL-606 | 277 | 365 | 88 | 31.8% | 236 | 119 | -117 | -49.6% | 513 | 484 | -29 | -5.7% | FL | 48069 | 1.0% |
| GA-500 | 4368 | 4725 | 357 | 8.2% | 2115 | 2115 | 0 | 0.0% | 6483 | 6840 | 357 | 5.5% | GA | 19639 | 34.8% |
| GA-501 | 3319 | 1971 | -1348 | -40.6% | 9162 | 8284 | -878 | -9.6% | 12481 | 10255 | -2226 | -17.8% | GA | 19639 | 52.2% |
| GA-503 | 388 | 333 | -55 | -14.2% | 87 | 131 | 44 | 50.6% | 475 | 464 | -11 | -2.3% | GA | 19639 | 2.4% |
| GA-504 | 532 | 451 | -81 | -15.2% | 37 | 38 | 1 | 2.7% | 569 | 489 | -80 | -14.1% | GA | 19639 | 2.5% |
| GA-505 | 246 | 188 | -58 | -23.6% | 220 | 352 | 132 | 60.0% | 466 | 540 | 74 | 15.9% | GA | 19639 | 2.7% |
| GA-506 | 330 | 329 | -1 | -0.3% | 330 | 208 | -122 | -37.0% | 660 | 537 | -123 | -18.6% | GA | 19639 | 2.7% |
| GA-507 | 316 | 344 | 28 | 8.9% | 343 | 170 | -173 | -50.4% | 659 | 514 | -145 | -22.0% | GA | 19639 | 2.6% |
| GU-500 | 258 | 103 | -155 | -60.1% | 792 | 622 | -170 | -21.5% | 1050 | 725 | -325 | -31.0% | GU | 725 | 100.0% |
| HI-500 | 926 | 755 | -171 | -18.5% | 1522 | 1565 | 43 | 2.8% | 2448 | 2320 | -128 | -5.2% | HI | 6070 | 38.2% |
| HI-501 | 1050 | 1957 | 907 | 86.4% | 1085 | 1793 | 708 | 65.3% | 2135 | 3750 | 1615 | 75.6% | HI | 6070 | 61.8% |
| IA-500 | 165 | 159 | -6 | -3.6% | 26 | 5 | -21 | -80.8% | 191 | 164 | -27 | -14.1% | IA | 2734 | 6.0% |
| IA-501 | 1746 | 1340 | -406 | -23.3% | 497 | 189 | -308 | -62.0% | 2243 | 1529 | -714 | -31.8% | IA | 2734 | 55.9% |
| IA-502 | 1209 | 942 | -267 | -22.1% | 1530 | 99 | -1431 | -93.5% | 2739 | 1041 | -1698 | -62.0% | IA | 2734 | 38.1% |
| ID-500 | 133 | 472 | 339 | 254.9% | 11 | 109 | 98 | 890.9% | 144 | 581 | 437 | 303.5% | ID | 1749 | 33.2% |

Appendix C: Continuum of Care Point-in-Time Homeless Counts

EXHIBIT #8-2

| Appendix C-4: 2007 List of Continuums of Care | |
| --- | --- |
| **CoC Number** | **CoC Name** |
| FL-503 | Lakeland/Highlands Counties CoC |
| FL-504 | Daytona Beach/Flagler Counties CoC |
| FL-505 | Fort Walton Beach/Walton Counties CoC |
| FL-506 | Tallahassee/Leon County CoC |
| FL-507 | Orlando/Orange/Seminole Counties CoC |
| FL-508 | Gainesville/Alachua, Putnam |
| FL-509 | Fort Pierce/St. Lucie/Martin Counties CoC |
| FL-510 | Jacksonville-Duval, Clay Counties CoC |
| FL-511 | Pensacola/Esca/Santa Rosa County CoC |
| FL-512 | Saint Johns County CoC |
| FL-513 | Palm Bay/Brevard County CoC |
| FL-514 | Ocala/Marion County CoC |
| FL-515 | Panama City CoC |
| FL-517 | Hardee/Highlands Counties CoC |
| FL-518 | Columbia/Suwannee CoC |
| FL-519 | Passo County |
| FL-520 | Citrus/Hernando/Lake |
| FL-600 | Miami/Dade County CoC |
| FL-601 | F. Lauderdale/Broward County CoC |
| FL-602 | Punta Gorda/Charlotte County CoC |
| FL-603 | Ft Myers/Cape Coral/Lee County CoC |
| FL-604 | Monroe County CoC |
| FL-605 | West Palm Beach/Palm Beach County |
| FL-606 | Collier County CoC |
| GA-500 | City of Atlanta CoC |
| GA-501 | Georgia Balance of State CoC |
| GA-503 | Athens/Clarke County  CoC |
| GA-504 | Augusta CoC |
| GA-505 | Columbus-Muscogee/Russell County CoC |
| GA-506 | Marietta/Cobb County CoC |
| GA-507 | Savannah/Chatham County CoC |
| GU-500 | Guam CoC |
| HI-500 | Hawaii Balance of State CoC |
| HI-501 | Honolulu CoC |
| IA-502 | Des Moines/Polk County CoC |
| IA-500 | Sioux City/Dakota County CoC |
| IA-501 | Iowa Balance of State CoC |
| ID-500 | Boise/Ada County CoC |
| ID-501 | Idaho Balance of State CoC |
| IL-500 | McHenry County CoC |
| IL-501 | Rockford/Winnebago, Boone Counties |
| IL-502 | North Chicago/Lake County CoC |

EXHIBIT #8-3

July 15, 2009



Boise City Planning and Development
Boise City Building Official
Revised-Narrative of proposed project
Requested by Plan Review BLD-09-00972

Dear Building Officials,

    As you know, the Boise Rescue Mission has operated the City Light Home for Women and Children at 1404 W. Jefferson street since 1999. Emergency shelter was established there in 2003 in a 30 bed dormitory providing care for homeless women and children. Over the past 12 months, the numbers of women and children seeking shelter at City Light has been up to double the number of available beds, resulting in many of the Guests to have to sleep on the dining room floor on foam matt's. This is a very difficult situation for small children and elderly Guests. To resolve this overcrowding problem, and to avoid having to turn homeless women and children away, we propose to convert our existing warehouse on the lower level of our apartment building at 1417 W. Jefferson into a 60 bed emergency dormitory with showers, and restrooms, storage areas, laundry facilities, an office and intake-reception room.

**Plan Corrections:**

a)    We request that the one accessible unisex restroom, to be used by male children 12 and under and any person requiring accessible accommodations, be approved as shown on the plans.

b)    We propose to use 60 as the number of guests maximum at any one time. There is only space in the building for 60 beds. On site staff maximum will be three.

c)    This shelter will be used by women and their custodial children only for overnight emergency shelter. Meals will continue to be served at the City Light facility and any "day use" by homeless women and children will also be at City Light. The only exception could be in the case of a Guest with an illness who needed bed-rest, and in that case, staff will remain in the building with her and her meals would be brought in. The hours of operation for the shelter will be **from 3:00 P.M. to 9:00 A.M daily**. Guests will be eligible to stay for 30 consecutive nights

**BC008490**

EXHIBIT #9-1

after which time they must, to continue as a Guest, be enrolled in a program of recovery, health care, work search program, professional counseling, or other activity recognized as a necessary practice to result in the Guest moving into a stable living environment. Exception MAY be made during inclement weather. Professional staff will be on duty in the shelter whenever Guests are on site.

d)      "Guests" refers to overnight emergency shelter recipients, including custodial children 12 years of age and under. The lounge is for use of Guests and on site staff only.

e)      No visitors will be allowed in the shelter, except for professional visits, such as medical, social service, justice, or clergy. Visitors and Guests will have to arrange to meet elsewhere.

f)      Children in shelter will range from infants to 12 years old.

g)      The Shelter will be staffed exclusively by female staff. Rest room facilities will be exclusive to use by female staff and Shelter Guests only.

h)      See sheet A-1.0, Code Analysis, for adjusted occupant number and restroom accommodation.

The project will include landscaping and paving the parking lot across from 1415-1417 W. Jefferson; Reconfiguring the existing warehouse under 1417 W. Jefferson Street to become an emergency shelter dormitory for women and children; Installing fire suppression and alarm systems in the entire building, including the second floor.

Exterior building changes will include the removal of two, roll-up garage doors and replacing them with steel and glass doors, windows with new siding and trim to match the existing building trim.

The Boise Rescue Mission is committed to providing excellent services to homeless women and children and this project will help us fulfill that goal. We will begin construction as soon as approval is granted and intend to fast-track the improvements to insure shelter availability for the winter 2009 season.

Thank you for your consideration of this project.

Rev. Bill Roscoe
Executive Director
Boise Rescue Mission

        P.S. If you would like to visit any of our facilities, or would like to meet with me, or our Architect, please call 343-2389 and we will make the arrangement.

EXHIBIT #9-2





# Certificate of Occupancy

This Certificate is issued pursuant to the requirement of the **International Building Code** and certifies that this structure has been inspected for compliance with the requirements of the code for the occupancy and division of occupancy and the use for which the proposed occupancy is classifed.

**Building Official**

Jason Blais

**Date Issued:** 11/23/2009

**Building Permit Number:** BLD09-00972

**Project Name:** City Lights

**Building Address:** 1417 W JEFFERSON ST

**Owner:** BRM FOUNDATION INC P O BOX 1494 BOISE ID 83701-0000

**Type of Use:** Tenant Improvements (Existing)

**Construction Types:** VB

**Occupant Loads:** 60, 3, 0

**Occupant Groups:** R2, B

**Code Edition:** IBC - 2006, IECC - 2006

**Automatic Sprinklers Required?** Full

**Zoning:** C-2DD

**Description:** (Woman's Dormitory Shelter - Boise Rescue Mission) To remodel an existing 4,452 sq. ft. enclosed parking garage, below existing apartments, for use as a 60 bed Dormitory Shelter for woman and children, with support facilities and administration offices. Work includes fur out of interior of exterior walls and insulating them, interior finishes, new store front door & window assemblies to infill existing garage door openings; an accessible unisex restroom and additional water closets, lavs and showers; electrical, mechanical, plumbing, fire sprinkler and alarm systems work. Site work on near by lot will provide additional parking to serve this facility. There are no food preparation kitchen areas scoped in this permit. drs

BC008387

EXHIBIT #10-1

08-30-2010

Maintenance Staff  Mat count per Fire Codes
@
City Light Home for Women & Children Guest Services

Family Floor:  Play room, Lobby & Laundry room.     21 mats
Dining/living area, corner room & clothing room.     59 mats
Current beds: 25+12= 37                              37 Beds
                                            Total   117

**This does not count the upper singles floor**

Fire Code is 36" apart for mats.

Rosie Dice

Rosie Dice
Guest Services Director
City Light Home for Women & Children
Ph:      208-343-4680
Cell:    208-353-0856
Fax:     208-3443099
e-mail: rosied@boiserm.org
Restoring Faith, Hope, & Family

Information contained in this e-mail and any attachments thereto is intended solely for use of the recipient(s) named above and may be privileged, confidential, and/or proprietary. If you are not the intended recipient, please do not read, distribute, or reproduce this transmission. You are advised that unauthorized use of this e-mail by any unintended recipient may be unlawful and could subject the user to civil damages and other penalties. If you have received this e-mail transmission in error, please notify the sender immediately by reply e-mail and delete this e-mail.  Thank you

12.05-07

EXHIBIT #11-1

#2

## Boise Rescue Mission

### DAILY CHECK IN LOG AND ROSTER:                    Wednesday, August 04, 2010

Section:

| Bed | RESIDENT | Check in 1 | Check in 2 | Check in 3 | Bed Check | Chapel | Intox | NoShow |
|-----|----------|-----------|-----------|-----------|-----------|--------|-------|--------|
| 1 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 2 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 3 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 4 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 5 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 6 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 7 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 8 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 9 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 10 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 11 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 12 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 13 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 14 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 15 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 16 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 17 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 18 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 19 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |
| 20 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|  | No TB Test Date Listed | | | | | | | |

BRM013181

EXHIBIT #12-1

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:                Wednesday, August 04, 2010

| 21 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| | No TB Test Date Listed | | | | | | | |
| 22 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 23 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 24 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 25 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 26 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 27 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 28 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 29 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 30 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 31 | open, bunk | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 32 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 33 | open, bunk | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 34 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 35 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 36 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 37 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 38 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 39 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 40 | ▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 41 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

BRM013182

EXHIBIT #12-2

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:          Wednesday, August 04, 2010

| 42 | ▅▅▅▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 43 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 44 | ▅▅▅▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed. | | | | | | |
| 45 | ▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 46 | ▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 47 | ▅▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 48 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 49 | ▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 50 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 51 | ▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 52 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 53 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 54 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 55 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 56 | ▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 57 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 58 | ▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 59 | BROKEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 60 | ▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 61 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 62 | ▅▅▅▅▅▅ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |

BRM013183

EXHIBIT #12-3

## Boise Rescue Mission

### DAILY CHECK IN LOG AND ROSTER:          Wednesday, August 04, 2010

| 63 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 64 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 65 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 66 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 67 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 68 | open, bunk | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 69 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 70 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 71 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 72 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 73 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 74 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 75 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 76 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 77 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 78 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 79 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 80 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 81 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 82 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 83 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

## Boise Rescue Mission

**DAILY CHECK IN LOG AND ROSTER:**          Wednesday, August 04, 2010

| 84 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|
| | No TB Test Date Listed | | | | | | |
| 85 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 86 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 87 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 88 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 89 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 90 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 91 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 92 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 93 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 94 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 95 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 96 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 97 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 98 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 99 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 100 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 101 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 102 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 103 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 104 | ▓▓▓▓▓ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |

BRM013185

EXHIBIT #12-5

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:          Wednesday, August 04, 2010

| 105 | ▉▉▉▉▉ | | | ☑ | ☑ | ☐ | ☐ |
|-----|-------|--|--|---|---|---|---|
| | No TB Test Date Listed | | | | | | |
| 106 | ▉▉▉▉▉ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 107 | OPEN, BUNK | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 108 | ▉▉▉▉▉ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 109 | ▉▉▉▉▉ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |
| 110 | ▉▉▉▉▉ | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | |

BRM013186

EXHIBIT #12-6

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:  Wednesday, August 04, 2010

Section: B

| Bed | RESIDENT | Check in 1 | Check in 2 | Check in 3 | Bed Check | Chapel | Intox | NoShow |
|-----|----------|-----------|-----------|-----------|-----------|--------|-------|--------|
| 1 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 2 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 3 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 4 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 5 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 6 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 7 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 8 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 9 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 10 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 11 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 12 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 13 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 14 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 15 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 16 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 17 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 18 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 19 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 20 | ███████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

BRM013187

EXHIBIT #12-7

## Boise Rescue Mission

**DAILY CHECK IN LOG AND ROSTER:**                    Wednesday, August 04, 2010

| 21 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| | No TB Test Date Listed | | | | | | | |
| 22 | ▓▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 23 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 24 | ▓▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 25 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 26 | ▓▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 27 | ▓▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 28 | ▓▓▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

BRM013188

EXHIBIT #12-8

## Boise Rescue Mission

**DAILY CHECK IN LOG AND ROSTER:**          Wednesday, August 04, 2010

Section:

C

| Bed | RESIDENT | Check in 1 | Check in 2 | Check in 3 | Bed Check | Chapel | Intox | NoShow |
|-----|----------|------------|------------|------------|-----------|--------|-------|--------|
| 1 | ▮▮▮▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 2 | ▮▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 3 | ▮▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 4 | ▮▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 5 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 6 | ▮▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 7 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 8 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 9 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 10 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 11 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 12 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 13 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 14 | ▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 15 | ▮▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 16 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 17 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 18 | BROKEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 19 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 20 | ▮▮▮▮▮ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

EXHIBIT #12-9

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:

Wednesday, August 04, 2010

| # | Name | | | | ☑ | ☑ | ☐ | ☐ |
|---|------|---|---|---|---|---|---|---|
| 21 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 22 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 23 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 24 | ████████ R | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 25 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 26 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 27 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 28 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 29 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 30 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 31 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 32 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 33 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 34 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 35 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 36 | ████████ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

Mutts

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:

Wednesday, August 04, 2010

Section:

FLC

| Bed | RESIDENT | Check In 1 | Check In 2 | Check In 3 | Bed Check | Chapel | Intox | NoShow |
|---|---|---|---|---|---|---|---|---|
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 6 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 10 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 11 | OPEN BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 12 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 13 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 14 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 15 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 16 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 17 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 18 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 19 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 20 | | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |

BRM013191

EXHIBIT #12-11

# Boise Rescue Mission

## DAILY CHECK IN LOG AND ROSTER:          Wednesday, August 04, 2010

| 21 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|
| | No TB Test Date Listed | | | | | | | |
| 22 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 23 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 24 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 25 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 26 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 27 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 28 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 29 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 30 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 31 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 32 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 33 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 34 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Date Listed | | | | | | | |
| 34 | OPEN, BUNK | | | | ☑ | ☑ | ☐ | ☐ |
| 35 | ▓▓▓▓▓ | | | | ☑ | ☑ | ☐ | ☐ |
| | No TB Test Data Listed | | | | | | | |

BRM013192

EXHIBIT #12-12

Boise Municipal Code

## Chapter 9-10

## STREET OBSTRUCTIONS

**Sections:**

| | |
|---|---|
| **9-10-01** | **OBSTRUCTING STREETS** |
| **9-10-02** | **PUBLIC PLACES; CAMPING IN** |
| **9-10-03** | **SELLING ON STREETS** |
| **9-10-04** | **PARADES** |
| **9-10-05** | **LOAFING; LOITERING** |
| **9-10-06** | **BELLS; GONGS** |
| **9-10-07** | **PENALTY** |
| **9-10-08** | **BOOTBLACK STANDS** |
| **9-10-09** | **(Repealed Ord. 3202; 7-12-71)** |
| **9-10-10** | **PERMITS REQUIRED** |
| **9-10-11** | **LOCATION OF MATERIALS** |
| **9-10-12** | **REMOVAL OF MATERIALS** |
| **9-10-13** | **OCCUPANCY TIME** |
| **9-10-14** | **BARRIERS TO BE ERECTED** |
| **9-10-15** | **TELEPHONES; REGULATING USE** |
| **9-10-16** | **UTILITY POLES** |
| **9-10-17** | **UTILITY POLES; REMOVAL** |
| **9-10-18** | **GUTTERS; CLEANING** |
| **9-10-19** | **PENALTY** |
| **9-10-20** | **PENALTY** |

**Section 9-10-01    OBSTRUCTING STREETS**

Whoever remains standing, lying or sitting down on any of the sidewalks, streets, alleys or public places in such a manner as to obstruct or impede the free passage of pedestrians or public travel, after being requested to immediately move on by any police officer, City Clerk Licensing Enforcement Officer, or Code Enforcement Officer or any police officer, or who wilfully remains on the sidewalk in front of any dwelling house or place of business which abuts on any of the sidewalks in this City, in such manner as to obstruct the free passage of any other person into or out of such dwelling house or place of business, without the consent or against the will of the proprietor, shall be deemed guilty of a misdemeanor; provided that this section shall not prohibit the operation of a sidewalk cafe pursuant to a permit issued by the City Clerk or licensed under Boise City Code, Title 5, Chapters 5 or 12.  (1922 Code, Sec. 614; 1936 Code, Sec. 10-901; 1952 Code, Sec. 19-1401)(Ord. No. 5467, Amended, 07/20/93)

**Section 9-10-02    PUBLIC PLACES; CAMPING IN**

It shall be unlawful for any person to use any of the streets, sidewalks, parks or public places as a camping place at any time, or to cause or permit any vehicle to remain in any of said places to the detriment of public travel or convenience; or to cause or permit any livestock of any description to be herded into any of said places during any hours of the day or night provided that this section shall not prohibit the operation of a sidewalk cafe pursuant to a permit issued by the City Clerk.  (1922 Code, Sec. 615; 1936 Code, Sec. 10-902; 1952 Code, Sec. 19-1402)(Ord. No. 5467, Amended, 07/20/93)

BC003050

EXHIBIT #13-1

1.  No such order shall apply to a news reporter or other person observing or recording the events on behalf of the public press or other news media, unless he is physically obstructing lawful efforts by such officer to disperse the group.

2. Nothing in this section requires persons to disperse who are peaceably assembled for a lawful purpose.

**Section 6-01-04        USE OF TOBACCO BY MINORS; SALES TO MINORS**

A.  Every person under eighteen (18) years of age who shall buy, accept, or have in his possession any cigarette, cigar or tobacco in any form, or any cigarette paper or wrapper intended for the wrapping of tobacco in the form of a cigarette, or compounds of tobacco used in the filling or makeup of cigarettes, shall be guilty of a misdemeanor.

B.  Every person who shall give, sell or furnish, directly or indirectly, any cigarettes, cigars or tobacco in any form or any cigarette paper or other paper or wrapper intended for the wrapping of tobacco in the form of a cigarette, or any compound of tobacco used in the filling or makeup of cigarettes, to any person under the age of eighteen (18) years, or shall permit such minor persons to frequent any premises owned, held or managed by him for the purpose of indulging in the use of cigarettes, cigars or tobacco in any form, shall be guilty of a misdemeanor.

**Section 6-01-05        DISORDERLY CONDUCT**

Any person who violates the provisions below is guilty of a misdemeanor:

A.  Occupying, lodging or sleeping in any building, structure or place, whether public or private, or in any motor vehicle without the permission of the owner or person entitled to possession or in control thereof; or

B.  Loitering, prowling or wandering upon the private property of another, without lawful business, permission or invitation by the owner or the lawful occupants thereof; or

C.  Loitering or remaining in or about school grounds or buildings, without having any reason or relationship involving custody of or responsibility for a pupil or student, school authorized functions, activities or use.

**Section 6-01-06        PUBLIC INTOXICATION**

BC003069

EXHIBIT #14-1



# IDAHO LEGAL AID SERVICES

*Administrative Office*
*www.idaholegalaid.org*

310 North 5th Street
P.O. Box 913
Boise, ID 83701-0913
208 / 336 / 8980
Fax 208 / 342 / 2561
www.idaholegalaid.org

Ernesto G. Sanchez
*Executive Director*

Howard A. Belodoff
*Associate Director*

James Cook
*Deputy Director*

Mary Zimmerman
*Administrator*

Camille A. Cameron
*Technology Project Developer*

Bev Allen
*Executive Assistant*

Gale Lacey
*Accounting Assistant*

November 3, 2008

Boise City Police Department
7200 Barrister Drive
Boise ID 83704

Re:   **Public Records Request**

To Whom It May Concern:

Under the Idaho Public Records Act, I request to inspect and copy all documents related to or describing any procedures or training materials for police officer enforcement and/or ticketing or writing citations for "camping" or "soliciting" under Boise City Code Sections 9-10-02; 13-03-04(E); and 6-01-07.

Please call me before your agency copies anything, as I request to inspect the documents first to determine whether a document is relevant before it is copied. If you have any questions or concerns I can be reached at 336-8980, ext 105. I will be out of the office until November 10, 2008.

Thank you.

Sincerely,

**Dictated and sent without signature to avoid delay**

Howard A. Belodoff
Attorney at Law

HAB:B

Administrative Office
P.O. Box 913
Boise, ID 83701
208 / 336 / 8980

Area Offices
P.O. Box 1683
Boise, ID 83701
208 / 345 / 0106

P.O. Box 1116
Caldwell, ID 83606
208 / 454 / 2591

P.O. Box 1439
Coeur d'Alene, ID 83814
208 / 667 / 9559

482 Constitution Way
Idaho Falls, ID 83402
208 / 524 / 3660

P.O. Box 973
Lewiston, ID 83501
208 / 743 / 1556

P.O. Box 1785
Pocatello, ID 83204
208 / 233 / 0079

P.O. Box 1296
Twin Falls, ID 83303
208 / 734 / 7024

EXHIBIT #15-1



# Boise Police Department

**Michael F. Masterson**
Police Chief

**Boise Police Dept.**
7200 Barrister Drive
Boise, Idaho 83704-9265

**Phone**
208/577-3000

**Fax**
208/577-3819

**TDD/TTY**
800/377-3529

**Web**
www.cityofboise.org/police
www.boisepolice.org



**Mayor**
David H. Bieter

**City Council**
**President**
David Eberle

**Council Pro Tem**
Maryanne Jordan

Vernon L. Bisterfeldt
Elaine Clegg
Alan W. Shealy
Jim Tibbs

November 25, 2008

Mr. Howard A. Belodoff
Idaho Legal Aid Services
P. O. Box 913
Boise, ID 83701

Dear Mr. Belodoff:

RE: REQUEST FOR PUBLIC RECORDS

In response to your request for a copy of public records, I have enclosed the powerpoint slides currently for BPD training regarding solicitation. I've also attached a sheet sent to officers after the ordinance went into effect. We have no specific training documents on the camping ordinance. These are the only documents located for these specific items in question.

Sincerely,

Nina Wheeler
Records Custodian
Administrative Support Division
(208) 577-3813

An Equal Opportunity Employer
♻ Printed on recycled paper

EXHIBIT #15-2

**From:**      Pete Ritter
**To:**        BPD
**Date:**      6/22/2009 11:32 AM
**Subject:**   Camping Citations Arrests

Last week I sent out information on the camping issues. This is the revised list of dos and don'ts until the issue is resolved.
Thanks Pete


9-10-02:  No citations for the camping portion until we have a definition of "camping."

6-17-06G:  No citations for "camping" portion until we have a definition of "camping."  Citations can still be written for remaining in the proscribed area overnight.

6-01-05A:  Can be used if person is found on private property.  If the person is on public property, they can cite if he/she is in a public building or structure at all times.  If person is on public property ('open space' for lack of better term) don't cite when the shelters are full.


Captain Pete Ritter
Boise Police Department
Community Outreach Division
208-570-6401 Office
208-761-2229 Cell

**BC009858**

EXHIBIT #16-1

ORDINANCE NO.    6757

BY THE COUNCIL:                    BISTERFELDT,  CLEGG,  EBERLE,
                                   JORDAN, SHEALY AND TIBBS

**AN ORDINANCE AMENDING TITLE 9, CHAPTER 10, SECTION 02; TITLE 6, CHAPTER 17, SECTION 06, SUBSECTION G; AND TITLE 13, CHAPTER 03, SECTION 04, SUBSECTION E, BOISE CITY CODE, TO ADD TO EACH A DEFINITION OF "CAMPING"; AND PROVIDING AN EFFECTIVE DATE.**

**WHEREAS**, from time to time it becomes necessary to update the Boise City Code; and

**WHEREAS**, clarification of the laws and regulations pertaining to the appropriate use of public property is necessary to allow for efficient administration and effective enforcement; and

**WHEREAS**, updating Boise City Code Titles 9, 6, and 13 by adding a definition of "camping" is essential to maintain and promote the public health, safety and welfare, to provide for the continued effective management of public property within Boise City, and to provide for the continued enjoyment and accessibility of public property by all Boise residents and the public at large; and

**WHEREAS**, the use of the streets, public areas, parks and Boise River for camping purposes interferes with the rights of others to use the areas for the purposes for which they were intended; and

**WHEREAS**, using public property for camping purposes causes the city to incur increased costs for policing, maintenance, sanitation, garbage removal, animal control, protection of the surrounding environment, and other problems which arise; and

**WHEREAS**, use of the parks and the Boise River for the camping purposes negatively impacts the cleanliness, beauty, and peace of parks and the Boise River; and

**WHEREAS**, the purpose of the camping related ordinances is to assist in maintaining the City in a clean, sanitary and accessible condition; to adequately protect the health, safety and public welfare of the community; and to preserve, protect and enhance the natural resource of the Boise River including its abundance and diversity of fish and wildlife; and

**WHEREAS**, the City wants to maintain the use of park property and other public property for their intended uses, the camping provision is not intended to prohibit such

O-63-09

**BC000047**

EXHIBIT #17-1

ordinary recreational use of the parks such as picnicking on a blanket or resting or sleeping in a park during park hours. It is intended to prohibit use of public property for the purpose of maintaining a temporary place to live; and

WHEREAS, the City shall not engage in unconstitutional enforcement of these ordinances.

**NOW, THEREFORE, BE IT ORDAINED BY THE MAYOR AND COUNCIL OF THE CITY OF BOISE CITY, IDAHO:**

**Section 1.** That Title 9, Chapter 10, Section 02, Boise City Code, be, and the same is hereby amended to read as follows:

It shall be unlawful for any person to use any of the streets, sidewalks, parks or public places as a camping place at any time, or to cause or permit any vehicle to remain in any of said places to the detriment of public travel or convenience; or to cause or permit any livestock of any description to be herded into any of said places during any hours of the day or night provided that this section shall not prohibit the operation of a sidewalk cafe pursuant to a permit issued by the City Clerk. The term "camp" or "camping" shall mean the use of public property as a temporary or permanent place of dwelling, lodging, or residence, or as a living accommodation at anytime between sunset and sunrise, or as a sojourn. Indicia of camping may include, but are not limited to, storage of personal belongings, using tents or other temporary structures for sleeping or storage of personal belongings, carrying on cooking activities or making any fire in an unauthorized area, or any of these activities in combination with one another or in combination with either sleeping or making preparations to sleep (including the laying down of bedding for the purpose of sleeping).

**Section 2.** That Title 6, Chapter 17, Section 06, Subsection G, Boise City Code, be, and the same is hereby amended to read as follows:

G. Set up any tents, shacks, or other temporary shelter for the purpose of camping, as defined in BCC 9-10-02. No person shall be permitted to camp or otherwise remain in the proscribed area overnight.

**Section 3.** That Title 13, Chapter 03, Section 04, Subsection E, Boise City Code, be, and the same is hereby amended to read as follows:

E. Camping. No person in any park shall set up tents, shacks, or any other temporary shelter for the purpose of camping, as defined in BCC 9-10-02, except by special permission by the Director, nor shall any person leave in a park after closing hours any movable structure or special vehicle to be used, or that could be used, for such purpose such as a motor home, camp-trailer, or the like.

EXHIBIT #17-2

Section 4.  This Ordinance shall be in full force and effect from and after its passage, approval and publication.

PASSED by the Council of the City of Boise, Idaho, this <u>10th</u> day of <u>November</u>, 2009.

APPROVED by the Mayor of the City of Boise, Idaho this <u>10th</u> day of <u>November</u>, 2009.

APPROVED:                                    ATTEST:

MAYOR   David H. Bieter          CITY CLERK   John E. Faw



**BC000049**

EXHIBIT #17-3



# Boise Police Department

## Overnight Shelter Capacity Advisory

### Protocol

Date: _____

| Shelter | Status | | Time |
|---------|--------|---|------|
| River of Life | Full _____ | | _____ |
| Interfaith Sanctuary | Full _____ (Men) | | _____ |
| | Full _____ (Women) | | _____ |
| City Light for Women and Children | Full _____ | | _____ |

Protocol:

- The above overnight shelters will call Boise State University Dispatch at (208) 426-1453 at 2300 hrs. when any of the respective overnight shelters reach "full **space** capacity".

- If **any** of the overnight shelters are all full, Boise State University Dispatch shall immediately send an e-mail on the Department e-mail system to "BPD" advising the reporting overnight shelter is full.

- If **any** of the overnight shelters are all full, Boise State University Dispatch shall immediately send a "TO" message on the M.D.T. system advising the reporting overnight shelter is full.

**BC002915**

EXHIBIT #18-1

# BRIEFING TRAINING
# NEW CAMPING ORDINANCE

## IMPORTANT POINTS TO BE COVERED:

- Background/Lawsuit
- Camping in public, sleeping in public
- Hand out code, Review
- Explain reasons for "Livestock" portion
- Definition of "Camping"
- Policy Review – Intent of Ordiance
- Familiarization with Shelter capacity protocol
- Don't call BSU
- Don't call shelters
- Will only be notified if all shelters are full

**Questions and Answers**

BC008729

EXHIBIT #19-1

## FIFTH EXTENSION OF TOLLING OF CLAIMS
## CHALLENGING BOISE MUNICIPAL CODE § 9-10-02

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Plaintiffs and the City agree to extend the Agreement for Tolling of Claims Challenging Boise Municipal Code § 9-10-02 originally dated April 28, 2009, and extended through September 25, 2009, an additional 30 days.

This Agreement may be signed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same Agreement. This Agreement is effective upon execution thereof by representatives of the Plaintiffs and the City, and without the requirement of filing with the Court.

DATED this 25th day of September 2009.

Howard A. Belodoff
IDAHO LEGAL AID SERVICES, INC.
310 N. 5th Street
P.O. Box 913
Boise, ID 83701
Telephone: (208) 336-8980 ext. 106
Facsimile: (208) 342-2561

Valencia J. Bilyeu
ASSISTANT CITY ATTORNEY
150 N. Capitol Boulevard
P.O. Box 150
Boise, ID 83701-0500
Telephone: (208) 384-3870
Facsimile: (208) 384-4454

EXHIBIT #20-1

## EXPERT OPINION REPORT OF DAVID KENT, M.D.
### Pursuant to Federal Rules of Civil Procedure, Rule 26a(2)(B)

I, David Kent, M.D., am an adult over 18 years of age and would be competent to testify if called as a witness in this matter. I have prepared this report on behalf of the plaintiffs in the matter of *Janet F. Bell et al. v. City of Boise et al.*, 1:09-CV-00540- REB, in the United States District Court for the District of Idaho.

### Background and Experience

In my clinical practice on an out-patient and in-patient basis at Boise's psychiatric hospitals I regularly diagnosis and treated persons, including individuals who have been or are homeless, with biologically-based mental illnesses. These diagnoses include depression, post traumatic stress disorder, bipolar affective disorder, schizophrenia, obsessive-compulsive disorder, panic disorder, and generalized anxiety disorders. As part of my practice and treatment of patients, I prescribe medications and monitor their effectiveness and the side effects in patients. I also have extensive experience treating patients with co-existing alcohol and polysubstance abuse. I have been the treating psychiatrist for the Idaho Department of Corrections minimum, medium and maximum security prisons located in Kuna, Idaho.

A copy of my Curriculum Vitae containing my education, board status, hospital affiliations, professional memberships and activities and research is attached as Exhibit A.

### Opinions

<u>In My Experience, Homeless Individuals in Boise, Idaho Commonly Suffer from the Effects of Poverty, Physical or Mental Disability and Substance Abuse Issues, and Social Isolation</u>

The homeless population in Boise is diverse in terms of personality, background and experience. However in my opinion there are common characteristics that are prevalent among homeless individuals:

(1) The majority of homeless individuals do not have the economic resources nor the ability to obtain those resources to access affordable housing and support and case management services;

(2) Included within the homeless population are "chronically homeless" persons (homeless for more than 1 year, or at least 4 episodes of homelessness in the past 3 years, and sleeping in a place not fit for human habitation (such as outdoors) or in an emergency shelter facility);

(3) In my experience, conservatively estimating, seventy-five percent of the homeless population in Boise suffer from physical or mental disabilities and/or coexisting alcohol and polysubstance abuse disorders, which may be a form of self-medication;

(4) A large proportion of the homeless population is socially isolated, that is, they are without family or friends who are willing to provide shelter or support. This includes persons who may have family in Boise but due to their mental and physical disabilities they are estranged and receive little or no support.

EXHIBIT #21-

My opinion is based upon the experience I have had as a psychiatrist in making assessments, evaluations, diagnosing and prescribing treatment for homeless patients, as well as my review of the medical literature.

<u>Prolonged Homelessness Exacerbates Existing Illnesses, Disability, and Substance Abuse Problems and Creates a Cycle of Homelessness</u>

These characteristics make it less likely that members of Boise's homeless population will receive the treatment and supportive and case management services needed to improve the quality of their lives and be able to access and maintain permanent housing. Poverty, physical or mental disability, substance abuse issues, and social isolation are also exacerbated by long or repeated periods of homelessness without accessibility to medically necessary and needed treatment and monitoring, case management and a suitable environment. Thus, a homeless person's status, disability and environment make it even less likely that the homeless person will be able to become housed permanently.

The treatment of the types of mental illnesses experienced by homeless individuals is primarily the use of medications that have to be closely monitored for effectiveness and serious side effects so they can changed or adjusted as necessary to achieve the best clinical result. Even for housed and stable persons this can be difficult. Homeless persons who do not have a stable environment in a shelter, or are socially isolation without any support, face a much more difficult adjustment. In addition, homeless persons most often lack the resources necessary to obtain medications, monitoring and follow up treatment.

The basis of this opinion is the experience I have had as a psychiatrist in making assessments, evaluations, and prescribing treatment for homeless patients, as well as my review of the medical literature.

<u>Mental and Physical Disabilities Create Inability to Access Temporary Shelter</u>

Many homeless persons cannot access available temporary shelter beds because of mental or physical disabilities. Circumstances common among the homeless population include the following: (1) psychiatric disorders such as PTSD, Bi-polar affective disorder, schizophrenia and others; (2) rigid shelter rules and policies that a person with psychotic disorders would be unable to or have difficulty conforming with or follow due the nature of their disability; (3) shelters can be frightening environments for the mental ill due to the temporary nature of the population; (4) shelters often have limited staffing and do not train staff in dealing with serious mental heath conditions; (5) restrictions on alcohol and substance use; (6) fear of authorities because of past involvement with police, criminal history or child welfare.

The very nature of a homeless person's mental illness make it extremely difficult for them to live in shelters for limited or sustained periods of time. For example, person who are schizophrenics or suffer from a bipolar disorder, PTSD, anxiety or compulsive disorders will have difficulty adjusting their behaviors to the shelter environment. These persons can be reclusive, socially inept, experience social anxiety and problems associated with close and overcrowded quarters, react negatively to loud and noisy environments, unexpected situations or surprises, especially

EXHIBIT #21-2

those who suffer from PTSD. Shelters that have rigid and strict policies without accommodations for mentally ill persons pose an especially difficult situations for the homeless population because these person have difficulties complying with normal societal norm but less the rules of the shelter to conform to or accept rules and policies that they perceive to be arbitrary, unfair or conflict with their own beliefs and viewpoints. This is true even if the person knows the consequences of their behavior because they simply cannot adjust their behavior to the rules and policies. These person could also have difficulties falling asleep or wake up at the designated times. A person who cannot fall sleep until late in the night is very unlikely to be able to be awake early in the morning at the shelters designated time for getting out of bed and leaving since typically this is very early. All of these factors would likely result in a person not tolerating and seeking to escape from such an environment and retreating to a more peaceful and tolerable environment outside of a shelter.

The basis of this opinion is the experience I have had as a psychiatrist in making assessments, evaluations, and prescribing treatment for homeless patients, as well as my review of the medical literature.

<u>Homelessness is an Involuntary Status of Condition</u>

Homelessness is almost always the result of factors beyond an individual's control, including poverty, mental and physical illness and disability, substance abuse issues, inability to assess government benefits, medical treatment, and social services, and social isolation. People do not choose to be homeless. That is, people rarely, if ever, make a decision to accept the risks and dangers associated with a life on the streets, including exposure, unsanitary and unsafe conditions, danger from other persons, and the risk of citation and arrest. Homelessness is almost always an involuntary status or condition.

Due to the scarcity of resources devoted to community mental health services provided by state, county and local governments the homeless populations mental illness is untreated and this results in exacerbated of their conditions and directly leads to their experiencing a crisis, incarceration or other harmful behaviors.

The basis of this opinion is the experience I have had as a psychiatrist in making assessments, evaluations, and prescribing treatment for homeless patients, as well as my review of the medical literature.

<u>Practice of Criminalizing Life Sustaining Activities has a Negative Physical and Psychological Impact on Homeless Persons</u>

Homeless persons, who cannot access shelter, have no choice but to sleep, rest, eat, and perform other life sustaining activities in the outdoors. The City of Boise's practice of criminalizing such necessary and inevitable activities and keeping homeless persons moving from place to place to avoid citation, arrest, and/or police harassment has a negative impact on these persons' physical and mental health. Homeless persons who are awoken and cited (or told to move on) or who walk the streets at night to avoid citation have difficulty getting adequate sleep and rest. Living and preparing and eating food outdoors under unsanitary conditions also pose a health risk. In

EXHIBIT #21-3

addition, the anxiety and stress associated with avoiding detection can worsen mental illnesses and make persons more susceptible to physical illnesses. Criminal punishments such as the being treated like a fugitive who is constantly on the run to avoid contact with the police, the issuance of a criminal citations, the threat of arrest, incarceration, imposition of fines and costs they have no ability to pay will not deter their behavior but only exacerbate their conditions and led to further stress and anxiety. These persons are highly unlikely to appear, enter a plea or mount a defense to these citations. Therefore it is inevitable that the result will be the issuance of a failure to appear arrest warrant and their incarceration due to their inability to post bail.

The basis of this opinion is the experience I have had as a psychiatrist in making assessments, evaluations, and prescribing treatment for homeless patients, as well as my review of the medical literature.

### Exhibits

Exhibit A:  Curriculum Vitae.

### Other

I have not served as an expert in any cases within the past four (4) years.

### Compensation

I am not charging the Plaintiffs for my services as an expert in this case; however, should the Plaintiffs prevail I would not oppose their seeking compensation for my services from the Defendants.

### Supplementation

I may be supplementing this report if appropriate and necessary since discovery in ongoing and I have not had an opportunity to review all of the evidence in this case.

***

I declare under penalty of perjury under the laws of the State of Idaho that the foregoing is true and correct, and that this document was executed this 2 8 day of May, 2010, in Boise, Idaho.

David Kent, M.D.

EXHIBIT #21-4

**Expert Opinion Report of William Rainford, Ph.D., LMSW**
*Pursuant to federal rules of civil procedure, Rule 26a (2) (B)*

*I, William Rainford, Ph.D., LMSW am an adult over the age 18 and would be competent to testify in this matter if called. I prepared this report at the request of plaintiffs. In this case in the matter of Janet F. Bell, et al. v. City of Boise, in the United States District Court for the District of Idaho.*

### Background and Experience

*In forming the professional opinions in this report, I relied on numerous sources of text, which are identified in brief citation throughout the declaration and in full in the listed references in the appendices. Further, I am an expert regarding causes of homelessness and the conditions of homelessness. My expertise is based upon the following:*

1. *In 1995, I completed a Bachelor of Social Work degree at San Jose State University. Included in my educational experiences was more than 300 hours as an intern social worker with a homeless day shelter in San Jose, California.*

2. *In 1996, I completed my Master of Social Work degree at Washington University in St. Louis, Missouri. I studied the causes of poverty, daily life in poverty, and potential remedies of poverty, all of which include homelessness.*

3. *In 2002, I completed my Doctorate of Philosophy in Social Welfare at the University of California at Berkeley, where I completed studies of welfare clients who had either been homeless or were on the verge of homelessness. This included people on welfare who were persistently, chronically addicted to alcohol or other drugs.*

4. *From 2002 to 2004, I was an assistant professor of social work at the University of Missouri, St. Louis, where my major academic work focused on poverty and anti-poverty programs.*

5. *Since 2004, I have been employed by Boise State University, first as an assistant professor and then, in 2006, an associate professor of social work. My major academic work has been focused on the causes of poverty, anti-poverty programs, and metropolitan homelessness.*

6. *Since 2004, I have served as the Lead Legislative Advocate for the Roman Catholic Diocese of Boise and Catholic Charities of Idaho. In this capacity, I officially represent the Catholic Church in Idaho in legislative matters at the city and state level.*

EXHIBIT #22-1

7. In 2005, Bishop Michael Driscoll, faith leader of the Roman Catholic Diocese of Boise, sent me to a gathering of faith leaders in Boise regarding homelessness in the city. From that meeting, I became directly involved in the formation of Interfaith Sanctuary Homeless Shelter, now Interfaith Sanctuary Housing Services, Inc.

8. I have volunteered hundreds of hours directly serving in the Interfaith Sanctuary Housing Services, Inc. shelter.

9. I currently serve as the Vice President, Board of Directors, Interfaith Sanctuary Housing Services, Inc.

My curriculum vitae is attached in the appendices to this report.

### Reasons for Homelessness in the City of Boise

In general, there are two populations of people who are homeless in Boise, those who experience temporary, cyclical homelessness and those who are identified as chronically homeless. Those who are temporarily homeless lack a fixed, regular, and adequate nighttime residence or residing in a shelter providing temporary living conditions. Chronic homelessness is defined by the US Department of Housing and Urban Development as including individuals who are homeless and who have substance use issues, serious mental health issues, developmental disabilities, chronic health issues, or physical disabilities who have either (1) been homeless continuously for one year or, (2) been homeless four or more times in the past three years (National Alliance to End Homelessness, 2007).

Based on my educational formation, knowledge of current social science literature (for example, see Gerdes, 2007; Jencks, 1994; Rossi, 1989; Schutt & Garett, 1992; Snow & Anderson, 1993), and personal experiences with people who are homeless in the City of Boise, I am able to attest there are at least thirteen causes of chronic homelessness, many or all of which interweave in the daily lives of people who are homeless, leaving them tangled in a web of issues they are powerless to overcome by themselves. These causes include:

1. Lack of affordable housing (Burt, et al., 2001)
2. Mental health issues (Rochefort, 1993)
3. Health issues (Gallagher, et al., 1997).
4. Alcohol or other drugs use/addiction ("AOD") (Kertesz, et al., 2005)
5. Domestic violence (McNamara, 2008)
6. Physical disabilities (Ho, et al., 2010)
7. Cognitive disabilities (Markos & Strawser, 2004)
8. Lack of human capital (knowledge, experience, skills needed for employment) (Midgley & Conley, 2010)
9. Lack of employment opportunities (Wilson, 1996)

EXHIBIT #22-2

    10. *Lack of living wages (Rank, 2005)*
    11. *Lack of work supports (transportation, child care) (Rainford, 2004)*
    12. *Criminal history (Cooke, 2004)*
    13. *Lack of social connectivity beyond others who are homeless*
        *(Stewart, et al., 2009)*

## Homelessness Exacerbates the Causes of Homelessness

*Chronic homelessness is a self-perpetuating condition. This is particularly true for people with chronic debilitating health conditions, mental health issues, and AOD issues. Thus, the conditions are both the cause of and caused by chronic homelessness. The greater the duration of spells of chronic homelessness, the greater the underlying medical, mental health, or AOD issues. The spiral downward within which the individual finds himself is truly inescapable without significant interventions and supportive services. Further, and more alarming in the context of this declaration, chronic homelessness and its self-exacerbating conditions often render the person incapable of even escaping the streets to available shelter without significant and sustained intervention on the part of the shelter staff and volunteers (Burt, et al., 2001).*

## Do People Choose to be Homeless?

*It is rare that a person who is homeless chooses to be homeless. Most people who are homeless know that living on the street is rife with significant risks, including extreme danger, exposure to harsh elements (bitter cold in winter, searing heat in summer), unsanitary conditions, lack of sustenance, and high risk of incarceration. While an exception to the rule can certainly be found should one look hard enough, a forensic examination of the particular case would highly likely reveal some of the above-enumerated causes of homelessness. For instance, studies show that young homeless adults (18 to 26 years old) often are the victims of family violence from their childhood and have not adequately redressed the mental health issues stemming from such abuse, often rendering them without social supports or the requisite human capital necessary to function in the economy. Withdrawal from mainstream society in the form of homelessness is, at best, rational choice, rather than a purposeful lifestyle change (Wright, Rubin & Devine, 1998).*

*Personal experiences inform my professional opinion that people who are homeless are, almost without exception, involuntarily homeless.*

> *I met a young man, age 22, in the Interfaith Sanctuary shelter on a night I was volunteering. He told me he was a "traveler" who had "chosen" to live on the streets. He was staying at the shelter because his girlfriend was sick and needed to sleep in a bed for a few days. As I chatted with the man, I came to learn he had lived in a home where*

EXHIBIT #22-3

*his alcoholic father was physically abusive to he and his mother. This violence dated back to when the man was a very young child. When the man turned 16, he confronted his father for abusing his mother. His father threw him out of the house. He has been on the streets ever since. He did not graduate from high school, has never held a job of significance, has no identification, and uses AOD on a daily basis. The man self-professes he could get a job and an apartment, but he has no desire to do so. My professional opinion is the man is suffering from significant PTSD, clinical depression, and addictions to alcohol and marijuana as a self-medicating attempt to escape the horrors of his childhood.*

**Lack of Adequate Shelter in the City of Boise**

*Results from a point-in-time count of people who are chronically homeless reveal that there are less than 250 people who are homeless and living on the streets in the City of Boise. However, according to the City of Boise 10 Year Homeless Plan, the point-in-time study is a considerable undercounting of the population. The current social science literature concurs, given significant barriers to accessing and counting people who are chronically homeless. The actual figure, based on Census Bureau analysis, is believed to be well over 600 individuals on any given night who are chronically homeless and who are in need of immediate shelter in the City of Boise (City of Boise, Ten Year Plan to Reduce and Prevent Chronic Homelessness, 2007).*

*Currently, excluding the shelter available at either the Hays House (adolescent shelter) or the Women and Children's Alliance Shelter (crisis shelter for victims of domestic violence), there are approximately 360 shelter beds available on any given night in the City of Boise (River of Life Men's Shelter, City of Light Women's Shelter, and the Interfaith Sanctuary Housing Services, Inc. Shelter) (City of Boise Continuum of Care Report, 2005).*

*The River of Life shelter has a 155-bed capacity. The City of Light shelter has a 35-bed capacity with an overflow of 30 sleeping spaces on the floor. I understand the Boise Rescue Mission is now sheltering individuals in a warehouse across from the City of Lights with an unknown number of bed spaces. The River of Life has at times persons sleeping on the floor, dayrooms, dining rooms, and hallways in periods of high demand.*

*It is my understanding the River of Life enforces a policy that men who are homeless may only stay at the shelter for 17 days before being asked to leave unless they enter into a long-term, behaviorally based program. A person who has stayed the night before and fails to check into the River of Life shelter the next night is prohibited from staying overnight for 30 days. Most people who are homeless contend with significant and serious entrenched problems, rendering them incapable of participating in such a program.*

EXHIBIT #22-4

*Thus, the number of beds actually available on any given night at the River of Life shelter is less than the number of existing beds. Further, the River of Life and its stringent behavioral requirements render the shelter and any available beds inaccessible to many people who are homeless and struggling with significant AOD and/or mental health issues.*

*The shelter at Interfaith Sanctuary Housing Services, Inc. has a maximum capacity of 155 people per night. However, nearly one third of the shelter is reserved for families with children. During the colder months of the year, typically late October through end of April, the shelter is at maximum capacity. Single men, in particular, are frequently turned away due to lack of bed space. Rarely, in those instances, is the shelter successful in finding another shelter to which the person could be sent. The only option in this case is for the person to try to survive the night on the street or along the river.*

*The policy of Interfaith Sanctuary Housing Services, Inc. for newly arrived people seeking shelter is that they wait until 9:00 PM for a bed. If the bed that was previously assigned is not occupied by the previously assigned person, then the newly arrived person may temporarily occupy the bed for the night. If three nights transpire, with the newly arrived person occupying the bed each night (meaning the other person did not return), then the bed is permanently reassigned to the newly arrived person. This results in waiting lists for beds each night at 9:00 PM. It can be and often is a most frustrating process for the newly arrived person.*

*Personal experiences inform my professional opinion that there simply is not adequate bed space available to shelter every person who is chronically homeless in Boise.*

> *On a cold winter night, with temperatures in the low 20s, I was the shelter manager at Interfaith Sanctuary Shelter. We were absolutely at maximum capacity for the number of people we could serve, with every bed filled and every available "mat space" occupied. Two men came to the shelter for the first time ever. They clearly were beyond anxious about their ability to survive the night in the cold. I could not admit them and the River of Life had already declared itself unavailable. I gave both men two blankets each, made sure they had dry socks, a hat, gloves, and a coat each, and wished them well.*

> *On a night when I was the shelter manager, a man attempted to gain shelter for the night. We were unable to accommodate him. I suggested he go to the River of Life and ask for shelter there. He responded that he had already stayed at River of Life and was out for 30 days due to their policies. I had to turn him away and he returned to the street.*

EXHIBIT #22-5

When someone has made the considerable effort to arrive at the shelter, which is a journey in itself, only to be turned away, it can be expected that a psychological barrier to reattempting access may arise. Feeling defeated in the first attempt, the person who is homeless may not attempt to gain shelter again. Expectancy of denial of services then becomes a self-fulfilling prophecy, leaving the person who is homeless unable to attempt to gain access in the future.

### Inability to Access Available Shelter

Given the significant health, mental health and AOD issues confronting the person who is homeless, many such people are often challenged to find shelter even when it is "available." For instance, if a person who is homeless has a diagnosable condition of PTSD, Schizophrenia, or Social Conduct Disorder (to name a few mental health conditions often plaguing people who are homeless), fear, inability to tolerate loud and chaotic crowds, or anxiety aroused by crowds of strangers may keep such a person away from a shelter. Paranoid Schizophrenia, in particular, will cause a person with such a diagnosis trapped in fear, and unable to appropriately or effectively interact with others. Post Traumatic Stress Disorder likewise disables a person from close contact with strangers (Gerdes, 2007).

> On a night when I was a shelter manager at Interfaith Sanctuary shelter, I encountered a woman who seemed to have severe Social Conduct Disorder. She yelled profanities at anyone who interacted with her, threatened bodily harm to people near her, and generally presented herself in deep chaos. After nearly an hour of attempting to help her emotionally stabilize herself, I had to ask her to leave the shelter, as she was causing many others to respond in distress.

Assault on the streets is a common experience among people who are homeless. Physical, emotional, and sexual assault and on-going to exposure to the threat of occurrence of assault can be, for many people who are homeless, a debilitating context in which seeking shelter is impossible. Avoidance of threat is, in this case a rational choice, even if the threat is imagined (Burt, 2001).

> On a night when I was the shelter manager at Interfaith Sanctuary shelter, a man I have known for five years entered the shelter. He had been severely beaten, and had numerous abrasions, cuts, and bruises about the face and head. He explained he had been assaulted on the street a couple of hours earlier. I called the police as a matter of shelter policy. After the police left, the man approached me and said he couldn't stay because it wasn't safe. He left and I did not see him again for nearly a week.

EXHIBIT #22-6

Rules of order and behavior in shelters is yet another barrier to accessing shelter (Wright, 2009).  People struggling with AOD addiction, for instance, may find refraining from use of substances to be an impossible condition of shelter. As is now commonly known in medical and psychological associations, addiction is a medical disease, rather than a choice.   Likewise, people who struggle with significant mental health issues often find adherence to the rules of a shelter to be impossible. If people with AOD or mental health issues are ejected from a shelter, returning to that shelter or seeking other shelters is perceived as a non-choice.

> On a night when I was the shelter manager at Interfaith Sanctuary shelter, a man who I have known for five years entered the shelter.  He was clearly intoxicated.  I attempted to help him into his sleeping space in what is referred to as the "observation room" (a place in the shelter designated for intoxicated men).  He became verbally combative and inappropriately confrontational.  Unfortunately, I had to ask him to leave the shelter.  He exited the shelter.

### Threat of or Actual Arrest Worsens Condition of Homelessness

When police are tasked with rousing people who are living on the streets, causing them to move from place-to-place with great frequency, the disruption that ensues increases the vulnerability of such people.  Life on the streets is a daily battle to survive, with even the simplest of life sustaining activities becoming nearly insurmountable.  Finding nutritious food in sufficient quantities, retaining protective clothing and bedding sufficient to brace against the elements, and locating safe and inconspicuous sleeping space consumes much of the day in the life of a person who is homeless.  When the police move to seize property and issue citations for "camping", thereby rousing the person who is homeless from a space selected for momentary relief, the disruption exacerbates symptoms of mental and physical illness.  This is especially true when one considers the on-going disruption with the ability to obtain rest and sleep, sanitation, and food.  Further, for those people who are homeless and have co-occurring conditions of mental health such as PTSD, Schizophrenia, or Social Conduct Disorder, the presenting symptoms of anxiety, fear, paranoia, and social disorganization are heightened.

### Exhibits:

> Exhibit A    Curriculum Vitae of William C. Rainford, LMSW, Ph.D.
>
> Exhibit B    Citations of referenced source materials

### Qualifications

EXHIBIT #22-7

*See attached Curriculum Vitae*

**Other Cases Qualified An Expert**

> *None*

**Compensation**

*I am not charging the plaintiffs for my services as an expert in this case. However, should the plaintiffs prevail, I would not oppose them seeking compensation for my services from the defendants.*

**Supplement**

*I reserve the right to supplement this report and the opinions contained herein, if appropriate and necessary since discovery is ongoing.*

*I declare under penalty of perjury under the laws of the State of Idaho that the foregoing is true and correct, and that this document was executed this 28th day of May, 2010 in Boise, Idaho.*

William C. Rainford, Ph.D., LMSW

EXHIBIT #22-8

# CURRICULUM VITAE

**William C. Rainford, Ph.D., LMSW** (License # LMSW-27510)
**Associate Professor of Social Work**
**Coordinator, Master of Social Work Program**

| | |
|---|---|
| School of Social Work | Home Phone:      (208) 890-0448 |
| Boise State University | Work Phone: (208) 426-3184 |
| 1910 University Drive | Fax:          (208) 426-4291 |
| Boise, Idaho 83725-1940 | willrainford@boisestate.edu |

## AREAS OF SPECIALIZATION

- Social Development Theory
- Critical Theory
- Social Welfare Policies and Programs
- Community Organizing
- Poverty in America
- Homelessness
- Social Justice Advocacy
- Action and Empowerment Research

## EDUCATION

Ph.D. Social Welfare, 2002, School of Social Welfare, University of California at Berkeley

> Dissertation: *Paternalistic regulation of the poor: Exploring the effects of the Temporary Assistance for Needy Families program on women and their children.* Chair: James Midgley, Ph.D.

Master of Social Work, 1996, George Warren Brown School of Social Work, Washington University in St. Louis. *Specialization in Management.*

Bachelor of Social Work, 1995, School of Social Work, San Jose State University, San Jose, California

## ADMINISTRATIVE POSITIONS

Special Assistant to the Provost, Office of the Provost, Boise State University, 2009-present. *http://academics.boisestate.edu/provost/*

EXHIBIT #22-9

Coordinator, MSW Program, Boise State University, School of Social Work, Boise, Idaho, 2007-present. http://www.boisestate.edu/socwork/

## ADMINISTRATIVE POSITIONS (cont.)

President, Faculty Senate, Boise State University, 2008-2009. http://academics.boisestate.edu/facultysenate/president/

Co-Chair, Institutional Review Board, Boise State University, 2005-2007. http://www.boisestate.edu/research/compliance/

## ACADEMIC POSITIONS

Associate Professor, Boise State University, School of Social Work, Boise, Idaho, 2007-present. http://www.boisestate.edu/socwork/

Assistant Professor, Boise State University, School of Social Work, Boise, Idaho, 2004-2007. http://www.boisestate.edu/socwork/

Assistant Professor, University of Missouri at St. Louis, School of Social Welfare, 2002-2004. http://www.umsl.edu/~socialwk/

Faculty Associate, Center for Social Development, Washington University in St. Louis, 2002-2004. http://gwbweb.wustl.edu/csd/

Adjunct Professor, California State University East Bay, Department of Sociology and Social Services, 2000. http://www.csuhayward.edu/ecat/20042005/u-soc.html#section1

Teaching Fellow, School of Social Welfare, University of California at Berkeley, 1999-2002. http://socialwelfare.berkeley.edu/

Research Associate, Social Investment Research Group, University of California at Berkeley, 1997-2002. http://cssr.berkeley.edu/socialinvestment/

## TEACHING AND INSTRUCTION

### Boise State University

- Social Justice Advocacy (MSW)
- Foundation Research I (MSW)
- Advanced Research II (MSW)
- Foundation of Human Diversity (MSW)
- Foundations of Social Policy Analysis (MSW)
- Advanced Social Policy: Individuals and Families (MSW)

EXHIBIT #22-10

- *Advanced Social Work Field Education (MSW)*
- *Organizations and Communities (BSW)*
- *Introduction to Social Welfare (BSW)*
- *Social Welfare Policy (BSW)*

## TEACHING AND INSTRUCTION *(cont.)*

### *University of Missouri at St. Louis*

- *Crisis Intervention (MSW)*
- *Family Policy (MSW)*
- *Social Issues and Social Policy Development (BSW)*

### *University of California at Berkeley*

- *Introduction to Social Welfare (BSSW)*

### *California State University, East Bay*

- *Introduction to Social Services (BA-Sociology & Human Services)*

## RECOGNITIONS

- *Boise State University Service Award, 2009*
- *Catholic Charities USA National Volunteer of the Year, 2009*
- *NASW-Idaho Social Worker of the Year, 2008*
- *Boise State University Cultural Center Faculty Hero Award, 2008*
- *Larry Selland Humanitarian Award, Boise State University, 2008*
- *United Vision for Idaho Grassroots Organizer of the Year, 2008*
- *Phi Kappa Phi Faculty Mentor Award, 2008*
- *Idaho Statesman Community Advocate of the Year, 2007*
- *Student Affairs Faculty Partner Award, Boise State University, 2007*
- *Honorary Lifetime Member, Phi Alpha Social Work Honor Society*
- *New Faculty Teaching Scholar, University of Missouri—St. Louis, 2004*
- *Doctoral Fellow, University of California—Berkeley, 1996-2002*
- *Alumni Scholar, Washington University, St. Louis, 1996*
- *Alumni Scholar, San Jose State University, 1995*
- *Honors Scholar, Golden Key Honor Society, 1994*
- *Honors Scholar, Alpha Gamma Sigma Honor Society, 1994*

## PUBLICATIONS

### *Peer Reviewed Journal Publications*

EXHIBIT #22-11

*Rainford, W.* *(2008). Gauging the glass ceiling in Idaho: Salary and career option differences between male and female lawyers.* The Advocate, Official Publication of the Idaho State Bar, 51 (2), 22-25.

*Sherraden, M., Johnson, L., Elliott, W., Porterfield, S., & Rainford, W. (2007). The 'I Can Save Program': School-based children's saving accounts for college.* Children and Youth Services Review, 29 (3), 294-312.

### Peer Reviewed Journal Publications (cont.)

*Porterfield, S., Sanders, C. & Rainford, W. (2006). The wealth holdings of married couple households with children with disabilities.* The Journal of Social Policy, 5 (4), 19-40.

*Rainford, W. (2004). Paternalistic regulation of women: Exploring punitive sanctions in the TANF program.* Affilia Journal of Women and Social Work, 19 (3) 289-304.

*Rainford, W. (2001). Promoting welfare by enhancing opportunity: The individual-enterprise approach to social development.* Social Development Issues, 23 (1), 51-57.

### Published Book Chapters/Sections

*Rainford, W. (2010). Crime, social investment, and correctional social work. In J. Midgley & A. Conley (Eds.), Social work and social development: Theories and skills for developmental social work. NY: Oxford University Press.*

*Allen, R., Rainford, W., Rodenhiser, R. & Brascia, K. (2007). Herding cats and making history: Service-learning in an Introduction to Social Welfare Course. In V. Majewski,*
*M. Nadel, & M. Sullivan-Corsetti (Eds.), Service learning and social work. NY: Rowman & Littlefield.*

*Harkness, D. & Rainford, W. (2007). The profession of social work. In D. DiNitto & A. McNeece (Eds.), Social Work: Issues and opportunities in a challenging professions (3rd edition). IL: Lyceum Books, Inc.*

*Rainford, W. (2006). Aid to Families with Dependent Children. In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.*

*Rainford, W. (2006). Food Stamps. In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.*

*Rainford, W. (2006). Paternalism and welfare. In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.*

EXHIBIT #22-12

*Rainford, W.* (2006). *Social work.* In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.

*Rainford, W.* (2006). *Workfare.* In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.

*Rainford, W.* (2006). *Work and welfare.* In M. Odekon (Ed.), Encyclopedia of World Poverty. NY: Sage Publications.

### Published Book Chapters/Sections (cont.)

Sherraden, M., *Rainford, W.,* & Gonzalez, R. (2006). *Hacia un futuro mas seguro: Pregnancy and childbearing among Latina adolescents.* In Holgate, H., Evans, D. & Yuen, F. (Eds.), Teenage Pregnancy and Parenthood: Issues, Programs, and Global Perspectives. London: Taylor & Francis

### Published Book Reviews

*Rainford, W.* (2004). *Making men into fathers: Men, masculinity, and the social policies of fatherhood. Book Review.* Journal of Sociology & Social Welfare, 31 (1), 233-234.

*Rainford, W.* (2000). *World's apart: Why poverty persists in rural America. Book Review.* Journal of Sociology & Social Welfare, 27 (3), 175-177.

### Research Reports

*Rainford, W.* & Sanders, C. (2006). *Exploring Success in Idaho's Enhanced Work Services: A mixed-method evaluation of employment outcomes for TAFI clients.* Idaho Department of Health & Welfare.

Jorgenson, E. & *Rainford, W.* (2005). *Idaho Department of Corrections Mental Health Blue Book: A resource guide from region to region.* Idaho Department of Corrections.

Hardiman, E. & *Rainford, W.* (1999). *Substance abuse among CalWORKs clients.* Social Investment Research Group, University of California at Berkeley.

## SCHOLARLY PRESENTATIONS

### Refereed Presentations

Allen, R., Rodenhiser, R., & *Rainford, W. Paper Presentation: Got students? Using service learning to increase the number of social work majors.*

EXHIBIT #22-13

Association of Baccalaureate Social Work Program Directors 25th Annual Conference. Destin, FL, March 6, 2008.

Allen, R., Rodenhiser. R. & *Rainford, W.* Paper presentation: *Does 'doing social work' matter? A quasi-experiment in BSW student recruitment.* Council on Social Work Education Annual Program Meeting.  San Francisco, CA, October 30, 2007.

Allen, R., *Rainford, W.*, & Rodenhiser, R. Paper presentation: *Herding cats and making history: Service-learning in an Introduction to Social Welfare Course.* Association of Baccalaureate Social Work Program Directors Annual Program Meeting.  Los Angeles, California, October 28, 2006.

### Refereed Presentations (cont.)

*Rainford, W.*, Allen, R., Brascia, K., & Rodenhiser, R. Paper presentation: *Service learning to field practicum: Experiential learning across the social work discipline.*
Council on Social Work Education Annual Program Meeting.  Chicago, Illinois, Feb 16, 2006.

Sanders, C., *Rainford, W.*, & Porterfield, S. Paper presentation: *The 'Ownership Society' and Women: Exploring the ability of women to accumulate assets in America.*  Tenth Annual Conference of the Society for Social Work and Research. San Antonio, Texas, January 13, 2006.

Gonzalez, R. & *Rainford, W.* Paper presentation: *Pregnancy and Childbirth among Latina Adolescents in the Untied States.*  Sexuality in a Diverse Society Conference, Boise State University, November 17, 2004.

*Rainford, W.*, Mason, L., Conner, J. & Sherraden, M. Paper presentation: *I Can Save: Effects of Asset Building by Primary Students on Academic Achievement.*  Creating Livable Communities: Symposium: Linking Research, Policy, and Practice. St. Louis, Missouri, April 12, 2004.

*Rainford, W.*  Paper presentation: *Domestic Violence and TANF: Failure of the FTO to prevent sanctions.*  Missouri Association for Social Welfare Annual Program Meeting. Branson, Missouri, October 24, 2003.

*Rainford, W.* & Sanders, C. Paper presentation: *Abused and betrayed: Domestic violence and sanctions in the Temporary Assistance to Needy Families program.* Trapped by Poverty/Trapped by Abuse Fourth National Research Conference. Austin, Texas, October 17, 2003.

EXHIBIT #22-14

*Rainford, W.* Paper presentation: *Paternalistic regulation of the poor: Effects of sanctions in the Temporary Assistance to Needy Families program.* Society for Social Work Research Annual Program Meeting. Washington, DC, January 16, 2003.

*Rainford, W.* Paper presentation: *Welfare justice: The effects of sanctions on mothers and their children in the TANF program.* Society for the Study of Social Problems Annual Program Meeting. Nashville, TN. January 12, 2002.

*Rainford, W.* Paper presentation: *Derailed lives: Exploration of sanctions under the Temporary Assistance to Needy Families Program.* National Association for Welfare Research and Statistics. Annual Workshop. San Diego, California. January 14, 2001.

Midgley, J. & *Rainford, W.* Paper presentation: *Social investment in an era of welfare reform.* Council on Social Work Education. Annual Program. New York, New York. February 24, 2000.

### Refereed Presentations *(cont.)*

*Rainford, W.* Paper presentation: *Enabling people in poverty to save: Missouri Family Development Accounts.* Missouri Association of Social Welfare, Annual Conference. Kansas City, Missouri. October 23, 1996.

## RESEARCH GRANTS AWARDED   *(total = $77,850)*

*Co-principal Investigator with Misty Wall, Ph.D., Boise State University College of Social Sciences Research Grant. The Cry of the Poor: A critical exploration of poverty in America. $7,500 awarded 01/09.*

*Co-principal Investigator with Cynthia Sanders, Ph.D. State of Idaho Contract (No. WC050800). Exploring success in Idaho's Enhanced Work Services: A mixed method evaluation of outcomes for TAFI clients. $40,350 awarded 05/05.*

*Co-principal Investigator with Margaret Sherraden, Ph.D. and Elisa Chambers, Ph.D. University of Missouri Research Board Grant. Effects of asset building on academic achievement. $30,000 awarded 12/03.*

## RESEARCH GRANTS NOT AWARDED

*Boise State University Research Grant Program.  Learning on the edge: A qualitative exploration of Latino English Learner students and their migrant families in Idaho. $4,550. April 2005.*

EXHIBIT #22-15

*U.S. Department of Justice. Offender programs and treatment: Transitional housing with emphasis on vocational rehabilitation and faith-based services.* $217,572.  September 2004.

*City of St. Louis.  Housing Development Accounts: Investments in the lives and neighborhoods of low income St. Louisans.* $2,468,450. August 2003.

**SUPPORT GRANTS AND AWARDS**

*Boise State University Service Learning Grant.  $300 learning grant in support of service learning practice in the classroom.   February 2005.*

*Boise State University College of Social Sciences and Public Administration Faculty Teaching Award, $500, January 2005.*

*Boise State University College of Social Sciences and Public Administration Faculty Research Award, $600, January 2005*


**SUPPORT GRANTS AND AWARDS** *(cont.)*

*Idaho Supreme Court Grant.   $1,500 grant in support of Mental Health Services for Department of Corrections Parolees Experiencing Mental Health Crises: A compendium of resources.  November 2004.*

*University of Missouri-St. Louis, October 2003. $1,000 grant in support of Assessing the role of domestic violence among sanctioned TANF recipients: A qualitative study paper. Society for Social Work and Research conference, January 16, 2004. New Orleans, Louisiana.*

*University of Missouri-St. Louis, May 2003. $1,000 grant in support of Abused and Betrayed: Domestic violence and sanctions in the Temporary Assistance to Needy Families program paper. Trapped by Poverty/Trapped by Abuse Fourth National Research Conference, October 17, 2003, Austin, Texas.*

**INVITED PRESENTATIONS**

***Rainford, W.*** Keynote address:  *Hunger and poverty in America: Reflections on social justice advocacy in an era of fiscal crisis.*  Boise State University Volunteer Services Board Hunger Awareness Banquet, November 17, 2009.

***Rainford, W.*** Speech: *Christianity and Human Rights:  A celebration of the life of Martin Luther King, Jr.* Boise State University Human Rights Week, January 28, 2008.

EXHIBIT #22-16

*Rainford, W.* Workshop: *Into the grey: Ethics in social work field instruction.* Boise State University School of Social Work Field Instructor Training, November 16, 2007.

*Rainford, W.* Roundtable presentation: *The state of policy advocacy and social justice in Idaho.* Idaho Roundtable Against Hunger, Boise, Idaho, September 18, 2007.

*Rainford, W.* Workshop: *Engaged discussion in the classroom.* Boise State University Center for Teaching and Learning, Annual Teaching Assistant Orientation, Boise, Idaho, August 20, 2007.

*Rainford, W.* Conference presentation: *Tapping the glass ceiling: Perceptions of male and female attorneys in Idaho of the career opportunities for women lawyers in the state.* Idaho State Bar Association Annual Program Meeting, Boise, Idaho, July 18, 2007.

*Rainford, W.* Workshop: *Ethics and values in the helping profession.* School of Social Work, Boise State University, August 11, 2006.

*Rainford, W.* Workshop: *Social justice advocacy: Food insecurity and hunger in Idaho.* National Association of Social Workers, Idaho Chapter, Annual Conference, Boise, Idaho, May 6, 2006.

**INVITED PRESENTATIONS** (cont.)

*Rainford, W.* Keynote Address: *If one is to be great: Public service in the State of Idaho.* State of Idaho Annual Martin Luther King, Jr./Human Rights Day Rotunda Celebration. Boise, Idaho January 16, 2005.

*Rainford, W.* Panel Discussant: *Who's to judge? An interfaith discussion on the death penalty.* Catholic Charities of Idaho, November 15, 2005.

*Rainford, W.* Lecture: *Social change, social advocacy: Students and volunteerships at Boise State University.* BSU Volunteer Fair, October 2005.

*Rainford, W.* Workshop: *An uncertain future: Perinatal exposure to controlled substances.* Adopting Families Training, CASI Foundation for Children, September 2005.

*Rainford, W.* Legislative Testimony: *Insure Idaho: Presentation on the 2005 Northwest Health Gap Study.* State of Idaho Legislative Health Care Task Force, July 2005.

EXHIBIT #22-17

*Rainford, W.* Workshop: *Ethics in practice: Commitment to social justice, client autonomy, and beneficence.* Boise State University School of Social Work Field Instructor Training, Fall 2004.

*Rainford, W.* Lecture: *Achieving real equality and access to opportunity for women and girls: Social investment strategies for America in the 21st Century.* Association of American University Women, Missouri Chapter, St. Louis, Missouri, February 14, 2004.

*Rainford, W.* Lecture: *Advocacy, community organizing, and direct practice: Directions for philanthropy.* Daughters of Charity Annual Board Meeting, Bellville, Illinois, September 2002.

*Rainford, W.* Lecture: *Unreasonable reform: Why and how welfare reform reauthorization will hurt St. Louisans.* Missouri Association for Social Welfare Workshop, St. Louis, Missouri. July 2002.

*Rainford, W.* Legislative testimony: *Family Development Accounts: A new policy for economic growth.* Missouri State Legislature, Social Services Sub-Committee, Jefferson City, Missouri. Fall 1996.

**WORKS IN PROGRESS**

- *Manuscript for publication in a peer-reviewed journal detailing the results of a quasi-experimental, non-random, non-equivalent comparison group study of the effects of service learning with pre-major undergrads in the valuing of diversity, democracy, and community service, as well as their perceptions of engagement in learning.*

**WORKS IN PROGRESS** *(cont.)*

- *Manuscript for publication in a peer-reviewed journal detailing the results of a quasi-experimental, non-random four cohort comparison study using pre-post scaled measurements to test the self-perceptions of entering Advance Standing MSW students who were required to take a summer bridge course in diversity on values of diversity.*

- *Manuscript for publication as a book entitled "Cry of the Poor: A critical examination of poverty in America", using the results from 30 in-depth phenomenological interviews with people who are impoverished in an urban center.*

- *Manuscript for publication as a book entitled "The Social Worker as Democracy Practitioner: Advocacy in an era of hope and change" which will provide social work students with a primer on the skills of social policy advocacy.*

EXHIBIT #22-18

*SERVICE*

*School of Social Work, Boise State University*

- *Chair, MSW Program 2007-Present*
- *Member, Faculty Search Committee, 2004-Present*
- *Member, Director's Search Committee, 2005*
- *Member, Graduate Admission's Committee, 2004-Present*
- *Member, Undergraduate Admission's Committee, 2004-2007*
- *Member, Curriculum and Instruction Committee, 2004-Present*
- *Advisor, Organization of Student Social Workers, 2004-2007*
- *Advisor, Phi Alpha Social Work Honor Society, 2004-2007*

*College of Social Sciences and Public Administration, Boise State University*

- *Chair, Dean's Annual Evaluation Committee, 2010*
- *Member, Dean's Financial Advisory Committee, 2009-Present*
- *Member, College Faculty Awards Committee, 2005-2006*

*Boise State University*

- *Faculty Senate Liaison, Graduate Council, 2009-2011*
- *Member, Academic Grievance Committee 2009-2011*
- *Senator (Graduate College), BSU Faculty Senate, 2007-2011*
- *President, BSU Faculty Senate, 2008-2009*
- *Co-Chair, Institutional Review Board, 2005- 2007*

*SERVICE (cont.)*

*University of Missouri at St. Louis School of Social Welfare*

- *Member, School of Social Welfare Scholarship Committee, 2002-2004*

*Professional Field*

- *Council on Social Work Education, 2008 EPAS Site Visitor (trained), 2009*
- *Member, NASW Idaho Chapter Legislative Advocacy Committee, 2005-2007*

*Community*

EXHIBIT #22-19

- *Vice-President, Board of Directors, Sanctuary Interfaith Homeless Services, Inc. 2006-Present*
- *Legislative Advocate, Catholic Charities of Idaho/ Roman Catholic Diocese of Boise, 2004-Present*
- *Member, Collaborative for Housing Development Accounts, St. Louis, 2002-2004*
- *Policy Consultant, MERS/Goodwill, St. Louis, 2004*
- *Chair, Economic Justice Task Force, Missouri Association for Social Welfare, 2002-2004*
- *Member, University Community Action Partnership, St. Louis, 2002-2004*

## PROFESSIONAL SOCIAL WORK EXPERIENCE

- **Media/Governmental Liaison**, *2005-Present, Interfaith Sanctuary Shelter for the Homeless, Boise, Idaho.*

- **Legislative Advocate**, *2004-Present, Catholic Charities of Idaho*

- **Medical Social Worker**, *1997-2002, Children's Hospital Oakland, Oakland, California.*

- **School Social Worker**, *2001-2002, Tara Hills Elementary School, San Pablo, California*

- **Medical Social Worker**, *1996-1997, Barnes Jewish Hospital, St. Louis, Missouri.*

- **Social Policy Advocate**, *1995-1996, Center for Social Development, St. Louis, Missouri.*

- **Social Work Case Manager**, *1992-1993 Emergency Housing Coalition Youth Shelter, San Jose, California.*

## PROFESSIONAL ASSOCIATIONS

*Association of Baccalaureate Social Work Program Directors*
*Association for Community Organization & Social Administration*
*Council on Social Work Education*
*International Consortium for Social Development*

EXHIBIT #22-20

## References

Burt, M. (2001). Helping America's Homeless: Emergency shelter or affordable housing? Washington, DC: Urban Institute Press.

Cooke, C. (2004). Joblessness and homelessness as precursors of health problems in formerly incarcerated African American men. *Journal of Nursing Scholarship*, 36 (2), 155-60.

Gallagher, T., Andersen, R., Koegel,P., & Gelberg, L. (1997). Detriments of regular source of care among homeless adults in Los Angeles. *Medical Care*, 35 (8), 814-30.

Gerdes, L. (2007). The Homeless. Detroit: Greenhaven Press.

Ho, P., Kroll, T., Kehn, M., Anderson, P., & Pearson, K. (2007). Health and housing among low-income adults with physical disabilities. *Journal of Health Care for the Poor and Underserved*, 18 (4), 902-15.

Jencks, C. (1994). The Homeless. Cambridge: Harvard University Press.

Kertesz, S., Larson, M., Horton, N., Winter, M., Saitz, R., & Samet, J. (2005). Homeless chronicity and health-related quality of life trajectories among adults with addictions. *Medical Care*, 43 (6), 574-85.

Marcos, P. & Strawser, S. (2004). The relationship between learning disabilities and homelessness in adults. *Guidance and Counseling*, 19 (2), 46-56.

McNamara, R. (2008). Homelessness in America. Westport: Praeger.

Midgley, J. & Conley, A. (2010). Social Work and Social Development: Theories and skills for developmental social work. NY: Oxford University Press.

National Alliance to End Homelessness (2007). *Chronic homelessness*. Washington, DC: Author.

Rainford, W. (2004). Paternalistic regulation of women: Exploring punitive sanctions in TANF. *Affilia*, 19, 289-304.

Rank, M. (2005). One Nation Underpriviledged: Why American poverty affects us all. NY: Oxford University Press.

Rochefort, D. (1993). From Poorhouses to Homelessness: Policy analysis and mental health care. Westport: Auburn House.

EXHIBIT #22-21

Rossi, P. (1989). *Down and Out in America: The origins of homelessness.* Chicago: University of Chicago Press.

Schutt, R. & Garrett, G. (1992). *Responding to Homelessness: Policy and Practice.* NY: Plenum Press.

Snow, D. & Anderson, L. (1993). *Down on Their Luck: A study of homeless street people.* Berkeley: University of California Press.

Stewart, M., Makwarimba, E., Reutter, L., Veenstra, G., Raphael, D., & Love, R. (2009). *Journal of Poverty.* 13 (2), 173-195.

Wilson, W.J. (1996). *When Work Disappears: The world of the new urban poor.* NY: Alfred A. Knopf.

Wright, J., Rubin, B., & Devine, J. (1998). *Beside the Golden Door: Policy, politics, and the homeless.* NY: Aldine De Gruyter.

EXHIBIT #22-22