UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JANET F BELL, BRIAN S. CARSON,        ) UNREDACTED VERSION

CRAIG FOX, ROBERT MARTIN,             ) CONFIDENTIAL:

LAWRENCE LEE SMITH, ROBERT            ) SUBJECT TO

ANDERSON, and PAMELA S. HAWKES,       ) PROTECTIVE ORDER

              Plaintiffs,            )

vs.                                   ) Case No.

CITY OF BOISE, BOISE POLICE           ) CIV 09-0540-S-REB

DEPARTMENT, and MICHAEL               )

MASTERSON, in his official            )

capacity as Chief of Police,          )

              Defendants.            )

_____   )


DEPOSITION OF JANET F. BELL NIGHTENGALE

June 29, 2010


REPORTED BY:

DIANA L. DURLAND, CSR No. 637

Notary Public

CONFIDENTIAL PORTION INCLUDED

a74e672f-1da3-46cb-bccb-dd29ea58d9d1

EXHIBIT # 23-1

Page 37

1   camp anywhere.  So I decided to leave.

2           Eventually I was going to go to Arkansas to

3   be with my kids, and I got injured.  I chose to stop

4   off and stay in Boise for a while, because it had

5   been a nice place to stay at one time.

6       Q. Are you saying that that's the reason you

7   left Newport, was because of the police?

8       A. Yes.  Police harassment, to be technical.

9       Q. How did you get to Boise?

10      A. I hitchhiked to Corvallis.  I can't remember

11  the name of the place I went to there.  It was a

12  shelter and all of that.  They got me a bus ticket to

13  Ontario and found a shelter in Ontario, and they got

14  me a bus ticket to Boise.

15      Q. When you arrived at Boise, where did you go?

16      A. It was already set up via the people that

17  got me the bus ticket from Ontario.  It was around

18  about give or take 11:30 at night.  It was set up for

19  me to go to City of Lights, which I did.  I spent the

20  rest of that night there.  I spent one or two nights

21  there.

22          Other than that, I think one other night.

23  They were very, very crowded there.

24      Q. And when you stayed at the City Light, did

25  you have a bed?

CONFIDENTIAL PORTION INCLUDED

a74e672f-1da3-46cb-bccb-dd29ea58d9d1

EXHIBIT # 23-2

Page 38

1     A. No.

2     Q. Where did you sleep?

3     A. Actually in the dining hall.  They have
4  little thin mats.  They put us on the floor crammed
5  together.  Then they would wake us up to set up
6  tables for breakfast.

7     Q. So are you saying you just stayed one night
8  or two nights?

9     A. I believe I stayed one night later on.  I
10  don't believe it was the following night.  I believe
11  it was later on that I was ill or something, I
12  believe.  I can't tell you for sure when it was.

13     Q. Did you have the opportunity to continue
14  staying there?

15     A. They asked me if I wanted to come back.  I
16  had several reasons not to.

17     Q. What are those reasons?

18        (The following portion of the transcript
19        has been designated CONFIDENTIAL:
20        SUBJECT TO PROTECTIVE ORDER.)

21

22

23

24

25

b019d903-8a9a-4691-9548-723fb0023e69

EXHIBIT # 23-3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18          (End of Confidential Portion of Testimony.)

19     Q. (BY MR. MUIR)  Tell me about living in the

20 truck.  Whose truck was it?

21     A. That was my husband's truck.

22     Q. And where did you park it when you lived in

23 it?

24     A. Up on Bogus over by -- different places out

25 on the outskirts of town, outside of town.  So not to

b019d903-8a9a-4691-9548-723fb0023e69

EXHIBIT # 23-4

1 be harassed by the police.

2      Q. Did you ever park anywhere within the city

3 limits?

4      A. Once or twice we parked at the Wal-Mart in

5 Garden City.  And we even got woke up then by the

6 police.

7      Q. What did they tell you at that time?

8      A. They just said, we got to check out people

9 that are parking here.  Luckily this guy was a vet as

10 well, and him and my husband hit it off.  So they

11 didn't give us any problem.

12      Q. When you lived in the truck, did it have a

13 camper on it?

14      A. A camper shell, yeah.

15      Q. You'd sleep in the back under the camper

16 shell?

17      A. Yeah.

18      Q. When you lived in the truck, where would you

19 go for bathrooms?

20      A. Wherever we wanted.  We could drive right --

21 is it Highway 21?  I think is -- would that be right?

22 Out kind of where Columbia Village and all of that

23 is.  Out past there we would park at this one spot

24 and just down the road a little ways.  Happens to be

25 kind of going towards his mother's place.  There's a

CONFIDENTIAL PORTION INCLUDED

Page 56

1   the only one there.  I got there maybe three minutes

2   before Officer Dotson.  We were the only ones there.

3        Q. Is it accurate that this was at 9:55 in the

4   morning?

5        A. That's about right.

6        Q. And is it correct that you were in a

7   sleeping bag?

8        A. I had just rolled out my sleeping bag to

9   wrap up in.  I don't believe I had a jacket at that

10  time, and it was rather cool that morning.

11       Q. On the ticket in the notes it appears to

12  refer to another person as being Wiseman.  Is that

13  name familiar?

14       A. Like I said, I did not believe that -- Dave.

15  I didn't know his last name.

16       Q. Do you know what finally happened in regards

17  to the citation?  Did you plead guilty to this?

18       A. I did.  This was because -- I believe this

19  is -- they told me that they would dismiss -- I had

20  several misdemeanor tickets.  They said they would

21  dismiss something and consolidate the others if I

22  pled guilty to all of them.  So that's what I did.

23       Q. Do you know how many others got

24  consolidated?

25       A. I believe there was five altogether.

CONFIDENTIAL PORTION INCLUDED

a74e672f-1da3-46cb-bccb-dd29ea58d9d1

EXHIBIT # 23-6

1      Yes I had a lot of anxiety, which caused my

2  high blood pressure to go even higher, which caused

3  my stomach problems to be worse.  Yeah.

4      And not to mention what it did to me

5  mentally and emotional.  That sometimes I felt like

6  I'm having a nervous breakdown or something.  I'm

7  always having to look over my shoulder and I'm doing

8  nothing wrong.

9      Q. Can you identify specific conduct by the

10  city that you claim causes you mental problems?

11      A. Well, they're constantly harassing me like

12  these things.  I wasn't even camping at these spots,

13  and I get tickets.  You get tickets.  Says right here

14  on the ticket on -- is this the one?  Yeah, right

15  here.  Exhibit 2.  Why does Officer Johnson write --

16  where was I?  Train trestle.  Do you camp on a train

17  trestle.

18      Since I've been with my husband living in a

19  truck, we have went to the park and laid out a

20  blanket.  Took a daytime nap.  Yet Dotson, Exhibit 1,

21  says you can sleep in the parks during the day all

22  day long if I want.  But we laid out our blanket in

23  the park to take a nap, and been awoken by Dotson and

24  Shuler.  Both times.  Why?  If I would dress like you

25  or you, would they wake you up sleeping in a park in

1    the daytime?  Probably not.

2         MR. BELODOFF:  Let the record reflect she

3    meant you, and she was pointing to Mr. Muir and the

4    court reporter.

5         Q. (BY MR. MUIR)  You did plead guilty to both

6    of those citations?

7         A. Again, that was because a public defender,

8    who I did not get to meet until right when I went

9    into the courtroom, said they would consolidate all

10   of the tickets if I pleaded guilty to all of them.

11   They gave me a package deal, and I took it.

12        Q. At this time are you saying you weren't

13   guilty?

14        A. I am.

15        MR. BELODOFF:  I just want to clarify that.

16   You're saying you were not guilty.

17        WITNESS:  Were not guilty.  Was not and am

18   not guilty.

19        Q. (BY MR. MUIR)  You had in a Request for

20   Admission.  Your response to it said that you are

21   aware that the Boise Rescue Mission places strict

22   limits on the number of days a person can stay in its

23   shelters.  Can you tell me what that is?

24        A. I don't recall exactly.  I know that you can

25   only stay -- I think it is like a week at a time or

CONFIDENTIAL PORTION INCLUDED

a74e672f-1da3-46cb-bccb-dd29ea58d9d1

EXHIBIT # 23-8

1  and have to take Promethazine.

2      Q. Do you contend that the City of Boise is in

3  any way responsible for any physical problems?

4      A. Not for them.  The blood pressure has

5  worsened.  The stomach problems has worsened, and the

6  anxiety has worsened.

7      Q. Are you aware of any specific instance where

8  a Boise police officer issued a citation to a person

9  for sitting and talking to friends in public?

10      A. Not to my recollection.  But they did issue

11  me one for walking on the trestle.  Oh, yeah.  And

12  they issued me one for sitting at Myrtle.  I guess I

13  am for sitting there on Myrtle and 13th.

14      Q. You answer in one of your interrogatories

15  that you have been threatened by Boise police

16  officers on several occasions while sitting with

17  friends or lying down on your side.

18      Can you tell me -- other than what you've

19  just told me, the citations we're looking at.

20      A. It's been a while.  But I think maybe I have

21  been -- as I said, I have been awoken.  I remember

22  that.  But I think that they may have threatened to

23  take me to jail if I didn't get up or stuff like

24  that.

25      Q. Where were you?

1      A. Ann Morrison Park.  I think maybe once at

2  Julia Davis park.

3      Q. What time of day?

4      A. I don't remember exactly.  It was in the

5  daytime.

6      Q. It was in the daytime.  Who threatened you

7  with that?

8      A. Dotson.  Shuler.  I don't remember exact

9  dates.  It's been a while.

10     Q. And you refer to an April 18, 2007,

11  incidence with Lawrence Smith.  Is that the one

12  reflected in the citation?

13     A. Yes.  As I said, there was a mix-up

14  somewhere in the date, I believe.  It was actually --

15  it would have been April 28.

16     Q. Do you believe that that's the

17  Lawrence Smith reference?

18     A. Yeah, it is.

19     Q. Again in one of your answers to

20  interrogatories you say that you were seeking

21  compensation for lost wages during the period that

22  you were incarcerated?

23     A. I don't believe that we asked for any lost

24  wages; did we?

25         MR. BELODOFF:  No.  I think that was

a74e672f-1da3-46cb-bccb-dd29ea58d9d1
EXHIBIT # 23-10

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

1                   UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF IDAHO

3
     JANET F. BELL, BRIAN S.        )
4    CARSON, CRAIG FOX, ROBERT      )   Civil Action No.
     MARTIN, LAWRENCE LEE SMITH,    )   CIV 09-0540-S-REB
5    ROBERT ANDERSON, and PAMELA    )
     S. HAWKES,                     )
6                                   )
                Plaintiffs,         )
7                                   )
           v.                       )   REDACTED VERSION
8                                   )
     CITY OF BOISE; BOISE POLICE    )   NOT CONFIDENTIAL
9    DEPARTMENT; and MICHAEL        )
     MASTERSON, in his official     )
10   capacity as Chief of Police,   )
                                    )
11              Defendants.         )
     _____)

12

13
                 DEPOSITION OF PAMELA S. HAWKES
14
              TAKEN ON BEHALF OF THE DEFENDANTS
15
          AT 8909 AIRPORT ROAD, SPOKANE, WASHINGTON
16
                JUNE 28, 2010, AT 12:58 P.M.
17

18   REPORTED BY:

19   ANITA W. SELF, CSR, RPR
     Notary Public
20

21

22

23

24

25

                              1


1                  A P P E A R A N C E S

2

EXHIBIT # 24-1

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

18      A.   I prefer not to stay at the City of Lights.

19  After a certain period of time, I did not stay there.

20      Q.   Okay.  But you don't know whether or not they

21  had space available?

22      A.   I am not aware of, no.

23      Q.   Okay.  Why wouldn't you stay at City of

24  Lights?

25      A.   I chose not to stay there -- well, I didn't

                        45

1   necessarily choose, but I do not approve of what they

2   do there by searching women and children before they

3   enter the shelter.

4           And I do not also like the fact that we had

5   to sit and listen to prayers and service that would go

6   on in the evening and morning.  I really felt really

7   violated to where I was taking my shoes off and

8   searched from head to toe physically by another person

9   to make sure I didn't have anything on me.

10      Q.   What was your understanding of what they were

11  looking for?

12           MR. BELODOFF:  I'm going to object to her

13  understanding.  What do you mean by that, Scott?  It's

14  just vague.

15           MR. MUIR:  Well, she's saying that they did a

16  thorough search.

17  BY MR. MUIR:

18      Q.   Do you have any idea what they were looking

19  for?

20           MR. BELODOFF:  Don't speculate.  Do you know?

21           THE WITNESS:  No.
                        Page 40

EXHIBIT # 24-2

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

10    you say that "Plaintiff has been threatened by Boise

11    police officers on several occasions while sitting with

12    friends or lying down on her side."

13              Can you tell me when those specific instances

14    were?

15        A.    I don't recall.

16        Q.    Okay.  But you're testifying that Boise

17    police -- all you were doing was sitting with friends

18    and they told you to leave?

19        A.    And laying on my side.

20        Q.    Was it during the day or night?

21        A.    During the day time.

22        Q.    And do you recall on what property you were?

23        A.    I don't recall.

24        Q.    And this happened more than once?

25        A.    Yes.

                              51


1        Q.    And do you recall who the officer was?

2        A.    I don't.

3        Q.    And you've referred to a person named Steven

4    Holt.  Can you tell me who that is?

5        A.    A friend.

6        Q.    Okay.  And he was there during those

7    instances?

8        A.    Yes.

9        Q.    Okay do you know where Mr. Holt resides?

10        A.    No.

11        Q.    Would you characterize him as a homeless

12    person?

13        A.    I do not know the answer to that question.

                         Page 45

EXHIBIT # 24-3

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

19      Q.   Okay.  Do you know if you got jail time for
20   this?
21      A.   Yeah.
22      Q.   Okay.  And this was after the -- in time
23   after the citation that was Exhibit 1; is that correct?
24      A.   Yes.
25      Q.   And at this time, the Exhibit 2 citation, you
                              61


1    knew at that time what conduct was unlawful under the
2    camping ordinance; is that correct?
3       A.   I don't recall because -- on this one right
4    here, I don't recall.
5       Q.   And you pled guilty there by admitting that
6    you violated the camping ordinance; is that correct?
7       A.   Correct.
8            MR. MUIR:  I'd like to mark Exhibit No. 3.
9            (Exhibit No. 3 was marked.)
10   BY MR. MUIR:
11      Q.   Pamela, I'm handing you Exhibit No. 3.  I
12   will represent to you that this is Citation 1231940.
13   It appears to be a citation for violation of the
14   disorderly conduct ordinance, Boise City Code 6-1-5, in
15   paren, cap A.  Would you agree with that statement?
16      A.   No.
17      Q.   And what do you disagree with?
18      A.   I disagree with the disorderly conduct.
19      Q.   And all I was asking you is if you agree that
20   that's what the citation says.
21      A.   Yes, that's what the citation does say.
22      Q.   Okay.  And are you saying that you just don't
                         Page 54

EXHIBIT # 24-4

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

23    agree you were guilty of disorderly conduct?

24        A.   Correct.

25        Q.   Okay.  And this was a citation written by

                          62

1    Officer Tony Dodson on 7/24/07?

2        A.   Um-hmm.

3        Q.   And if you look at page two, can you tell me

4    where this citation took place?

5        A.   Near the restroom at Rhodes Skate Park.

6        Q.   Okay.  And go ahead and explain to me why you

7    did not think you were guilty of disorderly conduct.

8        A.    Why I feel is because I just went in to use

9    the restroom, but he's -- I'm being accused of staying

10   there all night and I wasn't.  And I went to go leave

11   the restroom and the officer confronted me and I had my

12   stuff, my belongings with me, so I ended up getting a

13   ticket.

14       Q.   And do you know, did you plead guilty to

15   this?

16       A.   I did.

17       Q.   Okay.  And do you know, did you get sentenced

18   to jail in this?

19       A.   Yes.

20       Q.   Were you represented by an attorney?

21       A.   Yes.

22       Q.   Okay.  Can you explain for me why you pled

23   guilty if now you're saying you were not guilty?

24       A.    I'm upset at myself because of the fact that

25   I did plead guilty to something that I felt strongly

                          63

EXHIBIT # 24-5

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

7   BY MR. MUIR:

8       Q.   I'll ask the question again.  Did he do

9    anything, Officer Dodson, to make you plead guilty?

10      A.   No.

11           MR. MUIR:  Okay.  Exhibit 4.

12              (Exhibit No. 4 was marked.)

13   BY MR. MUIR:

14      Q.   I'm going to hand you what's Exhibit 4,

15   Pamela.  This is another citation, and it is Citation

16   1231933 and, again, it's camping in public under Boise

17   City Code 9-10-2.  Would you agree with that?

18      A.   Yes.

19      Q.   And it appears this was again by Officer

20   Dodson on 7/23/07.  Would you agree with that?

21      A.   Yes.

22      Q.   Can you tell me where this occurred?

23      A.   At Rhodes Skate Park.

24      Q.   Okay.  The notes to the citation say -- they

25   used the symbol saying defendant had all her gear out.

                            66


1            Do you know what that would refer to?

2       A.   Blankets and sleeping bag.

3       Q.   Okay.  And do you know what the -- whatever

4    happened on this one; did you plead guilty to this one?

5       A.   Yes.

6       Q.   Were you represented by an attorney?

7       A.   I don't recall.

8       Q.   Okay.  And did you get jail for this?

9       A.   Yes.

10           MR. MUIR:  Okay.  5.

                        Page 58

EXHIBIT # 24-6

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

15        A.   I was -- no, I was not allowed in City Light

16   at that time.

17        Q.   That wasn't my question.

18        A.   No.  There was not any space for a woman in

19   Boise at that time.

20        Q.   How do you know?

21        A.   Because the only place that I was aware of

22   that was a place for single woman was the City of Light

23   at that time.

24        Q.   So there was shelter space available?

25             MR. BELODOFF:  That's not what she said.

                            68

♀

1             MR. MUIR:  Okay.

2    BY MR. MUIR:

3         Q.   Explain.

4         A.   I was not allowed in the City of Light for

5    that period of time so, no, there was no space.

6    Women --

7         Q.   For you?

8         A.   For me.

9         Q.   And was there any other shelter that had

10   space?

11        A.   Not that I'm aware of, no.

12        Q.   Okay.  Did you check?

13        A.   I did, but I did not find at the time any

14   other shelter that would be accessible to women and men

15   as a couple.

16        Q.   And why are you characterizing it as a

17   couple?

18        A.   Because of myself and my fiance.

                       Page 60

EXHIBIT # 24-7

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

16  complaint.

17          MR. BELODOFF:  Okay.  So you're asking her

18  what she meant -- she means by "over capacity."  Okay.

19          THE WITNESS:  As to what I saw personally and

20  I noticed, that, yes, they are over-crowded.  There's a

21  lot of people that use the shelters, but that is only

22  what I noticed.

23  BY MR. MUIR:

24      Q.   Were you aware that you could sleep in Boise

25  city parks during the day?

                        76


1       A.   No.

2       Q.   Are you aware of that now?

3       A.   Yes.

4       Q.   When did you become aware of it?

5       A.   Let's see.  Shortly before I came back to

6  Spokane the last time.

7       Q.   And who told you?

8       A.   I can't recall.

9       Q.   And do you allege that any officers ever

10  bothered you about sleeping in a Boise city park during

11  the day?

12      A.   Yes.

13      Q.   Okay.  Specifically what?

14      A.   Um, Rhodes Skate Park, I would be laying down

15  on a park bench and I would have -- most of the time it

16  was either Shuler or Dodson would come up to me and

17  pretty much tell me, Pamela, you cannot be laying down.

18  You need to be sitting up.  And I was like, okay, and

19  so I would sit up.

                    Page 67

EXHIBIT # 24-8

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

20        And then later on, I ended up finding out

21   that it was okay to be -- and so -- but that's the only

22   incident I've had is I would be told that I couldn't be

23   laying down, I couldn't even -- at Ann Morrison one

24   time I was laying in the grass, and I was never given a

25   ticket, but I was told on numerous occasions during the

                               77

1   day time that I couldn't be sleeping in a certain area

2   in the park or I couldn't be laying in this area, that

3   I needed to wake up and get up.

4        Q.   Was it during the day?

5        A.   Yeah.

6        Q.   Okay.  Do you have any dates?

7        A.    It would have approximately -- I don't know

8   an exact date, but it would be during the summertime

9   when it was hot out.  I'd go to the park and put a

10   blanket down and fall asleep and I would be woken up by

11   a bicycle officer coming by and waking me up and

12   telling me that I needed to wake up and get up.

13        Q.   Did you have other personal belongings other

14   than a blanket?

15        A.   Yes.

16        Q.   Okay.  Like what?

17        A.   My backpack.

18        Q.   You didn't have a tent or anything?

19        A.   No.

20        Q.   Okay.  And what officer?

21        A.   It was Officer Dodson and Shuler.

22        Q.   And are you referring to the Ann Morrison

23   incident now?

                        Page 68

EXHIBIT # 24-9

PAMELA S. HAWKES Deposition Transcript Redacted.TXT

24      A.    Ann Morrison and Rhodes Skate Park.

25      Q.    Okay.  Are you alcohol dependent?

                        78


1       A.    Me?

2       Q.    Yes.

3       A.    No.

4       Q.    Okay.  Do you drink?

5       A.    Occasionally, yes.

6       Q.    Okay.  Never been diagnosed as having a

7    problem alcohol-wise?

8       A.    No.

9       Q.    How about drug dependent?

10      A.    Nope.

11           MR. MUIR:  If we could just real quick,

12   Howard, to get it on the record, we've asked for the

13   medical providers, and obviously I think that this is

14   being made an issue, a big issue in this case, I think,

15   and you can correct this on the record if it's not what

16   we're agreeing to, but my understanding is since we've

17   asked to identify the providers, you're going to try to

18   get the records.  You will get those to us, the name of

19   the providers and the records.  If we need to keep this

20   open to go over the medical records and issues on the

21   medical, are we agreeing that that's okay?

22           MR. BELODOFF:  Yes, Scott.  We will agree to

23   keep the record open for purposes of any testimony

24   directly related to those medical records, and

25   hopefully we can do that without having to come back to

                        79


                    Page 69


EXHIBIT # 24-10

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JANET F. BELL, BRIAN S. CARSON,   )

CRAIG FOX, ROBERT MARTIN,   )

LAWRENCE LEE SMITH, ROBERT   )

ANDERSON, and PAMELA S. HAWKES,   )

        Plaintiffs,   )

      vs.   ) Civil Action No.

CITY OF BOISE; BOISE POLICE   ) CIV 09-0540-S-REB

DEPARTMENT; and MICHAEL   )

MASTERSON, in his official   )   UNREDACTED VERSION

capacity as Chief of Police,   )   CONFIDENTIAL

      Defendants.   ) ATTORNEYS' EYES ONLY!

     _____   )


DEPOSITION OF ROBERT ANDERSON

JUNE 30, 2010


REPORTED BY:

BEVERLY A. BENJAMIN, CSR No. 710, RPR

Notary Public

CONFIDENTIAL

9ae1d49e-2c19-435f-8397-536cbec009e2
EXHIBIT # 25-1

1          Q.   Do you know what date you went to the

2     mission?

3          A.   No, I don't.

4          Q.   How long did you stay at the mission?

5          A.   The allotted time is 17 days.

6          Q.   Explain to me the allotted time.

7          A.   You are allowed to stay at the mission

8     for 17 days.  After 17 days you are not allowed

9     to stay for 30 days.

10         Q.   Do you understand what the idea is

11    behind that policy?

12         A.   No, I don't.

13         Q.   Did you return after the 30 days?

14         A.   No.

15         Q.   So you only stayed at the mission once?

16         A.   Yes.

17         Q.   When you were done with your 17 days,

18    where did you go?

19         A.   I went camping.

20         Q.   Where would you camp at?

21         A.   8th Street.

22         Q.   And when you went camping, what kind of

23    equipment did you have?

24         A.   I had a tent and a sleeping bag.

25         Q.   Do you know whose property you were on?

CONFIDENTIAL

9ae1d49e-2c19-435f-8397-536cbec009e2
EXHIBIT # 25-2

1   A.   At the time, no.

2   Q.   What is your understanding now?

3   A.   It was City property.

4        MR. MUIR:   Howard, can we take a quick

5   five-minute break?

6        MR. BELODOFF:   Sure.

7        (Recess taken.)

8   Q.   (BY MR. MUIR)   We took a short break,

9   and when we did we were talking about you camping

10  up on 8th Street.   And you had stated that you

11  are now aware that was City of Boise property; is

12  that correct?

13  A.   Correct.

14  Q.   How long did you camp up 8th Street?

15  A.   About a week.

16  Q.   Was this all in one location up there?

17  A.   No.

18  Q.   Tell me about that.

19  A.   Three different locations.   The first

20  location is where I got the citation.   I had only

21  been there a night.

22  Q.   So you moved the site?

23  A.   We moved the site to another area

24  thinking that we were out of city limits, and we

25  received a memo from an officer stating that we

CONFIDENTIAL

9ae1d49e-2c19-435f-8397-536cbec009e2
EXHIBIT # 25-3

1   were still in city limits, that we had to move up

2   further.  So we packed up and moved up further.

3   We were there for about four nights, at which

4   time I decided to pack up my stuff and move out.

5        Q.  When you were there the first night and

6   you got cited, you believed that you were outside

7   of the city limits?

8        A.  Yes.

9        Q.  And did you know that you couldn't camp

10  within the city limits at that time?

11       A.  No, I didn't.

12       Q.  Why did it matter then whether or not

13  you were in the city limits?

14       A.  I don't understand what you mean.

15       Q.  You said that you didn't know or you

16  thought you weren't in the city limits at that

17  time.

18       A.  Correct.

19       Q.  Why did that matter to you?

20       A.  At that time I didn't think of it.

21       Q.  Why would it even enter your mind

22  whether or not you were in the city limits?

23       A.  We were -- I don't know.

24       Q.  Who was at these camp locations?

25       A.  Chris Hosford, John Miller, and three

CONFIDENTIAL

9ae1d49e-2c19-435f-8397-536cbec009e2
EXHIBIT # 25-4

Page 34

1          Q.  This is the first camp location that

2     you were just testifying to me about on 8th

3     Street; is that correct?

4          A.  Yes.

5          Q.  And on the front of the citation it's

6     got in parentheses "yellow tent."  Was that your

7     tent?

8          A.  Yes.

9          Q.  How did you end up finding this spot?

10         A.  I was invited to the spot.

11         Q.  By whom?

12         A.  By Chris and John.

13         Q.  Had they already set up a camp there?

14         A.  Yes, they had.

15         Q.  Did they have tents also?

16         A.  Yes.

17         Q.  Now, after the citation I understand

18    that you say you moved; is that correct?

19         A.  Correct.

20         Q.  Where did you move to?

21         A.  About 100 feet away, further up.

22         Q.  What was your understanding by moving?

23         A.  Officer Schuler told us that we had to

24    move somewhere between 100 and 150 feet further

25    up 8th Street to be safe.  So we moved about 125

1  feet up.

2      Q.  What do you mean by "to be safe"?

3      A.  To be out of the city limits.

4      Q.  And then apparently you ended up moving

5  again; is that correct?

6      A.  Yes.

7      Q.  Why was that?

8      A.  We had received a note from another

9  officer stating that we were still in the city

10 limits.

11     Q.  And do you know who that officer was?

12     A.  No, I don't.

13     Q.  Did you get any citation from that?

14     A.  No.

15     Q.  If we look back at the citation, which

16 is Exhibit 1, can you tell me what became of

17 that?  Did you plead guilty to it?

18     A.  I pled not guilty.

19     Q.  Eventually what resulted then if you

20 pled not guilty?

21         MR. BELODOFF:  Do you understand?

22 Because I'm not sure.  Rephrase that.

23     Q.  (BY MR. MUIR)  Were you represented by

24 an attorney?

25     A.  No.

CONFIDENTIAL

9ae1d49e-2c19-435f-8397-536cbec009e2
EXHIBIT # 25-6

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JANET F BELL, BRIAN S. CARSON,     )
CRAIG FOX, ROBERT MARTIN,          )
LAWRENCE LEE SMITH, ROBERT         )
ANDERSON, and PAMELA S. HAWKES,    )
JONATHAN LEIGH MILLER, JAMES M.    )
GODFREY, BASIL E. HUMPHREY, and    )
KIRK ROSS,                         )
                 Plaintiffs,       )
vs.                                ) Case No.
CITY OF BOISE, BOISE POLICE        ) CIV 09-0540-S-REB
DEPARTMENT, and MICHAEL            )
MASTERSON, in his official         )
capacity as Chief of Police,       )
                 Defendants.       )
_____  )


DEPOSITION OF JAMES M. GODFREY

August 24, 2010


REPORTED BY: DIANA L. DURLAND, CSR No. 637,

Notary Public

836bc960-ff45-4ba6-aef5-5846cc277c2b
EXHIBIT # 26-1

1      A. Because of my disabilities.  Plus I had a
2  few, you know.
3      Q. By "a few," you mean you'd had a few beers
4  or alcohol of some sort?
5      A. Beers.
6         (Exhibit 1 marked.)
7      Q. (BY MS. BILYEU)  Mr. Godfrey, I'm handing
8  you what's been marked as Exhibit 1 to your
9  deposition.  Do you recognize that?
10      A. Yes, it's the camping ticket I got, I
11  believe.
12      Q. And does it indicate that you received this
13  camping ticket on June 18 of 2009?
14      A. It's about right.
15      Q. At about 6:35 in the morning?
16      A. Yes.
17      Q. So tell me where you were when you got this
18  ticket?
19      A. I was down behind the Americana Suite,
20  whatever they call it.  Where the old El-Ada used to
21  be.
22      Q. The old what?
23      A. El-Ada.  It's a big vacant lot now.  I was
24  down that way kind of by the river.
25      Q. And do you recall what you were doing the

836bc960-ff45-4ba6-aef5-5846cc277c2b
EXHIBIT # 26-2

1   night before or the night -- you got this at 6:30 in

2   the morning.  So the night before, what were you

3   doing?

4          A. I was in the park.  And it started getting

5   dark.  And I got as far as that turnoff, and I

6   couldn't walk any more.  So I went down -- I know the

7   area kind of because I've camped there before.

8   Sanctuary didn't used to be open all year-round.

9          Q. But in 2009, was it open all year-round?

10         A. Yes.  That's why I know the area, because I

11  had been down there before.

12         Q. So you said that you had been drinking in

13  the park before you headed back to Sanctuary the

14  night before you got the ticket?

15         A. Yes.

16         Q. Which park were you drinking in?

17         A. Ann Morrison.

18         Q. Had you slept in the park during the day at

19  all?

20         A. No.

21         Q. Are you aware that you can sleep in parks

22  during the day?

23         A. Yeah.  That park.  Yeah, I guess you can in

24  a lot of them.  I know they kind of frown on it at

25  the skate park.  Nobody likes to sleep on concrete.

1    I used to go down to Ann Morrison and read because

2    it's quieter.  Not as crazy.

3         Q. So how long have you been aware that you can

4    sleep in the park during the day?

5         A. Since I came here pretty much.

6         Q. So for at least three or four years you've

7    known you can sleep in the parks during the day?

8         A. At least that.

9         Q. Okay.

10        A. And sometimes they'll check your ID if they

11   come up on you when you're asleep.  I don't know why.

12        Q. You don't know why they ask for your ID when

13   you're asleep?

14        A. They check on you to see if you're still

15   alive, for one thing.  That's what they say anyway.

16   There might be a beer can or two laying around in a

17   bag.  That helps you sleep.

18        Q. Okay.  This answer is probably going to be

19   obvious to you, but I need to make it clear for the

20   record.  Did you have a job during the time that you

21   received your ticket?

22        A. No.

23        Q. By "ticket," I mean the one that we were

24   just talking about, your camping ticket in June of

25   2009?

836bc960-ff45-4ba6-aef5-5846cc277c2b
EXHIBIT # 26-4

Page 26

1        A. That's right.  No.

2        Q. How long before you received your camping

3    ticket was it that you had held a job?

4        A. A long time.

5        Q. Over a couple of years would you say?

6        A. Yes.

7        Q. Do you remember receiving the ticket that's

8    been designated as Exhibit 1?

9        A. Yes.

10        Q. Do you recall the officer at the time?

11        A. Mr. Shuler, I believe.

12        Q. Mr. Godfrey, how did Officer Shuler treat

13    you when you received your ticket?

14        A. Good.  He's a nice guy, really.

15        Q. And did he arrest you at that time?

16        A. No.

17        Q. Is part of your position -- do you think

18    that you were not camping at the time you received

19    this ticket?

20        A. I don't believe I was.  I was just sleeping

21    out.  I had a blanket I found.  It was cool at night

22    still.

23        Q. Did I already ask you, were you arrested at

24    the time you received the ticket?

25        A. I wasn't, no.

836bc960-ff45-4ba6-aef5-5846cc277c2b
EXHIBIT # 26-5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JANET F. BELL, BRIAN S. CARSON,   )

CRAIG FOX, ROBERT MARTIN,   )

LAWRENCE LEE SMITH, ROBERT   )

ANDERSON, and PAMELA S. HAWKES,   ) Civil Action No.

       Plaintiffs,   ) CIV 09-0540-S-REB.

     v.   )

CITY OF BOISE; BOISE POLICE   )   UNREDACTED VERSION

DEPARTMENT; and MICHAEL   )   CONFIDENTIAL

MASTERSON, in his official   )   ATTORNEYS' EYES ONLY!

capacity as Chief of Police,   )

      Defendants.   )

    _____   )


DEPOSITION OF ROBERT MARTIN

JUNE 30, 2010


REPORTED BY:

BEVERLY A. BENJAMIN, CSR No. 710, RPR

Notary Public

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-1

Page 14

1      Q.   So they separate you and then you were

2   in the family area.

3      A.   With my wife and son, yes.

4      Q.   Did you have one bed for the family?

5      A.   Me and my wife shared a bed and we had

6   a playpen/bed area for our son.

7      Q.   How long were you at Sanctuary?

8      A.   Me and my wife and son were at

9   Sanctuary for roughly a year.

10      Q.   Can you give me a time frame as to when

11   that was?

12      A.   To the best of my knowledge, mid 2008

13   to early -- almost mid 2009, I believe.

14      Q.   At some point did you have to leave

15   Sanctuary?

16      A.   Yes.

17      Q.   Approximately when would that have

18   been?

19      A.   Towards the end of the year that we

20   were there, so early spring maybe, or late

21   winter.  So the beginning of 2009, January

22   February, March, somewhere in that point.

23      Q.   Why did you have to leave there?

24      A.   Just we had accumulated too many

25   belongings, property and everything.  We were

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-2

1    only allotted a certain amount of stuff that we

2    could bring in and keep there during the day and

3    we over -- well, over -- had too much stuff

4    there.  They talked to us multiple times about

5    it.  We had gotten in arguments a couple times

6    with Dan, one of the main staff members there

7    about it.  And they set up a -- tried to help us

8    out, set it up to where one of us would be out

9    for 30 days while the other family member was

10   there with the child, so he wasn't kicked out.

11   Then if it continued to be a problem after the 30

12   days, I was able to come back and my wife was out

13   for 30 days and I would have my son there.  So

14   that way they didn't kick our son out.

15        Q.   What is Dan's last name, do you

16   remember?

17        A.   I don't.

18        Q.   Any idea if he still works there?

19        A.   He does.

20        Q.   He does.

21        A.   Yes.

22        Q.   Any other reasons why you weren't able

23   to stay there in early '09?

24        A.   Not that I know of.

25        Q.   So other than accumulating too many

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-3

Page 25

1    you say you stayed there?  How many nights, let's

2    do nights.  If you could sum it into how many

3    nights from 2003 to 2009, did you say?

4          A.  Yeah.  I would probably be able to give

5    a better answer in months.

6          Q.  That would be fine.

7          A.  Nights I couldn't tell.

8          Q.  That's okay.

9          A.  Months, probably through that entire

10   time frame altogether maybe three to six months

11   altogether.

12         Q.  It says in the complaint here that you

13   were told you could not return because your

14   disabilities make it difficult to wake up at the

15   required time.  Can you tell me about that.

16         A.  Living on the street for so many years,

17   the light doesn't wake me up, I sleep during the

18   days a lot of times, too, so light does not wake

19   me up at all.  That is the only way they would

20   actually wake people up is they just flip on the

21   lights and they expect you to get up.

22             And with my insomnia, I have a really

23   hard time getting to sleep, is takes me about an

24   hour or so, sometimes more or less, depending on

25   the night, to fall asleep.  And I don't wake up

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-4

Page 26

1    to the lights just being flicked on, so I would

2    sleep past the lights being on.  And everybody

3    needs to be out by 8:00.  They would come through

4    usually to check if everyone is out at 8:00 and

5    see me still sleeping there.  Wake me up, hey,

6    you have to get out now, you are late.  And they

7    just got tired of dealing with it.

8         Q.  Any other reason you were asked not to

9    return to River of Life shelter?

10        A.  My religious beliefs conflict with

11   theirs.

12        Q.  They asked you to leave because of

13   that?

14        A.  Not directly, more along the lines

15   their attitude, behavior towards me and

16   everything was directed at me telling, basically

17   stating in a round way that I'm not welcome to

18   stay there.

19        Q.  So who was it that made you feel like

20   that there?

21        A.  Pretty much all of the staff members.

22        Q.  Do you know any of their names?

23        A.  Back in 2003 and 2004 Chaplain Gates,

24   we would get into arguments multiple times over

25   their religious policies and my religious

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592
EXHIBIT # 27-5

1    up, I couldn't deal with it any more and I quit

2    the job.

3            (Exhibit 1 marked.)

4        Q.  (BY MS. BILYEU)  Mr. Martin, you have

5    in front of you what has been marked Exhibit 1 to

6    your deposition.  Do you recognize that?

7        A.  Yes, I do.

8        Q.  Can you tell me what it is.

9        A.  It's a copy of the ticket that I

10   received for disorderly conduct.

11       Q.  What is the date on that?

12       A.  I believe it says 4/23/2009.

13       Q.  So April 23rd or 24th maybe of '09?

14       A.  Yes.

15           (Exhibit 2 marked.)

16       Q.  (BY MS. BILYEU)  You've also been

17   handed Exhibit No. 2.  Do you recognize that?

18       A.  Yes, I do.

19       Q.  Can you tell me what it is.

20       A.  It is the ticket that I received for

21   camping.

22       Q.  On what day?

23       A.  March 4th, 2009.

24       Q.  Could that be a "21"; could that be

25   March 21st of 2009?

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592
EXHIBIT # 27-6

Page 36

1        A.   Could be, yes.   Looks like a "4" to me

2    though.

3        Q.   It's kind of sloppy handwriting, isn't

4    it?

5        A.   Yeah.

6        Q.   In any event, maybe we'll just refer to

7    that one as the March '09 ticket.

8        A.   That works.

9        Q.   So referencing the March of 2009

10   camping ticket, which is Exhibit 2, can you tell

11   me what occurred around this time that you got

12   this ticket.

13       A.   To the best of my knowledge, I had

14   dropped my wife and my son off at the City of

15   Lights family shelter, or maybe -- wherever she

16   was staying at at the time, I'm not 100 percent

17   sure.   I don't know where she was staying at that

18   time.   I don't remember, per se.

19       Q.   When did you drop them off?

20       A.   Sometime prior -- well, I believe

21   somewhere maybe between 3:00 in the afternoon and

22   say 8:00 at night, some point between that time

23   frame.

24       Q.   So that would have been the night

25   before you got the ticket?

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-7

Page 37

1   A.  Yes, the night before I got the ticket.

2   Dropped them off, went around trying to find

3   someplace to stay for the night, because I

4   couldn't stay at the shelters or anything at the

5   time, and needed to be near downtown to where I

6   could go and get my wife in the morning and my

7   son and do whatever we needed for the next day.

8   Pulled up alongside the I-84 Connector

9   wall by an abandoned field, kind of an empty

10  field, pulled up alongside there.  I had my

11  bicycle that I had at the time and the child cart

12  behind it, pulled it up in the weeds, pulled out

13  my sleeping bag, laid down in the weeds and went

14  to sleep.

15  Q.  So when you say you dropped your wife

16  and child off, you don't mean with a car.

17  A.  No, no.  At the time they would usually

18  end up, like if we needed to go anywhere

19  distance-wise, they would both climb in the bike

20  cart in the back and I would pull them around.

21  Q.  I like that arrangement.

22  A.  Yeah.  She got the ride; I got the

23  work.

24  Q.  About what time did you pull up to the

25  I-84 wall?

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-8

1    A.   I know it was well after dark.  I would

2  say anywhere between 10:00 and midnight.

3    Q.   So you said at that time you weren't

4  able to stay at the shelters?

5    A.   Yes.

6    Q.   Which shelters had you been -- which

7  shelters were you unable to stay at at that time?

8    A.   The Boise Rescue Mission and the

9  Interfaith Sanctuary.

10    Q.   Any other shelters that you couldn't

11  stay in at that time?

12    A.   Not that I know, I don't believe there

13  is any other shelters here in Boise that I'm able

14  to stay at.  The Salvation Booth House is

15  specifically for women or families with children.

16  I couldn't stay there by myself.  So other than

17  that, there is really no other shelters in Boise

18  that I know of.

19    Q.   Had you applied for any housing

20  assistance at that time?

21    A.   We have been on Section 8 housing, I

22  have been on Section 8 housing myself since 2005.

23  And my wife and son has been on it since 2007.

24    Q.   Where did you stay when you were in

25  Section 8?

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-9

1       A.   Not that I can think of.

2       Q.   Did it cause you any anxiety or --

3       A.   Extremely.

4       Q.   Tell me about that.

5       A.   As soon as I got the ticket, I went

6   over to Corpus, met with my wife there, told her

7   well, I've got bad news for you.  She asked me

8   what.  I said I just got a ticket.  She asked me

9   what for.  I told her for camping on the side of

10  the Connector.  And she wasn't happy about that.

11          I went in at some point after that to

12  take care of the ticket, do what I could for it

13  and found out all the information I needed to do

14  for it, that there is potential fines, jail time

15  potential, everything else.  That added a lot of

16  stress and anxiety on to me, because I take care

17  of my family.  My wife at the time, she has no

18  prior job experience, my son was extremely young

19  at the time.  They rely on me to provide and take

20  care of them.

21          And I was looking, if I've got to do

22  jail time for this -- I was extremely worried

23  about my family.  I didn't know what was going to

24  happen.  Just lots and lots of stress over it.

25      Q.   Your friend Ben, were you also asking

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-10

1   Did you indicate to me, did you tell Mr. Shuler,

2   Officer Shuler, that you were unable to stay at

3   the shelters?

4        A.   Yes.

5        Q.   For this ticket?

6        A.   I believe I told him on both instances

7   that I wasn't able to stay at the shelters.

8        Q.   For the March '09 ticket, Exhibit 2,

9   what was the reason that you told Mr. Shuler that

10  you were not able to stay at the shelter?

11       A.   I believe it was because I had been

12  kicked out, because of my wife having too much

13  property and everything at the Sanctuary.   I

14  believe that is what it was.

15       Q.   Any other reason you would have given

16  him?

17       A.   Not to my knowledge.

18       Q.   At any time on this Exhibit 2 ticket

19  did you plead not guilty at any time, to your

20  recollection?

21       A.   Not to my recollection, I don't.   I

22  don't believe I did.

23       Q.   Do you recall whether or not you

24  entered into a written guilty plea?

25       A.   I don't remember.   I don't remember if

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592

EXHIBIT # 27-11

Page 52

1    Q.   Is there a reason why you haven't paid

2    it off?

3    A.   No income.   What little money I do

4    manage to make here and there, it either goes

5    directly to my family or other expenses that need

6    to be done at that moment.

7    Q.   Has anybody told you that it would be

8    okay not to pay that fine?

9    A.   No.   I know I need to pay it off.   I

10   just haven't had the ability to.

11   Q.   I would like to move on now to your

12   April 24th, '09 ticket, which is Exhibit No. 1.

13   I apologize because I got them mixed up.   I

14   should have done the other one first, but I

15   didn't.

16   A.   Not a problem.

17   Q.   In any event, tell me about this

18   ticket.

19   A.   That night I ended up pretty much not

20   having anywhere to go, I didn't have a bike or

21   anything else like that at this time, it broke

22   down, so I was walking around everywhere.

23   Literally just wandering around downtown Boise

24   trying to find some place I could go.   I knew

25   from the camping ticket that I received that I

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592
EXHIBIT # 27-12

Page 53

1    couldn't sleep in the obvious places and whatnot.
2    So I just ended up wandering around downtown as
3    long as I could.  I think, probably about 3:00,
4    maybe 4:00, close to almost 5:00 in the morning I
5    just couldn't stay awake any more and just
6    couldn't deal with it.  I was nodding off
7    walking, couldn't stay awake at all any more, my
8    insomnia was kicking my butt.
9         So I figured I could go off on the side
10   of the Sanctuary building next to Corpus Christi
11   day shelter and just sit down there and wait for
12   Corpus to open and hope I would be okay.  Hoping
13   that people that knew me from the Sanctuary and
14   Corpus, as soon as they saw me when they left
15   they would wake me up, so I could go inside and
16   sleep inside Corpus.
17        Q.  You can sleep inside Corpus Christi?
18        A.  Kind of in a sense.  They'll allow you
19   to sit at the tables, kind of put your arms up
20   and rest your head on them and take a nap there.
21   But they don't really say anything about that or
22   whatnot, or you can kind of stretch out a little
23   bit in the back courtyard in a sense a little,
24   but you can't really sleep, sleep in a sense
25   there.  People nap there on and off all day.

CONFIDENTIAL

Page 54

1      Q.   What time do they open in the mornings?

2      A.   Currently they open at -- they open

3  their doors at 7:00 a.m., and the women and

4  children and families can be inside the building

5  from 7:00 on, but the men, single men and

6  whatnot, they cannot be inside the building

7  itself until 7:30 to allow the children to get

8  showered and food and whatnot before they go to

9  school or whatever.

10     Q.   Is that the same opening time or hours

11 that they had in April of 2009?

12     A.   Roughly, I believe.  They might have

13 opened maybe an hour before that occasionally.

14 Maybe 6:30 is the earliest they would open at

15 that time, if I remember correctly.

16     Q.   So back to the ticket here, Exhibit 1.

17 You said that you were sleeping hoping that

18 somebody, I guess, would wake you up on their way

19 from Sanctuary to Corpus Christi.

20     A.   Yes.

21     Q.   Someone did wake you up, but it wasn't

22 who you expected?

23     A.   Pretty much, yes.

24     Q.   So tell me about that.

25     A.   I was kind of dozing there, not really

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592
EXHIBIT # 27-14

Page 55

1    awake, not really asleep, and I got the familiar

2    "Boise Police Department," and it was Officer

3    Shuler.  He asked me what I was doing out there

4    pretty much.  Told him just waiting for Corpus

5    Christi to open up, so I could go in and try to

6    get a nap there or something.

7              I couldn't stay at any of the shelters.

8    He talked to me.  Why couldn't I find anywhere

9    else to stay, why couldn't I stay at the

10   shelters.  I told him again I can't stay because

11   of property issues and everything, they weren't

12   going to allow me in and whatnot.  And he asked

13   me a couple times, I believe, what were the

14   reasons, if there were any other reasons, trying

15   to figure out what was going on, why I wasn't

16   able to stay anywhere, if I was able to stay with

17   my family, my wife's family.  I just couldn't

18   stay anywhere.

19             He asked me if I was doing anything as

20   far as like work or anything and I told him I

21   can't hold a job right now.  Just trying

22   everything I could at the time to get stable

23   living, financial and everything for my family

24   and everything, just unable to do it.

25             Waiting for my disability to come in

CONFIDENTIAL

fdd1beb4-3390-431e-88b0-549d9b0c6592
EXHIBIT # 27-15

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JANET F BELL, BRIAN S. CARSON,   ) UNREDACTED VERSION

CRAIG FOX, ROBERT MARTIN,        )   CONFIDENTIAL:

LAWRENCE LEE SMITH, ROBERT       )    SUBJECT TO

ANDERSON, and PAMELA S. HAWKES,  ) PROTECTIVE ORDER

                Plaintiffs,      )

vs.                              ) Case No.

CITY OF BOISE, BOISE POLICE      ) CIV 09-0540-S-REB

DEPARTMENT, and MICHAEL          )

MASTERSON, in his official       )

capacity as Chief of Police,     )

                Defendants.      )

_____ )


DEPOSITION OF LAWRENCE SMITH

June 29, 2010


REPORTED BY:

DIANA L. DURLAND, CSR No. 637

Notary Public

Page 7

1       A. Yes.

2       Q. Do you have kids?

3       A. Yes.

4       Q. How many?

5       A. Two.

6       Q. What are their ages?

7       A. I don't even know any more.

8       Q. Do you know where they are?

9       A. I have no clue.  Hopefully with their

10 mother.  Or they're probably out on their own by now.

11      Q. Fair enough.  Mr. Smith, do you receive any

12 benefits like Social Security?

13      A. I do.

14      Q. What do you receive?

15      A. At the point now it's SSI.

16      Q. How much do you get?

17      A. $630 a month.

18      Q. Do you get that even while here

19 incarcerated?

20      A. I don't think so.

21      Q. Do you get any other types of benefits?

22      A. No.

23      Q. Do you have any checking accounts or savings

24 account?

25      A. I do have a savings account.

CONFIDENTIAL PORTION INCLUDED

38ed23ae-678b-49d0-a48e-1d521de5f591
EXHIBIT # 28-2

1   getting prayed at and prayed over and having to sit

2   through grace while they serve meals.

3        Q. Did they do that on the evenings that you

4   told me you stayed at the Rescue Mission?

5        A. They do it every day.

6        Q. I've never stayed at the Rescue Mission.

7   Can you tell me like how you get in and how you get a

8   place to stay there?  Kind of run me through it.

9        A. You go there.  Basically you wait in line to

10  get through the door.  When people start getting

11  turned away, you know that you might as well not stay

12  in line, so you go somewhere else.

13        If you do get inside, I've never slept in a

14  bed at the Rescue Mission ever.  It's always been on

15  the floor on a mat.  A very crowded small room with

16  four or five other people in it.  It's just really

17  not a very conducive living arrangement period.

18        Q. Tell me this, because I don't know that I

19  have my timing right.  When you stayed at the Rescue

20  Mission, is this the one when it was on Front Street?

21        A. The newer one.

22        Q. River of Life?

23        A. River of Life.

24        Q. And did you ever stay at the one over on

25  Front Street?

1      A. No, but I've stayed there before.

2      Q. How is the food?

3      A. It's not bad.

4      Q. What about Sanctuary?  Tell me how you get a

5 room at Sanctuary or a bed at Sanctuary?

6      A. It's a lot easier as long as they have

7 available beds.  You just show up and request a bed.

8 If they have beds available you're assigned a bed.

9 They will put you on the floor if they have to.

10     Q. Did you ever stay in a bed there?

11     A. I have.

12     Q. Did you ever stay on a mat there?

13     A. I have.

14     Q. Were you ever turned away from Sanctuary?

15     A. Yeah, there's been times when there's no

16 room.

17     Q. And did they turn you away?

18     A. Yes.

19     Q. What did they tell you?

20     A. Just no room available.

21     Q. Can you tell me when that was?

22     A. No.  Early on.

23     Q. Can you tell me approximately what time of

24 year?

25     A. It was cold.

CONFIDENTIAL PORTION INCLUDED

38ed23ae-678b-49d0-a48e-1d521de5f591
EXHIBIT # 28-4

1       Q. Where did you go after you were turned away

2   from Sanctuary?

3       A. You go find a place to sleep.

4       Q. You didn't go to River of Life?

5       A. No.

6       Q. How come?

7       A. I just can't.  I don't like the place.

8       Q. Have you ever been turned away from River of

9   Life?

10      A. Turned away like no space?

11      Q. Yes.

12      A. A lot of times.

13      Q. Can you tell me when?

14      A. The same timeframe somewhere.

15      Q. Winter?

16      A. This was all grouped together.

17      Q. Winter of what year would you say?

18      A. Probably the same year.  `07.

19      Q. Winter of `07?

20      A. Give or take six or eight months, I guess.

21      Q. Back on Exhibit No. 2.  That May 12 of `07

22  citation.  Were you just by yourself at that time?

23      A. When the officer rolled up, yes.

24      Q. Had anyone else been camping out with you

25  that week?

Page 40

1      Q. Do you know his address?

2      A. I don't.

3      Q. Do you know what street he lives on?

4      A. I just know how to get there.

5      Q. Now at the bottom of this complaint, which

6   was filed on October 22 of 2009, on page eight it

7   states that -- it says, I'll quote it for you,

8   "He --" referencing you -- "left Boise because of the

9   real threat that he will face citation, arrest and

10  incarceration for sleeping outdoors."  It says you

11  left Boise.

12     A. I did.

13     Q. Where did you go to?

14     A. Middleton.

15     Q. How long did you stay in Middleton?

16     A. I was there for probably less than a year.

17     Q. With Mr. Watson?

18     A. Yeah.  And then there's another guy.  I

19  can't remember his name.  He lived right in downtown.

20  We were all kind of three friends.

21     Q. Okay.  So you were in Middleton for about a

22  year?

23     A. Or under, yeah.

24     Q. Can you tell me what the approximate

25  timeframe was that you were in Middleton?

CONFIDENTIAL PORTION INCLUDED

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JANET F. BELL, BRIAN S. CARSON,      )
CRAIG FOX, ROBERT MARTIN,            )
LAWRENCE LEE SMITH, ROBERT           )
ANDERSON, PAMELA S. HAWKES,          ) Civil Action No.
JONATHAN LEIGH MILLER, JAMES M.      )    CIV 09-0540-S-REB
GODFREY, BASIL E. HUMPHREY, and      )
KIRK ROSS,                           )
          Plaintiffs,                )
          vs.                        )
CITY OF BOISE; BOISE POLICE          )
DEPARTMENT; and MICHAEL              )
MASTERSON, in his official           )
capacity as Chief of Police,         )
          Defendants.                )
_____      )


DEPOSITION OF BASIL E. HUMPHREY

AUGUST 26, 2010


REPORTED BY:

MONICA M. ARCHULETA, CSR NO. 471

NOTARY PUBLIC

61390721-5535-4f49-9aac-b0c7790bddc8
EXHIBIT # 29-1

1          A.   River of Life.   Yes.

2          Q.   And do you know where that is located?

3          A.   13th and River Street, I think.   I'm

4     not exactly sure of the address.   I know where it

5     is at.   But I'm not sure of the address.   I think

6     13th and River.   But I could be wrong.

7          Q.   So do you remember approximately when

8     you entered the River of Life?

9          A.   I'm not sure.   I'm not sure as far as

10    dates go.

11         Q.   Do you have an approximate year?

12         A.   Four-and-a-half years ago.

13         Q.   So would that have been in 2005?

14         A.   Yeah.   Somewhere around there.   I'm not

15    sure.

16         Q.   Tell me about the program at the River

17    of Life?

18         A.   I felt it wasn't doing no good for me.

19    Plus, it seemed to me like from the time you get

20    up in the morning, until a certain time in the

21    evening, you was constantly being preached at.

22    Religion.   The Bible.   So forth and so forth.

23    And I didn't really feel that all of the

24    preaching had anything to do with trying to help

25    me with the alcohol problem.   And I got tired of

61390721-5535-4f49-9aac-b0c7790bddc8
EXHIBIT # 29-2

1    it and I ended up getting kicked out.

2         Q.  So let me ask you this, then.  When you

3    first went to the River of Life did you enter as

4    a person going into their alcoholism program?

5         A.  Yeah.

6         Q.  And did your daughter drive you there?

7         A.  Yes.

8         Q.  Or how did you get there?

9         A.  My daughter took me there.

10        Q.  So at that time were you homeless?  Or

11   were you living with your daughter?

12        A.  Well, I was living with my daughter.

13   But then, you know, at the ROL, I guess you

14   wouldn't be considered homeless as long as you

15   are there.  But when I got kicked out I was

16   homeless.

17        A.  Because your daughter wouldn't take you

18   back after you got kicked out; is that right?

19        A.  Pretty much.  She was mad because I

20   didn't complete the program.  Like I let her down

21   and whatnot.  She was mad.  And I haven't really

22   talked to her or anything since.

23        Q.  Do you know approximately how long you

24   were in the River of Life alcoholism program?

25        A.  Approximately six months.  Maybe seven

(208)345-9611    M & M COURT REPORTING (208)345-8800  (fax)

61390721-5535-4f49-9aac-b0c7790bddc8
EXHIBIT # 29-3

1    A.   No.  I was kicked out.

2    Q.   And how many days prior to receiving

3  this ticket had you been kicked out of the River

4  of Life?

5    A.   If I remember right, this being the

6  first ticket, it happened on the night I was

7  kicked out.  Same day, but at nighttime.  The

8  very first night I was kicked out, actually

9  homeless, is when I got the first ticket.  The

10 same night of being kicked out.  Because I had

11 nowhere to go.  Didn't even know where to go at

12 that point in time, because I was kicked out of

13 ROL.  And the sanctuary wasn't open then.  The

14 sanctuary didn't open until further on down the

15 line.  So I didn't have nowhere to go.  If I

16 wouldn't have been sleeping there I would have

17 had to find someplace else to camp.  And it would

18 have been illegal.  It just so happens that is

19 where I ended up staying under that tree.

20   Q.   So you think that you were kicked out

21 of River of Life on August 1 of 2007?  Does that

22 sound about right?  If this ticket was on

23 August 2 of 2007, which was in the morning, do

24 you think you got kicked out of River of Life the

25 day just prior to this?

61390721-5535-4f49-9aac-b0c7790bddc8
EXHIBIT # 29-4

Page 63

1      A.   Yeah.

2      Q.   And do you remember the approximate

3   time you got -- you were booted out of River of

4   Life on August 1?

5      A.   Not the exact time.  But it would have

6   probably been -- taking a wild guess, maybe

7   around 6:00.  It is just a wild guess.  Because I

8   worked that day.  And by the time I went back to

9   Labor Max, drank two little Mike's, and got back

10  to the ROL, it had to be probably around 6:00.

11  Give or take.  Somewhere right in there.

12     Q.   6:00 p.m.?

13     A.   Yeah.  In the evening.

14     Q.   And you said you worked how many hours

15  that day for Labor Max?

16     A.   If I remember right, it was like ten

17  hours.  A long day.

18     Q.   What kind of work were you doing for

19  them that day?

20     A.   I can't even remember it was so long

21  ago.  If I remember right -- I don't remember the

22  job itself or where it was.  But if I remember

23  right it was some kind of clean-up job.  Like

24  construction clean-up.  But it didn't involve

25  physical labor.  It was like they would have

(208)345-9611      M & M COURT REPORTING (208)345-8800  (fax)

61390721-5535-4f49-9aac-b0c7790bddc8
EXHIBIT # 29-5

1   **are still under oath?**

2         A.   Um-hmm.

3         Q.   **Yes?**

4         A.   Yes.

5         Q.   **Thank you.   Are you doing okay?**

6         A.   Yes.

7              (Exhibit 2 marked.)

8         Q.   **(BY MS. BILYEU)   I'm going to hand you**

9   **what has been marked as Exhibit 2 to your**

10  **deposition.   It is a complaint that contains two**

11  **pages, just for the record, because I didn't get**

12  **it stapled.**

13             **Do you recognize that complaint?**

14             MR. BELODOFF:   Can you read that?   Do

15  you understand that?

16             THE WITNESS:   Not really.

17        Q.   **(BY MS. BILYEU)   Okay.   Let me talk to**

18  **you about what this is.   And, Howard, if I make**

19  **any misrepresentations, please let me know.   And**

20  **I appreciate you pointing that out for me,**

21  **Mr. Belodoff.**

22             **Mr. Humphrey, what is in front of you**

23  **as Exhibit No. 2 is a complaint that was filed**

24  **with the court on November 14, of 2007 for --**

25  **against you by the State of Idaho for camping in**

1    a public place.  And if you turn to page two of

2    that exhibit, up at the top it indicates that on

3    or about approximately the 18th day of September

4    of '07 in the City of Boise, Ada County, Idaho,

5    that you were camping in a public place.  That

6    being Rose Pond.  And it is states that the

7    person who signed it believes that this was a

8    violation of the Boise City Code 9-10-02.  So

9    that is what that indicates.

10            So do you understand that now?

11       A.  Yeah.

12       Q.  Is that a better clarification for you?

13       A.  Yeah.

14       Q.  So I take it that you don't necessarily

15    recognize the document itself?

16       A.  No.

17       Q.  Does the information that I just read

18    to you assist you in knowing perhaps the

19    approximate date that at least this complaint,

20    which is Exhibit No. 2, was filed against you?

21       A.  Yeah.  Yes.

22       Q.  And you don't seem super sure.  And I'm

23    not trying to trick you or stress you or

24    anything.  So take your time and get a drink of

25    water if you need one.  Okay?

EXHIBIT # 29-7

[Page 73]

1    A.   I'm not exactly sure.

2         MR. BELODOFF:  Valencia, he has

3    testified he has never seen this before.  So I'm

4    not sure that it is fair to ask him what this is

5    in terms of --

6         MS. BILYEU:  I'm not asking him what

7    the complaint is, Howard.  I know he hasn't seen

8    it.  That is why I clarified it for the record.

9    It was obvious he didn't recognize it.  And I

10   understood that he may not have even seen it.  I

11   don't know.

12        MR. BELODOFF:  And he may not even know

13   what the significance of this is.  It's a legal

14   document and I don't really think he knows.

15        **Q.   (BY MS. BILYEU)  Mr. Humphrey, around**

16   **September 18 of 2007 do you recall whether or not**

17   **you were in the Rose Pond area?**

18        A.   I believe I was camping down there.  I

19   had a campsite down there for a while.

20        **Q.   Can you describe for me your campsite?**

21        A.   It was just a spot in the woods that

22   was surrounded by a bunch of trees.  I had it all

23   cleared out.  And I had what personal belongings

24   I had.  A blanket.  So forth and so forth.  And

25   that is where I camped at.  And I can't remember

1    A.   Not that I'm aware of.  Nothing was

2 ever said to me.  That I can remember of, anyhow.

3    **Q.   So were you arrested in about November**

4 **of 2007?**

5    A.   Yeah, I believe so.  I think that is

6 probably why I don't remember the second camping

7 ticket.  Because I thought about it.  And the

8 reason I don't remember getting one is because I

9 didn't get one.  But I got arrested.  I think

10 that is why I don't remember a second camping

11 ticket.  Because I didn't get a ticket.  But I

12 was arrested.

13    **Q.   You were arrested?**

14    A.   Yes.

15    **Q.   And was one of those arrests the ones**

16 **when you were out in front of Corpus Christi?  Or**

17 **do you remember?**

18    A.   I don't remember for sure.  But I think

19 the two in front of Corpus Christi had to do with

20 open containers.  They didn't really say for

21 sure.  The first time it happened he told me open

22 container.  And then he said failure to appear.

23 The second time all he told me was failure to

24 appear.

25    **Q.   So do you remember ever getting**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANET F. BELL, BRIAN S. CARSON, | ) |
| CRAIG FOX, ROBERT MARTIN, | ) |
| LAWRENCE LEE SMITH, ROBERT | ) |
| ANDERSON, and PAMELA S. HAWKES, | ) |
| Plaintiffs, | ) |
| vs. | ) Civil Action No. |
| CITY OF BOISE; BOISE POLICE | ) CIV 09-0540-S-REB |
| DEPARTMENT; and MICHAEL | ) |
| MASTERSON, in his official | ) |
| capacity as Chief of Police, | ) |
| Defendants. | ) |
| ———————————— | ) |

DEPOSITION OF BRIAN CARSON

JULY 1, 2010

REPORTED BY:

BEVERLY A. BENJAMIN, CSR No. 710, RPR

Notary Public

ebea742b-3e92-4e9c-8e35-3ccc7401d758
EXHIBIT # 30-1

1          Q.   Can you tell me other than -- we are

2     taking this deposition today in the jail, aren't

3     we, Ada County Jail?

4          A.   Yes.

5          Q.   So can you tell me where you live other

6     than when you are here in jail.

7          A.   I live with my friend on Rifleman

8     Street.

9          Q.   What is your friend's name?

10         A.   Jeremy Wells.

11         Q.   Can you give me an address.

12         A.   10503 West Rifleman Street.

13         Q.   How long have you lived there with

14    Jeremy?

15         A.   Off and on about four or five months.

16         Q.   Why do you live with Jeremy?

17         A.   He's helping me to try and find work

18    and to help get me a place to stay for a little

19    while, get my stuff in order.

20         Q.   So do you consider that your residence?

21         A.   No.

22         Q.   Where do you consider your residence?

23         A.   Well, I guess that is where I'm

24    staying, so yes, I guess it is, it would be my

25    residence then.

Page 41

1   this citation, of 2009?

2        A.  I didn't attempt to find shelter

3   anywhere.  Well, I didn't try to go to the

4   Sanctuary.

5        Q.  Did you try to go to River of Life?

6        A.  No.  I was still hard barred from

7   there.  I couldn't go there.

8        Q.  So you didn't try to find shelter at a

9   homeless shelter.

10       A.  Right.

11       Q.  So let me make this clear for the

12  record.  On May 5th of 2009 you did not attempt

13  to find shelter at a homeless shelter.

14       A.  I figured they were full, so I didn't

15  even bother going there.

16       Q.  Mr. Carson, have you ever applied for

17  public housing or housing assistance?

18       A.  No, ma'am.

19       Q.  How come?

20       A.  I just haven't.

21       Q.  I'll represent to you that in some of

22  the answers to interrogatories, your response to

23  one interrogatory indicated that you currently

24  receive assistance from a friend who is allowing

25  you to stay in his home while he recuperates from

ebea742b-3e92-4e9c-8e35-3ccc7401d758

EXHIBIT # 30-3

Page 45

1      Q.   You testified earlier that you had

2  regularly stayed at Sanctuary during the winter

3  of 2007; correct?

4      A.   Correct.

5      Q.   Can you explain, after the winter of

6  2007 did you ever stay there on a regular basis

7  at Sanctuary?

8      A.   I did off and on, not very long, a day

9  here, a day there.

10     Q.   And can you explain to me -- so you

11  said a day here and a day there.  Did you ever

12  stay there for an extended period of time at

13  Sanctuary?

14     A.   No.

15     Q.   Can you explain to me a little bit why

16  not?

17     A.   There were some health issues over

18  there, this thing called the Sanctuary crud where

19  everybody would get it, it's a respiratory thing.

20  Once you had it you would have it for like a good

21  month or two, just constant cough.  There was a

22  case of head lice at one point where they would

23  check every single day.  You would have to go in

24  and check in where they would check for head

25  lice.  There was another time when there was a

ebea742b-3e92-4e9c-8e35-3ccc7401d758
EXHIBIT # 30-4

1    bed bug problem, and sleeping on the floor,

2    sometimes I was put in the drunk tank.

3         Q.  Can you explain to me a little bit

4    about the drunk tank at Sanctuary.  This was at

5    Sanctuary; right?

6         A.  Yeah.  They give you like these little

7    thin mats, they look like a puzzle and you put

8    them together like a little puzzle and that is

9    where you sleep at.  It's just a little

10   itty-bitty room, not bigger than this.

11        Q.  Any other conditions about the drunk

12   tank?

13        A.  No.  Just unpleasant.

14        Q.  Can you explain why it was unpleasant?

15        A.  Just really smelly in there, people

16   piss themselves and it's just pretty gross

17   actually.

18        Q.  I'm going to move back to what has been

19   marked as Exhibit 2.  You testified earlier that

20   you had pled guilty to this citation; is that

21   correct?

22        A.  Yeah, I did.

23        Q.  And I believe you also testified that

24   you had a public defender appointed in this case;

25   is that right?

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


JANET F. BELL, BRIAN S.          )

CARSON, CRAIG FOX, ROBERT        )

MARTIN, LAWRENCE LEE SMITH,      )

ROBERT ANDERSON, PAMELA S.       )

HAWKES, JONATHAN LEIGH MILLER,   )

JAMES M. GODFREY, BASIL E.       )

HUMPHREY, and KIRK ROSS,         )

         Plaintiffs,             )

vs.                              )   Case No.

CITY OF BOISE; BOISE POLICE      )   CIV 09-0540-S-REB

DEPARTMENT; and MICHAEL          )

MASTERSON, in his official       )

capacity as Chief of Police,     )

         Defendants.             )

_____ )

   DEPOSITION OF WILLIAM C. RAINFORD, PH.D., LMSW

            AUGUST 13, 2010

REPORTED BY:

JEFF LaMAR, C.S.R. No. 640

Notary Public

8e8fd1b3-d92d-4257-b276-cde722545241
EXHIBIT # 31-1

1          The Urban Institute International

2    Survey of Homeless Assistance Providers estimates

3    that Ada County has somewhere between 6.3 and

4    10 percent of people who are homeless, and that

5    translates to roughly 13,000 to 21,000 homeless

6    people.  I'm not reading, I'm estimating -- or I'm

7    rounding.

8          Q.   Okay.  Let me slow you down just a

9    bit.

10          Are these published reports?

11          A.   They are.  And they're cited here.  So

12    I got them off the Internet.  And they're also

13    down below in the reference section.

14          Q.   Okay.  So I'll let you go on and tell

15    me where you're coming up with your numbers here.

16          A.   Uh-huh.  So the rounded up 13,000 to

17    21,000 homeless people as the estimation for Ada

18    County, majority of homeless people live in large

19    cities where social services are located, as

20    opposed to rural or suburban areas.

21          If 10 percent of the homeless in any

22    U.S. metropolitan city are chronically homeless,

23    then Ada County has a chronically homeless

24    population of between 1,200 to 2,000, rounding,

25    chronically homeless.

8e8fd1b3-d92d-4257-b276-cde722545241
EXHIBIT # 31-2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____

JANET F. BELL, BRIAN S. CARSON,      )
CRAIG FOX, ROBERT MARTIN, LAWRENCE   )
LEE SMITH, ROBERT ANDERSON,          )
PAMELA S. HAWKES, JONATHAN           )   Case No.
LEIGH MILLER, JAMES M. GODFREY,      )   1:09-cv-540-REB
BASIL E. HUMPHREY, and KIRK ROSS,    )
                                     )
                                     )
                    Plaintiffs,      )
                                     )
vs.                                  )
                                     )
CITY OF BOISE; BOISE POLICE          )
DEPARTMENT; and MICHAEL MASTERSON,   )
in his official capacity as          )
Chief of Police,                     )
                                     )
                    Defendants.      )
_____)

DEPOSITION OF THOMAS E. SHULER

Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Tuesday, August 10, 2010
Beginning at 9:00 o'clock a.m.

QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)      Telephone:  (208) 484-6309

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

EXHIBIT # 32
f5fdec46-2696-4efa-a5f1-200d1f0ec096

Page 191

1                    C E R T I F I C A T E

2

3            I, LORI A. PULSIFER, Certified Shorthand Reporter, do

4      hereby certify that:

5            The foregoing proceedings were taken before me, at which

6      time the witness was placed under oath;

7            The testimony and all objections made were recorded

8      stenographically by me and were thereafter transcribed by me;

9            The foregoing is a true and correct record, to the best of
       my
10     skill and ability;

11         Pursuant to request, notification was provided that the

12     deposition is available for review and signature; and

13           I am not a relative or an employee of any attorney, nor am I

14     financially interested in the action.

15           I have hereunto set my hand and seal this 7th day of

16     November 2009.

17

18                         /s/ Lori A. Pulsifer

19                         _____
                           LORI A. PULSIFER, CSR, RDR, CRR
                           Certified LiveNote Reporter
20                         Idaho CSR No. 354

21

22

23

24

25

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 17

1    A.    Patrol for four years.

2    Q.    Patrol where?

3    A.    With Boise City.

4    Q.    On the Bike Patrol Unit, what are your

5    responsibilities?

6    A.    Just in general?

7    Q.    Yes.

8    A.    I wish I brought a Mission Statement for you.

9    Basically, we're police officers.  We are not park

10   rangers or anything else.  We are responsible for the

11   Greenbelt, the parks, and any other duties.

12        We are not confined to those areas.  Obviously,

13   with our bikes, we have specialties that others don't.

14   That's where we are mostly used -- be it downtown, after

15   dark, for the bars, wherever they have special events.

16   It's those kind of things.

17   Q.    Can you explain your daily routine?

18   A.    I'm currently on day shift.  I either come to

19   work at 6:00 or 7:00 in the morning.  I usually come in,

20   do a quick check of the e-mail, see if there is anything

21   important that happened from the last time I worked.

22        I go out on my bike.  I usually go down the

23   Greenbelt, check the parks, looking in restrooms to see

24   if anyone is sleeping in the restrooms, see if there is

25   any trouble in the parks, see if there is branches over

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096

EXHIBIT # 32-3

1    the path.

2            I see a lot of people jogging, running.  Our

3    presence is very important, so we try to get out early

4    and be seen.

5            Then I usually either go through the parks

6    right off the bat, making sure they are safe and well

7    taken care of -- or other problem areas.

8            Then I go through the downtown core and just do

9    that for the rest of the day, listening to the radio and

10   handling any calls that I can handle.

11       Q.   Just to be clear, each morning, as part of your

12   routine, you go and look for people that are sleeping in

13   the various areas that you are on patrol?

14       A.   It doesn't happen every day, but I try to make

15   sure I look at least once or twice a week.

16       Q.   What do you do if you find someone that is

17   sleeping?

18       A.   I make contact with them, depending on where

19   they are and what they are doing, and then deal with it

20   from there.

21       Q.   What does that mean, "deal with it"?

22       A.   Just like anything, I can write a ticket.  I

23   can warn them.  I can let them -- then I usually educate

24   them on what the law is.

25       Q.   Do you have an employment contract with the

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 32

1    Q.   How do you get guidance about those changes in

2    the interim?

3    A.   Usually something will come out over -- like,

4    they will put out an e-mail saying, "Hey, there has been

5    a change."  Then they will say, "Here comes a new

6    Special Order;" and a Special Order will come out

7    updating that.

8    Q.   You will get notice over e-mail first?

9    A.   Right.

10   Q.   And then the official, formal policy --

11   A.   Either notice over e-mail or your sergeant will

12   say, "Hey, we had a meeting.  This is a change that's

13   coming."

14   Q.   Have you ever received any training on how to

15   interact with homeless individuals?

16   A.   Transients?  Transient individuals?

17   Q.   Could you define what you mean by "transient

18   individuals"?

19   A.   My definition of "transient" is a person who

20   is, by choice -- usually, it's by choice -- not in a

21   home or staying in a place.

22       A homeless individual I think more of as a

23   person, due to economic circumstances, other

24   circumstances, who is not in a residence or a place to

25   stay.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096
EXHIBIT # 32-5

1      That's a big part of my job is -- guys, due to

2  alcohol, due to drugs, due to maybe mental illness, are

3  not living -- or have kind of slipped below the rate of

4  society's norm, I guess.

5      Q.   Is it your testimony that any transient

6  individual, as you define it, is on the street by

7  choice?

8      A.   It's just a broad definition but there is --

9  there are two separate groups with maybe some gray area

10  in between.

11      Q.   Can you distinguish for me again if --

12      A.   Do you want me to say the same thing again?

13      Q.   I just want to understand.  If it's a transient

14  individual, in your mind, that person is on the street

15  by choice?  If it's a homeless individual, that

16  person --

17      A.   When I hear "homeless," I think of someone who

18  lost their job, something bad has happened, you know, a

19  domestic situation -- those kind of things.

20      When I think of a transient gentleman --

21  usually, it's a gentleman -- it's usually because that's

22  the kind of lifestyle, either because of -- alcohol

23  abuse, drug abuse, and those kind of things have led

24  them into that.

25      Again, there is some gray area in between.  I

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096
EXHIBIT # 32-6

Page 34

1   usually never would use the word "homeless."  I would

2   usually use the word "transient" for most of my

3   contacts.

4        Q.   Can you differentiate between how you treat a

5   transient and a homeless individual that you encounter

6   on the street?

7        A.   Not usually, no.  Let me take that back.  It

8   all -- everything -- it depends.  There is a lot of

9   discretion in this job.

10       Q.   All right.  In using your discretion, how do

11  you decide whether or not to issue a citation?

12       A.   My job is to stop activity and to, you know,

13  protect and serve.  So whatever I think will work for

14  that is what I do.

15       Q.   Sometimes that involves issuing a citation?

16       A.   Arrest, citation, warning -- those are the big

17  three.

18       Q.   Just going back to where we started before the

19  definition, have you ever received any training

20  regarding how to react with transient individuals?

21       A.   When you first start on the police department,

22  there is a whole laundry list of calls they want you to

23  respond to.

24            Obviously, you start out in patrol.  You are

25  not on a bike.  They want you to go to a murder scene,

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096
EXHIBIT # 32-7

Page 35

1   go to a rape scene, go to a burglary -- everything.  So

2   your field training officer tries to get you involved

3   with everything.

4              So part of that training would be trying to

5   take calls that involve transient individuals.  I can't

6   remember specifics; but I would imagine, during that

7   period of my training, we did probably come into contact

8   with individuals.

9              I was instructed on how to, you know -- this is

10  what to expect and this is -- those kind of things.

11  Since being on the Bike Unit, again usually riding with

12  an individual, at first, you just -- the other

13  officer -- you kind of just watch and learn as you go.

14      Q.    Was your training on how to deal with transient

15  individuals on-the-job training from observing other

16  officers?

17      A.    Yeah.  I don't think there was ever -- we have

18  classes on dealing with folks who have mental illness,

19  you know, and folks who have some medical issues.  I

20  don't ever remember having a formal class on transient

21  individuals.

22      Q.    What about homeless individuals?

23      A.    Again, probably just folks with mental illness,

24  folks with -- folks that -- never any classes

25  specifically on transient or homeless individuals.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096

EXHIBIT # 32-8

Page 36

1    Q.    Have you ever received any written instructions

2  on how to interact with transient or homeless

3  individuals?

4    A.    Written instructions?  I would have to say no.

5  That doesn't mean there wasn't some piece of paper at

6  some point in fifteen years.

7    Q.    Is there any that you recall?

8    A.    I do not recall anything.

9    Q.    Have you ever received any verbal instructions

10  regarding how to interact with transient individuals --

11  verbal instructions from your supervisor?  To clarify,

12  also, the written instructions from your supervisor?

13    A.    Well, from my supervisor -- again, if I'm

14  riding with my sergeant and he says something, I guess

15  that would be verbal instruction.  Again, no specifics

16  come to mind.

17    Q.    Do you recall at any point any specific

18  instructions you got on how to deal with a situation

19  when you come across a transient individual?

20    A.    Just like I said earlier, if I'm riding with

21  someone and we get done with the call and he says, "Hey,

22  could we have done that better?  How could we have done

23  that different?" that's when it would come up.

24    Q.    Do you recall any specific instances when such

25  a conversation occurred?

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 49

1    Q.    Do you keep statistics yearly?

2    A.    Since I joined the bike patrol, I keep track of

3    my mileage and then my statistics for just, like,

4    camping, tobacco -- the couple big ones that we write.

5    Q.    Can you specify which ones you keep records of?

6    A.    Let's see.  Open container, tobacco, camping,

7    littering, youth drug, adult drug, traffic.  Then I just

8    put "miscellaneous" as another column.

9    Q.    Is disorderly conduct one of the categories?

10   A.    I usually put it under "camping."  It's the

11   same thing.

12   Q.    You treat them as the same?

13   A.    Yeah.

14   Q.    Who in the Boise Police Department is

15   specifically responsible for enforcing the Camping

16   Ordinance?

17   A.    I don't -- no one is -- I mean, we, by nature,

18   do; but it's the entire department.  I mean, we enforce

19   everything.  Just because of the nature of our job, we

20   are the ones who it seems to fall on because of where

21   we are.

22   Q.    "We" meaning the bike patrol?

23   A.    The bike patrol, yes, ma'am.

24   Q.    Have you issued more camping citations as a

25   bike patrol officer than as a patrol officer?

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 51

1    Q.   From 2007 forward, have you been working the

2  day shift?

3    A.   Most probably.  I know for, at least, the last,

4  I think, three years I have been on day shift.  2007 is

5  probably a pretty good estimate.

6    Q.   Do you ever come in early for your shift?

7    A.   Sometimes, yes.

8    Q.   Do any other officers come in early for their

9  shift?

10    A.   Yeah.  I mean, it's not unusual but -- yeah.

11  We have discretion.  You know, if you want to work a

12  little early, then you can just kind of shift your

13  schedule around.  You just let our sergeant know what's

14  going on.

15    Q.   Have you ever been instructed to come in early

16  for your shift?

17    A.   We used to -- boy, about seven or eight years

18  ago, I think, once a year we would come in very early,

19  just to try to, basically, go along the Greenbelt and

20  make sure that there weren't people camping.  That was

21  about six or seven years ago, at least.  We haven't done

22  it since then.

23    Q.   You have never had situations where you came in

24  early since 2002 --

25    A.   As a group.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

1    Q.    -- or 2003?

2    A.    As a group.  I want to say 2003 or 2004, I

3  think, was the last time.  Don't hold me to those dates.

4  I'm not 100-percent certain when that was, but I know we

5  haven't done it in a long time.

6    Q.    Have you personally come in early in order to

7  go along the Greenbelt and look for campers?

8    A.    Yes.

9    Q.    When did you do that?

10   A.    Ever since I have been on day shift.

11   Q.    How many times did you do that?

12   A.    We would have to look at my -- when we go on

13  duty, we say we are on duty.  We would have to look at

14  that.  It's not -- I couldn't tell you.

15   Q.    Is it every day?

16   A.    No.

17   Q.    Is it more than ten times in your time on bike

18  patrol?

19   A.    Oh, yeah.  Yeah.  My shift, on paper, is 7:00

20  to 5:00.  I always told my sergeant I could work from

21  6:00 to 4:00.  Because I help coach my daughter's

22  lacrosse team and other things, a lot of times I will

23  come in early so I can do that.

24   Q.    In a given month, how many times do you come in

25  early?

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 83

1  property?

2      A.   I don't recall anything that specifically spoke

3  about that, no.

4      Q.   All right.  You can put the Annual Reports

5  down.

6           Have you ever issued a citation -- let's focus

7  on the old Camping Ordinance -- to a person who was not

8  homeless?

9      A.   I would say, yes, I have.

10     Q.   Do you recall on how many occasions you issued

11  a citation to someone who is not homeless?

12     A.   I have no idea.

13     Q.   Is it the majority of the citations you

14  issued?

15     A.   The majority to whom?

16     Q.   To people that are not homeless?

17     A.   No, that would not be the majority.

18     Q.   Who would be the majority of citations -- who

19  would receive the majority of camping citations?

20     A.   It's the same -- if you don't drive a car, you

21  can't get a speeding ticket.  I guess the majority of

22  the people would be people who are sleeping along the

23  river.

24     Q.   The majority of the people would be people who

25  are --

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

1     A.    Sleeping along the river or the parks.

2     Q.    Sleeping along the river and the parks?  That

3  would be people who are without a home, at least for

4  that night?

5     A.    Whatever brings them down there.  That's

6  usually the case, yes.

7     Q.    You mentioned before that you saw repeat

8  people?

9     A.    Uh-huh.

10    Q.    Normally, when you come across someone, is it

11 someone that you have seen before?

12    A.    Normally, yes.

13    Q.    You have a good sense, when you see someone,

14 whether or not they are homeless?

15    A.    Do I have a sense that they are homeless?  If I

16 have seen them before, I have usually spoken with them.

17 I kind of ask them, "Hey, where are you from?  What's

18 going on?  How's things?"

19          Usually, I try to get a rapport with

20 individuals, kind of find out a little bit about their

21 situation and make sure they know -- you know, "Hey,

22 have you got problems?

23          "Are you lost?  Do you know where the shelters

24 are?  Do you know where to get a meal?  Do you know

25 where you can drink?"  That's a big question a lot of

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 85

1   guys ask.

2       Q.   You know whether they have a home?

3       A.   Yeah.   Just based on their answers, you can

4   pretty much determine it pretty quick.

5       Q.   By "determine it" meaning --

6       A.   Determine --

7       Q.   By "determine it," you mean determine whether

8   or not they have a home?

9       A.   Yes, determine if they are going to stay in a

10  shelter or what they need.

11      Q.   Is there a particular time of day that you

12  usually look for camping violations?

13      A.   Usually, it would be first thing in the

14  morning.

15      Q.   "First thing in the morning" meaning before

16  sunrise?

17      A.   If I'm at work before sunrise, yes.   If not,

18  then first thing in the morning, first thing when I come

19  on.

20      Q.   Why do you look first thing in the morning?

21      A.   People usually don't usually camp in the

22  afternoon.   You sleep, and you get up in the morning.

23  If people are camping, that's when they are there, in

24  the morning.

25      Q.   Just to be clear, if someone is sleeping during

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096
EXHIBIT # 32-15

1    May 19, 2007, Bates No. BC011755.  I'm sorry.  They go

2    in order.

3         A.    There it is.

4         Q.    The second line of this e-mail dated May 19,

5    2007, from you, says, "Came in at 0500 for camper

6    sweep"?

7         A.    Uh-huh.

8         Q.    Can you explain what you mean by "camper

9    sweep"?

10        A.    Well, there is a Camping Ordinance, 9-10-02,

11   which states -- we have already talked about what it

12   states.  So I guess I came in at 5:00 o'clock to check

13   to see if anyone was violating that ordinance.

14        Q.    On this particular day, you came in at 5:00

15   a.m.  Had you come in on other occasions early

16   specifically to check for campers?

17        A.    Occasionally, yeah.  I mean, nothing is set.

18   No times.  Sometimes early.  There was no set schedule,

19   no.

20        Q.    Do you recall how many times you came in early

21   specifically to look for campers?

22        A.    I do not.

23        Q.    Do you know if other officers came in early

24   specifically to look for campers?

25        A.    I do not.

DEPOSITION OF THOMAS E. SHULER  (TAKEN 08.10.10)

1     Q.   It will be given to you.  It's a citation for

2   Pamela Hawkes from May 19, 2007.  It is premarked as

3   Exhibit 13.  We will hand it to you right now.

4     A.   Thank you.

5     Q.   This citation looks like it was issued at 6:45

6   a.m. on May 19, 2007.  Is that how you read that?

7     A.   Yes.

8     Q.   For camping, under 9-10-02?

9     A.   Yeah.

10    Q.   From looking at the citation, can you tell why

11  you went to this particular location?

12    A.   I can't remember if it was on the e-mail.

13  That's just my normal routine -- along the river,

14  through Kathryn Albertson Park, maybe through JD Park,

15  Ann Morrison Park, Rhodes Park -- just hitting those,

16  the big four.

17    Q.   Looking at the next page, BC000002 --

18    A.   Uh-huh.

19    Q.   -- in the "Admissions," the first line, it

20  says, "Came in early on a camper sweep."  Was this

21  citation part of your mission to clear campers out of

22  the parks?

23    A.   Part of my mission to clear -- say that one

24  more time.

25    Q.   Sorry.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 109

1      A.    Could you rephrase that?  I don't understand

2   what you're --

3      Q.    Sure.  Was this citation part of your camper

4   sweep, as you refer to it in the e-mails?

5      A.    Well, I would assume, yes.

6      Q.    And the purpose of the camper sweep, as we

7   discussed, was to clear the parks of campers sleeping in

8   the parks?

9      A.    Yes, ma'am.

10     Q.    Do you recall, on this particular occasion or

11  any other occasions, telling Pamela Hawkes to go to

12  Spokane?

13     A.    I talked to her a lot about it.

14     Q.    Do you recall telling her to go to Spokane?

15     A.    Not ordering her to go to Spokane.  She would

16  tell me about her mom.  Her mom had a job.  She could

17  work with her at a hotel.  I think she wanted to -- her

18  mom was a maid or whatever the correct term is.  She was

19  working in a hotel.

20         She said, "My mom could probably get me a job."

21         Pam and I would talk about it.  I'm, like,

22  "Pam, it seems like a better option.  You know, your mom

23  loves you."

24         I talked to her about it quite a bit; but it

25  wasn't like I was telling her, "You need to leave."  It

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096
EXHIBIT # 32-18

1    was just a friendly conversation.  I felt sorry for her.

2         Q.   Let's look at the citation for Pamela Hawkes

3    from June 10, 2007, marked as Exhibit 14, BC000005 and

4    06.  This looks like it was issued on June 10, 2007, at

5    5:50 a.m.?

6         A.   Uh-huh.

7         Q.   Where was it issued?

8         A.   Ann Morrison Park.

9         Q.   Again, it has "transient" as an address.  Does

10   that mean that she had no --

11        A.   She didn't provide me with an address.

12        Q.   Are you aware of whether Ms. Hawkes had a place

13   to stay on that particular occasion?

14        A.   From my notes, it doesn't mention that, no.

15        Q.   You found her asleep in a sleeping bag?

16        A.   Yes.  That's what the notes say.

17        Q.   Was it your practice to wake people up in the

18   morning when you encountered them sleeping in the

19   parks?

20        A.   Yes.

21        Q.   Were you specifically looking for campers on

22   this particular day when you came across Ms. Hawkes?

23        A.   Again, what I do every morning is I go on the

24   rivers.  I'm looking for whatever I see.  If it's

25   campers, then that's what I deal with.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

1   Q.   Look at what has been premarked as Exhibit 17,
2   BC0111780.  This is July 27, 2007.  We will hand you a
3   copy.  It's an e-mail from you to Mollie Holt and
4   Sergeant Bevier.  This is, in fact, from you; correct?
5   It is from your e-mail account?
6        Are you finished?
7   A.   Yep.
8   Q.   "We are slowly eradicating the overnight
9   sleeping in Rhodes Park."  What do you mean by
10  "eradicating the overnight sleeping"?
11  A.   Well, by getting there early in the morning,
12  citing people or getting them out so they're not
13  sleeping.
14  Q.   Did you find, through your enforcement
15  citation, that there were less sleepers over time in
16  2007?
17  A.   I think, based on the first line, I would
18  surmise that, yes.
19  Q.   The number of sleepers was decreasing?
20  A.   At this point, on the 27th of July, compared to
21  weeks, days, months earlier, apparently, there had been
22  fewer at that point.  That's my observation, according
23  to this.
24  Q.   You also note that, starting around 6:00 a.m.,
25  when the River of Life opens, parks fill with transients

Page 122

1      Q.   Your intention of slowly eradicating the

2  overnight sleeping in Rhodes Park was to clear the park

3  of people sleeping in the park?

4      A.   It's to enforce the park rules.

5      Q.   To enforce the park rules for what purpose?

6      A.   That's what we do; we enforce the park rules.

7      Q.   And, also, to make the park more kid-friendly?

8      A.   Whatever helps to make it transient-friendly,

9  make it kid-friendly, make it useable.  But if it's

10  against the rules to sleep in the park and it's against

11  the rules to speed -- those are the rules.  That's what

12  police officers are for.

13      Q.   My understanding, by saying you want to make

14  the park kid-friendly, is you want to make the park

15  friendly for non-homeless individuals?

16      A.   Yes.

17      Q.   Why did you write "kid-friendly" instead of

18  "user-friendly"?

19      A.   Or "people-friendly?"  Why do we write

20  anything?  I don't know.  I put the word down.  Again, I

21  don't write this thinking of legal scrutiny at the time.

22  When I write an e-mail to somebody, I don't spend two

23  hours reading it, going back over it, and having a

24  lawyer look through it.

25      Q.   Just to be clear, you didn't write

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 124

1   program or do something -- there is steps.

2        I don't know what steps are in order to stay

3   there longer.  I don't know what those are.  That's his

4   verbiage, I think, that he had done his time.

5        Q.   Did you infer that to mean that he could not

6   stay at River of Life on that particular night?

7        A.   I think I determined that he made the decision,

8   based on whatever program or whatever that he was -- he

9   was done.  So he wasn't going to go to another program

10  in order to stay there longer.

11       Q.   Did you specifically ask whether he had the

12  option of staying at River of Life?

13       A.   We would have to check my audiotape.  I don't

14  know.

15       Q.   On the notes you write there, he specifically

16  told you he had no place to stay?

17       A.   That's what the note says, yes.

18       Q.   You issued the citation, even though he told

19  you he had no place to stay?

20       A.   Yes.

21       Q.   Is it your practice to inquire whether or not

22  someone -- at this time, in 2007, was it your practice

23  to inquire whether someone had a place to stay before

24  issuing them a citation?

25       A.   Usually.  I can't say I did it all the time but

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 141

1   posed a danger to you when you found them sleeping?

2       A.   Again, I have got a gun.  I have got all sorts

3   of stuff.  I keep my distance.  People act accordingly.

4   With these two, I don't -- Mr. Bonham drank a lot.  I

5   don't think I ever had to fight with Mr. Bonham.

6            I guess, if I was scared all the time, I

7   wouldn't be a very good police officer.  They were

8   pleasant enough most all of the time.

9       Q.   All right.  I would like to look at the

10  citation for Robert Anderson from September 1, 2007.

11  It's been premarked as Exhibit 23.

12           Are you finished?

13      A.   Yes, ma'am.

14      Q.   This particular citation is for Mr. Anderson

15  from September 1, 2007, 7:03 a.m.  You note in your

16  notes, "Very hidden spot off Eighth Street Extension"?

17      A.   Uh-huh.

18      Q.   Do you recall where this hidden spot was?

19      A.   I would just have to look at my diagram.  I

20  mean, I probably couldn't take you there today but it

21  was just kind of up by -- there's a creek that follows

22  the road.  There's a trail on the other side.

23           Sergeant Bevier got that information from a

24  volunteer and told me about where that is, and then I

25  looked for it.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

1   them talking about lice and stuff.  I don't remember

2   this exact one, no.

3       Q.   Do you remember whether you issued any

4   citations when someone told you there was a lice

5   outbreak at Sanctuary?

6       A.   I have, yes.

7       Q.   Did you ever follow up with Sanctuary to

8   determine whether or not, in fact, there was a lice

9   outbreak?

10      A.   I have spoken to them, yes.

11      Q.   Has Sanctuary confirmed to you that, on

12  occasion, they have lice issues?

13      A.   Oh, yeah.  They have told me about it

14  occasionally, and they go over what their process was to

15  eradicate it.

16      Q.   All right.  On this particular occasion, the

17  individual seems to be telling you that he couldn't

18  sleep at Sanctuary because of the lice outbreak?

19      A.   That was his opinion.  Again, I have people

20  tell me that all the time.  I will go talk to Sanctuary;

21  and they will be, like, "We don't have a lice outbreak

22  at this time."  I take everything with a grain of salt.

23      Q.   You issue the citation before you talk to the

24  shelter?

25      A.   Yeah.  I can't -- if I leave, I'm never going

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

Page 178

1    A.   Well, there's numerous shelters available.  I

2  assume, if every one of them is full, and we know they

3  are all full, then you would not be able to cite on

4  public property.

5    Q.   How do you find out if they are full or not?

6    A.   I think we have a system now, if they are full,

7  we receive an e-mail overnight that says that the

8  Sanctuary is full; River of Life is full; the women's

9  shelter is full -- those kind of things.

10    Q.   Do you receive one for each shelter?

11    A.   You know, I don't think I have ever -- I don't

12  think there has ever been more than one full at any one

13  time.  I don't ever remember seeing two or three

14  listed.

15    Q.   If you receive that e-mail saying, for example,

16  "Sanctuary is full," do you still issue a citation if

17  you didn't get it for every single shelter?

18    A.   I haven't, but that doesn't mean I wouldn't.  I

19  haven't, no.

20    Q.   You haven't issued --

21    A.   No.

22    Q.   Do you remember specific occasions where you

23  received an e-mail saying a shelter was full?

24    A.   Yes.

25    Q.   Do you remember how many times?

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

f5fdec46-2696-4efa-a5f1-200d1f0ec096

EXHIBIT # 32-25

Page 182

1    Q.   All right.   I would like to turn your attention

2 to an e-mail from December 17, 2009, from Clair Walker.

3 It's Exhibit 36.   It is BC003458.   It should be close to

4 the back but not the very back.

5       This has been premarked as Exhibit 36.   This is

6 an e-mail from Clair Walker dated December 17, 2009, to

7 Officers Dotson, Johnson, Walker, O'Rourk, Gutierrez,

8 and you, Mr. Shuler -- or Officer Shuler regarding

9 camping training clarification.   It is Bates No.

10 BC003458.

11   A.   Uh-huh.

12   Q.   Just take a minute to review this.

13   A.   Okay.

14   Q.   Do you remember receiving this e-mail?

15   A.   I don't.   Yeah.   I don't remember receiving

16 this.   That doesn't mean I didn't, but I don't remember

17 this.

18   Q.   This doesn't refresh your recollection about

19 the advisory going to the entire BPD e-mail system?

20   A.   No.   I just know I get it.

21   Q.   The first line here says, "The above overnight

22 shelters will call Boise State University Dispatch" --

23 it gives the phone number -- "when any of the respective

24 overnight shelters reach full-space capacity."

25       Did you have any discussions with anyone about

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

EXHIBIT # 32-26
f5fdec46-2696-4efa-a5f1-200d1f0ec096

Page 183

1    what "full-space capacity" means?

2        A.    I didn't, no.

3        Q.    Do you have an understanding of what

4    "full-space capacity" means?

5        A.    I would be speculating what their internal

6    definition is.

7        Q.    You don't have any personal knowledge of what

8    that means?

9        A.    No.

10       Q.    Let's look at Exhibit 37, Bates No. BC003480.

11   We're almost done.

12       A.    When you start pulling 50s and 60s out, I'm

13   going to --

14       Q.    I promise; we're getting close.

15             This has been premarked as Exhibit 37.  This is

16   a training sign-in sheet, from what I can tell.

17       A.    Uh-huh.

18       Q.    It says, "Camping Ordinance Training."  It

19   lists the instructor as you, Shuler.  Is this your

20   handwriting?

21       A.    Well, the name looks -- well, yeah.  That looks

22   like my handwriting.

23       Q.    Do you recall leading a training on January 13,

24   2010?

25       A.    Yeah.  These are all of the resource officers.

DEPOSITION OF THOMAS E. SHULER (TAKEN 08.10.10)

EXHIBIT # 32-27
f5fdec46-2696-4efa-a5f1-200d1f0ec096

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

---

JANET F. BELL, BRIAN S. CARSON,    )
CRAIG FOX, ROBERT MARTIN, LAWRENCE )
LEE SMITH, ROBERT ANDERSON,        )
PAMELA S. HAWKES, JONATHAN         )   Case No.
LEIGH MILLER, JAMES M. GODFREY,    )   1:09-cv-540-REB
BASIL E. HUMPHREY, and KIRK ROSS,  )
                                   )
                                   )
                    Plaintiffs,    )
                                   )
vs.                                )
                                   )
CITY OF BOISE; BOISE POLICE        )
DEPARTMENT; and MICHAEL MASTERSON, )
in his official capacity as        )
Chief of Police,                   )
                                   )
                    Defendants.    )
                                   )

---

DEPOSITION OF ANDREW S. JOHNSON

Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Tuesday, August 10, 2010
Beginning at 9:00 o'clock a.m.

QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)          Telephone:  (208) 484-6309

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33

561bad20-64c7-4a39-bb09-207dbb973587

Page 139

1                    C E R T I F I C A T E

2

3          I, LORI A. PULSIFER, Certified Shorthand Reporter, do

4     hereby certify that:

5          The foregoing proceedings were taken before me, at which

6     time the witness was placed under oath;

7          The testimony and all objections made were recorded

8     stenographically by me and were thereafter transcribed by me;

9          The foregoing is a true and correct record, to the best of
      my
10    skill and ability;

11       Pursuant to request, notification was provided that the

12    deposition is available for review and signature; and

13         I am not a relative or an employee of any attorney, nor am I

14    financially interested in the action.

15         I have hereunto set my hand and seal this 10th day of

16    September 2010.

17

18         /s/ Lori A. Pulsifer

19                   _____
                     LORI A. PULSIFER, CSR, RDR, CRR
20                   Certified LiveNote Reporter
                     Idaho CSR No. 354

21

22

23

24

25

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-2
561bad20-64c7-4a39-bb09-207dbb973587

Page 19

1      Q.    Does the number of citations you issue play any
2  role in your compensation?
3      A.    No.
4      Q.    And do you receive any bonuses or any other
5  rewards based on the number of citations you issue?
6      A.    No.
7      Q.    Thank you.
8            We are going to begin by talking about the
9  Camping Ordinance, Section 9-10-02.  What sort of
10  written guidance have you received on how to enforce the
11  Camping Ordinance?
12     A.    What type of written --
13     Q.    Written guidance?
14     A.    None that I'm aware of.
15     Q.    I am going to have you take a look at what has
16  previously been marked as Exhibits 2 through 5 -- so it
17  is 2, 3, 4, and 5.  These are the Policy and Procedure
18  Manuals for the Boise Police Department for the years
19  2003, 2005, 2007, and 2009.
20            Actually, let me back-track a little bit.  What
21  sort of written guidance do you receive, generally, on
22  how to conduct yourself as a police officer?
23     A.    The policy manual.
24     Q.    The policy manual.  Are there any other written
25  sources of written policy?

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-3
561bad20-64c7-4a39-bb09-207dbb973587

Page 28

1      Q.    Other than right here?

2      A.    Well, the code book.  I think that allows -- it

3  is written as an omission, I guess, that you can sleep

4  in the park during daylight hours.

5      Q.    Where in the code book is that written?  Do you

6  know?

7      A.    No.

8      Q.    Prior to the adoption of the Special Order, was

9  there any exception, in terms of giving citations to

10 people when they did not have available shelter?

11     A.    Say that again.

12     Q.    Sorry.  Prior to the adoption of this Special

13 Order, how would the availability of shelter impact

14 whether someone would be cited for camping or sleeping

15 outdoors?

16     A.    The impact of shelter wouldn't have a bearing

17 on whether they received a citation for camping.

18     Q.    Are there any other ways that this Special

19 Order alters the enforcement of the Camping Ordinance?

20     A.    Other than the availability of shelter?

21     Q.    Yes.

22     A.    I believe the biggest change for us is the

23 availability of shelter, now that we are made aware

24 whether shelter is available or not.  We don't write

25 them citations if there's not shelter available.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-4
561bad20-64c7-4a39-bb09-207dbb973587

1    Q.   Prior to 2009 when the Special Order --

2         MS. BILYEU:   I think she is done with that for

3    now.

4         MS. JOHNSON:   I'm done with those for now, yes.

5    Thank you.

6    Q.   Can you take a look at Exhibit 6?   This is a

7    copy of the Revised Camping Ordinance that was passed on

8    November 10, 2009, by the Boise City Council.

9         Prior to November 10, 2009, when this ordinance

10   took effect -- when this amended ordinance took

11   effect -- excuse me -- did the statute contain any

12   definition of "camping"?

13   A.   I don't believe so.

14   Q.   Prior to November of 2009, how did you define

15   "camping"?

16   A.   However it was described under the code at that

17   time.

18   Q.   What was your understanding of what behaviors

19   would violate the Camping Ordinance?

20   A.   I'm not trying to be argumentative, but however

21   the code was written at that time -- I would read the

22   code.   If it fit, I would make my determination based on

23   what I saw.

24        I can't paint a picture for you of a nice scene

25   of what I saw out there.   I mean, that's why we are

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-5
561bad20-64c7-4a39-bb09-207dbb973587

1   given discretion.   That's why we are given discretion,

2   because it runs from black to white.   I mean, I don't

3   understand it just one way.

4         Q.   Would somebody who is merely sleeping outdoors

5   violate the Camping Ordinance?

6         A.   No, not necessary.

7         Q.   Are there circumstances under which someone who

8   is merely sleeping outside would violate the Camping

9   Ordinance?

10        A.   Possibly.

11        Q.   Can you give me an example?

12        A.   I could make something up.   I haven't come

13   across it, though.   I could do my best to make something

14   up for you.

15        Q.   So you have never encountered anybody who was

16   merely sleeping and violating the Camping Ordinance?

17        A.   I don't recall.

18        Q.   You have no recollection.   Okay.

19             Would somebody sleeping in a tent violate the

20   Camping Ordinance?

21        A.   It's possible.

22        Q.   Are there any instances in which they would not

23   be violating the Camping Ordinance?

24        A.   Yes.

25        Q.   Can you articulate those?

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-6
561bad20-64c7-4a39-bb09-207dbb973587

Page 37

1   refuses to go and chooses -- they want to stay in the

2   park, versus someone who is seeking help and doesn't

3   know, who needs help, and is wanting to go to a shelter

4   or really -- really just doesn't know.

5           I try and help people out as much as I can.  So

6   you have got camping, either way.  You know, I use a lot

7   of discretion.  So is it camping?  Yes.

8           But, you know, the totality of the

9   circumstances -- by the letter of the law, it could be.

10  But I don't really think it is.  I think it's a person

11  who is stuck and needs help.

12      Q.   So I just want to make sure I understand what

13  you are saying correctly.  So would you say that

14  somebody who is sleeping in a sleeping bag is violating

15  the letter of the Camping Ordinance?

16      A.   In a park or by the river, in a public place?

17      Q.   Yes.

18      A.   I would say they are.

19      Q.   And you have made that determination based on

20  your common sense understanding of camping?

21      A.   I make my determination based on the totality

22  of the circumstances, my training, just my experience on

23  the department, and kind of going along with how things

24  are done.

25      Q.   At this point, I am not asking whether or not

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-7
561bad20-64c7-4a39-bb09-207db5973587

1   you would give a citation but whether or not you believe

2   that the letter of the law has been violated.

3          So I believe I understand you to say, if

4   someone is sleeping in a sleeping bag, the letter of the

5   law has been violated; and whether or not you would

6   issue a citation is based on your discretion?  Is that

7   correct?

8          MS. BILYEU:  I am going to object.  I think

9   that his testimony was that sleeping in a sleeping bag

10  may or may not be violating the law, depending on the

11  totality of the circumstances.

12         THE WITNESS:  That's more accurate.

13  BY MS. JOHNSON:

14     Q.   Thank you.

15         Have you received any specific training with

16  respect to when to issue a citation under the Camping

17  Ordinance?

18     A.   No.

19     Q.   When you joined the force in 2000, were you

20  given any sort of training at that point with respect to

21  the Camping Ordinance?

22     A.   No more training than on any other general

23  misdemeanors.

24     Q.   So what did that general training consist of?

25     A.   If you ran into a violation, they would just

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-8
561bad20-64c7-4a39-bb09-207dbb973587

Page 39

1    explain to you what you are seeing and what the

2    applicable law is at that time.

3            You know, like, if it was a battery in progress

4    or a theft or anything you encounter in your training,

5    your training officer would explain to you what you are

6    seeing, how to handle it, and how it's been handled by

7    the department.

8        Q.    That was on-the-job training?

9        A.    Correct.   Field training.

10       Q.    Field training.   Thank you.

11           Did you have any training sessions on the

12   Camping Ordinance when you joined the force in 2000?

13       A.    What do you mean by "training sessions"?   A

14   class?

15       Q.    Yes.

16       A.    No.

17       Q.    Did you have any such training when you joined

18   the Bike Patrol Unit?

19       A.    A special class?

20       Q.    Yes.

21       A.    No.

22       Q.    Did you receive any special field training with

23   respect to the Camping Ordinance when you joined the

24   Bike Patrol Unit?

25       A.    No.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-9
561bad20-64c7-4a39-bb09-207dbb973587

1    Q.   So at any point, have you ever received any

2  training, aside from your field training, with respect

3  to the Camping Ordinance?

4    A.   Not that I recall.

5    Q.   So you have no recollection of such training?

6    A.   Correct.

7    Q.   Do you recall any specific field training on

8  the Camping Ordinance?

9    A.   No.

10   Q.   So it's fair to say you don't recall any

11  training on the Camping Ordinance?

12   A.   Correct.

13   Q.   Thank you.

14       After the new version of the Camping Ordinance

15  passed in November of 2009, have you since received any

16  training on the Camping Ordinance?

17   A.   I believe we sat around and talked about it.   I

18  don't know if it was a formal class or training.

19   Q.   Did you lead any such training?

20   A.   Not as an instructor, no.

21   Q.   Were you initially scheduled to lead such

22  training?

23   A.   I gave a talking-briefing.  I don't know --

24  again, not a formal instruction but just making people

25  aware that the code was there and telling them where to

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-10
561bad20-64c7-4a39-bb09-207dbb973587

1    find it, how to access it, and that it was now in

2    force.

3         Q.    Who did you tell?

4         A.    Patrol officers.

5         Q.    Do you recall when that briefing occurred?

6         A.    No.

7         Q.    Do you recall if that briefing was mandatory

8    for the patrol officers?

9         A.    Briefings are mandatory at the beginning of the

10   shift.  Mandatory to the point where -- it's the start

11   of the day.  If guys don't just show up, they just catch

12   up later.  It's not like there is a penalty for missing

13   it.

14        Q.    When you say "we" sat around and talked about

15   the new version of the ordinance, who is "we"?

16        A.    The bike officers.

17        Q.    How often did you talk with them about it?

18        A.    I don't recall.

19        Q.    Do you recall what was discussed -- the

20   specifics?

21        A.    The new code.

22        Q.    Do you recall if all of the bike patrol

23   officers were there?

24        A.    I don't.

25             MS. BILYEU:  Is this a good time for a little

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-11
561bad20-64c7-4a39-bb09-207d bb973587

Page 42

1    break?

2              MS. JOHNSON:  It is.

3                        (Break taken.)

4    (Exhibit Nos. 43 and 44 were marked for identification.)

5    BY MS. JOHNSON:

6         Q.   If you can, take a look at Exhibit 44 and let

7    me know when you're ready.

8         A.   I'm ready.

9         Q.   Exhibit 44 is titled "Briefing, Training, New

10   Camping Ordinance, Important Points To Be Covered."  It

11   has what appears to be a list of classes.

12              If you can, take a look at the first page,

13   Bates No. BC008729.  Were these points you covered in

14   the briefing you conducted with patrol officers?

15        A.   I may or may not have hit on some or all of

16   them.

17        Q.   Do you recall whether you discussed the

18   background and the lawsuit?

19        A.   I don't know which ones I hit on and which ones

20   I didn't.

21        Q.   I will ask you about each one in particular.

22        A.   Okay.

23        Q.   You can tell me if you recall speaking to those

24   points.  Do you recall speaking to the background of the

25   new Camping Ordinance or to the lawsuit?

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-12
561bad20-64c7-4a39-bb09-207dbb973587

1    A.    I don't recall, but I probably did.

2    Q.    The next one listed is camping in public,

3  sleeping in public.  Do you recall what you discussed on

4  those points?

5    A.    No.

6    Q.    Do you recall whether you defined those

7  violations?

8    A.    No.

9    Q.    Did you hand out a copy of the code and review

10 it?

11   A.    I don't recall.

12   Q.    Did you discuss the new definition of

13 "camping"?

14   A.    I may have read that.

15   Q.    Do you mean you may have read it outloud?

16   A.    Yes.

17   Q.    But you don't recall whether or not you did

18 that?

19   A.    No.

20   Q.    And did you discuss the intent of the

21 ordinance?

22   A.    I don't recall.

23   Q.    Did you discuss the shelter capacity

24 protocol?

25   A.    Yes.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)    EXHIBIT # 33-13

561bad20-64c7-4a39-bb09-207dbb973587

Page 44

1    Q.   Can you tell me what you discussed on that

2  point?

3    A.   I don't recall.   I believe -- I do recall --

4  yes.   I recall one point.   They would get an MDT

5  message, which is the computer in their car.   They would

6  get a message in their car if the shelters were full.

7    Q.   And did you discuss how the shelters determine

8  whether or not they are full?

9    A.   No.

10    Q.   Or what that means for the shelters to be

11  full?

12    A.   No.

13    Q.   Did you instruct the patrol officers not to

14  call the BSU --

15    A.   Boise State University.

16    Q.   Thank you.

17    A.   Yes.

18    Q.   And did you instruct them not to call the

19  shelters?

20    A.   I don't recall.

21    Q.   Did you discuss when officers would be notified

22  if shelters were full?

23    A.   Say that again.

24    Q.   I'm sorry.   The last point says, "Will only be

25  notified if all shelters are full."   Is that accurate?

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-14
561bad20-64c7-4a39-bb09-207dbb973587

Page 48

1    before?

2        A.   Yes.

3        Q.   If you encounter someone camping or -- excuse

4    me -- sleeping in the evening, at the end of your shift,

5    would you consider writing them a citation?

6        A.   Yes.

7        Q.   Would you check your e-mail to determine if

8    shelters are full?

9        A.   That wouldn't be practical, no.

10       Q.   So you wouldn't take any steps before issuing a

11   citation to determine whether or not there is shelter

12   capacity -- or whether there is available shelter?

13       A.   At this time of year, I haven't had the need to

14   do that.  No.

15       Q.   When you say you haven't had the need, can you

16   explain that a little bit further?

17       A.   Because the sun hasn't gone down on my shift to

18   where someone would be camping.  It's been daylight

19   hours on my shift, thus far.  I haven't encountered that

20   situation yet.  I haven't encountered that yet.

21       Q.   You haven't encountered anyone sleeping

22   outdoors?

23            MS. BILYEU:  Objection.  That's not what he

24   said.  He said he hasn't encountered the situation that

25   you were specifying, not that he hasn't encountered

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-15
561bad20-64c7-4a39-bb09-207dbb973587

Page 55

1    Q.    Did you keep any statistics?

2    A.    I keep no statistics whatsoever.

3    Q.    Are you required to report the number of

4    citations or the type of citations you write every day?

5    A.    No.

6    Q.    Who would you say the Camping Ordinance is

7    primarily enforced against?

8    A.    People who illegally camp in the parks.

9    Q.    Would you say there is a particular type of

10   person that, more often than not, gets those citations?

11   A.    I don't believe so.  I don't know.

12   Q.    Is it your understanding that the homeless more

13   often get these citations than the non-homeless?

14   A.    In my personal experience, unfortunately, that

15   seems to be the case.

16   Q.    Are there any other characteristics of the

17   people who are cited that you have noticed?

18   A.    I've cited people who give me addresses.  What

19   their demographic is I don't know.  I don't keep

20   statistics.  I don't try to take notice of those things.

21   Q.    When people have given addresses, do you know

22   if these are the addresses of homeless shelters?

23   A.    I'm familiar with almost all of the addresses

24   of homeless shelters in the city.  I recognize most of

25   the homeless shelter addresses, yes.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)    EXHIBIT # 33-16

561bad20-64c7-4a39-bb09-207dbb973587

1    against a certain type of person?

2        A.   I don't keep track of what type of person they

3    are enforced against.   If someone is breaking the law,

4    they are breaking the law.   I don't pick and choose who

5    does that.

6        Q.   With respect to citations you issued under the

7    camping or disorderly conduct statutes, have the persons

8    you have cited generally had home addresses?

9        A.   Probably, more often, they have not.

10       Q.   They have not had addresses.   Okay.

11            And would you say that homeless individuals get

12   more camping citations than non-homeless individuals?

13       A.   Unknown.

14       Q.   I'm sorry?

15       A.   Unknown.   I could speculate for you, if you

16   would like.

17       Q.   In your experience?

18       A.   I have very limited experience with camping.

19   In my experience with the citations I have written, yes.

20       Q.   I am going to give you exhibits marked 45, 46,

21   and 47.   If you can, review those and let me know when

22   you are ready.

23            MS. BILYEU:   Take your time.

24   BY MS. JOHNSON:

25       Q.   If you can, take a look at Exhibit 45 for me.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-17
561bad20-64c7-4a39-bb09-207dbb973587

1  them what's available in town, offer them the addresses,

2  phone numbers, and write it down for them, like I

3  generally do.

4      Q.   If a person indicated that they were not able

5  to stay at the shelter for any reason, what would you

6  do?

7      A.   I would try to find out why, if they were

8  kicked out or if they really just don't want to go.

9      Q.   If they had been kicked out, would you issue a

10  citation?

11      A.   If they were in violation of the law and they

12  were kicked out, I probably would, yes.

13      Q.   Would you attempt to contact the shelter to

14  verify any statements they made?

15      A.   No.

16      Q.   If they stated that they were not able to stay

17  in the shelter because there was no space available for

18  them or no bed available for them, would you still issue

19  the citation?

20      A.   No.

21      Q.   Would you require verification from the shelter

22  before doing so?

23      A.   Are we talking about now that the new ordinance

24  is in effect?

25      Q.   Under the old ordinance.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

EXHIBIT # 33-18
561bad20-64c7-4a39-bb09-207dbb973587

Page 67

1    A.   Repeat the question, please.

2    Q.   Under the old ordinance, if they indicated they

3  could not stay at the shelters because there was no bed

4  space available, would you still issue a citation?

5    A.   Generally, yes.

6    Q.   Would you contact the shelters to confirm or

7  verify whether a space was available before doing so?

8    A.   No.

9    Q.   And under the new ordinance, if somebody

10 indicated that there was no space available at the

11 shelter, would you issue a citation now, under the new

12 ordinance?

13   A.   It would depend on whether I had knowledge of

14 the shelters being full or not.

15   Q.   If you had no knowledge, because you had not

16 checked your e-mail, would you contact the shelters to

17 determine if they were full?

18   A.   Well, I would hope I wouldn't be remiss in my

19 duties.  I check my e-mails every day.  So I haven't run

20 into it.  I don't know.

21        I wouldn't base my decision on someone's word

22 because, generally, people aren't quite as honest with

23 me as I would like them to be.  I wouldn't take

24 someone's word for it.

25   Q.   If, because of timing, you had not checked your

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)   EXHIBIT # 33-19

561bad20-64c7-4a39-bb09-207dbb973587

Page 78

1    Q.    Do you read the reports that other bike

2  officers send?

3    A.    Most of the time.

4    Q.    What is your personal practice of writing these

5  e-mails?  Do you write them at the end of your shift?

6    A.    Generally.

7    Q.    Are there times when you write them later?

8    A.    Yes.

9    Q.    How much later might you write them?

10    A.    The next day.

11    Q.    So, typically, you write your daily reports at

12  the end of your shift or maybe the next day; is that

13  correct?

14    A.    Or maybe the end of the week.  I might skip a

15  few days.

16    Q.    Generally, do you write them the day of your

17  shift?

18    A.    Generally, yes.

19    Q.    And what do these daily reports include?

20    A.    What I've done for the day.

21    Q.    Do these include events that happened during

22  your shift?

23    A.    Yes.

24    Q.    Do these include a record of citations you've

25  issued?

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

Page 79

1    A.   Sometimes.

2    Q.   Generally, would you say that these are a

3 record of what has occurred on your shift each day?

4    A.   I wouldn't call them a record.

5    Q.   What would you call them?

6    A.   A synopsis.  It highlights, sometimes, the

7 funny things that happen or important information.

8    Q.   The important things that happen on your shift?

9    A.   No.  I would call it a synopsis of the things

10 that happen.  Sometimes important information.

11 Sometimes the funny things.  Sometimes things that are

12 notable.

13   Q.   Would you omit important information that

14 happened on your shift?

15   A.   Yes.

16   Q.   In what circumstances would you omit such

17 important information?

18   A.   I can give you an example.  I can't think of a

19 general example.

20   Q.   Please give me an example.

21   A.   When I caught a homicide suspect, I thought it

22 best to leave that information out of the daily because

23 there was an active investigation involving an ongoing

24 homicide investigation by detectives.

25       I would probably leave out names and things

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

1    Q.   Is there any information you have been told not

2  to put in the daily report e-mails?

3    A.   Not that I recall.

4    Q.   Who receives these daily report e-mails?

5    A.   There's a lot of people.  I don't know.

6    Q.   Do you address this to BPD NST Greenbelt

7  Listserv?

8    A.   I address it to what it says here -- BPD NST

9  Greenbelt.  Who is on that list?  I don't know.

10    Q.   In your entire tenure in the Bike Patrol Unit,

11  have you addressed the daily report e-mails to BPD NST

12  Greenbelt Listserv?

13    A.   I don't know what "Listserv" is.

14    Q.   In your entire tenure on the Bike Patrol Unit,

15  have you addressed these daily report e-mails to BPD NST

16  Greenbelt?

17    A.   Yeah.  That's who I address them do -- BPD NST

18  Greenbelt.  That's what I type in the "to" line.  When I

19  do an e-mail, I type in BPD NST, G -- it pops up

20  "Greenbelt."

21    Q.   That's been the same for your entire period of

22  time on the Bike Patrol Unit?

23    A.   I don't know if that's how it started, but

24  that's what I do now.  I don't recall any changes, so I

25  probably started that way.

DEPOSITION OF ANDREW S. JOHNSON (TAKEN 08.10.10)

561bad20-64c7-4a39-bb09-207dbb973587
EXHIBIT # 33-22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

———————————————————

JANET F. BELL, BRIAN S. CARSON, )
CRAIG FOX, ROBERT MARTIN,        )
LAWRENCE LEE SMITH, ROBERT       )
ANDERSON, PAMELA S. HAWKES,      )
JONATHAN LEIGH MILLER, JAMES M. )
GODFREY, BASIL E. HUMPHREY, and  )
KIRK ROSS,                       )
                                 )
              Plaintiffs,        ) Case No.
                                 ) 1:09-CV-00540-REB
vs.                              )
                                 )
CITY OF BOISE; BOISE POLICE      )
DEPARTMENT; and MICHAEL          )
MASTERSON, in his official       )
capacity as Chief of Police,     )
                                 )
              Defendants.        )
———————————————————————————————)


DEPOSITION OF ANTHONY DOTSON


Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Wednesday, August 11, 2010
Beginning at 9:00 o'clock a.m.


QnA COURT REPORTING, LLC
Jeana Reiner, CSR, RPR
Idaho Certificate No. 711
776 East Riverside Drive, Suite 200
Eagle, Idaho 83616
Web:  www.qnacourtreporting.com
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)   Telephone:  (208) 484-6309


DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-1

Page 114

```
1                    C E R T I F I C A T E

2

3           I, Jeana Reiner, Certified Shorthand Reporter, do hereby

4   certify that:

5           The foregoing proceedings were taken before me, at which

6   time the witness was placed under oath;

7           The testimony and all objections made were recorded

8   stenographically by me and were thereafter transcribed by me;

9           The foregoing is a true and correct record, to the best of
    my
10  skill and ability;

11      Pursuant to request, notification was provided that the

12  deposition is available for review and signature; and

13          I am not a relative or an employee of any attorney, nor am I

14  financially interested in the action.

15          I have hereunto set my hand and seal this 29th

16  day of August 2010.

17

18                                  /s/ Jeana Reiner
                           _____
19                         Jeana Reiner, CSR, RPR
                           Certified Shorthand Reporter
20                         Idaho CSR No. 711

21

22

23

24

25
```

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-2

Page 12

1      Q.    What hours did you work?

2      A.    12:00 noon to 10:00 p.m.

3      Q.    How long did you work the swing shift?

4      A.    I don't know.  Year and a half, maybe two

5   years.  Then I'd work a day shift, back to swing shift.

6   We only have two shifts to choose from, so I jumped

7   around from those.  And then I would say for the last

8   four or so I've been on day shift.

9      Q.    What time does the day shift start?

10     A.    7:00 o'clock in the morning.

11     Q.    What time does it finish?

12     A.    5:00 o'clock in the afternoon.

13     Q.    Did you ever go in early?

14     A.    I did on some occasions.

15     Q.    For what reason?

16     A.    To beat the heat.

17     Q.    Any other reason?

18     A.    Not really.

19     Q.    Did you ever go in early specifically to look

20   for campers?

21     A.    Yes.

22     Q.    Did you ever go in early for -- sorry.  Backing

23   up to that question, did you go on the instruction of

24   anyone to look for campers?

25     A.    No.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-3

Page 13

1    Q.    Was it your own decision to do that?

2    A.    Yes.

3    Q.    Did you discuss this decision with anyone?

4    A.    My sergeant.

5    Q.    Your sergeant at the time was?

6    A.    Sergeant Phil Bevier.

7    Q.    At what time frame are you talking about that

8    you would come in early to look for campers?

9    A.    Oh, like 5:00 o'clock in the morning.

10   Q.    What year?  When did you start this practice?

11   A.    I wouldn't say --

12         MS. BILYEU:  Objection to the term "practice."

13   BY MS. O'MALLEY:

14   Q.    When did you start coming in early to look for

15   campers?

16   A.    Do you mean the time that I came in, or what

17   year did I --

18   Q.    What year?  What month?

19   A.    Summer months, four or five years ago.  And I

20   think I've probably done it two summers, maybe three.

21   Q.    How many times per week would you do that in

22   the summertime?

23   A.    It was usually one week.

24   Q.    One week?

25   A.    One work week.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

1     Q.    Are you referring to the special order that

2     took effect January 1st, 2010?

3     A.    That's what I'm referring to.

4     Q.    Can you turn to the back of the manual.  It's a

5     couple pages from the back.  And I'll tell you the

6     number on the bottom.  The Bates number is BC011431.  Is

7     this the special order you were referring to?

8     A.    Yes.

9     Q.    Is there anything else anywhere else in the

10    current manual that addresses interactions with homeless

11    persons?

12    A.    I don't know if it specifically addresses that,

13    but it talks about just treating people fairly, all

14    people.

15    Q.    But nothing specific to homeless individuals?

16    A.    I can't -- this is the one that I recall as

17    being specific.

18    Q.    Do you recall any previous versions of the

19    manual addressing interactions with homeless persons?

20    A.    Not that I recall.

21    Q.    Does the manual address the camping ordinance,

22.   9-10-02?

23    A.    Other than this special order that we're

24    talking about, I don't believe it does.

25    Q.    And it didn't have any previous versions that

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

Page 19

1    addressed the camping ordinance?

2         A.   I don't believe so.

3         Q.   What about the disorderly conduct ordinance;

4    does the manual address that?

5         A.   I don't believe it does specifically.

6         Q.   Have you received any training over the course

7    of your career on how to interact with homeless persons?

8         A.   I have not.

9         Q.   Have you received any training on how to act

10   with mentally ill individuals?

11        A.   I have.

12        Q.   How many times?

13        A.   It's been pretty recently.  I don't even have a

14   number for you.

15        Q.   Do you remember the last training you received?

16        A.   I don't remember it, and I don't remember when

17   it was.

18        Q.   Was it within the last year?

19        A.   I'd have to look at my training record.

20        Q.   Do you remember the substance of the training?

21        A.   In general, yes.

22        Q.   Could you describe that?

23        A.   I believe that it spoke about being able to

24   identify mental illness and treat it as an illness as

25   opposed to criminal conduct.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-6

Page 20

1    Q.   Do you recall what factors would help you

2    identify mental illness?

3    A.   Well, typically if we're dispatched to what

4    they would call 24-hour emergency hold or a mental hold,

5    that kicks into place, the training that we had received

6    about how to deal with those, how we're supposed to

7    handle those types of calls, and the process by which we

8    handle it.  Which hospital to take them to.  Who to

9    call.  That sort of thing.

10   Q.   Did you have any discussions within the context

11   of that training about encountering mentally ill

12   homeless individuals?

13   A.   They didn't differentiate.

14   Q.   Have you ever received any written instructions

15   on how to interact with homeless individuals?

16   A.   No, other than this.

17   Q.   Have you ever received any verbal instructions

18   on how to interact with homeless individuals?

19   A.   No.

20   Q.   Have you ever received any on-the-job training

21   how to interact with homeless individuals?

22   A.   Again, no, other than this special order.

23   Q.   I'm specifically referring here to field

24   training from other officers.

25   A.   No.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

Page 21

1     Q.   How to interact with homeless individuals?

2     A.   No.

3     Q.   Do you read criminal ordinances in the Boise

4 Municipal Code as part of your job?

5     A.   I do.

6     Q.   How often do you read those?

7     A.   Can you be more specific in that question?

8     Q.   Sure.  Every time a new criminal ordinance

9 comes out, do you read the new ordinance immediately

10 upon issuance?

11     A.   Yeah.  If it's made available to me, yes.

12     Q.   How are ordinances made available to you?

13     A.   Well, often we will get legal updates from the

14 City Legal, and there will be a number of new laws that

15 go into effect.  And I scan those and read the ones that

16 I think are going to be pertinent to my level of

17 enforcement.

18     Q.   Did you review the new version of the camping

19 ordinance when it came out?

20     A.   Yes, I did.

21     Q.   Do you remember when you reviewed that?

22     A.   Well, when it came out specifically.  And then

23 I think I was privy to some of the rough drafts prior

24 to.

25     Q.   And just so I make sure, as we continue our

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-8

1    A.   Well, if they are hidden off of a trail tucked

2   into some brush, that is like a natural lean-to, I would

3   think that they are more likely camping there than if

4   they were out in the middle of the greenbelt path.

5    Q.   So if an individual is laying in the middle of

6   the greenbelt path, that would not be camping?

7    A.   Initially, I would ride up and think -- no, I

8   wouldn't think that that would be camping.

9    Q.   And you mentioned a bedroll.  If someone only

10  has the bedroll, under your observations, pre new

11  statute, would that be camping?

12   A.   Totality of the circumstances.  I would have to

13  talk with them and see what they were all about, see

14  what they were doing.  Sometimes they'll tell me that's

15  what they were doing.

16   Q.   Did you require an admission that someone had

17  slept in the area overnight before you issued a

18  citation?

19   A.   I didn't require that.

20   Q.   Did you ask that question?

21   A.   I usually did.

22   Q.   Did you receive any written guidance on what

23  factors to take into account on whether something

24  constituted camping prior to November 2009?

25   A.   No.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-9

1    Q.   Did you receive any verbal guidance on what

2    constituted camping prior to November 2009?

3         MS. BILYEU:  I'm going to object to the extent

4    that it's asking for attorney-client, privileged

5    communications.

6    BY MS. O'MALLEY:

7    Q.   From the police department did you receive any

8    verbal guidance on how to determine whether or not

9    somebody was camping prior to November 2009?

10   A.   No.

11   Q.   From our previous discussion, I take it it's

12   correct that you have issued citations under the camping

13   ordinance; correct?

14   A.   Yes.

15   Q.   And you issued citations before the passage of

16   the new statute?

17   A.   Yes.

18   Q.   Have you issued citations under the currently

19   existing version of the camping ordinance?

20   A.   No.

21   Q.   How come you have not issued any citations

22   under the current statute?

23   A.   I have not felt comfortable doing that.

24   Q.   Why do you not feel comfortable doing that?

25   A.   Because of this very thing that we are

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-10

Page 33

1    A.    I do, if the subject is on public property.

2          MS. BILYEU:   Could we take a quick break?

3          MS. JOHNSON:   Yes.

4          (Break taken.)

5    BY MS. O'MALLEY:

6    Q.    I'd like to talk about enforcement of the

7    camping ordinance prior to the passage of the new

8    ordinance.

9          In the period prior to the passage of the new

10   ordinance, did you ever issue a citation under the

11   camping ordinance to a person who was not homeless?

12   A.    I'd have to look at the actual cites.

13   Q.    Do you have any recollection of issuing a

14   citation to a person who was not homeless?

15   A.    No, I do not.

16   Q.    Is there a particular time of day that you tend

17   to issue most of your camping citations?

18   A.    It would be in the morning hours, because I

19   work the day shift.  And if I was on a swing shift, it

20   would be in the evening hours.

21   Q.    For the current day shift that you work, why

22   would the citations be in the morning?

23   A.    That's typically when I find them camps or

24   people camping.

25   Q.    And what do you mean by find people camping?

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-11

Page 49

1   idea.

2        Q.   Was it hundreds of times over your career?

3        A.   Oh, no.  No.  No.  No.  Usually on the end of

4   my workweek, I'm hot; I'm tired; and I'm ready to go

5   home, and I just don't do one.

6        Q.   So every Saturday we would never find a daily

7   report?

8        A.   No.  I won't say every Saturday.  That is an

9   example of a time when I wouldn't do one.

10        Q.   You write these reports and send them to BPD

11   NST Greenbelt.  Do you know who receives those

12   reports?

13        A.   Not everybody on the list.  I do not know.

14        Q.   Do you know if it includes the bike patrol

15   officers?

16        A.   Yes.  I do know that.

17        Q.   Does it include your immediate supervisor?

18        A.   Yes, it does.

19        Q.   Does it include the chief of police?

20        A.   I don't know if he's on the list, but I'm sure

21   he gets them somehow.

22        Q.   Do you receive daily report e-mails like this

23   from other officers in the bike patrol unit?

24        A.   I do.

25        Q.   Do you read those daily reports from the other

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-12

Page 51

1    Q.   And this records what you encountered in your
2    patrols on June 18th and 19th, 2007; correct?

3    A.   Yes.

4    Q.   Looking particularly at June 19th, the second
5    bullet you say, "Checked all restrooms along the
6    greenbelt and in the core parks.  No sleepers."  Was it
7    part of your regular routine to look for sleepers in the
8    rest rooms and parks along the greenbelt?

9    A.   It's part of my routine.  I don't know how
10   regular I do it, but yeah, I do check them.

11   Q.   Is it something you do every day?

12   A.   No.

13   Q.   Is it something you do every other day?

14   A.   No.

15   Q.   Is it once a month?

16   A.   I don't have an answer for you.  Sometimes I
17   check them.  Sometimes I don't.  I mean I don't have --
18   there is no routine about it.  There is no regular
19   schedule about it.

20   Q.   This particular daily report e-mail you put a
21   date and the word "daily."  Is that your practice on how
22   you format your daily report e-mails?

23   A.   Yes.

24   Q.   Have you always used that format?

25   A.   Yes.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-13

Page 52

1    Q.   Going back to the line of, "Checked all the
2   rest rooms along the greenbelt and the core parks.  No
3   sleepers," do you consider it part of your job on patrol
4   to look for sleepers?

5    A.   Yes.

6    Q.   I'd like to look at what's been premarked as
7   Exhibit 64.  This is an e-mail from you to BPD NST
8   Greenbelt, dated July 10th, 2007, subject line
9   "7-9,10-2007 daily."  Is this also one of your daily
10  reports?

11   A.   Yes.

12   Q.   If you look specifically at your entry covering
13  July 10th, 2007, the second line you note, "Got out
14  early and had no luck with sleepers, campers, early
15  morning OCs, or anything for that matter.  It seemed
16  that on my second pass through an area, people TAs had
17  just appeared."  Could you define for me the term
18  "TA"?

19   A.   Transient American.

20   Q.   What is a transient American?

21   A.   It's a transient.

22   Q.   Could you be more specific on what a transient
23  individual is?

24   A.   A homeless person.

25   Q.   Under your definition, do all homeless

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-14

Page 59

1    Q.    On July 24th, 2007?

2    A.    That's correct.

3    Q.    At 5:15 a.m.?

4    A.    That's correct.

5    Q.    And, again, 5:15 a.m. is before the start of

6    your shift on July 24, 2007; correct?

7    A.    That's correct.

8    Q.    This citation was issued for disorderly

9    conduct?

10   A.    Yes.

11   Q.    And it was the women's rest room, Rhodes Park,

12   Boise?

13   A.    That's correct.

14   Q.    Can you tell me why you issued a citation for

15   disorderly conduct and not camping in this circumstance?

16   A.    Yeah.  I believe that I chose this code because

17   of the location of her being locked inside the women's

18   rest room, inside a building overnight.

19   Q.    Is your differentiation, then, being outside is

20   camping and being in a building is disorderly conduct?

21   A.    I guess in this case I made that distinction.

22   Q.    Was the women's rest room in Rhodes Park

23   private or public property?

24   A.    That's a good question.  I believe that because

25   it's a public rest room in a public park that it's

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-15

Page 60

1    public property.

2         Q.    And you still issued a citation for disorderly

3    conduct on public property?

4         A.    That's correct.

5         Q.    Did you, before issuing the citation, check

6    with a shelter to determine whether Ms. Hawkes had the

7    option of staying in a shelter?

8         A.    I did not.

9         Q.    Did you ask Ms. Hawkes whether she had the

10   option of staying in a shelter?

11        A.    I did not.

12        Q.    And this is, in fact, one day later than the

13   citation we just looked at; correct?

14        A.    That's correct.

15        Q.    Take a look now at what has been marked as

16   Exhibit 69.  This is a citation to Pamela Hawkes on July

17   25th, 2007; correct?

18        A.    That's correct.

19        Q.    This is also your citation and your

20   handwriting?

21        A.    That's correct.

22        Q.    This citation was issued at 5:40 a.m.;

23   correct?

24        A.    That's correct.

25        Q.    And, again, this is before the start of your

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-16

Page 61

1    shift?

2         A.    Yes.

3         Q.    And this is three days in a row of you coming

4    in before the start of your shift; correct?

5         A.    Yes.

6         Q.    And three days in a row of you issuing camping

7    citations before the start of your shift or disorderly

8    conduct citations for sleeping?

9         A.    Yes.

10        Q.    This is, again, in Rhodes Park; correct?

11        A.    It is.

12        Q.    Can you describe the circumstances of why you

13   issued a citation in this case?

14        A.    Well, again, my ticket notes indicate this was

15   and is "the third consecutive morning that I cited

16   defendant (in this park) for violations.  Defendant had

17   two outstanding 1099s," which is the ten code for a

18   warrant.  And I arrested her.

19        Q.    Why did you arrest her on this occasion and not

20   the two previous occasions?

21             MS. BILYEU:  If you recall.

22             THE WITNESS:  Independently, I don't recall;

23   however -- well, can I tell them the conversation you

24   had with me?

25             MS. BILYEU:  No, you can't tell them our

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-17

Page 64

1    Q.   It is written the next day; correct?

2    A.   Yes.

3    Q.   I want to focus your attention on the first

4  dash, "In Shuler early, which has its benefits.  Cooler

5  temps, for one, chance to find sleepers still in the

6  rack.  Case in point to follow."  What did you mean by

7  having benefits coming in early with Shuler?

8    A.   Not with Shuler.  "In Shuler early, which has

9  its benefits."

10   Q.   I apologize.  Can you explain what you mean by

11 "in Shuler early"?

12   A.   Officer Shuler tends to come in early more

13 often than not.

14   Q.   So you are using "Shuler" as an adjective here,

15 I take it?

16   A.   Yes.

17   Q.   So the benefits are what in this case?

18   A.   Cooler temps, and as I wrote, "A chance to find

19 sleepers still in the rack."

20   Q.   So, in your own words, you consider it a

21 benefit to be able to come in early and find sleepers?

22   A.   And to cool off, yes.

23   Q.   And focusing on the second part of that

24 sentence, in your own words, it's a benefit to come in

25 early and find sleepers?

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-18

Page 65

1    A.   Yes.  It is a chance to find sleepers.

2    Q.   In your first sentence you say it's one of the

3  benefits.

4         MS. BILYEU:  I'm going to object.  It's been

5  asked and answered.

6         MS. O'MALLEY:  He's trying to qualify the

7  answer by saying it was a chance.  I'm trying to make

8  clear that, in his own words, it's a benefit.

9         MS. BILYEU:  Objection.  Asked and answered.

10  BY MS. O'MALLEY:

11    Q.   What do you mean "chance to find sleepers still

12  in the rack"?

13    A.   I mean it's a chance to find people that are

14  still asleep.

15    Q.   Why is that a benefit?

16    A.   I don't know that it's necessarily a benefit.

17    Q.   Just to go back to your own language, first

18  sentence says, "In Shuler early, which has its benefits.

19  Cooler temps for one.  A chance to find sleepers still

20  in rack.  Case in point to follow."

21    A.   I guess.

22         MS. BILYEU:  Objection.  Is there a question

23  there?

24         MS. O'MALLEY:  The question is the same

25  question that was posed.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-19

Page 66

1     Can you read back the question that I asked

2  before reading that?

3     (Record read.)

4  BY MS. O'MALLEY:

5     Q.   There's two questions there:  What do you mean

6  "Chance to find sleepers still in the rack," which you

7  answered.  And then my question is why is it a

8  benefit?

9     A.   Well, if they are sleeping in the rack and they

10  are in violation, they would most likely be cited.

11     Q.   Why is it a benefit to be able to issue a

12  citation to a sleeper?

13     A.   It may be semantics, but it's not a benefit.

14  It's the fact that they were in violation and I could

15  issue them a citation.

16     Q.   What is your purpose in issuing citations to an

17  individual still sleeping when you come in early?

18     A.   The purpose would be to change their behavior.

19     Q.   By changing their behavior, you mean to --

20     A.   Seek shelter and not camp out in public or

21  sleep in areas where they are not allowed to be

22  sleeping.

23     Q.   I'd like to look at what's been marked as

24  Exhibit 67.  This is your daily report from July 24th,

25  2007; correct?

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-20

Page 67

1    A.    Yes.

2    Q.    And the four bullet points down, you note, "Pam

3    Hawkes camped out in the women's rest room (Rhodes).

4    Cited and ejected."

5    A.    Yes.

6    Q.    In the daily report you use the term "camped

7    out"; correct?

8    A.    I do.

9    Q.    Yet you issued her a station for disorderly

10   conduct ordinance?

11   A.    I did.

12   Q.    Is there a reason why you used "camped" if she

13   was committing a disorderly conduct violation?

14   A.    There is no reason.  I think the word is just

15   the one that came out and what I typed.

16   Q.    I'd like to look at what's been marked as

17   Exhibit 68.  This is your daily report from July 25th,

18   2007; correct?

19   A.    Yes.

20   Q.    The first line of this e-mail says, "Out early

21   again.  Rhodes Park is still a freak show."  Can you

22   explain what you meant by that?

23   A.    Probably that there was a bunch of people out

24   and about in Rhodes Park.

25   Q.    What kind of people were out and about in

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-21

Page 74

1    2009?

2         A.    Probably not.

3         Q.    So why would you have come in early on October

4    23rd, 2009?

5         A.    Probably looking for campers.

6         Q.    And in the second line, in fact, you say,

7    "Looking for campers in the parking system during the

8    hours of closure"; correct?

9         A.    Uh-huh.

10        Q.    Does that mean that you were hoping to cite

11   individuals for camping while the park was closed?

12        A.    I can't speculate.  I don't recall if I was

13   hoping to cite individuals.  I came in looking for

14   violations; I'm sure.

15        Q.    And you say, "None worthy of cites."  So you

16   did not come across any individuals sleeping in the

17   parks?

18        A.    I don't recall specifically.  Based on that, I

19   probably ran into some and just sent them on their way

20   and warned them about being in the parks during the

21   hours of closure.

22        Q.    The three lines below that you say, "Chased all

23   the TAs around with not much to show for it."  What do

24   you mean by "Chased all the TAs around"?

25        A.    Probably that in my patrolling I saw them,

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-22

Page 75

1   watched them to see what they were doing, and then moved

2   along in my patrolling.

3       Q.   What's your understanding of who has the right

4   to use the parks in Boise?

5       A.   Everybody.

6       Q.   Does that include homeless individuals?

7       A.   Yes.

8       Q.   And in Exhibit 68, which is your daily report

9   from July 25th, 2007, you refer to Rhodes Park as a

10  "freak show."

11          And just to clarify, so I remember correctly,

12  did that have anything to do with the homeless

13  individuals being there?

14      A.   Can you read back what I said?

15      Q.   I can withdraw the question and ask a different

16  one.

17          Focusing on Exhibit 71 instead, sorry, which

18  says, "Rhodes Park is out of control.  The TAs camping

19  out everywhere," why does that cause you any concern if

20  homeless individuals have the same rights to use the

21  parks as anyone else?

22      A.   My observations from this particular date was

23  that it was just unsightly.  It just looked terrible,

24  like I indicated.

25      Q.   I'm sorry.  It looked terrible because homeless

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-23

Page 76

1   individuals are sitting around in the park?

2       A.   No.   Because subjectively I thought that it

3   looked terrible, looked unsightly to me, and that's what

4   I was commenting on.

5       Q.   I guess I'm confused about what you mean by

6   "looking unsightly."   What makes the situation look

7   unsightly?

8       A.   Well, as I described, the hanging around with

9   seemingly nothing to do.   There is absolutely nothing

10  wrong with what they are doing.   It appeared unsightly

11  to me.

12           So, I mean, I don't know how else to explain

13  it.   It was just a feeling that I had.

14      Q.   If you saw like a group of kids skateboarding

15  in the park, would that look unsightly to you?

16      A.   That has looked unsightly to me before, based

17  on the way they dress, the way they are talking, but

18  they are just skateboarders using the park; same

19  thing.

20      Q.   What about individuals just having a picnic in

21  the park; is that unsightly?

22      A.   I have seen some that have made it unsightly,

23  yeah.

24      Q.   But you didn't find it necessary to comment

25  about picnickers or skateboarders in your daily

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-24

Page 86

1    in record that it changed the enforcement.  So I'm just

2    going to object to that term "change."

3    BY MS. O'MALLEY:

4        Q.   Ask you another question:  In your opinion, did

5    the special order change the enforcement of the camping

6    ordinance?

7        A.   It provided for the exception when they are on

8    public property and there is no available overnight

9    shelter.

10       Q.   So in your opinion, did the special order

11   change the enforcement of the camping ordinance?

12       A.   In regards to those exceptions, yes.

13       Q.   Could you elaborate how the special order

14   changed the enforcement of the camping ordinance?

15       A.   Well, after that special order went into

16   effect, if we found somebody that was on public property

17   camping, and there was no available overnight shelter,

18   then we would not issue citations.

19       Q.   I want to back up and talk about a couple terms

20   you just mentioned.  After this special order took

21   effect, what was your understanding of "camping"?  What

22   is your current understanding of "camping"?

23       A.   The same as it's always been with the inclusion

24   of the definition that we now have of "camping."

25       Q.   Does the definition that you have now change

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-25

Page 87

1    how you previously understood the term "camping"?

2        A.    I think it clarifies it and -- well, it

3    clarifies it.

4        Q.    I'd like to look at the actual ordinance,

5    which, I believe, is Exhibit 6 in your -- could you take

6    a look at Exhibit 6, specifically the page No. BC003083.

7        A.    Okay.

8        Q.    Is this the language of the new camping

9    ordinance, 9-10-02?

10       A.    Yes.

11       Q.    The underlying portion defines the term "camp"

12   or "camping"; correct?

13       A.    That's correct.

14       Q.    Was it your understanding, prior to the passage

15   of this ordinance, that camping only applied between

16   sunset and sunrise?

17       A.    No.

18       Q.    What was your understanding as far as the time

19   of day that camping applied prior to the passage of this

20   ordinance?

21       A.    At any time.

22       Q.    Was your understanding?

23       A.    Well, that's what the code was.

24       Q.    Did your understanding of the time of day to

25   which the camping ordinance applies change with the

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-26

Page 92

1    Women and Children, will call Boise State University

2    Dispatch when any of the respective overnight shelters

3    reach full space capacity; correct?

4        A.   Yes.

5        Q.   What is your understanding of "full space

6    capacity"?

7        A.   I don't know what they consider "full space

8    capacity."  I would assume if they don't have anymore

9    room, that it is full.  So that's, I guess, determined

10   by the River of Life and the Sanctuary and the City

11   Light for Women and Children.

12       Q.   And you indicated that you would receive an

13   e-mail if the shelters were full.  Have you, in fact,

14   received such e-mails?

15       A.   Yeah.  They get sent out to the entire

16   department, I believe.  So, yes, I have received those

17   e-mails.

18       Q.   Do you know how much such e-mails you have

19   received?

20       A.   I don't have a number.

21       Q.   Do you know if it's more than 20?

22       A.   If I had to -- well, I don't -- I don't know if

23   it's more than 20.

24       Q.   In your practice, when do you check your

25   e-mails?

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-27

1      A.    I try and check them before I leave the office

2   in the morning, but I don't always do that.  But by and

3   large, that's my practice.

4      Q.    And so if you received any e-mails indicating

5   the shelters were full, would it be before you go out

6   and patrol in the morning?

7      A.    Yes.

8      Q.    Looking again at the special order, which

9   is the back of Exhibit 5, the second paragraph up from

10  the bottom, it starts, "If an individual cannot utilize

11  available space."  Do you see that paragraph?

12     A.    Yes.

13     Q.    The first sentence reads, "If an individual

14  cannot utilize available space because the space is not

15  allowed for or is not suitable to meet the individual's

16  disability needs or the individual has exceeded the

17  maximum allowable stay, then the space cannot be

18  considered available for that individual."

19          What is your understanding of a space not

20  meeting or being "suitable to meet the individual's

21  disability needs"?

22     A.    I don't think I've run across that.

23     Q.    Have you had any conversations with anyone

24  about what this particular sentence in the special order

25  means?

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-28

1       A.    No.

2       Q.    Do you have any independent understanding of

3  what that means?

4       A.    You mean my own take on it?

5       Q.    You're governed by this special order;

6  correct?

7       A.    Yes.

8       Q.    That governs your behavior on whether or not

9  you issue a citation?

10      A.    Yes.

11      Q.    So how do you determine when you come across an

12  individual who has disability needs whether or not a

13  shelter can accommodate that?

14      A.    I haven't come across that to where it has come

15  up.

16      Q.    If you come across a disabled individual, how

17  would you handle that situation?

18      A.    I think I would probably ride over to the

19  shelter, and advise them of who I found, and what their

20  disability was and can they accommodate them.

21      Q.    And the next part of the sentence says, "Or the

22  individual has exceeded the maximum allowable stay."  In

23  your experience, do shelters have maximum periods that

24  individuals can stay there?

25      A.    Yes.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-29

Page 101

1    Q.   Do you have any understanding of why the

2 livestock portion is in the statute?

3    A.   None.

4    Q.   The next bullet point says, "Definition of

5 camping."  What did you discuss about the definition of

6 camping during your briefings?

7    A.   I read to them -- we read their ordinance

8 earlier.  And you basically read the camping definition,

9 and that's what I read to them.  And I indicated that

10 that was just the new definition of "camping" and this

11 was essentially the only change to the current camping

12 law.

13    Q.   Do you recall any additional discussion on the

14 definition of "camping" during those briefings?

15    A.   I recall some of them asking questions about,

16 "Would this be camping?  Would that be camping?"  And I

17 just referred back, as best I could, to the definition

18 to see if that fit into place.

19    And those -- I mean, that's all that took

20 place.  So they were asking me the kind of what-ifs.

21 And I said, "Guys, it's got to fit into the definition.

22 If it doesn't, it's probably not camping."

23    Q.   Do you recall any specific what-ifs and your

24 responses?

25    A.   No.  But I know they were asked.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-30

1     Q.    Your next bullet point is "Policy review and

2  tentative ordinance."  Do you recall what you briefed

3  officers about regarding the policy or the intent of the

4  ordinance?

5     A.    I think at this time we had a rough draft of

6  that special order.  And I just went over that with

7  them, letting them know that this was going to be the

8  new standard.

9     Q.    "Familiarization with shelter capacity

10  protocol."  Is that the document that we looked at

11  previously with the names of the shelters and whether or

12  not they were full?

13     A.    Yes.

14     Q.    Did you hand out that document as part of your

15  training?

16     A.    I did.

17     Q.    And the next one says, "Don't call BSU."  What

18  does that refer to?

19     A.    That if they were to come across a subject and

20  they wanted to know if there was available shelter, they

21  weren't -- the protocol was they were not to call BSU.

22  They would have already had an e-mail indicating whether

23  or not shelter was available.  So if they didn't have an

24  e-mail, then there was shelter available.

25     Q.    Is that the same understanding of the next

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-31

1   bullet point that says, "Don't call shelters"?

2       A.   That's correct.

3       Q.   So as part of your briefing, you instructed

4   officers not to call shelters; correct?

5       A.   For finding out if there was available shelter.

6   They can call them for whatever other reason, but if it

7   is in reference to available shelter in reference to

8   camping or disorderly conduct, they didn't need to --

9   the protocol was that the e-mail would have been sent

10  out.

11      Q.   Just so I understand your answer, the policy is

12  that if there is no e-mail, then the officer should

13  assume that there is available shelter space?

14      A.   That's correct.

15      Q.   And therefore, they have the option of issuing

16  a citation if they choose to do so and the conduct meets

17  the --

18      A.   That's correct.

19      Q.   -- definition or the requirements of the

20  statute?

21      A.   That's correct.

22      Q.   And so the last point says, "Will only be

23  notified if all shelters are full."  What did you

24  discuss in connection with that?

25      A.   Well, I don't recall if it was discussed as

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

EXHIBIT # 34-32

1    Q.    Do you recall any specific guidance you

2  provided to the officers regarding this special order?

3    A.    I remember telling them that it was going to be

4  effective coming up on January 1st, and clarified the

5  public property versus the available shelter.

6    Q.    Did you give any instruction to officers during

7  the three briefings you gave in December 2009 regarding

8  the paragraph that we looked at earlier that discusses

9  disability needs and maximum allowable stay?

10    A.    I'm sorry.  Could you repeat that?

11    Q.    Did you provide any guidance to the officers

12  that you briefed in December 2009 about the paragraph of

13  the special order that discusses disability needs and

14  maximum allowable stay?

15    A.    I think just reading it over to them was all

16  that was discussed on that.

17    Q.    Did you provide any guidance to officers on how

18  to determine whether or not a shelter could meet an

19  individual's disability needs?

20    A.    I don't believe I did.

21    Q.    Did you provide any guidance to officers on how

22  they were supposed to determine whether or not an

23  individual had exceeded his maximum allowable stay at a

24  shelter?

25    A.    I don't believe I did.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-33

1      Q.    Did you yourself receive any training on how to

2   determine whether a shelter could meet an individual's

3   disability needs?

4      A.    I don't think I received specific training on

5   that, no.

6      Q.    Did you yourself receive any specific training

7   on how to determine whether an individual had exceeded

8   his maximum allowable stay at a shelter?

9      A.    I don't believe I did.

10     Q.    In the course of this deposition, is there any

11  question that when I asked it you couldn't recall an

12  answer but you recall it now and would like to provide

13  an answer?

14     A.    No.

15     Q.    Is there any answer that you gave during this

16  deposition that you'd like to clarify or correct now?

17     A.    No.

18     Q.    Is there anything else that you want to share

19  on the subjects that we've been discussing today?

20        MS. BILYEU:  I'm going to object.  You can ask

21  him a pointed question.

22  BY MS. O'MALLEY:

23     Q.    Is there anything specific on the enforcement

24  of the camping ordinance that you want to discuss?

25     A.    No.

DEPOSITION OF ANTHONY DOTSON (TAKEN 08.11.10)

6ec2dfc4-8578-4541-8b8d-4e396b4b7aa5

EXHIBIT # 34-34