UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

———————————

JANET F. BELL, BRIAN S. CARSON,      )
CRAIG FOX, ROBERT MARTIN, LAWRENCE   )
LEE SMITH, ROBERT ANDERSON,          )
PAMELA S. HAWKES, JONATHAN           )   Case No.
LEIGH MILLER, JAMES M. GODFREY,      )   1:09-cv-540-REB
BASIL E. HUMPHREY, and KIRK ROSS,    )
                                     )
                                     )
                 Plaintiffs,         )
                                     )
vs.                                  )
                                     )
CITY OF BOISE; BOISE POLICE          )
DEPARTMENT; and MICHAEL MASTERSON,   )
in his official capacity as          )
Chief of Police,                     )
                                     )
                 Defendants.         )
———————————————————————————————————— )


DEPOSITION OF KEVIN R. O'ROURKE

Law Office of Howard A. Belodoff
1004 West Fort Street
Boise, Idaho

Thursday, August 12, 2010
Beginning at 2:19 o'clock p.m.


QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)      Telephone:  (208) 484-6309


DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-1

Page 122

1                    C E R T I F I C A T E

2

3          I, LORI A. PULSIFER, Certified Shorthand Reporter, do

4    hereby certify that:

5          The foregoing proceedings were taken before me, at which

6    time the witness was placed under oath;

7          The testimony and all objections made were recorded

8    stenographically by me and were thereafter transcribed by me;

9          The foregoing is a true and correct record, to the best of my

10   skill and ability;

11       Pursuant to request, notification was provided that the

12   deposition is available for review and signature; and

13         I am not a relative or an employee of any attorney, nor am I

14   financially interested in the action.

15         I have hereunto set my hand and seal this 12th day of

16   September 2010.

17

18             /s/ Lori A. Pulsifer

19             _____
               LORI A. PULSIFER, CSR, RDR, CRR
               Idaho CSR No. 354
20

21

22

23

24

25

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-2

1    that has informational value to them.

2        Q.   What types of things would you consider to have

3    informational value to the other officers?

4        A.   Where I wrote citations, where I encountered

5    people that were new to town and what their names are,

6    any kind of emergency activity that happened, like if

7    there was a river rescue or something like that, and

8    anything else I think might be interesting to them.

9        Q.   Do you typically write these daily logs or

10   daily report e-mails at the end of your shift?

11       A.   Yes.

12       Q.   Are there occasions when you will write them

13   later?

14       A.   Yes.

15       Q.   How frequently does that occur?

16       A.   Not very frequently now.  It used to be maybe

17   once a week I would write them the next day.  I would

18   put two of them together.

19       Q.   In those instances, though, you did complete a

20   daily log or a daily report for that day?

21       A.   Yes.

22       Q.   When did you become more diligent about

23   completing these at the end of your shift every day?

24       A.   In the last two weeks.

25       Q.   Is there any reason for that?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-3

1    A.    Our sergeant wanted us to make sure we do it
2  every day.
3    Q.    I want to go back a moment to the shifts you
4  have worked.  Have you ever worked the morning shift?
5    A.    Yes.
6    Q.    What hours were those?
7    A.    7:00 in the morning until 5:00 in the
8  afternoon.
9    Q.    And you referred to that earlier as the day
10 shift; correct?
11   A.    Yes.
12   Q.    While on that shift, did you ever arrive
13 earlier than 7:00 a.m.?
14   A.    Yes.
15   Q.    How frequently?
16   A.    Very rarely.
17   Q.    By "very rarely," do you mean once a month?
18   A.    Somewhere around once a month, yes.
19   Q.    What were your reasons for arriving early?
20   A.    Sometimes because I would find indications of a
21 camp somewhere with nobody in it.  I would put a notice
22 on it.  Maybe it was the time of year where it wasn't
23 light at -- or it was light, rather, when I started my
24 shift.  So I would want to go there and see if anybody
25 was at the camp.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-4

1      A.    Yes.

2      Q.    How often has that occurred?

3      A.    Very rarely.  Maybe once a month when I've had

4   to flex my shift.

5      Q.    Is that similar to the frequency for which you

6   have gotten to work early in past years?

7      A.    Yes.

8      Q.    Do you ever arrive on shift before it's light

9   outside?

10      A.    No.  I come on at noon.  Usually, the earliest

11   I would flex in would be 10:00 o'clock, maybe, in the

12   morning.

13      Q.    In prior years when you worked the day shift or

14   the morning shift, did you ever arrive before light?

15      A.    Yes.

16      Q.    How frequently?

17      A.    It depends.  If it was wintertime, it was every

18   day that it was before light.  If it was summertime, it

19   was rarely.  I don't know.  I don't know what you

20   want for an answer on that.  Occasionally, I guess.  I

21   don't know.

22      Q.    During the summer months, on the occasions when

23   you would arrive early, before daylight, was there a

24   reason for the time you chose to come in?

25      A.    Yes.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-5

1    Q.   And what was that reason?

2    A.   Usually, to find campers or camps.

3    Q.   Can you clarify?  Why did you need to arrive

4    before daylight in order to find campers or camps?

5    A.   Because, generally, the people were out of the

6    camps by daylight.

7    Q.   How often are people in Rhodes Park when the

8    lights are on?

9    A.   I can only tell you how often I see them

10   because I don't know if it's every day.  "Frequently" is

11   the only answer I can give you because I don't see -- I

12   don't go by there after dark every night.

13        Even though I go off at 10:00 o'clock, a lot of

14   times it's not dark yet.  I'm in the Bike Substation by

15   9:30 to do all of my other stuff.

16   Q.   What percentage of the time would you say, when

17   you do go past Rhodes Park and the lights are on, there

18   are people in the park?

19   A.   Probably 80 percent of the time.

20   Q.   And what are they doing?

21   A.   Usually skating, skateboarding.

22   Q.   Is it a violation to be in the park at that

23   time after dark?

24   A.   It depends upon your interpretation.  I don't

25   enforce it as being in the park after dark.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-6

1    Q.   Can you explain what you mean by it depending

2    upon the interpretation?

3    A.   There is a code for being in a city park after

4    dark.  It's a violation to be in a city park after dark,

5    but Rhodes Park is a lighted facility.  So if the lights

6    are on, I don't consider it in the park after dark, much

7    as the softball fields up at Ann Morrison Park.

8    Q.   What would you enforce as being in the park

9    after dark?

10    A.   Someone loitering or sleeping or doing other

11    things where they are not moving through a park I would

12    consider in the park after dark, including near the

13    Greenbelt.

14    Q.   Would you cite someone for those activities in

15    Rhodes Park?

16    A.   No.

17    Q.   Are skaters moving through the park?

18    A.   No.  They are moving in the park.  They are not

19    moving through the park.  They are utilizing it.

20    Q.   What you do you mean "moving through the

21    park"?

22    A.   Transiting through the park is the way it's

23    usually put in the code.  They can go through a park.

24    They just can't be in it, just staying in it, stopped,

25    stationary.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-7

Page 38

1    Q.   Let me clarify.  You are saying it's a

2 violation to be in the park but not a violation to be

3 going through the park?

4    A.   Correct.

5    Q.   Would a skateboarder be in the park using the

6 park?

7    A.   Yes.

8    Q.   Would that be a violation?

9    A.   No, because it's a lighted facility.  It's

10 after dark, but it's lit up.

11    Q.   So just to clarify, a skater can be in Rhodes

12 Park after dark if the lights are on?

13    A.   Yes.

14    Q.   Would you cite other people for being in the

15 park at that time?

16    A.   I never have, no.

17    Q.   Would other officers?

18    A.   I don't know.

19    Q.   Does Rhodes Park close at a particular time?

20    A.   No.

21    Q.   Is it open 24 hours a day?

22    A.   As far as I know, yes.

23    Q.   Are the lights on for the entire night?

24    A.   I don't know.

25    Q.   Do you see persons on the Greenbelt after

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-8

1  Q.   Do you understand all of your obligations under

2  the policy and procedures manual?

3  A.   I believe so, yes.

4  Q.   Are there any you do not understand?

5  A.   No.

6  Q.   Please turn to Section 11.03.10.  Excuse me.

7  You are already there; correct?

8  A.   Yes.

9  Q.   This section also requires that employees must

10  be aware of and understand updates to the policy manual;

11  correct?

12  A.   Yes.

13  Q.   Have you ever asked a supervisor for a

14  clarification of any portion of the manual?

15  A.   Probably, yes.

16  Q.   Do you recall specific instances?

17  A.   No, I don't.

18  Q.   I want to clarify one point.  You mentioned

19  updates.  Does that term mean Special Orders?

20  A.   Yes.

21  Q.   Are there any other types of updates?

22  A.   Not that I know of.

23  Q.   Does the current manual address interactions

24  with homeless persons?

25  A.   "The current manual" being this manual?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-9

1     Q.   Yes.

2     A.   Not until we got a policy change, it didn't,

3 no.

4     Q.   So prior to the Special Order that is on page

5 BC011431, did this manual address interactions with

6 homeless persons?

7     A.   No, I don't believe it did.

8     Q.   Do any previous versions of the manual address

9 interactions with homeless persons?

10    A.   Not that I recall.

11    Q.   Please take a look at the special orders that

12 are attached to this version of the manual, Exhibit 5.

13    A.   Okay.

14    Q.   Are these all the special orders or updates

15 that have occurred since this manual was finalized?

16    A.   I'm not sure.

17    Q.   Do you know of any other special orders which

18 are not attached to that version of the policy manual?

19    A.   No, I don't.

20    Q.   Does this version of the manual address the

21 camping ordinance?

22    A.   Yes.

23    Q.   Aside from the Special Order on page BC011431,

24 does this manual address the camping ordinance?

25    A.   I don't believe so, no.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-10

1    Q.   Prior to 2009 when the camping ordinance was

2    amended, had you received any training regarding

3    enforcement of the camping ordinance?

4    A.   No.

5    Q.   Did you receive any such training when you

6    first became a bike patrol officer?

7    A.   No.  I rode with a person who was already on

8    the bike patrol, and I learned from them how they do it.

9    Other than that, no, no formal training.

10    Q.   In that informal training you describe, riding

11    with another officer, what did you learn?

12    A.   I learned locations where people were most

13    likely to be camping and how we place a notice on a camp

14    that was empty so that they can move it.  That's about

15    it, I guess.

16    Q.   Did you receive any guidance on what

17    constitutes camping?

18    A.   Not that I recall, no.

19    Q.   Prior to 2009 when the camping ordinance was

20    amended and the Special Order was put in place, had you

21    received any training on interactions with homeless

22    persons?

23    A.   No.

24    Q.   You never received such training when you

25    became a bike patrol officer?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-11

1    A.    Are you talking about formal training sponsored

2  by the department?

3    Q.    Let's begin with that.

4    A.    No.

5    Q.    Did you receive any informal training on that

6  topic?

7    A.    Other than experienced bike patrol officers and

8  riding with them, no.

9    Q.    What guidance do you get from experienced bike

10  patrol officers on how to interact with the homeless?

11    A.    Basically, just to treat people fairly.  That

12  was it.

13    Q.    You didn't receive any more specific

14  guidance?

15    A.    No.  There was no specific guidance as to, "Do

16  this," or, "Do that," no.

17    Q.    Did you receive any formal training when you

18  first joined the Boise Police Department on how to

19  interact with homeless persons?

20    A.    No.

21    Q.    And did you receive any formal training when

22  you first joined the Boise Police Department on

23  enforcement of the camping ordinance?

24    A.    No.

25    Q.    Are you familiar with the camping ordinance?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

1    A.    Yes.

2    Q.    Prior to the passage of the amended camping

3    ordinance, was there a definition of "camping"?

4    A.    No.

5    Q.    How would you determine if someone was

6    camping?

7    A.    Basically, by the appearance of the camp or the

8    location where they were and the statements of the

9    person who was in that location.

10   Q.    You stated that one of the factors you would

11   consider is the appearance of the camp.  Tell me what

12   you mean by that.

13   A.    Things such as if they have a tarp rolled out

14   and a sleeping bag on the ground and their backpack

15   there -- their positions.  They might have a fire pit.

16   Sometimes they will have a tent.

17         They will have a garbage site where they have

18   garbage on the ground.  Sometimes they will have a

19   little latrine where they go to the bathroom on the

20   ground.  They will have toilet paper on the ground.

21   It's things like that.

22   Q.    Are any of these things you mentioned necessary

23   for something to be a camp?

24   A.    Some of them are.  Not all of them are.

25   Q.    Which ones?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-13

Page 52

1    A.    They have to have some means of sleeping -- a

2    sleeping bag, a place to place the sleeping bag -- and

3    some of their possessions there.  If they were just in a

4    sleeping bag, that alone would not do it.

5    Q.    If somebody had possessions that did not

6    include a sleeping bag or a blanket or something to lie

7    down on, would that be a camp?

8    A.    It depends upon the totality of the

9    circumstances, where it was that they were laying down,

10   if they were asleep.  Things like that.  The weather --

11   if it was really warm, maybe they didn't need a sleeping

12   bag.

13   Q.    If someone were lying down on the ground

14   without any sort of bedding and had some personal

15   belongings with them, would you consider that a camp?

16   A.    Again, it depends.  It could be, yes.

17   Q.    In what circumstances could that be a

18   violation?

19   A.    If they're down by the river in the middle of

20   the night and they are sound asleep and they have got a

21   backpack and nothing else -- they don't have a sleeping

22   bag, maybe, but they're asleep -- that could be camping.

23   Q.    You also mentioned that a person's statements

24   would affect whether or not you consider them to be

25   camping?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-14

Page 56

1       Q.    What is it?

2       A.    It's the amended camping ordinance, "camping"

3    definition.

4       Q.    What is the definition of "camping" it gives?

5       A.    "The term 'camp' or 'camping' shall mean the

6    use of public property as a temporary or permanent place

7    of dwelling, lodging, or residence, or as a living

8    accommodation at any time between sunset and sunrise, or

9    as a sojourn.

10          "Indicia of camping may include, but are not

11   limited to, storage of personal belongings, using tents

12   or other temporary structures for sleeping or storage of

13   personal belongings, carrying on cooking activities or

14   making any fire in an unauthorized area, or any of these

15   activities in combination with one another or in

16   combination with either sleeping or making preparations

17   to sleep (including the laying down of bedding for the

18   purpose of sleeping)."

19       Q.    Is there any definition of dwelling, lodging,

20   residence or living accommodation?

21       A.    No.

22       Q.    How do you understand those terms?

23       A.    Dwelling, lodging, residence, or living

24   accommodation?  Dwelling or lodging would have to be

25   something that was a structure that has a roof on it, in

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-15

Page 57

1    my opinion.

2            A living accommodation -- you could have a

3    living accommodation just sleeping on the ground if you

4    had other things there.

5        Q.    How long would a person have to stay before

6    establishing a dwelling, lodging, residence, or living

7    accommodation?

8        A.    There is no time factor involved.

9        Q.    So you are stating, if a person arrives with

10   their belongings, they immediately establish a residence

11   or a living accommodation?

12       A.    They can, yes.

13       Q.    How would they go about establishing a

14   residence or a living accommodation?

15       A.    If they unrolled their sleeping bag and had it

16   on a tarp, if they had a ring for a fire for future use,

17   if they had all of their stuff out of their backpack or

18   even had their backpack stored there, to me, they are

19   staying there.

20       Q.    Would keeping a backpack somewhere be an

21   indication that somebody intends to stay there?

22       A.    Not alone, no.

23       Q.    What else would they need to provide -- or what

24   else would you need to observe to consider that a

25   residence or a living accommodation?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-16

1      A.    Probably a place where they were going to the

2  bathroom and storing their garbage and, most likely,

3  sleeping, also.

4      Q.    Is there a definition of "sojourn"?

5      A.    No.

6      Q.    How do you know that term?

7      A.    I understand it as a short trip, a short

8  journey.

9      Q.    How would someone be on a short trip or journey

10  if they were in one place?

11      A.    Or a short stay during a short trip, if they

12  were staying for a short amount of time.

13      Q.    How do you understand the length of time

14  required for it to be a sojourn?

15      A.    I don't have a time limit on that.  I don't

16  know what the time is.

17      Q.    This definition states several indicia of

18  camping; correct?

19      A.    Yes.

20      Q.    It states things such as storage of personal

21  belongings, using a tent or other temporary structure,

22  carrying on of cooking activities, or making a fire;

23  correct?

24      A.    Yes.

25      Q.    Does it indicate how many of these elements

DEPOSITION OF KEVIN R. O'ROURKE  (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-17

1    need to be present in order for someone to be camping?

2        A.    No.

3        Q.    Are there other indicia of camping?

4        A.    Yes.

5        Q.    What would you consider other indicia of

6    camping?

7        A.    Like I said, storage of garbage -- sometimes

8    they have garbage bags or sometimes they just have a

9    pile of garbage that you can tell has accumulated over

10   time and a bathroom area where they go to the

11   bathroom.

12       Q.    Would one of these indicia of camping be

13   sufficient to create a camp?

14       A.    Probably not.

15       Q.    If someone were carrying on cooking activities

16   in a park or in a public place, such as having a

17   barbecue, would you consider that to be a camp?

18       A.    No.

19       Q.    If someone were to attend such a barbecue and

20   bring their personal belongings with them, would you

21   consider that to be a camp?

22       A.    No.

23       Q.    What if someone were to lay down on a blanket

24   afterwards?

25       A.    No, not camping.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

1    Q.    What distinguishes that from camping?

2    A.    The location.

3    Q.    Like I said, barbecues occur in barbecue pits

4    or in barbecue grills, by our code.  The fire they are

5    talking about in the camping ordinance is on the bare

6    ground.

7          It's usually not in the middle of the park.

8    It's down by the river or someplace out in an

9    undeveloped area of the park.  It's not on the lawn.

10   It's on wild grass or weeds.  It's a much different

11   area.

12   Q.    If a homeless individual were to carry out

13   cooking activities in one of these areas you have

14   discussed, would that be camping?

15   A.    Not necessarily, no.

16   Q.    Are there situations where that would be

17   camping?

18   A.    Yes.

19   Q.    What are those situations?

20   A.    Where other indicia of camping are there, like

21   if they have a bedroll on the ground that is laid out

22   and storage of other pieces of living gear.

23   Q.    So if a homeless person cooks in one of these

24   designated cooking areas and lays down on a blanket,

25   would you consider that camping?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

Page 61

1      A.    Not necessarily, no.

2      Q.    How would you distinguish that from the

3  previous example I gave where someone attends a barbecue

4  and then lies down on the blanket?

5      A.    Because the barbecue is in a designated area

6  for having barbecues with a barbecue pit and it's not on

7  the bare ground, back in the weeds, hiding from public

8  view.

9      Q.    Let me clarify.  In my previous example, I

10  asked if a homeless person were at a barbecue pit or a

11  designated area for cooking and laid down on a blanket,

12  would you consider that camping?

13      A.    I said, "No."

14      Q.    I believe you said, "In some circumstances."

15      A.    No.  I must have misunderstood your question,

16  then, because I thought you said they just had a fire on

17  the ground.

18           If they had a fire in a barbecue pit -- we see

19  it all the time -- and they have somebody laying on the

20  ground, it's not camping.  We don't cite them for

21  camping.

22      Q.    Is being back in the woods or back in the weeds

23  a requirement of camping?

24      A.    No, not necessary.

25      Q.    Is that how you distinguish camping from

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-20

Page 62

1  non-camping?

2      A.   No.  If somebody pitched a tent on the lawn at

3  Ann Morrison Park and they were there in the middle of

4  the night and they were sleeping in it, that's still

5  camping.

6      Q.   If someone pitched a tent in that location at

7  Ann Morrison Park during the day, would you consider

8  that camping?

9      A.   It could be camping, but I would just tell them

10 to move the tent.  It's discretion.  I would not cite

11 them for camping.

12     Q.   Leaving aside your discretion for the moment,

13 would you consider that a violation of the camping

14 ordinance?

15     A.   It could be, yes.

16     Q.   When could it be a violation?

17     A.   It's a structure.  It's a tent.  It's a

18 dwelling.  If they had other things there -- not just

19 that -- then, yes, it would be camping.

20     Q.   What other things would need to be there for it

21 to be camping?

22     A.   Other indicators that they are staying there

23 and not just pitching a tent for sun shade or something

24 else.  Things like cooking utensils and sleeping gear

25 and other things.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-21

1    Q.    But sleeping gear is permitted in the parks

2  during the day; correct?

3    A.    Yes.  But a tent is not.

4    Q.    Cooking gear is permitted in the parks during

5  the day; correct?

6    A.    Correct.

7    Q.    None of these indicia are things that are not

8  permitted to be in parks?

9    A.    Correct, except the tent.  You can't pitch a

10 tent in the park.

11   Q.    Pitching a tent in the park, alone, would be a

12 violation of the camping ordinance?

13   A.    No.  It would be a violation of having a tent

14 in the park.  If you had these other things, that

15 indicates they were staying there.

16   Q.    Is there an ordinance that prohibits having a

17 tent in the park?

18   A.    Well, essentially, this ordinance prevents

19 having a tent.  It prevents having a tent there.

20   Q.    I just asked you if the camping ordinance

21 prohibited having a tent in the park; and you said,

22 "No."

23   A.    Well, the way I read it it, does.  So I must

24 have misstated.  If they have a tent -- we have always

25 gone by the fact that you cannot have a tent in the

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-22

Page 64

1    park, no matter where in the park.

2            I think there is an ordinance that actually

3    says you cannot have a tent in the park.  It's either in

4    the river ordinance or our parks codes, 13-3-4 or

5    something like, recreational activities.

6            You can't actually pitch a tent in the parks

7    without permission from the Parks Department.

8        Q.   If someone were in another public area that

9    were not a park, would it be a violation of the camping

10   ordinance to have a tent?

11       A.   To have a tent?  Not that I know of, no.

12       Q.   Would it be a violation of any other

13   ordinance?

14       A.   In another public area?

15       Q.   Correct.

16       A.   Not that I know of.

17       Q.   Have you received written guidance or training

18   materials explaining the new definition of "camping"?

19       A.   Yes.

20       Q.   What are those materials?

21       A.   This Special Order.

22       Q.   Aside from the Special Order, have you received

23   any written materials?

24       A.   I believe we have, yes.

25       Q.   What other materials?

DEPOSITION OF KEVIN R. O'ROURKE  (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-23

1    A.   I don't recall exactly what they are.  It was

2  just reviewing this and explaining what the meaning of

3  it is and what the intent of it is.

4    Q.   And did you receive any other guidance on the

5  new definition of "camping"?

6    A.   Other than talking to Ms. Bilyeu, no.

7    Q.   Did you receive any such guidance from the

8  supervisor?

9    A.   Yes.

10    Q.   What was that guidance?

11    A.   Basically, after the change to the ordinance,

12  that we would enforce it with these guidelines in place,

13  as far as the definition of "camping" -- all of the

14  indicia and anything else.

15    Q.   Did you receive any guidance as to the meaning

16  of those specific indicia?

17    A.   The meaning of those indicia?  No.

18    Q.   Did you receive any guidance as to the required

19  elements of the camping ordinance?

20    A.   Yes.  This guideline is the required

21  elements.

22    Q.   Aside from the wording of the ordinance itself,

23  did you receive any explanation or guidance as to what

24  is required to violate the camping ordinance?

25    A.   Yes, probably.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-24

1  camping ordinance?

2      A.   The police department.

3      Q.   Was any particular division of the police

4  department primarily responsible for enforcing the

5  ordinance?

6      A.   Not officially.

7      Q.   Unofficially?

8      A.   Unofficially, it was the bike patrol because

9  that's our area of operations.  Officially, all police

10  officers can enforce the camping ordinance.

11     Q.   What groups of people was the camping ordinance

12  primarily enforced against at that time?

13     A.   What groups of people?

14     Q.   Yes.

15     A.   Campers, people sleeping overnight in the parks

16  areas.

17     Q.   Was this ordinance primarily enforced against

18  the homeless?

19     A.   Most of the violators were homeless people,

20  yes.

21     Q.   Do you recall specific instances where you

22  cited someone under the camping ordinance who was not

23  homeless?

24     A.   I don't know names but, yes, I remember

25  instances where I did that.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-25

1    Q.    Describe those incidents.

2    A.    We had people going through town to go to what

3  they call the Rainbow Gathering.  They had one in

4  Wyoming.  I don't know when that was.  It was five or

5  six years ago.

6          These people had addresses.  They had IDs.

7  They had addresses.  We cited them for camping.  They

8  were staying down by the river as they came through

9  town.

10   Q.    Aside from people traveling through Boise for a

11 short period of time, have you cited anyone under the

12 camping ordinance who was not homeless?

13   A.    Probably.  I can't remember specifics, but I

14 probably have.

15   Q.    So you don't recall any instance where this has

16 occurred?

17   A.    No.

18   Q.    What changes in enforcement have occurred

19 during your tenure as a bike patrol officer with respect

20 to the camping ordinance?

21   A.    Changes in enforcement?

22   Q.    Yes.

23   A.    Really, nothing that I can think of.  They

24 still enforce -- it's still illegal to camp on the river

25 or in those areas.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-26

1    Q.   More recently, are there any groups against

2  whom the camping ordinance has been more frequently

3  enforced?

4    A.   Since the ordinance was updated?

5    Q.   Let's start with that, yes.

6    A.   It's going to be homeless people, most of the

7  time.

8    Q.   Say, in the last five years, what groups of

9  people has the camping ordinance been enforced against

10  most frequently?

11    A.   If you want to group homeless people into one

12  group of people, it's been homeless people, yes.

13         MS. JOHNSON:  I would like to take another

14  short break.  Two minutes.

15         MS. BILYEU:  That's fine.

16              (Break taken.)

17  BY MS. JOHNSON:

18    Q.   Officer O'Rourke, I hope we can go back to one

19  point you made earlier in the deposition.  You stated,

20  in the last five years, homeless people have received

21  the majority of citations for the camping ordinance; and

22  then you said, "If you consider homeless people one

23  group."  Can you tell me what you meant by that?

24    A.   Well, I don't classify homeless people as,

25  like, a racial group or anything else.  They are just

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-27

1    Do you recognize this document?

2         A.   Yes.

3         Q.   Can you tell me what it is?

4         A.   It is the Boise Police Department's Overnight

5    Shelter Capacity Advisory.  It says it's a protocol for

6    that.

7         Q.   What information is provided on this document?

8         A.   It indicates the three different shelters --

9    River of Life, Interfaith Sanctuary, and City Light for

10   Women and Children -- and whether they are full or not

11   and the time they are full.

12             The Sanctuary has it for men and women.  River

13   of Life does not and neither does City Light because

14   they only have one class there, one gender there.

15        Q.   Does this document provide any definition of

16   what it means for a shelter to be full?

17        A.   No.

18        Q.   Have you been given any training or guidance on

19   what it means for a shelter to be full?

20        A.   Not that I recall, no.

21        Q.   Have you had any conversations with shelters

22   regarding when they use this protocol?

23        A.   No.

24        Q.   Excuse me.  Just to clarify the record, when

25   they use this overnight shelter capacity advisory?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-28

Page 80

1    A.   No, I have not.

2    Q.   If you look at the bottom bullet point on this

3    document which is Exhibit 35, it states, "If any of the

4    overnight shelters are all full, the Boise State

5    University dispatch shall immediately send a TO message

6    on the MDT system advising the reporting overnight

7    shelter is full."  What is a TO message?

8    A.   It's a "to" message.  It's just a message that

9    you are sending to someone.  They will get it on their

10   MDT, Mobile Data Terminal.

11   Q.   What is the Mobile Data Terminal?

12   A.   It's the computer.  Essentially, it is a laptop

13   computer mounted in each one of the patrol cars.

14   Q.   So if a shelter is full and reports that to

15   dispatch, how will you get a message?

16   A.   We will get it on our e-mail system, since we

17   do not have MDTs and we are not in cars.  Patrol

18   officers get it on their MDT.  I don't know if it goes

19   out on their e-mail.  I imagine it does go to the whole

20   police department.

21   Q.   Do you have the ability to check your e-mail

22   while patroling in the field?

23   A.   Not while I'm on the bicycle, no.  I can stop

24   at another substation to check it.

25   Q.   Do you routinely stop at other substations?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-29

1    A.   Yes.

2    Q.   How frequently during your shift do you do

3 that?

4    A.   Usually once a shift.   Sometimes more in the

5 winter when it's cold.

6    Q.   Are you required to check your e-mail to

7 determine if a notice has been sent, under this system,

8 prior to issuing a citation?

9    A.   No.

10    Q.   Are you encouraged to do so?

11    A.   Yes.

12    Q.   But there is no guidance in place?

13    A.   No.   You are not required to check the e-mail

14 before you issue a citation, no.

15    Q.   So if a shelter had called in reporting that

16 they were full and you had not checked your e-mail, how

17 would you know if you were permitted to issue a camping

18 citation?

19    A.   You wouldn't.

20    Q.   So despite not knowing if you are permitted to

21 issue a camping citation, you would do so anyway?

22    A.   It would depend on the circumstances.

23    Q.   If you believed there was a violation, would

24 you do so anyway?

25    A.   Yes.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-30

1    Q.   When have you been told that you should check

2    your e-mail frequently throughout the day?

3    A.   We have only been told we need to check it when

4    we come on duty.

5    Q.   So when have you been encouraged to check your

6    e-mail prior to issuing a citation?

7    A.   I have not been encouraged to check my e-mail

8    prior to issuing a citation.

9    Q.   You mentioned that you had discussions with

10   Sergeant Walker prior to leading trainings on the

11   camping ordinance; correct?

12   A.   Yes.

13   Q.   When did these conversations occur?

14   A.   Like I said, sometime at the end of the year,

15   last year, 2009.  November or December, probably, is the

16   best of my recollection.

17   Q.   Did these occur in a meeting?

18   A.   I believe so, yes.

19   Q.   What type of meeting?

20   A.   Just a bike patrol meeting with bike patrol

21   officers.

22   Q.   Were all of the bike patrol officers there?

23   A.   I'm not sure.  I don't know.

24   Q.   You were present, though?

25   A.   I was present, yes.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58

EXHIBIT # 35-31

1    notify us by e-mail or MDT message if the shelters were

2    full.

3        Q.   Was there anything else you discussed on that

4    topic?

5        A.   No, not that I recall.

6        Q.   The eighth bullet point states, "Don't call

7    BSU"?

8        A.   Correct.

9        Q.   What does that mean?

10       A.   That means don't call the BSU Substation to

11   find out what shelters are full and what shelters are

12   not full because they will put it out as soon as they

13   find out.  So they didn't want us calling them.

14       Q.   So even if you were not in a position -- you

15   had not checked your e-mail recently and you did not

16   have the ability to check your e-mail because you were

17   on a bicycle, you were not permitted to call the BSU

18   dispatch?

19       A.   We could if we wanted to, but we were

20   encouraged not to.

21       Q.   This states, "Don't call BSU"?

22       A.   Right.

23       Q.   Did they tell you there are situations where

24   you can call BSU?

25       A.   No, they didn't.

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-32

1  Q.  The next bullet point states, "Don't call

2  shelters"?

3  A.  Correct.

4  Q.  What did you interpret this to mean?

5  A.  That you don't call the shelters directly to

6  confirm or deny that there were spaces.

7  Q.  Was any exception given if you did not have

8  access to your e-mail?

9  A.  No.

10  Q.  Were you provided any alternatives for how to

11  determine if shelters had space available if you could

12  not check your e-mail?

13  A.  I don't recall specifics.  He may have said

14  that we can call shelters if we wanted to, but he

15  discouraged us from doing that.  I don't recall for

16  sure, so I couldn't tell you.

17  Q.  So you don't recall an exception?

18  A.  No.

19  Q.  At the end of the first page of this document,

20  it states, "Questions and Answers."  Did you have any

21  other questions or answers or any other discussion with

22  Sergeant Walker?

23  A.  Did I have questions?

24  Q.  Yes.  Did you have any other questions for

25  Sergeant Walker?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-33

1  notified."

2      Q.   And with respect to the bullet point "Don't

3  Call Shelters," what did you tell the people you were

4  briefing?

5      A.   Basically, the same thing.  If they haven't

6  been notified, there is room.

7      Q.   Did you provide any alternatives for officers

8  to determine if shelter space is available if they have

9  not recently checked their e-mail?

10     A.   No.

11     Q.   Did you discuss any requirement to verify

12  whether shelter space is available?

13     A.   No.

14     Q.   The last bullet point here states, "We will

15  only be notified if all shelters are full."  Is this

16  accurate?

17     A.   I don't believe it is.

18     Q.   Can you explain how it's no longer accurate?

19     A.   Because the Sanctuary is sending us e-mails

20  saying when they are full.  It's not just that all the

21  shelters are full.  We are getting it from individual

22  shelters.

23     Q.   You mentioned that, without your other

24  materials, it was difficult to put into context my

25  question regarding the intent of the ordinance?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-34

1    the time, during the week, I will read everybody's

2    dailies.

3        Q.   What sort of events or interactions are

4    captured in these daily reports?

5        A.   Basically, contacts with -- law enforcement

6    contacts and anything else that may be interesting to

7    other people on that group.

8        Q.   With respect to this specific daily report,

9    Exhibit 86, which you identified as your daily report of

10   February 19, 2008 --

11       A.   Yes.

12       Q.   -- the first line reads, "AM Pk."  Does that

13   refer to Ann Morrison Park?

14       A.   Ann Morrison Park.

15       Q.   "About a dozen TAs at the BBQ at one point.

16   Watched them awhile.  Nothing."

17           What do you mean by "TAs"?

18       A.   That was a term that we came up with,

19   "transient Americans."

20       Q.   Who came up with that term?

21       A.   I believe Tony Dotson did.

22       Q.   How long ago was that term coined?

23       A.   I have no idea.  It's been three or four years,

24   probably.

25       Q.   And what do you mean by "transient Americans"?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-35

Page 105

1    A.    We meant transients, people we deal with all

2  the time.

3    Q.    What do you mean by "transients"?

4    A.    Transients are guys that live on the street, as

5  opposed to homeless where they are trying to seek a

6  permanent home.

7        These guys -- I know guys that have lived on

8  the street for fourteen years.  I have known the same

9  guys that are still on the street.  That's what I mean,

10  "transient" meaning don't have a place to stay.

11    Q.    Would anybody who is homeless be transient?

12    A.    No, not necessarily.

13    Q.    How would you distinguish between someone who

14  is homeless and someone who is transient?

15    A.    Usually someone who is homeless we might see

16  once and not anymore because they take advantage of the

17  shelter and then they will get some other kind of

18  semi-permanent housing.

19        Most of the transients do not do that, except

20  maybe in the winter when they they pool their money and

21  get an apartment.

22    Q.    If you encounter someone in the course of your

23  patrol, how do you determine if they are what you would

24  call transient versus what you just referred to as

25  homeless?

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-36

Page 112

1    A.   I usually try to do it in time sequence, in

2  sequential order.   Sometimes I don't.   I try to do it

3  with the first thing I ran into for the day, and the

4  next thing comes in next.   That's the way I usually do

5  it.

6    Q.   It's likely that this is the first significant

7  thing that occurred during your shift?

8    A.   That's likely, yes.

9    Q.   I am going to have you take a look at what has

10  been marked as Exhibit 84.   Do you recognize this

11  document?

12    A.   Yes.

13    Q.   Can you tell me what it is?

14    A.   It's another one of my dailies from 9/26/2007.

15    Q.   In the first line, you state, "Morning camp

16  check - nothing."

17       Tell me what that means.

18    A.   That means, as far as I know -- just based on

19  that one line, it means I checked camping areas or

20  places where there are usually sometimes campers.   I

21  found none.

22    Q.   Is that a routine part of your patrol?

23    A.   On day shift, yes.

24    Q.   So when you were on the day shift in

25  approximately 2007, that was a routine part of your

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-37

1    patrol?

2        A.    Yes.

3        Q.    Again, you list this first in your daily

4    report.   What does that indicate to you?

5        A.    It was probably the first thing I did in the

6    morning.

7        Q.    The next line states:   16/Bancock (phonetic).

8    Does that indicate the intersection of those two

9    streets?

10       A.    It's 16th and Bannock.

11       Q.    Oh, Bannock?

12       A.    Yes.

13       Q.    You state, "Chased a couple of TAs out of the

14   laundry there"?

15       A.    Yes.

16       Q.    What did you mean?

17       A.    Transients will sit in the laundry at 16th and

18   Bannock -- I think it's call the 16th Street Laundry --

19   and they will drink beer in there.   They've caused

20   problems in the restrooms in there.

21            The owner has said he doesn't want them in

22   there, and he has signed a trespass letter.   Instead of

23   citing them, I told them to leave.

24       Q.    I am going to have you take a look at what has

25   been marked as Exhibit 89.   Do you recognize this

DEPOSITION OF KEVIN R. O'ROURKE (TAKEN 08.12.10)

c41da38b-c77d-4749-beae-d455834c3a58
EXHIBIT # 35-38

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

JANET F. BELL, BRIAN S. CARSON, )
CRAIG FOX, ROBERT MARTIN,        )
LAWRENCE LEE SMITH, ROBERT       )
ANDERSON, PAMELA S. HAWKES,      )
JONATHAN LEIGH MILLER, JAMES M.  )
GODFREY, BASIL E. HUMPHREY, and  )
KIRK ROSS,                       )
                                 )
                Plaintiffs,      ) Case No.
                                 ) 1:09-CV-00540-REB
vs.                              )
                                 )
CITY OF BOISE; BOISE POLICE      )
DEPARTMENT; and MICHAEL          )
MASTERSON, in his official       )
capacity as Chief of Police,     )
                                 )
                Defendants.      )
_____)


DEPOSITION OF CLAIR WALKER


Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Wednesday, August 11, 2010
Beginning at 2:20 o'clock p.m.


QnA COURT REPORTING, LLC
Jeana Reiner, CSR, RPR
Idaho Certificate No. 711
776 East Riverside Drive, Suite 200
Eagle, Idaho 83616
Web:  www.qnacourtreporting.com
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)    Telephone:  (208) 484-6309

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

Page 139

1                        C E R T I F I C A T E

2

3           I, Jeana Reiner, Certified Shorthand Reporter, do hereby

4    certify that:

5           The foregoing proceedings were taken before me, at which

6    time the witness was placed under oath;

7           The testimony and all objections made were recorded

8    stenographically by me and were thereafter transcribed by me;

9           The foregoing is a true and correct record, to the best of my

10   skill and ability;

11       Pursuant to request, notification was provided that the

12   deposition is available for review and signature; and

13          I am not a relative or an employee of any attorney, nor am I

14   financially interested in the action.

15          I have hereunto set my hand and seal this 29th

16   day of August 2010.

17

18                                /s/ Jeana Reiner

19                          _____
                            Jeana Reiner, CSR, RPR
                            Certified Shorthand Reporter
20                          Idaho CSR No. 711

21

22

23

24

25

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

Page 20

1   up the overlap at that time of night?

2       A.   Our basic role was to go anywhere in the city,

3   even though there is two divisions in the city: the

4   Valley Division and the Bench Division.   Our role was to

5   go anywhere in the city and pick up the slack and handle

6   the calls for service.

7       Q.   At what point did you start in that role?

8       A.   Three years prior to becoming the bicycle

9   patrol sergeant.

10      Q.   So, approximately, March of 2006?

11      A.   Thereabouts, yeah.   And I've been in uniform

12  patrol -- that was my most recent assignment, but I've

13  been a uniform patrol sergeant prior to -- I think I was

14  promoted in 2000.   I've been a sergeant for about ten

15  years.

16      Q.   How long have you worked for the Boise Police

17  Department?

18      A.   Twenty years and two days.

19      Q.   Congratulations.

20           Prior to your role with the uniform patrol and

21  the overlap unit, what was your role with the Boise

22  Police Department?

23      A.   We changed shifts every three months on the

24  semester break so officers can go to school if they

25  want.   So I was uniform patrol sergeant on a myriad of

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e

EXHIBIT # 36-3

1          But, you know, when your bicycle unit does a

2    good job -- and recognition is still the strongest

3    motivator in human beings, even above sex and money.   So

4    if I can give them recognition, that's the best reward I

5    can give them.

6          So basically recognition.

7      Q.   Were there any other victories you included in

8    that report to justify more staff?

9      A.   Yes, there were.  But I don't -- I'm trying

10   to -- I'm just trying to think of --

11     Q.   Go ahead.  I'm sorry to interrupt you.

12     A.   I have new battles to fight and new things to

13   conquer.  So I don't -- I just don't hold on to the

14   information.  There are some other things, but I can't

15   tell you what they are.

16     Q.   Aside from victories, was there any other

17   information you put in the report to justify more staff?

18     A.   I don't recall the report that well to be able

19   to answer that question.

20     Q.   I'm going to have you discuss camping ordinance

21   for a little bit.

22     A.   Okay.

23     Q.   Can you tell me, prior to April of 2009, what

24   kind of training or guidance was provided to officers

25   regarding the camping ordinance?

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

1     A.   None that I recall.  Are you talking about the

2  officers in general and the police department?  I mean,

3  what officers are you talking about?  I'm taking it to

4  mean you mean all the officers on the police

5  department.

6     Q.   Let's start with the bike patrol officers.

7  What kind of training or guidance was given to the bike

8  patrol officers?

9     A.   Prior to me coming into the position?

10    Q.   To your knowledge.

11    A.   I don't know.

12    Q.   Since April 2009 or March of 2009, when you

13  assumed the role as a sergeant of the bike patrol unit,

14  what kind of training has been put into place with

15  respect to the camping ordinance?

16    A.   The same training we previously discussed that

17  we gave to the entire department.

18    Q.   So this is the training that occurred late in

19  2009?

20    A.   Correct.

21    Q.   Was there any other training before that?

22    A.   No.

23    Q.   I'm going to back up for one moment.  With

24  respect to the seasonal report we were discussing, who

25  received copies of that?

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-5

1    that if there is any complaints that might be

2    forthcoming from the field that they give me a heads up;

3    that they back in the car and truck, because we don't

4    drive them very often, it's more easy to jump the

5    battery when they are dead.

6          I could go on and on.  I mean, there is all

7    sorts of policies; that they double lock the door when

8    they leave at night, because we don't have an alarm

9    system, and we don't want anybody breaking in and

10   stealing our bicycles.  I mean, there is all sorts of

11   policies.

12        Q.   Are you on the BPD NST Listserv?  Or excuse me.

13   The BPD NST Greenbelt Listserv?

14        A.   Is that the mail, GroupWise thingy?  I don't

15   know --

16        Q.   Yes.  Are you on the -- if an e-mail is sent to

17   the GroupWise account BPD NST Greenbelt, do you receive

18   that e-mail?

19        A.   I do.

20        Q.   And do you review those daily reports?

21        A.   I do.

22        Q.   Do you review them the day you receive them?

23        A.   Not always.

24        Q.   If you don't review them the day you receive

25   them, how soon do you review them?

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e

EXHIBIT # 36-6

1  order; correct?

2      A.   We reviewed the special order.

3      Q.   Did you provide specific instructions?

4      A.   I don't believe so.

5      Q.   Did you discuss Section 2.15.01, "Available

6  overnight shelter"?

7      A.   We did.

8      Q.   What did you discuss?

9      A.   We discussed the procedure that had been put

10  into place as far as having the shelters notify us when

11  their shelters were full, and the protocol that they

12  follow in that area.

13      Q.   Is that the shelter capacity protocol?

14      A.   Yes.

15      Q.   I'll come back to that in a moment.

16      A.   Okay.

17      Q.   Did you discuss Section 2.15.02, "Enforcement

18  discretion"?

19      A.   Yes.

20      Q.   What did you discuss with respect to persons

21  with disabilities?

22      A.   Other than to review that part of the section

23  of the ordinance, I don't know that we had any in-depth

24  discussions.

25      Q.   So you didn't provide any training or guidance

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-7

1    on the needs of the disabled or how officers would

2    determine whether there was space available that met an

3    individual's disability needs?

4         A.   No.

5         Q.   Did you discuss maximum allowable stays at

6    various shelters?

7         A.   No.

8         Q.   Did you discuss or provide training or guidance

9    on how one of your officers would determine if an

10   individual has exceeded the maximum allowable stay at a

11   shelter?

12        A.   No.

13        Q.   Do you have knowledge of the Boise Rescue

14   Mission's maximum length of stay?

15        A.   I don't.

16        Q.   Is that something you've ever discussed with

17   your officers?

18        A.   No.

19        Q.   Is that something your officers asked about

20   during this briefing?

21        A.   No.

22        Q.   I believe it's the seventh bullet point that

23   discusses familiarization with a shelter capacity

24   protocol.  Can you describe to me how that protocol

25   operates?

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-8

1    capacity?  So for instance, do they provide information

2    with respect to whether or not they can accommodate

3    certain disabilities or whether they can accommodate

4    certain individuals?

5         A.    No.

6         Q.    Do these shelters have a written agreement with

7    the substation or with the police department stating

8    that they will provide this information?

9         A.    Not that I'm aware of.

10        Q.    Is this voluntary on the part the shelters?

11        A.    Yes.

12        Q.    Once this information is received by the Boise

13   State University Dispatch, how is that provided to the

14   officers in the field?

15        A.    There is an e-mail sent out to everybody in the

16   police department.  So, I mean, anybody -- all BPD

17   employees.

18        Q.    Is any further information provided?

19        A.    Yes.

20        Q.    What is that?

21        A.    The person who is on duty who puts out the

22   e-mail, e-mails me a copy of the shelter capacity.  I

23   don't remember the title of the form even.  They e-mail

24   a copy of the form to me that specifies exactly what the

25   fullness status was.

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e

EXHIBIT # 36-9

1    Q.   So you get a copy of that form, but the bike

2    patrol officers themselves do not; correct?

3    A.   Correct.   They receive an e-mail.

4    Q.   If the officers are in the field, how will they

5    know if the e-mail has been sent?

6    A.   They would not.

7    Q.   Are officers expected or required to find out

8    if an e-mail has been sent before they issue a citation?

9    A.   No.

10   Q.   So in that sense, it's possible that shelters

11   can call in and let the dispatch know, and through that

12   let you know that the shelter is full, and there is no

13   mechanism in place to insure that officers get that

14   information before they issue a citation?

15   A.   No.

16   Q.   How often are officers required to check their

17   e-mail?

18   A.   Daily.

19   Q.   At what point during their shift would they

20   check?

21   A.   I can't answer for all the officers on the

22   police department.   I don't know when they check their

23   e-mail.

24   Q.   At what point are they required to check?

25   A.   Daily.   Other than that, there is no

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-10

1   requirement.  They can check it at the beginning,

2   middle.

3       Q.   If an officer checks at the beginning of his

4   shift, would he see e-mails from the day before?

5       A.   Sure.

6       Q.   So an officer would find out at the beginning

7   of his shift when he checks his e-mails whether shelter

8   was available on the previous night; correct?

9       A.   I would say that's correct.

10      Q.   But if they checked at the beginning of their

11  shift, they would not find out whether shelter became

12  unavailable that evening?

13      A.   If that was the only time they checked it, yes.

14      Q.   Do you maintain all the forms you receive from

15  dispatch regarding shelter availability?  Do you keep

16  all these forms?

17      A.   I keep all the forms I receive.

18      Q.   Do you have any way of guaranteeing you receive

19  all the forms?

20      A.   No, I don't.

21      Q.   How many forms have you received?

22      A.   Do you want me to guess?  Because I don't know

23  the exact amount.

24      Q.   Have you received more than ten?

25      A.   Yes.

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e

EXHIBIT # 36-11

1   upon the officers to call and see if the phone calls had

2   come in.

3       Q.   Well, I believe this bullet point says, "Don't

4   call BSU."  The next one is the one that says, "Don't

5   call shelters."

6       A.   Right.

7       Q.   Is there any reason why officers shouldn't call

8   the BSU Dispatch?

9       A.   Because we don't want -- there is only one

10  person in there.  They're a receptionist.  They monitor

11  the radio.  They monitor the alarms all over the

12  University.  They monitor eight screen TVs in there.

13          We did not want officers calling.  We did not

14  want 37 officers in the field calling on a nightly basis

15  clogging up that person's time, because it was not

16  incumbent upon the officers to call BSU.  It was

17  incumbent upon the shelter to call BSU.

18      Q.   Is it likely that 37 officers would encounter a

19  situation that required them to call BSU anyway?

20      A.   Probably not all 37 officers would call.

21      Q.   It's more likely that officers on the bike

22  patrol who were on their shift would be the ones likely

23  to call; correct?

24      A.   More likely, yes.

25      Q.   And how many bike patrol officers are on shift

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

Page 110

1    at any point?

2         A.    Up to three.

3         Q.    So we're really talking about one to three

4    calls; correct?

5         A.    On average.

6         Q.    The next bullet point states, "Don't call

7    shelters."  I believe we've discussed that.  Who decided

8    to create these instructions, not to call the BSU

9    Dispatch or the shelters?

10        A.    It was all part of the negotiations and who was

11   going to do a discussion within the department.

12        Q.    Aside from calling the Boise State University

13   dispatch or the shelters, were any other

14   opportunities -- excuse me.  I'm going to rephrase that.

15             Aside from calling the dispatch or the

16   shelters, were there any alternatives given to officers

17   to allow them to determine if shelter space is available

18   before they issue a citation?

19        A.    Other than the e-mail, no.

20        Q.    So no guidance was provided with respect to

21   what an officer should do if he's in the field and

22   doesn't have access to his e-mail and is not supposed to

23   call the dispatch or the shelters; correct?

24        A.    No.  There was no other alternative.

25        Q.    I'm going to go to the last bullet point.  It

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-13

1    my job was.  And that's why I don't do dailies, because

2    they would be really boring, because all I do is go to

3    stupid special event meetings.

4         Q.   Who receives these daily reports?

5         A.   I can't tell you specifically.  I can tell you

6    generally.  I couldn't name off exact people that are on

7    the list.

8         Q.   What categories of people are included on the

9    BPD NST Greenbelt Listserv on which these daily reports

10   are sent?

11        A.   Anybody that the intelligence would impact or

12   anybody in the chain of command.

13        Q.   How far up the chain of command do these daily

14   report e-mails go?

15        A.   All the way to the chief.

16        Q.   So Chief Masterson gets these daily report

17   e-mails?

18        A.   He does.

19        Q.   Does your lieutenant get these daily report

20   e-mails?

21        A.   He does.

22        Q.   And his supervisor gets these e-mails?

23        A.   Yes.

24        Q.   So literally each step in the chain of command

25   has somebody receiving these daily report e-mails?

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-14

1        A.    Yes.

2        Q.    I am going to go through some examples of these

3   daily report e-mails with you.  Can you take a look at

4   what has been previously marked as Exhibit 5?

5        A.    Sure.

6              I need to use the rest room.  I hate to be a

7   party pooper.

8              (Brief break taken.)

9   BY MS. JOHNSON:

10       Q.    Please take a look at Exhibit 53, and let me

11   know when you are ready.

12       A.    I'm ready.

13       Q.    Can you please take a look at the last line in

14   the second paragraph.

15       A.    Okay.

16       Q.    I apologize.  Before we go on, can you confirm

17   that this is a daily report e-mail sent by bike patrol

18   officer Andrew Johnson to the BPD NST Greenbelt Listserv

19   on March 3rd?

20       A.    It appears so.

21       Q.    Are you familiar with this document?

22       A.    This particular daily, no.  I couldn't say that

23   I --

24       Q.    Do you have any reason to believe this is not

25   exactly what it appears to be, a daily report from March

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-15

1   one?

2       A.   Close.   I would say that he was in the area of

3   their operation looking for them to see if there was any

4   violations in the area where they usually frequent.

5       Q.   How would you define "transient Americans"?

6       A.   Transients are people that are disenfranchised

7   and choose to not be in mainstream America.   So if you

8   are a transient -- in my personal definition is if you

9   are a transient, you've disenfranchised yourself from

10  mainstream America, and you don't want to be part of it.

11  You don't want to be part of any rules.   You don't want

12  to live in a house.   You don't want to have a job.   You

13  don't want to have responsibilities.   You don't want to

14  be a God fearing, tax paying, law abiding citizen.

15      Q.   Do you believe this is a voluntary decision?

16      A.   For the transients, yes.   I think that most of

17  the people that are truly transient, choose to be that

18  way.

19      Q.   Would you include people with mental illnesses

20  of your definition of transient?

21      A.   No.   To me there is a difference between being

22  homeless and being transient.   Homeless people have been

23  involuntarily connected from society and are truly

24  looking for resources and wanting to connect with the

25  mainstream population.

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-16

1    Q.    Kirk Ross.

2    A.    No.

3    Q.    Or James Godfrey?

4    A.    No.

5    Q.    So you don't know whether the plaintiffs in

6    this lawsuit would fall under the category of people you

7    consider transient?

8    A.    I do not.

9    Q.    I'm going to hand you what has been previously

10   marked as Exhibit 82.  Please review it and let me know

11   when you are ready.

12   A.    Okay.

13   Q.    Can you confirm that this is a daily report

14   e-mail from Officer Tom Shuler sent to the BPD NST

15   Greenbelt Listserv on October 20th, 2009?

16   A.    From all appearances, yes.

17   Q.    Do you have any reason to believe this is not a

18   daily report e-mail?

19   A.    No.

20   Q.    And do you have any reason to believe you did

21   not receive and review this e-mail?

22   A.    No.

23   Q.    Can you describe to me what Mr. Shuler appears

24   to be discussing in this e-mail?

25   A.    Well, the first sentence says, "I have invented

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-17

1   a new game to rival Fantasy Football, poker and American

2   Idol.  This involves our regular transients and ranks

3   them by average BAC and number of cites in their past."

4       Q.   Does it appear from this e-mail that Officer

5   Shuler has created a game out of sighting transient?

6       A.   No.

7       Q.   It doesn't?

8       A.   No.  I think he's having some fun.

9       Q.   It appears from this e-mail that he's comparing

10  different individuals that he has issued citations to to

11  various football players; is that correct?

12      A.   Yes.  Except there is basketball in there, too.

13      Q.   I apologize.  I'm not much of a sports person.

14           Does it appear that he is comparing this to

15  Fantasy Football?

16      A.   It does.

17      Q.   The process of locating and citing

18  individuals?

19      A.   To the best of my knowledge -- I don't play

20  Fantasy Football, and I don't understand -- I don't

21  understand the aces.  So, yeah, to the best of my

22  knowledge, he's describing Fantasy Football.

23      Q.   Do you believe this is appropriate language to

24  use with respect to individuals who have been cited?

25      A.   No.  He isn't denigrating them at all.

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-18

1     Q.   I'm sorry.  Just for the record, can you

2  clarify?  I asked if you felt this was appropriate and

3  you said "no"?

4     A.   I don't have any problem with this.  I don't

5  think appropriate has anything to do with it.  This is

6  an intel sheet, and he's having a little bit of fun.

7  He's having a joke.

8     Q.   So he's having fun at the expense of people

9  he's cited?

10     A.   No.

11     Q.   How is this not at their expense?

12     A.   They're not present.  They don't even know this

13  exists.  As far as I know, Vincent could be -- I think

14  he might be happy that somebody compares him to Tom

15  Brady.  I wish people would compare me to Tom Brady.

16     Q.   There might be some comparisons he would find

17  appropriate, but I believe from looking at this e-mail,

18  he appears to be comparing people he considers

19  transients to sport stars based on their average blood

20  alcohol content and number of citations; is that

21  correct?

22     A.   That's how it appears.

23     Q.   And do you believe these individuals would find

24  that flattering?

25     A.   I don't know.

DEPOSITION OF CLAIR WALKER (TAKEN 08.11.10)

7c63a039-6ee8-4ba3-a4a3-29d5d054e47e
EXHIBIT # 36-19

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JANET F. BELL, BRIAN S. CARSON,  )
CRAIG FOX, ROBERT MARTIN,        )
LAWRENCE LEE SMITH, ROBERT       )
ANDERSON, PAMELA S. HAWKES,      )
JONATHAN LEIGH MILLER, JAMES M.  )
GODFREY, BASIL E. HUMPHREY, and  )
KIRK ROSS,                       )
                                 )
              Plaintiffs,  ) Case No.
                           ) 1:09-CV-00540-REB
vs.                        )
                           )
CITY OF BOISE; BOISE POLICE  )
DEPARTMENT; and MICHAEL     )
MASTERSON, in his official  )
capacity as Chief of Police, )
                            )
              Defendants.  )
_____)


DEPOSITION OF PETER BRUCE RITTER


Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Friday, August 27, 2010
Beginning at 9:00 o'clock a.m.


QnA COURT REPORTING, LLC
Jeana Reiner, CSR, RPR
Idaho Certificate No. 711
776 East Riverside Drive, Suite 200
Eagle, Idaho 83616
Web:  www.qnacourtreporting.com
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)   Telephone:  (208) 484-6309


DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

Page 173

1                    C E R T I F I C A T E

2

3          I, Jeana Reiner, Certified Shorthand Reporter, do hereby

4    certify that:

5          The foregoing proceedings were taken before me, at which

6    time the witness was placed under oath;

7          The testimony and all objections made were recorded

8    stenographically by me and were thereafter transcribed by me;

9          The foregoing is a true and correct record, to the best of
     my
10   skill and ability;

11      Pursuant to request, notification was provided that the

12   deposition is available for review and signature; and

13          I am not a relative or an employee of any attorney, nor am I

14   financially interested in the action.

15          I have hereunto set my hand and seal this 7th

16   day of September 2010.

17

18

19                         _____
                           Jeana Reiner, CSR, RPR
                           Certified Shorthand Reporter
20                         Idaho CSR No. 711

21

22

23

24

25

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-2

1    Q.    Did you have any kind of reports that were

2  weekly or monthly, you know, specific types of reports

3  that you were responsible for providing?

4    A.    I guess if I understand the question you are

5  asking me, is there a report that, a written report that

6  was required monthly.

7    Q.    Or in any other time frame.

8    A.    I don't -- no, not required.

9    Q.    But did you make written reports?

10    A.    I believe I already said that I did.

11    Q.    How often would you make those reports to the

12  deputy chief?

13    A.    Frequently.

14    Q.    Once a week?

15    A.    Sometimes.

16    Q.    And what were the nature of these reports?

17  Just briefly describe for me what types of activities of

18  your division would you report on?

19    A.    Projects that officers were working on;

20  personnel issues within the division; projects that I

21  was working on; suggestions for projects that the

22  Department should work on; officer accommodations for

23  particular activities; synopsis of projects that had

24  been worked on; results of projects that had been worked

25  on; grant.

DEPOSITION OF PETER BRUCE RITTER  (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-3

1  between the day-to-day activities and the projects.  Did

2  you report on day-to-day activities at times of the

3  officers?

4      A.    Yes.

5      Q.    And could they have included enforcement

6  issues?

7      A.    Yes.

8      Q.    Could it have included trends in citations or

9  work that they were involved in?

10      A.    Are you talking specifically homeless people or

11  are you talking about transient citations generally

12  or --

13      Q.    Well, we can do both.

14      A.    I don't recollect anything that we did that was

15  specific to enforcement with homeless folks.  We did do

16  some -- I would give reports on the number of warrants

17  we served at drug houses and that type of stuff with

18  enforcement, but individual citations we don't -- I

19  never did a report based on that.

20      Q.    But you have seen reports on the amount of

21  citations that are issued; have you not?

22      A.    Throughout the department?

23      Q.    Yes.

24      A.    Yes.

25      Q.    And have you seen reports, for example, from

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-4

1   the bike unit?

2       A.    Yes.

3       Q.    What reports have you seen from the bike unit?

4       A.    Well, the division itself does an annual

5   report, or at least it did when I was there.  There was

6   their status for like what they had done for the year in

7   terms of quantitative stuff, as well as some in

8   qualitative things.  I believe that Officer Walker also

9   may have sent me e-mails with numbers of citations

10  written.

11      Q.    Did he send you any kind of seasonal reports

12  that you remember?

13      A.    Actually, the bike sergeant and one of the SRO

14  sergeants were tasked with doing a report about the

15  river enforcement, because that was a project that was

16  actually mandated by the chief, the deputy chief; the

17  whole rowdiness on the river, drinking, float thing.  So

18  that one required a report.  So that would be seasonal,

19  because it was usually Labor Day they would wrap that

20  effort up.

21      Q.    Besides the seasonal and the annual report,

22  were there any other reports from the bike patrol

23  sergeant?

24      A.    So going back to how this started, required

25  reports?

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-5

1    Q.    No.

2    A.    No, there is no required reports.

3    Q.    Any reports.  I'm not just including required

4    ones.

5    A.    Yeah, they communicate regularly, as we've

6    discussed.

7    Q.    And do you pass on that information to the

8    deputy chief?

9    A.    Not always.

10    Q.    Do you pass on the information that's in the

11    annual report to the chief?

12    A.    Yeah.  It's bound and given to whoever wants

13    it; that divisional report was.  I don't know that they

14    still do it, but --

15    Q.    Did you have meetings with the deputy chief?

16    A.    Yes.  About meetings or meetings about

17    homeless?

18         MS. BILYEU:  Just answer the question.

19         THE WITNESS:  Yes, I have meetings.

20    BY MR. BELODOFF:

21    Q.    How often do you meet with him?

22    A.    Formally or informally?

23    Q.    You can give me an answer both.

24    A.    Daily.

25    Q.    You have daily meetings.  And those are more

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-6

1    A.    Yes.

2    Q.    And the sergeant is usually the person who is

3  in charge of that unit, to your knowledge; is that

4  correct?

5    A.    Yes.

6    Q.    And it's the sergeant of that unit who is the

7  direct supervisor of the officers in the bike unit?

8    A.    Yes.

9    Q.    Now, the bike unit officers complete a daily

10 report; are you aware of that?

11   A.    Yes.

12   Q.    Do you receive those reports?  Did you receive

13 those reports?

14   A.    Yes.

15   Q.    During the entire time that you were the

16 captain of the COD?

17   A.    Yes.

18   Q.    Did you review those reports on a regular

19 basis?

20   A.    All of them?

21   Q.    I'm sure you can't say that you reviewed all of

22 them, but on a regular basis did you try to review those

23 daily reports?

24   A.    I reviewed some of them on a regular basis.

25   Q.    Did you review them every time you were at

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

fb929c9b-b2bb-4a61-a0c9-9019fda15199

EXHIBIT # 37-7

1      A.   No.

2      Q.   Is it the Boise Police Department's policy to

3  chase transients around?

4      A.   No.

5      Q.   Is it the Boise Police Department's policy to

6  stalk transients?

7      A.   No.

8      Q.   Is it Boise Police Department policy to

9  conduct, quote-unquote, camper sweeps?

10     A.   No.

11     Q.   Were you ever aware when you were in the COD of

12 bike officers stalking transients?

13     A.   Stalking?

14     Q.   Yes.

15     A.   No.

16     Q.   Were you ever aware of officers in the bike

17 patrol unit conducting camper sweeps?

18     A.   I was aware that they came in early to check

19 camps.  So I guess if that's how you are defining

20 "sweeps," yes, I was aware of that.

21          And, I guess, going back to the question, I

22 guess if you are saying policy -- I mean, they do check

23 those, because we get complaints, and we also are aware

24 that there is people in violation.

25          So I guess I don't view that as anything

DEPOSITION OF PETER BRUCE RITTER (TAKEN 08.27.10)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

————————————————

JANET F. BELL, BRIAN S. CARSON,       )
CRAIG FOX, ROBERT MARTIN, LAWRENCE    )
LEE SMITH, ROBERT ANDERSON,           )
PAMELA S. HAWKES, JONATHAN            )   Case No.
LEIGH MILLER, JAMES M. GODFREY,       )   1:09-cv-540-REB
BASIL E. HUMPHREY, and KIRK ROSS,     )
                                      )
                                      )
                   Plaintiffs,        )
                                      )
vs.                                   )
                                      )
CITY OF BOISE; BOISE POLICE           )
DEPARTMENT; and MICHAEL MASTERSON,    )
in his official capacity as           )
Chief of Police,                      )
                                      )
                   Defendants.        )
————————————————————————————————————  )


DEPOSITION OF MICHAEL F. MASTERSON

Law Office of Howard A. Belodoff
1004 West Fort Street
Boise, Idaho

Thursday, August 12, 2010
Beginning at 9:16 o'clock a.m.


QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)       Telephone:  (208) 484-6309


DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-1

Page 117

```
 1                    C E R T I F I C A T E

 2

 3          I, LORI A. PULSIFER, Certified Shorthand Reporter, do

 4   hereby certify that:

 5          The foregoing proceedings were taken before me, at which

 6   time the witness was placed under oath;

 7          The testimony and all objections made were recorded

 8   stenographically by me and were thereafter transcribed by me;

 9          The foregoing is a true and correct record, to the best of
     my
10   skill and ability;

11       Pursuant to request, notification was provided that the

12   deposition is available for review and signature; and

13          I am not a relative or an employee of any attorney, nor am I

14   financially interested in the action.

15          I have hereunto set my hand and seal this 12th day of

16   September 2010.

17

18          /s/ Lori A. Pulsifer

19                     _____
                       LORI A. PULSIFER, CSR, RDR, CRR
20                     Idaho CSR No. 354

21

22

23

24

25
```

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-2

1              There's a binder in front of you that has all

2    of the exhibits in it that have been premarked.  If you

3    would, turn to Exhibit 5, please.

4         A.    Exhibit 5, the policy and procedures manual?

5         Q.    That's correct.  Do you recognize this

6    document?

7         A.    I do.

8         Q.    Is this the current policy and procedure manual

9    that is in effect for the Boise Police Department?

10        A.    I don't know.  It's dated 2009.  I don't know

11   if there is a more recent edition or not.

12        Q.    Can you turn to the third page, BC011362?

13        A.    Yes.

14        Q.    Is that your signature on the document?

15        A.    Yes.

16        Q.    And it says, above it, "This manual has been

17   recommended by the Boise Police Department Policy

18   Committee and has been reviewed and approved by the BPD

19   Executive Staff."

20             Does your signature signify that you have

21   approved this manual?

22        A.    It does.

23        Q.    Have you received any other copies of this

24   manual since this one that you have been asked to

25   approve and sign?

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-3

1  There will be alcohol violations in the park.  There

2  will be glass container violations in the park.

3      Downtown, there will be private property

4  issues; people drinking open containers in laundromats.

5  There will be bicycle violations.  There will be

6  Pedestrian violations.

7      They answer calls for service, when they can,

8  in the downtown area.  They supplement the work that

9  patrol does.  Generally, because of congestion in the

10  streets, they can get to locations quicker.

11      They will respond to any type of call,

12  priority-three calls, which are our highest priority,

13  which are emergencies and light-threatening calls.  They

14  make themselves available for that.

15      They enforce open container laws.  They enforce

16  rules that regulate city parks and other ordinances that

17  are created by our Mayor and City Council.

18  Q.   What are the most common violations for which

19  they issue citations?

20  A.   Open container, public urination and, I would

21  guess, disorderly conduct.

22  Q.   What about camping?

23  A.   They would be the primary unit that would write

24  violations of camping.

25  Q.   What sort of reports do you receive regarding

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-4

1  the work of the bicycle patrol unit?

2      A.   Very few.  I receive, on a daily basis, e-mails

3  that describe, basically, their work performance for a

4  day, their daily performance.

5      Q.   Do you receive reports on an annual basis?

6      A.   I do.

7      Q.   Do you receive seasonal reports from Sergeant

8  Walker at the end of the typical bike patrol season?

9      A.   There is no particular bike patrol season.

10  It's year-round.

11     Q.   Do you receive a report in October of each

12  year, or thereabout, or after October of each year,

13  describing the busiest season of the bike patrol

14  officers?

15     A.   If I do, I'm not aware of it.

16     Q.   Do you receive a trimester report, an

17  every-four-month report, from Sergeant Walker?

18     A.   I'm not aware of it.

19     Q.   Do you receive any reports directly from

20  Sergeant Walker?

21     A.   I receive, occasionally, a daily that he does.

22     Q.   Going back to the policy and procedures manual

23  that's right in front of you, this manual sets forth the

24  policies governing police officer conduct; is that

25  correct?

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-5

Page 24

1    A.    It does.

2    Q.    As we already established, you approved this

3    manual for distribution and implementation; correct?

4    A.    I do.

5    Q.    Do you review the entire manual before signing

6    it?

7    A.    I do not.

8    Q.    Which portions of the manual would you review

9    before signing it?

10   A.    Changes and revisions that have been made on an

11   ongoing basis.

12   Q.    And just to make sure that I understand which

13   manuals you have been involved in, if you could, turn

14   back for one moment to Exhibit 4, please, about three

15   pages in, again, the approval page.

16   A.    Yes.

17   Q.    BC011288?

18   A.    Yes.

19   Q.    Is this your signature on this page?

20   A.    It is.

21   Q.    And your signature signifies that you approved

22   this manual dated October 2007 for distribution and

23   implementation; correct?

24   A.    It does.

25   Q.    And if you could, turn to Exhibit 3.  It is one

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-6

1    more back, please.  This signature page is not your

2    signature.  I believe it's Chief Tibbs'; correct?

3         A.   It is.

4         Q.   Is Chief Tibbs the person that preceded you

5    in --

6         A.   My position?

7         Q.   -- your position as Chief of Police?

8         A.   Yes.

9         Q.   Even though Chief Tibbs signed this manual,

10   when you took over the job on January 1, 2005, you would

11   be responsible for implementing the policies within this

12   manual; correct?

13        A.   Yes.

14        Q.   If you would, turn back to Exhibit 5, please.

15   Who else besides you is on the executive staff?

16        A.   The two deputy chiefs, Patricia Braddock and

17   James Kerns.

18        Q.   Do they approve the manual before you approve

19   and sign it?

20        A.   Yes.

21        Q.   Do they offer you any feedback on portions of

22   the manual for your consideration before you approve it?

23        A.   Yes.

24        Q.   Do you recall any specific revisions of this

25   particular manual on which they offered you feedback

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-7

1    before you signed and approved it?

2        A.    No.

3        Q.    This manual is distributed electronically to

4    all employees who have access to the BPD server;

5    correct?

6        A.    Yes.

7        Q.    It is also available in hard copy for every

8    supervisor?

9        A.    Yes.

10       Q.    And available in various locations throughout

11   the police department in hard copy, as well?

12       A.    That's correct.

13       Q.    Revisions to the manual, such as special

14   orders, are sent out to all police officers, as well;

15   correct?

16       A.    Yes.

17       Q.    All employees are required to read the policy

18   manual and policy manual updates regularly; correct?

19       A.    Yes.

20       Q.    To the extent that a special order is issued

21   for the manual, you are the person that signs off and

22   approves that; correct?

23       A.    Yes.

24       Q.    Can you tell me how policies in the manual are

25   created?

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-8

1    A.   We have a policy committee that is composed of

2   a planner from training and various captains that serve

3   in the organization.  I think it includes other ranks,

4   as well.

5          It also includes a legal advisor to the police

6   department, generally Jill Musser, who goes over our

7   policies on an annual basis or at the request of anyone

8   in the organization to take a look at the policy to make

9   sure that it's current with our laws.

10    Q.   And what is your specific role in the

11   development of policies?

12    A.   My role, once the policies come forward and

13   have been reviewed and scrutinized by the committee and

14   then come up the chain of command, is to sign off on the

15   policy so it becomes the official policy of the Boise

16   Police Department.

17          My role is also to take a look at policy and

18   policy development, as the leader, to make sure that

19   some of the policies that exist out there -- for

20   instance, domestic violence -- where there are frequent

21   changes that we learn from others in our profession or

22   from our legal advisors or from our other partners in

23   the community that they are updated, as well.

24          I will make recommendations back to the policy

25   committee to examine those.

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-9

1     Q.   If you would, turn to Section 3.08.4.

2     A.   Okay.

3     Q.   It's entitled "Supervisor Authority and

4 Responsibility"?

5     A.   Yes.

6     Q.   Under "Authority," it says, "The Chief has the

7 authority to establish policy and to direct all actions

8 of the Department and its employees;" correct?

9     A.   Yes.

10     Q.   Is it correct that no other employees have

11 authority to establish policy for the police department?

12     A.   Correct.

13     Q.   Has the same practice for setting policy

14 existed since you have been the Chief of Police?

15     A.   Yes.

16     Q.   Was it the practice before you became the Chief

17 of Police?

18     A.   I can't tell you.

19     Q.   Do officers have discretion to set their own

20 policies within the police department?

21     A.   No.

22     Q.   Is this policy and procedures manual the only

23 policy that governs officer conduct?

24     A.   The only policy?  Yes.

25     Q.   Is it the only written guidance that governs

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-10

1     Q.    Prior to November of 2009, did the Boise Police

2    Department have any written finding protocols governing

3    officer interactions with homeless individuals?

4         A.    I don't believe so.

5         Q.    Your job requires you to be familiar with the

6    Boise Municipal Code; correct?

7         A.    Yes.

8         Q.    Are you familiar with Boise Municipal Code

9    9-10-02?

10        A.    Can you tell me what it is and where I may find

11   it?

12        Q.    9-10-02 is the camping ordinance that we have

13   been discussing today.

14        A.    Oh, okay.

15        Q.    You may find it in Exhibit 6.

16        A.    Okay.

17        Q.    This is the resolution passing the ordinance on

18   the document that is Bates No. BC003083?

19        A.    Yes.

20        Q.    That is the language of the actual ordinance?

21        A.    Yes.

22        Q.    Are you familiar with this ordinance?

23        A.    I am.

24        Q.    Prior to the passage of this particular

25   ordinance, this particular version of the ordinance, did

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-11

1   being closed during the hours, the fact that he couldn't

2   be there.  The individual complied and moved on.

3       Q.   Are there any other instances that you observed

4   of a camping violation or a potential camping violation?

5       A.   No.

6       Q.   Prior to this Special Order that took effect on

7   January 1, 2010, was there any other written guidance

8   issued on Section 9-10-02?

9       A.   I don't believe so.

10      Q.   Did you issue any written guidance?

11      A.   I did not.

12      Q.   Did you send any e-mails explaining to your

13  officers the enforcement of 9-10-02?

14      A.   I did not.

15      Q.   Did you receive any e-mails discussing the

16  enforcement of 9-10-02?

17      A.   I don't believe so.

18      Q.   When you have ridden with bike patrol officers,

19  have you ever heard them use the term "transient

20  American"?

21      A.   I have.

22      Q.   What is your understanding of what the term

23  "transient American" means?

24      A.   It is, I believe, a component or a subsection

25  of economically-challenged or homeless people who prefer

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-12

1    a particular style of lifestyle and want to be isolated.

2            Basically, they don't want to have contact with

3    other people.  In many cases, they are loners and enjoy

4    the independence of not being in a structured living

5    environment.

6        Q.   Is it your belief that a transient American is

7    someone who is outside or living outside by choice?

8        A.   Yes.

9        Q.   Are those --

10       A.   Could be.

11       Q.   Are those individuals alcohol-dependent?

12       A.   Many of them are.

13       Q.   Are there any other specific characteristics

14   that you would use to describe a transient American?

15       A.   I think that they have -- many of that

16   population have mental health issues.  Certainly, they

17   have physical health issues.

18       Q.   How do you differentiate between a homeless

19   individual with disabilities and alcohol dependence who

20   is not, under your definition, a transient American and

21   who is?

22       A.   I think a homeless person, in the larger

23   context, is someone who is there not by choice -- an

24   economic situation, a housing situation, a family

25   situation -- and necessitated that form of lifestyle for

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-13

Page 62

1   the number of camping citations issued over the course

2   of one year; correct?

3       A.   Yes.

4       Q.   Did a 500-percent increase in the number of

5   citations catch your attention in 2007?

6       A.   No.

7       Q.   Do you have any knowledge of why there was such

8   a significant increase in the number of citations

9   between 2006 and 2007?

10      A.   The report on page 9839 alludes to the fact

11  that the increase was due to complaints from both park

12  users and Boise Parks and Recreation and a change in the

13  hours of deployment, which I'm not aware of specific

14  hours.  Those would be the reasons that would be cited

15  for the increase.

16      Q.   Did you have any discussions with anyone about

17  the complaints that were issued by park users at this

18  time or at any time?

19      A.   I did not.  I delegate that authority down to

20  the staff that works for me.

21      Q.   Who would have the responsibility for dealing

22  with issues such as complaints from park users?

23      A.   What year?

24      Q.   2007.

25      A.   It would be the sergeant in the bike unit, the

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-14

Page 65

1    it was either Spokane or Coeur d'Alene.  I think it was

2    Coeur d'Alene.  He was given a bus ticket to come to

3    Boise.

4           The net result of that investigation was

5    linking that individual up with community support

6    services that got him food and shelter.

7           I would hope that's the expectation that Boise

8    Police Officers do when dealing with individuals,

9    regardless of their socio-economic background, in terms

10   of getting them the help that they need.

11       Q.   You describe what you hope that your officers

12   are doing out on the streets.  My question is:  Is it

13   consistent with policy to issue camping citations to

14   homeless individuals who do not have available shelter?

15       A.   It is now, as of January 1st.

16       Q.   It is now acceptable, under the policy, to

17   issue a citation to an individual, a homeless

18   individual, who does not have available shelter?

19       A.   If the shelters are full, we do not issue

20   homeless camping citations to anyone.

21       Q.   Prior to the Special Order that took effect

22   January 12, 2010, would it be acceptable, under Boise

23   Police Department policies, to issue a citation to an

24   individual who does not have available shelter?

25       A.   It could be.

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-15

1      Q.    Under what circumstances?

2      A.    Has the individual sought out shelter?  Are

3  there other available means of shelter to that person

4  instead of camping in the city park while it was closed

5  along the Greenbelt?

6            I guess it would involve the totality of the

7  circumstances of each case.  Just because a person is

8  homeless would not necessitate either giving a ticket or

9  not giving a ticket.

10     Q.    Was there a requirement for your officers to

11 find out if shelter space was available before issuing

12 citations prior to January 1, 2010?

13     A.    Yes.  I believe that e-mail that you showed me

14 from Captain Ritter dated 6/22/09 makes reference in

15 there about shelters.

16     Q.    Prior to the e-mail on June 22, 2009, by

17 Captain Ritter, was it a requirement for your officers

18 to find out whether there was available shelter before

19 issuing a citation for camping?

20     A.    No, there was not.

21     Q.    If, in fact, it is a violation of an

22 individual's constitutional rights to cite that

23 individual for sleeping in public when there is no

24 available shelter, would it be a violation of the Boise

25 Police Department policy to cite an individual for

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-16

1    A.   No.

2    Q.   Do you know whether your bike patrol officers

3    issue any citations for sleeping in public places under

4    the disorderly conduct ordinance?

5    A.   I don't know.

6    Q.   Is it consistent with Boise Police Department

7    policy to issue a citation for disorderly conduct for

8    sleeping in a public place?

9    A.   I don't know.

10   Q.   Can you take a look again at Exhibit 5, the

11   Special Order that went into effect January 1, 2010?

12   A.   Okay.

13   Q.   Bates No. BC011431?

14   A.   Yes.

15   Q.   Does this Special Order govern both the

16   enforcement of the camping ordinance and the disorderly

17   conduct ordinance?

18   A.   Certainly, camping/sleeping ordinances.

19   Q.   What is a sleeping ordinance?

20   A.   I believe it refers to the camping ordinance.

21   Q.   Does this Special Order that you approved and

22   implemented address the disorderly conduct ordinance?

23   A.   To me, it refers only to the camping ordinance.

24   Q.   So there is no current policy governing

25   enforcement of the disorderly conduct ordinance by the

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-17

1    Boise Police Department?

2        A.    I don't know.

3        Q.    You are the one that is the only authority that

4    can issue policies for the Boise Police Department;

5    correct?

6        A.    I am.

7            MS. BILYEU:   We would like to take a break.

8            MS. O'MALLEY:   I would like an answer, first,

9    to my question of whether or not there is a policy by

10   the Boise Police Department --

11           MS. BILYEU:   He just answered your last

12   question that was standing.

13           THE WITNESS:   I will just answer the question.

14   The policy is extensive, and the laws are extensive.   I

15   don't think it's fair to ask any one individual if they

16   have memorization of any one particular ordinance or

17   policy.

18           I would be happy to review and answer your

19   question after I have had the opportunity to take a look

20   at it.

21                      (Break taken.)

22   BY MS. O'MALLEY:

23       Q.    Are you aware of any disorderly conduct

24   citations being issued for individuals sleeping who were

25   not identified as transient or homeless?

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

1      Q.    Could you turn a couple more pages?

2      A.    I have 9/1.

3      Q.    I believe it's out of order from last time.

4            This is a daily from Tom Shuler dated August 6,

5      2007.  In this daily report, he indicates, "Stalked a

6      few transients with no success."  Did Officer Shuler

7      ever indicate to you that he was stalking transients?

8      A.    No.

9      Q.    Was Officer Shuler ever disciplined for

10     stalking transients?

11     A.    No, not to my knowledge.

12     Q.    Look at Exhibit 52, please.

13     A.    Okay.

14     Q.    This is a daily report from Andrew Johnson

15     dated May 15, 2008?

16     A.    Okay.

17     Q.    Three lines down, he says, "The transient

18     nation is well within bounds"?

19     A.    Okay.

20     Q.    Do you recall ever receiving this e-mail?

21     A.    I don't.

22     Q.    Do you recall ever hearing Officer Johnson

23     refer to "the transient nation"?

24     A.    Not Officer Johnson, no.

25     Q.    Do you recall hearing the term "transient

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-19

1    nation" being used by any officer?

2        A.    I've heard "transient Americans."  I have not

3    heard "transient nation."

4        Q.    Do you know if Officer Johnson received any

5    discipline for his use of the term "transient nation"?

6        A.    I do not.

7        Q.    If you would, look at Exhibit 71, please.

8              If you would, just take a moment to read the

9    bullet point that starts with, "Rhodes Park is out of

10   control..."  This is a daily report from Officer Dotson

11   dated July 8, 2008, covering July 6th and 7th of 2008.

12   Do you recall receiving this e-mail?

13       A.    I don't.

14       Q.    Do you know what the term "TA" stands for?

15       A.    "TA"?

16       Q.    Correct.

17       A.    I believe that is in reference to "transient

18   Americans."

19       Q.    Did you have any discussions with Officer

20   Dotson about a problem in Rhodes Park and transient

21   Americans camping out there?

22       A.    I did not.

23       Q.    Did you have any discussions with any other

24   officer about the problem in Rhodes Park with transient

25   Americans?

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-20

1    earlier?

2        A.    I am.

3        Q.    This is the one we were discussing earlier?

4        A.    Yes.

5        Q.    Did you review the recommendations in this

6    report?

7        A.    I did.

8        Q.    Did you review them before preparing for this

9    deposition?

10       A.    I reviewed them several years ago.

11       Q.    Did you review them immediately when the report

12   came out?

13       A.    Yes.

14       Q.    The Ombudsman, in the first paragraph here,

15   recommends, "...the Department create a written police

16   protocol overseeing interaction between police officers

17   and persons experiencing homelessness."

18            Has the Boise Police Department implemented

19   that recommendation?

20       A.    Not to my knowledge.

21       Q.    The Ombudsman's Report also says, "The protocol

22   should include the creation of a training program to

23   familiarize officers with the services available, the

24   location of facilities, and the staff at those

25   facilities" -- the homeless shelters.

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-21

1          Has the Boise Police Department implemented

2     that portion of the recommendations?

3          A.   We do not have official protocols.  For

4     officers that are working in these areas, whether it's

5     the Booth Home, River of Life, Sanctuary, or Corpus

6     Christi, they get out and they become familiar with the

7     staff.

8          They introduce themselves.  They understand

9     what the problems are.  They make their phone numbers

10    available to those people as a resource and, if there

11    are problems, call directly.

12         Q.   Just so I am clear, the officers make their

13    phone numbers available to the shelters or the shelters

14    make their phone numbers available to the officers?

15         A.   The officers -- some of them have relationships

16    with these shelters that go beyond just a building being

17    in their area.

18         Q.   Are you aware of any specific individual

19    relationships between officers and shelters?

20         A.   Not specifically, no.

21         Q.   How do you know that the officers have

22    relationships with the shelters?

23         A.   Because back in -- probably one or two years

24    ago, I asked patrol captains to direct their people to

25    get out and visit the shelters so that they know who the

DEPOSITION OF MICHAEL F. MASTERSON (TAKEN 08.12.10)

2ff73a05-062f-4017-99a6-3637797d59ee

EXHIBIT # 38-22

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____

| | |
|---|---|
| JANET F. BELL, BRIAN S. CARSON, CRAIG FOX, ROBERT MARTIN, LAWRENCE LEE SMITH, ROBERT ANDERSON, PAMELA S. HAWKES, JONATHAN LEIGH MILLER, JAMES M. GODFREY, BASIL E. HUMPHREY, and KIRK ROSS, | ) ) ) ) ) ) ) |

Case No.
1:09-cv-540-REB

                  Plaintiffs,

vs.

CITY OF BOISE; BOISE POLICE
DEPARTMENT; and MICHAEL MASTERSON,
in his official capacity as
Chief of Police,

                  Defendants.

_____


DEPOSITION OF ROSALEE "ROSIE" K. DICE

Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Tuesday, August 31, 2010
Beginning at 9:00 o'clock a.m.


QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)      Telephone: (208) 484-6309


DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-1

1                    C E R T I F I C A T E

2

3          I, LORI A. PULSIFER, Certified Shorthand Reporter, do

4    hereby certify that:

5          The foregoing proceedings were taken before me, at which

6    time the witness was placed under oath;

7          The testimony and all objections made were recorded

8    stenographically by me and were thereafter transcribed by me;

9          The foregoing is a true and correct record, to the best of my

10   skill and ability;

11       Pursuant to request, notification was provided that the

12   deposition is available for review and signature; and

13         I am not a relative or an employee of any attorney, nor am I

14   financially interested in the action.

15         I have hereunto set my hand and seal this 18th day of

16   September 2010.

17                    /s/ Lori A. Pulsifer

18

19                    _____
                      LORI A. PULSIFER, CSR, RDR, CRR
20                    Idaho CSR No. 354

21

22

23

24

25

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-2

Page 32

1    Q.    And you know that --

2    A.    We have never been up here even to capacity.

3    Q.    That's 117?  You are pointing to this

4  document?

5    A.    Yes.

6    Q.    Nobody from the Boise Fire Department has

7  approved this capacity, have they?

8    A.    I can't recall.

9    Q.    You can't recall if --

10    A.    I can't recall if they have been there to do

11  that.

12    Q.    Should you have been notified if the Boise Fire

13  Department was inspecting City Light?

14    A.    It could have been a day I wasn't there.  I'm

15  not the director of the shelter.

16    Q.    I thought you said you were the director of the

17  shelter.

18    A.    I am the director of the guest -- I'm the

19  director for the City Light Shelter.  I am not the

20  director of City Light.

21    Q.    Now, in all of your time since you have been

22  employed at City Light, do you remember any fire

23  officials being on the premises?

24    A.    Quite a few times.

25    Q.    When?

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-3

Page 33

1    A.    Well, they come when we have situations happen.

2    You know, if we have an emergency with one of our

3    guests, they come in.   If our alarm systems are

4    malfunctioning, they come in.

5    Q.    Do you recall when an inspection of City Light

6    was conducted by a Boise Fire Department Inspector?

7    A.    No, I don't.

8    Q.    Do you know the name of the Fire Inspector for

9    the Boise City Fire Department that would have the

10   responsibility to conduct inspections at the City Light

11   Shelter?

12   A.    No, I don't.

13   Q.    Have you ever seen a report, an inspection

14   report, completed by a Boise Fire Department

15   Inspector?

16   A.    No.

17   Q.    That would be pertaining to the City Light

18   Shelter?

19   A.    If it went to anybody, it would go to our

20   director of City Light.

21   Q.    My question is:   Have you ever seen one?

22   A.    No.

23   Q.    Was it you who determined the numbers of mats

24   and beds on Exhibit 147?

25   A.    We had our maintenance man come and check it

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-4

1    out.

2         Q.    How did he do that?

3         A.    Measures everything.

4         Q.    What did he measure?

5         A.    He measured our family, our play room, our

6    lobby, laundry room, you know, dining room, living area,

7    and the corner, small room and the clothing room.

8         Q.    And when you say he measured it, tell me what

9    he did exactly.

10        A.    He went there.  He measures.  He knew the

11   statistics, and so he measured to see what we could --

12   what our capacity could be.  Then he called me and he

13   told me.

14        Q.    Are you saying that he measured the total

15   square footage of each of these rooms?

16        A.    Yes.

17        Q.    And then he calculated the measurement of a mat

18   and then --

19        A.    Yes.

20        Q.    -- placed them 36 inches apart?

21        A.    Yes.

22        Q.    And this was for the total square footage of

23   each room?

24        A.    Yes.

25        Q.    Did he exclude any furniture or other items

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-5

Page 35

1   that were in the room, itself, if you know?

2        A.   Not that I know of.

3        Q.   And when did he do this?

4        A.   Yesterday.  Well, he gave them to me yesterday.

5   I don't know when he did it.

6        Q.   And who told him to do this?

7        A.   I did.

8        Q.   And when did you tell him?

9        A.   About three weeks ago.

10       Q.   And why did you request that he do this?

11       A.   Because I wanted to know what our actual

12  capacity was supposed -- or could be.

13       Q.   So prior to three weeks ago, did you know what

14  the actual capacity could be?

15       A.   No.

16       Q.   Have you provided this information to anybody

17  else besides the people in this room, I guess, on

18  Exhibit 147?

19       A.   To Jean Lockhart.

20       Q.   The director?

21       A.   Yes.

22       Q.   Why did you provide it to her?

23       A.   Because I provide everything that I think is

24  important to her.  She's my boss.

25       Q.   Was there a reason why you determined, three

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

1   weeks ago, to figure out what the capacity of the

2   shelter was?

3       A.   We had a meeting about this situation and we

4   wanted to find -- I wanted to find out.  The men's

5   mission already knew, but we didn't.

6       Q.   Who did you have a meeting with?

7       A.   River of Life.

8       Q.   What are the names of the persons present at

9   the meeting?

10      A.   Stuart.

11      Q.   Stuart who?

12           MR. HENDRICKSON:  Sampson?

13           THE WITNESS:  Who?

14           MR. HENDRICKSON:  Sampson?

15           THE WITNESS:  Yes, Stuart Sampson.

16   BY MR. BELODOFF:

17      Q.   Who is he?

18      A.   He is the director.

19      Q.   Of?

20      A.   City Light -- I mean, River of Life.

21      Q.   Since there are two directors, can you be more

22   specific?

23      A.   I don't know quite -- he's the director of the

24   shelter.  He's the director of the shelter program.

25      Q.   And was he the only person present?

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-7

Page 49

1    Q.    In this letter, you say that City Light has 95

2    beds?

3    A.    Uh-huh.

4    Q.    Where are those beds located?

5    A.    We have 58 beds in our new dorm across the

6    street.  We have 25 beds in an upper dorm.  We have 12

7    beds in the lower dorm.

8    Q.    Then you say there's 32 mats?

9    A.    Well, that's what we had.  We had 32 mats in

10   storage at that point.

11   Q.    So those are stored where?

12   A.    In the dining area.

13   Q.    Are those all of the mats that have been in

14   City Light since you have been there?

15   A.    Uh-huh.

16   Q.    Yes?

17   A.    Yes.

18   Q.    Have you ever had to use all 32 of those mats?

19   A.    No.

20   Q.    How do you know that?

21   A.    Because we have never been above capacity.

22   Let me add this up.  Well, I'm sorry.  We

23   probably have used the mats.  We probably have used the

24   mats.

25   Q.    What do you mean by, "...have used the mats"?

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

cd27ea4e-804c-45ab-952d-40b889516dd1

EXHIBIT # 39-8

1      A.   And they have to come in every night.

2      Q.   Right.  My question is:  If it's not during the

3   winter and there is that thirty-day limit you spoke

4   about -- do you remember that?

5      A.   Yes.

6      Q.   And they hit that thirty-day limit that the

7   shelter imposes?  Yes?

8      A.   Yes.

9      Q.   The shelter asks them to leave; correct?

10     A.   If -- yes -- extenuating circumstances.

11     Q.   And so it's not necessarily a choice?  That's

12   just the policy at City Light?

13     A.   Uh-huh.

14     Q.   Yes?

15     A.   Yes.

16     Q.   And you talked about this a little.  There are

17   individuals among the homeless who suffer significant

18   mental health concerns?

19     A.   Right.

20     Q.   I am sure you are aware of that?

21     A.   Yes.

22     Q.   It sometimes makes it difficult for them to

23   stay in a shelter environment?  True?

24     A.   Yes.

25     Q.   And to be around large groups of people?

DEPOSITION OF ROSALEE "ROSIE" K. DICE (TAKEN 08.31.10)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

_____

JANET F. BELL, BRIAN S. CARSON,      )
CRAIG FOX, ROBERT MARTIN, LAWRENCE   )
LEE SMITH, ROBERT ANDERSON,          )
PAMELA S. HAWKES, JONATHAN           )   Case No.
LEIGH MILLER, JAMES M. GODFREY,      )   1:09-cv-540-REB
BASIL E. HUMPHREY, and KIRK ROSS,    )
                                     )
                                     )
                    Plaintiffs,      )
                                     )
vs.                                  )
                                     )
CITY OF BOISE; BOISE POLICE          )
DEPARTMENT; and MICHAEL MASTERSON,   )
in his official capacity as          )
Chief of Police,                     )
                                     )
                    Defendants.      )
_____)


DEPOSITION OF STUART SAMPSON

Howard Belodoff Law Office
1004 West Fort Street
Boise, Idaho

Tuesday, August 31, 2010
Beginning at 2:03 o'clock p.m.


QnA COURT REPORTING, LLC
Lori A. Pulsifer, CSR, RDR, CRR
Idaho CSR No. 354
E-mail: realtimeqna@msn.com
(ELECTRONIC COPY)    Telephone:  (208) 484-6309


DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

Page 73

1

2                      C E R T I F I C A T E

3

4        I, LORI A. PULSIFER, Certified Shorthand Reporter, do

5   hereby certify that:

6        The foregoing proceedings were taken before me, at which

7   time the witness was placed under oath;

8        The testimony and all objections made were recorded

9   stenographically by me and were thereafter transcribed by me;

10       The foregoing is a true and correct record, to the best of
    my
11   skill and ability;

12     Pursuant to request, notification was provided that the

13   deposition is available for review and signature; and

14       I am not a relative or an employee of any attorney, nor am I

15   financially interested in the action.

16       I have hereunto set my hand and seal this 18th day of

17   September 2010.

18

19            /s/ Lori A. Pulsifer
                 _____
20               LORI A. PULSIFER, CSR, RDR, CRR
                 Idaho CSR No. 354
21

22

23

24

25

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a
EXHIBIT # 40-2

Page 32

1    out; correct?

2         A.    Yes.  I, actually, painstakingly did that.

3         Q.    Thank you.

4               I just have a couple of questions.  Starting on

5    the first page, BRM013181, there is a section that says

6    "Section A."  What is Section A?

7         A.    Section A is the A Dorm.

8         Q.    And that's on the first floor?

9         A.    That is correct.

10        Q.    And Section A, on the form, has 110 beds, under

11   the "Bed" column; is that correct?

12        A.    That is correct.

13        Q.    And is that the number of beds that are in the

14   A Dorm, Section A?

15        A.    Currently, I believe so.

16        Q.    And are those bunk beds?

17        A.    Yes, sir.

18        Q.    55 bunk beds would be 110 beds; correct?

19        A.    That would be correct, sir.

20        Q.    Has that number changed since you became

21   employed at the River of Life -- in that dorm?

22        A.    Yes, sir.

23        Q.    What was it before, and what did it change to?

24        A.    To the best of my knowledge, if there was 68

25   total in that dorm -- actually, I'm not quite sure.

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-3

Page 33

1    Q.   Do you know what that changed to?  Did it
2    change from 68 to 110?
3    A.   Oh, no.  As you are well aware, when the
4    economy went into the tank, I believe, in 2007, we
5    started having to expand that dorm to accommodate.  We
6    were experiencing winter numbers in July in 2007.
7    Q.   By that, what do you mean?
8    A.   By that, I mean we were nearly full.
9    Q.   In A Dorm or the total shelter?
10   A.   Well, what we had known as the total shelter.
11   Q.   So did you increase the number of beds, as a
12   result?
13   A.   Yes.
14   Q.   And do you recall what you increased it to?
15   A.   Possibly by five to ten, maybe, bunk beds, at
16   first.
17   Q.   Can you give me an approximate date?  Is that
18   in 2007 or 2008?
19   A.   I believe it was in 2008.
20   Q.   And then it was increased again?
21   A.   Just this last winter.
22   Q.   To the current 110?
23   A.   That's correct.
24   Q.   And the reason why it was increased last winter
25   is why?

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-4

1     A.    The same reason.   There wasn't any letting up.

2  We experienced probably over 1,300 new clients, new

3  homeless people, last year alone.

4     Q.    Is that over the course of 2009, or is that in

5  the winter of 2009?

6     A.    2008, 2009.

7     Q.    So the existing bed capacity was filled, and

8  you felt the need to increase the number of beds?   Is

9  that accurate?

10    A.    That is accurate.

11    Q.    Go to page BRM013187, Section B.   Where is

12 Section B located?

13    A.    Section B is located on the first floor,

14 between the A Dorm and the dining room.

15    Q.    On this date, in August of 2010, it shows there

16 are 28 beds, 14 bunks; correct?

17    A.    That's correct.

18    Q.    Were the number of bunks increased in Dorm B

19 during the time that you worked there?

20    A.    No, sir.

21    Q.    Since 2007, there has always been 28 beds in

22 Dorm B?

23    A.    That's correct.

24    Q.    And I think you previously told me who is

25 housed in Dorm B.   Did you want to add to what you told

---

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-5

Page 35

1  me?

2      A.    Generally, medicals.

3      Q.    And by "medicals," you mean what?

4      A.    There is a physical and mental health.

5  Primarily, physical.  There is the bathrooms on that

6  side.  All of the bathrooms are handicap accessible, but

7  the bathrooms are located closer to the dorm.  One of

8  the stalls is bigger.  It's a matter of convenience for

9  the disabled.

10     Q.    The next section, starting at BRM013189, is

11  Section C.  Where is that located?

12     A.    Section C is the south wing of the second

13  floor.

14     Q.    We talked about that; correct?

15     A.    Correct.

16     Q.    About who is there?

17     A.    Correct.

18     Q.    Turn to Section FL.  That would be page 13191

19  and 13192.  What does "FL" stand for?

20     A.    That is the dining hall.

21     Q.    What does "FL" stand for?

22     A.    "Floor."

23     Q.    And these people have beds in the dining hall?

24     A.    These people are provided a six-inch single mat

25  to sleep on on the dining room floor.

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-6

1    Q.   And this contains 35 -- it says "beds," but you

2  are telling me it's all mats; correct?

3    A.   Correct.

4    Q.   Is that the number of people that, at any one

5  time, can stay on the dining room floor?

6    A.   That's correct.

7    Q.   Who stays on the dining room floor?  Is there a

8  type of resident that stays in there?

9    A.   No, sir.

10    Q.   I noticed that there were open bunks in the

11  dormitories -- actual beds -- in Section A and Section B

12  and Dormitory B, and you still had people on the floor

13  in the dining room.  Can you tell me why that is?

14    A.   On any given night, particularly with this

15  demographic, individuals just don't show up.  So it's

16  common procedure, in the course of reproducing this

17  document every day and updating it, to pull the

18  individual's name from the bunk prior to check-in the

19  following day.

20    Q.   So I am just trying to understand.  So what

21  time of day, when you run this report, does it reflect?

22  Is it run in the morning?  Is it run after the residents

23  leave in the afternoon?  When is it run?

24    A.   This is used at check-in.  This was used on

25  August 4th.  The staff of August 5th updates it.

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-7

Page 42

1    A.    Yes.

2    Q.    Could you mark where that is, please?  Just

3    mark "old bathroom."

4    A.    This is kind of tricky here.  These would be

5    the showers, right over in here.

6    Q.    Would you just put "SH" and we can call it

7    showers?

8    A.    Okay.  There we go.  Is that good enough?

9    There's stalls and urinals, right in here, in this

10   particular area.  This bathroom is pretty good-sized.

11   Then the showers are over in this particular area.

12   Q.    Two showers that you marked "SH"?

13   A.    Eight.  There are showers on both walls, in

14   here.

15   Q.    Okay.

16   A.    It's kind of like the Y.  It's very similar to

17   the Y.

18   Q.    Are there showers in the new bathroom area?

19   A.    Yes, sir.

20   Q.    How many?

21   A.    I believe there's around the same amount.  Once

22   again, I haven't been down in that area for quite a

23   while.  Most of my time is spent elsewhere.  I believe

24   there are six to eight in that shower facility, as well.

25   Q.    For the emergency shelter residents, are there

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-8

Page 43

1    any limits on the length of stay a person can stay in

2    the River of Life?

3         A.    It's dependent upon the time of year.

4         Q.    Tell me what they are, depending on the time of

5    year.

6         A.    Summer and winter rules -- if an individual

7    isn't showing any motivation to assist himself in moving

8    forward with his life, if he's not taking advantage of

9    the mental health services that are offered, the

10   vocational services that we offer, if he's, basically,

11   roaming the streets, not looking for work, not willing

12   to file for disability -- if he wants to truly sustain

13   his homelessness, then it's a seventeen-day-in,

14   thirty-day-out requirement.  I do not like using that

15   rule.

16        Q.    But you do use it?

17        A.    Yes.

18        Q.    You mentioned winter hours.  How does it change

19   during the winter?

20        A.    There is no length of stay.  We can't do that.

21        Q.    Is there a period of time which you consider to

22   be the winter-hour period?

23        A.    That's, basically, just a gut call.  Like, for

24   instance, the other night, I called down there and told

25   them not to put anybody out that night.

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a
EXHIBIT # 40-9

Page 55

1   that.

2       Q.    You have made it very clear.

3             And you don't call the Sanctuary either, if you

4   put somebody out, to see if they can stay there during

5   the summer?

6       A.    Generally, we do if they are seeking other

7   arrangements for shelter during the summer, if they,

8   more or less, give us the bird and walk out.

9             But if they are wondering where they are going

10  to stay, then we try to make arrangements for them.

11      Q.    If a person doesn't want to participate in the

12  recovery program, are they allowed to stay in River of

13  Life?

14      A.    You are going to have to rephrase that.   A

15  person seeking substance abuse treatment?

16      Q.    I will just ask you a new question.

17            If a person is staying in River of Life and

18  they have reached their seventeen days and they don't

19  want to participate in the recovery program, the New

20  Life Recovery Program, are they allowed to stay there if

21  they don't participate?

22      A.    The New Life Recovery Program is a substance

23  abuse program.   That has nothing to do with the

24  seventeen-day-in, thirty-day-out policy.

25      Q.    If they wanted to stay in the shelter and they

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-10

Page 56

1   hit their seventeen-day limit in the summer, they could

2   stay if they enrolled in the recovery program?

3        A.   I think you have got your programs mixed up.

4   Let me see if I can clarify this for you.   The New Life

5   Recovery Program is a substance abuse program.

6        If an individual comes into guest services

7   that's an emergency services guest, yes, he would have

8   to enroll in the work search program, the work ethics

9   program, or the accountability program and put his best

10  foot forward to solve his situation or else we would

11  impose the seventeen-day-in and thirty-day-out policy on

12  him.

13        Generally, it's way longer than seventeen days.

14  Usually, we don't get to that point until it's somewhere

15  around the time that they have forged 105 job contacts.

16  So it's more like a thirty-day-in program.

17        They, basically, just have to want to do

18  nothing to get kicked out of River of Life.   The

19  seventeen-day-in rule is just kind of an imaginary kind

20  of policy to incite some motivation for people to get on

21  with their lives.

22        Q.   But you are not telling me that the

23  seventeen-day rule is never enforced, are you?

24        A.   No, I'm not.

25        (Exhibit No. 160 was marked for identification.)

DEPOSITION OF STUART SAMPSON (TAKEN 08.31.10)

f06cca09-1ee7-42dd-afa3-316b6b420a6a

EXHIBIT # 40-11

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
Phone: (208) 336-8980; Fax: (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Tulin Ozdeger, # 476548 (DC)
Catherine Bendor, # 442437 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington DC 2005
Phone: (202) 638-2535; Fax: (202) 628-2737
Email: tozdeger@nlchp.org
Email: cbendor@nlchp.org
Email: kcunningham@nlchp.org

Marguerite M. Sullivan, # 497894 (DC)
Kristi O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Kirstin Scheffler, # 991586 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington DC 20004-1304
Phone: (202) 637-2200; Fax: (202) 637-2201
Email: Maggy.Sullivan@lw.com
Email: Kristi.O'Malley@lw.com
Email: Heather.Johnson@lw.com
Email: Kirstin.Scheffler@lw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANET F. BELL, et al., | ) Case No. 1:09-cv-00540-REB |
| | ) |
| Plaintiffs, | ) PLAINTIFF JANET F. BELL'S |
| | ) ANSWERS TO DEFENDANTS' |
| v. | ) FIRST SET OF INTERROGATORIES |
| | ) AND REQUESTS FOR PRODUCTION |
| CITY OF BOISE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

PLAINTIFF JANET F. BELL'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 1

EXHIBIT # 41-1

wages during periods of incarceration.  Discovery is ongoing and Plaintiffs will supplement this response as necessary.

INTERROGATORY NO. 9: Identify all efforts that you made to find employment subsequent to April 1, 2007, including the identities of potential employers contacted.

ANSWER:  Plaintiff incorporates General Objection Nos. 2 and 3 in response to Interrogatory No. 9.  Subject to and without waiving the forgoing general and specific objections, Plaintiff has been disabled and unable to work.

INTERROGATORY NO. 10: Identify with specificity each instance where a Boise police officer issued a citation to a person for sleeping, sitting or talking with friends in public places as alleged in your complaint.

ANSWER:  Plaintiff incorporates General Objection Nos. 7 and 8 in response to Interrogatory No. 10.  Plaintiff notes that information sought by this interrogatory was requested in Plaintiffs' First Set of Requests for Production of Documents and Things and Interrogatories.  Defendants objected as unduly burdensome, suggested that the interrogatory was "interposed to harass Defendants," and have yet to answer.  Subject to and without waiving the forgoing general and specific objections, Plaintiff directs Defendants to documents identified in response to Request for Production No. 11, as well as the interrogatory responses by other Plaintiffs.  In addition, Plaintiff was cited twice by Boise police officers for allegedly sleeping in public, including citations under Boise Municipal Code § 9-10-02 for camping in a public place issued on April 28, 2007 and May 22, 2007.  Discovery is ongoing and Plaintiff will supplement this response as appropriate.

INTERROGATORY NO. 11: Identify with specificity each instance where a Boise police officer issued a citation to homeless residents merely for sleeping in public as alleged in your complaint.

PLAINTIFF JANET F. BELL'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 6

EXHIBIT # 41-2

INTERROGATORY NO. 13: Identify each and every time you have attempted to obtain housing (public or private) or housing assistance since April 1, 2007, and with specificity identify the entity with whom you applied, the date, and the reason you were accepted or denied.

ANSWER: Plaintiff incorporates General Objection No. 3 in response to Interrogatory No. 13. Subject to and without waiving the forgoing general and specific objections, Plaintiff has attempted to obtain housing at the Boise Rescue Mission and Interfaith Sanctuary since April 2007. She cannot recall and does not know the specific dates. She does not know the "reason" she was "accepted or denied", however, many times the shelters were full because all the beds in the Boise Rescue Mission and Interfaith Sanctuary were occupied by other persons and there were wait lists. She was not allowed to stay at the Boise Rescue Mission because of the religious and work program requirements the Boise Rescue Mission imposes on persons and the Boise Rescue Mission's policy that prohibits married couples from staying at their shelters. Because of her disabilities and health problems during that time, Plaintiff needed to stay with her husband because she needed his assistance. In the later part of 2007 she began to apply for housing with her husband at El Ada Community Action. She believes the "reason" she was "accepted" in July 2008 was because she and her husband were homeless and he was eligible as a disabled veteran.

INTERROGATORY NO. 14: For each and every date in which you allege that you were cited under Boise Municipal Code § 9-10-02 or § 6-01-05(A), identify all efforts which you made to find shelter space or other lodging, including the name of the shelter or other lodging, to whom you spoke, and the reason for not securing shelter or lodging.

ANSWER: Plaintiff incorporates General Objection Nos. 2 and 3 in response to Interrogatory No. 14. Subject to and without waiving the forgoing general and specific objections, during this time, Plaintiff knew from past experience when she would try to secure a bed at the Boise

PLAINTIFF JANET F. BELL'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 8

EXHIBIT # 41-3

Rescue Mission shelter that there were no available beds.  When she previously went to the shelter there were no available beds and she had no reason to believe there would be beds available. She was only provided with a mat on the floor in an overcrowded dining area.  There was no "space" because the room was packed wall to wall with approximately 30 to 40 other women and children.  The number of homeless women and children exceeded the number of available shelter beds and the policies of the shelter prevented her from obtaining a bed.  She cannot recall and does not know the names of the persons she spoke with at the Boise Rescue Mission.

INTERROGATORY NO. 15: If you contend that the religious philosophies of any of the shelters conflicts with your religious philosophy, explain in detail how a difference in religious philosophies prevents you from staying at that shelter.

ANSWER: Plaintiff did not want to participate in or be subject to the Boise Rescue Mission's religious activities and policies that are required in order to remain in the Mission's shelter.  The Boise Rescue Mission operates on a daily and continuous basis as a Christian church and she does not share the Boise Rescue Mission's beliefs or philosophies, nor does she believe in what Mission members preach.  The atmosphere in the Mission is hostile to other beliefs and she objects to the Mission's staff and volunteers' attempts to convert residents to their religious philosophy.  Although active participation in religious services was not required, Plaintiff was forced to attend and listen to religious services despite her different religious viewpoint.  She was told that if she did not attend she would be forced to leave the shelter and would not be permitted to return for a 30-day period.  She considers herself a spiritual person but does not agree with the Mission's religious philosophy or policies.  The Boise Rescue Mission's policy of separating married couples based upon their religious philosophy conflicts with her beliefs.

PLAINTIFF JANET F. BELL'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 9

EXHIBIT # 41-4

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5ᵗʰ Street
Boise, ID 83702
Phone: (208) 336-8980; Fax: (208) 342-2561
Email:  howardbelodoff@idaholegalaid.org

Tulin Ozdeger, # 476548 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington DC 2005
Phone: (202) 638-2535; Fax: (202) 628-2737
Email: tozdeger@nlchp.org
Email: cbendor@nlchp.org
Email: kcunningham@nlchp.org

Marguerite M. Sullivan, # 497894 (DC)
Kristi O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Kirstin Scheffler, # 991586 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington DC 20004-1304
Phone: (202) 637-2200; Fax: (202) 637-2201
Email: Maggy.Sullivan@lw.com
Email: Kristi.O'Malley@lw.com
Email: Heather.Johnson@lw.com
Email: Kirstin.Scheffler@lw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANET F. BELL, et al., | )  Case No. 1:09-cv-00540-REB |
| | ) |
| Plaintiffs, | ) PLAINTIFF JANET BELL'S |
| | ) SUPPLEMENTAL ANSWERS TO |
| v. | ) DEFENDANTS' FIRST SET OF |
| | ) INTERROGATORIES AND REQUESTS |
| CITY OF BOISE, et al., | ) FOR PRODUCTION |
| | ) |
| Defendants. | ) |
| _____ | ) |

PLAINTIFF JANET BELL'S SUPPLEMENTAL ANSWERS TO DEFENDANTS' FIRST SET
OF INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 1

EXHIBIT #42-1

COMES NOW, Plaintiff Janet Bell ("Plaintiff"), by and through her attorney of record, Howard A. Belodoff, and supplements her answers to Defendants' First Set of Interrogatories and Requests for Production as follows:

### General Objections

Plaintiff incorporates the General Objections articulated in her Answers to Defendants' First Set of Interrogatories and Requests for Production dated April 16, 2010. Plaintiff reserves the right to supplement these answers at a later date.

### INTERROGATORIES

INTERROGATORY NO. 2: Identify by name, address and telephone number any and all persons known to you or to anyone acting on your behalf who have knowledge or purport to have knowledge of any of the events or happenings related to the subject lawsuit and the damages, if any, resulting there from; and, for each, state the relevant facts which you understand to be within the knowledge of such person.

ANSWER: Plaintiff reasserts her objections and incorporates her response dated April 16, 2010. Subject to and without waiving the forgoing general and specific objections, Plaintiff Lawrence Smith's knowledge of the relevant facts is contained in paragraphs 7 and 11 of the Complaint and is incorporated by reference.

INTERROGATORY NO. 6: Identify any medical, psychological, psychiatric, or other treatment received by Plaintiff for any medical, psychological, mental, or anger management problems or disorder, including the name of the provider, the diagnosis, and dates of treatment.

EXHIBIT #42-2

ANSWER:  Plaintiff reasserts her objections and incorporates her response dated April 16, 2010.

Subject to and without waiving the forgoing general and specific objections,   REDACTED

# REDACTED

INTERROGATORY NO. 7: Describe your employment history, including dates of employment, employer, job title, job description, and amount of salary or wages.

ANSWER:  Plaintiff reasserts her objections and incorporates her response dated April 16, 2010. Subject to and without waiving the forgoing general and specific objections, Plaintiff has not been employed since coming to Boise in 2007 due to her disabilities.

INTERROGATORY NO. 8: Set forth in full detail, what you contend are the damages and in what amount, incurred and sought in this action.

ANSWER:   Plaintiff incorporates her initial response dated April 16, 2010.  Plaintiff seeks damages for each citation, fine, and period of incarceration, as well as lost wages during periods of incarceration.  Plaintiff will also seek compensatory and punitive damages for injuries suffered, including mental anguish and emotional distress, as a result of the Defendants' intentional, reckless or callously indifferent conduct that violated his/her constitutional rights. Discovery is ongoing and Plaintiff will supplement this response as necessary.

INTERROGATORY NO. 9: Identify all efforts that you made to find employment subsequent to April 1, 2007, including the identities of potential employers contacted.

---

PLAINTIFF JANET BELL'S SUPPLEMENTAL ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 3

EXHIBIT #42-3

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
Phone: (208) 336-8980; Fax: (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Tulin Ozdeger, # 476548 (DC)
Catherine Bendor, # 442437 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington DC 2005
Phone: (202) 638-2535; Fax: (202) 628-2737
Email: tozdeger@nlchp.org
Email: cbendor@nlchp.org
Email: kcunningham@nlchp.org

Marguerite M. Sullivan, # 497894 (DC)
Kristi O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Kirstin Scheffler, # 991586 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington DC 20004-1304
Phone: (202) 637-2200; Fax: (202) 637-2201
Email: Maggy.Sullivan@lw.com
Email: Kristi.O'Malley@lw.com
Email: Heather.Johnson@lw.com
Email: Kirstin.Scheffler@lw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| JANET F. BELL, et al., | ) | Case No. 1:09-cv-00540-REB |
| | ) | |
| Plaintiffs, | ) | |
| | ) | PLAINTIFF PAMELA S. HAWKES'S |
| v. | ) | ANSWERS TO DEFENDANTS' |
| | ) | FIRST REQUESTS FOR |
| CITY OF BOISE, et al., | ) | ADMISSIONS |
| | ) | |
| Defendants. | ) | |
| | ) | |
| _____ | ) | |

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST REQUEST
FOR ADMISSIONS – Page 1

EXHIBIT # 43-1

COMES NOW, Plaintiff Pamela S. Hawkes ("Plaintiff"), by and through her attorney of record, Howard A. Belodoff, and answers Defendants' First Requests for Admissions as follows:

ADMISSION NO. 1:  Admit that on the day you received each citation at issue in this case, shelter space for a single woman was available within the city limits of Boise, Idaho.

ANSWER:  Denied.  Plaintiff objects to the request for admission because it is irrelevant and because the phrase "shelter space for a single woman was available" is irrelevant and vague, overly broad and general.  Subject to and without waiving the foregoing objection, and to the best of her recollection, Plaintiff denies the request for admission because, as far as she was able to determine, there were no shelter beds available to her within the city limits of Boise, Idaho on many of the nights in question.  Further, there were no emergency shelters in the City of Boise that would house both her and her fiancé.

ADMISSION NO. 2:  Admit that you have been banned from a shelter(s) within the city limits of Boise, Idaho.

ANSWER:  Denied. Plaintiff objects to the request for admission because it is irrelevant and because the word "banned" is vague, overly broad and general.  Subject to and without waiving the foregoing objection, Plaintiff denies the request for admission because she has no knowledge of having ever been banned from a shelter in Boise, Idaho.  However, on more than one occasion, Boise Rescue Mission personnel told Plaintiff that she would not be permitted to return to the City of Light shelter for a certain period of time.

ADMISSION NO. 3:  Admit that for each citation you contend is at issue in this case, you did not try to obtain space at an overnight shelter.

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST REQUEST FOR ADMISSIONS – Page 2

EXHIBIT # 43-2

ANSWER: Denied.  Plaintiff objects to the request for admission because it is irrelevant and because the phrase "obtain space" is irrelevant and vague, overly broad and general.  Subject to and without waiving the foregoing objection, Plaintiff denies the request for admission because on several occasions she sought a bed at the City of Light shelter, was turned away, and was cited for camping.  Plaintiff received multiple camping citations during a relatively short time period and cannot recall on which dates she was turned away from City of Light.  Because of the instances when City of Light personnel told Plaintiff she could not return to the shelter for a set period of time, Plaintiff had not sought a bed from that shelter on every occasion when she was cited for camping.

ADMISSION NO. 4:  For each citation you contend is at issue in this case, admit a public defender was appointed to you.

ANSWER: Denied.  Plaintiff objects to this request for admission as irrelevant.  Subject to and without waiving the foregoing objection, Plaintiff admits that a public defender was appointed to her on September 10, 2007, for camping citations issued on July 21, July 23, and July 25, 2007.  Plaintiff also admits that a public defender was appointed to her on January 22, 2008, for camping citations issued on August 14, and August 19, 2007.  For all other camping citations at issue in this case, Plaintiff denies that she was appointed a public defender.

ADMISSION NO. 5:  Admit that you do not reside in Boise, Idaho.

ANSWER: Admitted.  Plaintiff presently resides in Spokane, Washington.  However, at the time of her citations, Plaintiff did reside in Boise, Idaho.  Plaintiff left Boise, Idaho and fears returning because she may receive additional citations and be incarcerated for camping.

ADMISSION NO. 6:  Admit that you do not reside in the state of Idaho.

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST REQUEST FOR ADMISSIONS – Page 3

EXHIBIT # 43-3

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
Phone: (208) 336-8980; Fax: (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Tulin Ozdeger, # 476548 (DC)
Catherine Bendor, # 442437 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington DC 2005
Phone: (202) 638-2535; Fax: (202) 628-2737
Email: tozdeger@nlchp.org
Email: cbendor@nlchp.org
Email: kcunningham@nlchp.org

Marguerite M. Sullivan, # 497894 (DC)
Kristi O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Kirstin Scheffler, # 991586 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington DC 20004-1304
Phone: (202) 637-2200; Fax: (202) 637-2201
Email: Maggy.Sullivan@lw.com
Email: Kristi.O'Malley@lw.com
Email: Heather.Johnson@lw.com
Email: Kirstin.Scheffler@lw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANET F. BELL, et al., | ) Case No. 1:09-cv-00540-REB |
| Plaintiffs, | ) |
| | ) PLAINTIFF PAMELA S. HAWKES'S |
| | ) ANSWERS TO DEFENDANTS' |
| v. | ) FIRST SET OF INTERROGATORIES |
| | ) AND REQUESTS FOR PRODUCTION |
| CITY OF BOISE, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 1

EXHIBIT # 44-1

INTERROGATORY NO. 4: If the expert witness identified in the above Interrogatory is to render an opinion in this action, please set forth the underlying facts or data supporting or tending to support the opinion as required by Rule 705 of the Federal Rules of Evidence.

ANSWER:  Plaintiff objects to Interrogatory No. 4 as premature.  Plaintiffs will supplement as appropriate in accordance with the Case Management Order.

INTERROGATORY NO. 5: Please set forth in full and complete detail, the exhibits you plan to introduce into evidence at the trial of this matter, and state the purpose for which these exhibits will be used.

ANSWER:  Plaintiff incorporates General Objection No. 6 in response to Interrogatory No. 5. Plaintiffs will supplement as appropriate.

INTERROGATORY NO. 6: Identify any medical, psychological, psychiatric, or other treatment received by Plaintiff for any medical, psychological, mental, or anger management problems or disorder, including the name of the provider, the diagnosis, and dates of treatment.

ANSWER:  Plaintiff incorporates General Objection Nos. 1, 2, 3 and 9 in response to Interrogatory No. 6.

INTERROGATORY NO. 7: Describe your employment history, including dates of employment, employer, job title, job description, and amount of salary or wages.

ANSWER:  Plaintiff incorporates General Objection Nos. 2, 3 and 9 in response to Interrogatory No. 7.  Subject to and without waiving the forgoing general and specific objections, during her time in Boise, Plaintiff was employed as a day laborer by Labor Max and made approximately $8/hour.  This employment was not guaranteed; Plaintiff was usually able to secure work only a couple days out of each week.  The types of work she performed included yard work and sorting clothes and goods at a thrift store.

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 5

EXHIBIT # 44-2

INTERROGATORY NO. 12: Identify each and every time that you have attempted to stay at a shelter since April 1, 2007, and with specificity identify the shelter name and address, the person at the shelter with whom you spoke, and the reason that you were either allowed to stay or were turned away.

ANSWER: Plaintiff incorporates General Objection No. 3 in response to Interrogatory No. 12. Subject to and without waiving the forgoing general and specific objections, since April 2007, Plaintiff has stayed at various times at the Boise Rescue Mission's City of Light shelter and at the Interfaith Sanctuary. She cannot recall and does not know the names of the people she spoke with at the shelters or the specific dates. She does not know the "reason" she was allowed or not allowed to stay on all occasions. However, many times when she was not allowed to stay the shelters were full because all the beds were occupied by other persons and there were wait lists. In addition, the City of Light shelter had a rule that a person who stayed in the shelter for one night, but not the next, was prohibited from returning to that shelter for a period of 30 days. At least once, Plaintiff was told that this was the reason she was not permitted to stay in the shelter.

INTERROGATORY NO. 13: Identify each and every time you have attempted to obtain housing (public or private) or housing assistance since April 1, 2007, and with specificity identify the entity with whom you applied, the date, and the reason you were accepted or denied.

ANSWER: Plaintiff incorporates General Objection No. 3 in response to Interrogatory No. 13. Subject to and without waiving the forgoing general and specific objections, Plaintiff has attempted to obtain housing at the City of Light shelter and Interfaith Sanctuary. At times the shelters were full because she was told and found that all the beds were occupied. She cannot recall and does not know the specific dates. In addition, Plaintiff applied for housing assistance,

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 8

EXHIBIT # 44-3

was placed on a wait list, and never heard back. She does not recall the date of her application or entity to which she applied and does not know why she was not accepted.

INTERROGATORY NO. 14: For each and every date in which you allege that you were cited under Boise Municipal Code § 9-10-02 or § 6-01-05(A), identify all efforts which you made to find shelter space or other lodging, including the name of the shelter or other lodging, to whom you spoke, and the reason for not securing shelter or lodging.

ANSWER: Plaintiff incorporates General Objection Nos. 2 and 3 in response to Interrogatory No. 14. Subject to and without waiving the forgoing general and specific objections, Plaintiff received multiple camping citations during a relatively short time period, and cannot recall on which dates she sought a bed at the City of Light shelter and was turned away. Because of the instances when City of Light personnel told the Plaintiff she could not return to the shelter for a set period of time, the Plaintiff had not sought a bed from that shelter on every occasion when she was cited for camping.

INTERROGATORY NO. 15: If you contend that the religious philosophies of any of the shelters conflicts with your religious philosophy, explain in detail how a difference in religious philosophies prevents you from staying at that shelter.

ANSWER: Plaintiff did not want to participate in or be subject to the Boise Rescue Mission's religious activities and policies that are required in order to remain in the Mission's shelter. The Boise Rescue Mission operates on a daily and continuous basis as a Christian church and she does not share the Boise Rescue Mission's beliefs or philosophies, nor does she believe in what Mission members preach. The atmosphere in the Mission is hostile to other beliefs and she objects to the Mission's staff and volunteers' attempts to convert residents to their religious philosophy. Although active participation in religious services was not required, Plaintiff was

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 9

EXHIBIT # 44-4

forced to attend and listen to religious services despite her different religious viewpoint. She was told that if she did not attend she would be forced to leave the shelter and would not be permitted to return for a 30-day period.

INTERROGATORY NO. 16: Identify with specificity each and every time that you have been threatened by Boise police officers with arrest for napping or sitting with friends in secluded areas, including the names, addresses, and phone numbers of any friends or witnesses of each occurrence.

ANSWER:  Plaintiff has been threatened by Boise police officers on several occasions while sitting with friends or lying down on her side. She was told that she would need to leave or she would be cited for squatting or camping. Plaintiff cannot recall the dates of these occurrences. A man named Steven Holt and a woman, whose name she does not recall, witnessed these incidents.

INTERROGATORY NO. 17: If your responses to the Requests for Admission are other than an unqualified admission, explain each denial in full detail.

ANSWER:  Plaintiff incorporates her Answers to Defendants' First Request for Admissions.

## REQUESTS FOR PRODUCTION OF DOCUMENTS

REQUEST NO. 1: Pay stubs, tax returns, employee benefits manual or statements, and other documents from April 1, 2007, to the present date reflecting plaintiff's earnings and benefits in employment.

RESPONSE:  Plaintiff incorporates General Objection Nos. 1, 2, 3 and 9 in response to Request No. 1. Subject to and without waiving the forgoing general and specific objections, Plaintiff does not have custody, possession or control of any of these documents.

PLAINTIFF PAMELA S. HAWKES'S ANSWERS TO DEFENDANTS' FIRST SET OF
INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 10

EXHIBIT # 44-5

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
310 N. 5th Street
Boise, ID 83702
Phone: (208) 336-8980; Fax: (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Tulin Ozdeger, # 476548 (DC)
Karen Cunningham, # 476830 (DC)
The National Law Center on Homelessness & Poverty
1411 K Street, Suite 1400
Washington DC 2005
Phone: (202) 638-2535; Fax: (202) 628-2737
Email: tozdeger@nlchp.org
Email: kcunningham@nlchp.org

Marguerite M. Sullivan, # 497894 (DC)
Kristi O'Malley, # 498584 (DC)
Heather Maria Johnson, # 986281 (DC)
Kirstin Scheffler, # 991586 (DC)
Latham & Watkins LLP
555 Eleventh Street, Suite 1000
Washington DC 20004-1304
Phone: (202) 637-2200; Fax: (202) 637-2201
Email: Maggy.Sullivan@lw.com
Email: Kristi.O'Malley@lw.com
Email: Heather.Johnson@lw.com
Email: Kirstin.Scheffler@lw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JANET F. BELL, et al., | ) Case No. 1:09-cv-00540-REB |
| | ) |
| Plaintiffs, | ) PLAINTIFF PAMELA S. HAWKES'S |
| | ) THIRD SUPPLEMENTAL ANSWERS |
| v. | ) TO DEFENDANTS' FIRST SET OF |
| | ) INTERROGATORIES AND REQUESTS |
| CITY OF BOISE, et al., | ) FOR PRODUCTION |
| | ) |
| Defendants. | ) |
| | ) |

PLAINTIFF PAMELA S. HAWKES'S THIRD SUPPLEMENTAL ANSWERS TO
DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR
PRODUCTION – Page 1

EXHIBIT #45-1

COMES NOW, Plaintiff Pamela S. Hawkes ("Plaintiff"), by and through her attorney of record, Howard A. Belodoff, and supplements her answers to Defendants' First Set of Interrogatories and Requests for Production as follows:

## General Objections

Plaintiff incorporates the General Objections articulated in her Answers to Defendants' First Set of Interrogatories and Requests for Production dated April 16, 2010.  Plaintiff reserves the right to supplement these answers at a later date.

## INTERROGATORIES

INTERROGATORY NO. 6:  Identify any medical, psychological, psychiatric, or other treatment received by Plaintiff for any medical, psychological, mental, or anger management problems or disorder, including the name of the provider, the diagnosis, and dates of treatment.

ANSWER:  **Pursuant to protective order, Plaintiff's answer to Interrogatory No. 6 is designated confidential.**  Plaintiff reasserts her objections and incorporates her initial and supplemental responses dated April 16, 2010, May 12, 2010, and June 24, 2010.  Subject to and without waiving her general and specific objections, REDACTED

# REDACTED

REDACTED          Plaintiff directs Defendants to her medical records produced by Plaintiffs with Bates numbers BELL000581 through BELL000582 and BELL000896 through BELL001414.

PLAINTIFF PAMELA S. HAWKES'S THIRD SUPPLEMENTAL ANSWERS TO DEFENDANTS' FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION – Page 2

EXHIBIT #45-2