UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO
BOISE, IDAHO


```
JANET F. BELL, et al.,        )
                              ) Docket No. 1:09-CV-00540-REB
              Plaintiffs,     )
                              )
         vs.                  )
                              )
CITY OF BOISE, et al.,        )
                              )
              Defendants.     ) Boise, Idaho
                              ) December 10, 2010
                              ) 9:38:17 a.m.
_____)
And related cases and parties )
```

**HEARING ON MOTIONS**


THE HONORABLE RONALD E. BUSH PRESIDING
MAGISTRATE JUDGE OF THE U.S. DISTRICT COURT






COURT RECORDER:

TRINIDAD DIAZ
U.S. District Court



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____
1:09-CV-0540-REB      Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                           1

```
APPEARANCES:



FOR THE PLAINTIFFS:        HOWARD A. BELODOFF, Esq.
                           Idaho Legal Aid
                           310 North 5th St.
                           Boise, Idaho  83702
                           howardbelodoff@idaholegalaid.org

                           ALLYSON M. MALTAS, Esq.
                           HEATHER M. JOHNSON, Esq.
                           MARGUERITE SULLIVAN, Esq.
                           Latham & Watkins LLP
                           555 Eleventh St. NW, Suite 1000
                           Washington D.C. 20004
                           allyson.maltas@lw.com
                           heather.johnson@lw.com
                           marguerite.sullivan@lw.com



FOR THE DEFENDANTS:        VALENCIA J. BILYEU, Esq.
                           SCOTT B. MUIR, Esq.
                           CARY COLAIANNI, Esq.
                           Boise City Attorney's Office
                           500 W. Capitol Blvd.
                           P.O. Box 500
                           Boise, ID 83702
                           BoiseCityAttorney@cityofboise.org
```

```
_____
1:09-CV-0540-REB        Bell v. City of Boise        12/10/10    Motions
                  NW TRANSCRIPTS, LLC - Idaho Division
                             P.O. Box 890
                       Nampa, Idaho 83653-0890
                  (208) 908-7998 - gayle@nwtranscripts.com          2
```

```
 1  BOISE, IDAHO                        FRIDAY, DECEMBER 10, 2010

 2                PROCEEDINGS BEGAN AT 9:38:17 A.M.

 3                           * * * * *

 4         THE CLERK:  All rise.  The United States Court for

 5  the District of Idaho is now in session, the Honorable Ronald

 6  E. Bush presiding.

 7         THE COURT:  Well, at least the Honorable Ronnie Bush

 8  gimping in, so thank you, ladies and gentlemen.  If you'll

 9  please be seated.

10         THE CLERK:  The Court will hear at this time the

11  pending motions in civil case number 09-540, Janet Bell, et

12  al, versus the City of Boise, et al.

13         THE COURT:  All right, good morning, counsel.  I

14  think we'll begin by having you each identify for the record

15  who is here, as well as who intends to argue what portion of

16  the pending motions.

17         Mr. Belodoff, if you'd make your presence known for

18  our record and introduce the folks who are with you this

19  morning.  Thank you.

20         MR. BELODOFF:  Very well, Your Honor.  Good morning.

21  To my left here is Heather Johnson.  Sitting next to her is

22  Allyson Maltas.

23         MS. MALTAS:  Allyson Maltas, Your Honor.

24         MR. BELODOFF:  Sorry, Your Honor.

25         THE COURT:  All right.
```

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com

```
 1              MR. BELODOFF:  Got so many counsel on this record I
 2   can't keep up with their names.
 3              THE COURT:  Mm-hmm.
 4              MR. BELODOFF:  And seated next to the podium is
 5   Marguerite Sullivan.  And counsel will be arguing -- I won't
 6   be arguing.  Ms. Sullivan will be arguing the merits of the
 7   summary judgment.
 8              THE COURT:  All right.
 9              Ms. Sullivan, will you also be arguing upon the
10   motions to strike?
11              MS. SULLIVAN:  No, Your Honor.  Allyson Maltas will
12   be arguing the motion to strike.
13              THE COURT:  All right.  Very well.  And welcome to
14   all of you.
15              Ms. Bilyeu, if you could do the same, please.
16              MS. BILYEU:  Thank you, Judge Bush.
17              Valencia Bilyea representing the City of Boise.  We
18   have Cary Colaianni who is the city attorney and my boss, so
19   hopefully I can represent the City well and not, I don't know,
20   get a pay cut or something.
21              THE COURT:  Good.
22              MS. BILYEU:  And Scott Muir, Your Honor.
23              I will be judging the -- or I will be judging.  I
24   wish I would be judging but I won't be, I will be arguing the
25   constitutional arguments in the summary judgment, as well as
```

1   the statute of limitations and *Rooker-Feldman*.

2         So Mr. Muir, do you want to tell the Judge what

3   you're going to be arguing?

4         MR. MUIR:  Your Honor, I just have a couple of

5   parts on the summary judgment.  I'm going to argue about

6   Defendant Boise Police Department not being a proper

7   defendant.  No direct cause of action under the Idaho

8   Constitution and res judicata collateral estoppel portion.

9         I will argue the motion to dismiss Plaintiff Smith.

10  And also I will argue the motion to strike argument.  Thank

11  you.

12        THE COURT:  All right.  Thank you.

13        I will be dealing this morning with the defendants'

14  motion for summary judgment; the defendants' motion to

15  dismiss Plaintiff Smith; defendants' motion to strike which

16  actually covers a number of different pieces of the

17  evidentiary record.

18        This case is before the Court with the parties

19  having consented to jurisdiction of a magistrate judge.

20  Counsel, I've read carefully all of the materials that have

21  been submitted to the Court.  I'm familiar, I think, with the

22  issues.  These are both interesting and weighty issues,

23  important to the plaintiffs that counsel are here represent,

24  as well as to the City.  So I'm giving it my most careful

25  attention.

_____
1:09-CV-0540-REB        Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                          5

1          Let's see if we can deal with some housekeeping

2   matters to begin with, or perhaps can save some time.  I'm

3   understanding from Ms. Pfisterer, who's here this morning who

4   is the staff attorney who's giving me very able assistance

5   with this case, that the Plaintiff Smith, and his first name

6   escapes me right now, that Mr. Belodoff, you've been able to

7   locate him and he would be available to verify the responses

8   that have been the issue of the motion to dismiss?

9          MR. BELODOFF:  Yes, Your Honor.  I anticipate being

10  able to do that next week.

11         THE COURT:  All right.

12         Mr. Muir, is that -- you still want to proceed on

13  that motion to dismiss as to him today?

14         MR. MUIR:  Your Honor, we still would have

15  objections just to the timeliness of it.  You know, the Court

16  is going to make its decision on what the -- what it thinks is

17  appropriate.

18         THE COURT:  Well, then I would urge you to simply

19  focus your argument in that regard --

20         MR. MUIR:  Okay.

21         THE COURT:  -- on how the City is prejudiced

22  because, otherwise, my focus will be on the nature of this

23  particular group of folks who are in these circumstances, and

24  I'll be taking that into account.  All right.

25         MR. MUIR:  Okay.  Real good, Your Honor.

 1            THE COURT:  So when we get to that point.

 2            All right, Ms. Bilyeu, let's -- let's begin with

 3  you then.

 4            MS. BILYEU:  Thank you, Judge.

 5            I've kind of toyed with where to begin with this

 6  argument.  And one thing that I decided to do, and it kind of

 7  struck me as I was going back through the voluminous cases

 8  that we have is that even though the *Jones* case has been

 9  vacated by the Ninth Circuit, I'm going to start my argument

10  with where the *Jones* case left off.

11            THE COURT:  For your benefit and benefit of opposing

12  counsel, I don't view that decision to be binding authority,

13  but I am reading it for any persuasive value.

14            Go ahead, please.

15            MS. BILYEU:  Thank you, Judge.

16            Well, Judge, at the end of that decision, which is

17  where the Ninth Circuit left off prior to vacating the case,

18  what the Ninth Circuit said was:

19            "All we hold is that so long  as there is a greater

20       number of homeless individuals in LA then the number of

21       available beds the city may not enforce  its sit lie and

22       sleep ordinance, at all times and places throughout the

23       city against homeless individuals for involuntary

24       sitting, lying and sleeping in public."

25            And here's the real point.

---
1:09-CV-0540-REB        Bell v. City of Boise      12/10/10     **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com

```
 1            "Appellants are entitled, at a minimum, to a
 2       narrowly tailored injunction against the city's
 3       enforcement of Section 41.18 Subsection (d) at certain
 4       times and/or places."
 5            And so I start where the Ninth Circuit left off,
 6   which is what appellants were entitled to, and that's really
 7   where the city has been all along is that we have never
 8   enforced this ordinance at all times and in all places.
 9            The record shows, and Jim Hall, who's the director
10   of Parks and Rec --
11            THE COURT:  Are you talking about the camping
12   ordinance or the disorderly conduct ordinance?
13            MS. BILYEU:  Well, either of those Judges [sic] --
14            THE COURT:  All right.
15            MS. BILYEU:  -- either of those, Judge.
16            THE COURT:  All right.
17            MS. BILYEU:  As the record shows the director of
18   Parks and Rec says that the parks have always been available
19   during park hours for sleeping, or napping, or sitting, or
20   lying.  They've always been available.  So the city to begin
21   with doesn't enforce it at all times throughout the city.
22            But secondly, the city did more in that it has
23   stated specifically in its police policy manual now that it
24   will not enforce those ordinances against homeless
25   individuals, specifically when the shelters are full.  And to
```

1    date there has been, to our knowledge, no evenings on which

2    the shelters were full as to specific populations.  For

3    instance, the shelters that serve women were not full on the

4    same night, and so therefore, women could not get shelter

5    that night, or for single men for that matter, or for

6    families.  So that's -- I just wanted to start with that,

7    Judge, because I think it's an important point.

8            And now I would like to segue, if it's all right

9    with the Judge, into the *Rooker-Feldman Doctrine*.  And in

10   that analysis one thing that becomes very important as to

11   whether or not this Court has jurisdiction is to look at the

12   damages that are requested, the relief that's requested.  And

13   I think it's important to do that because it shows that it's

14   -- that the Court does not have jurisdiction over these

15   convictions because they seek to discover damages from their

16   criminal fines, from their incarceration costs, lost earnings

17   while they were in jail, and they want their criminal records

18   expunged.  More specifically, in their response brief at Note

19   46 they specifically ask that their criminal convictions be

20   expunged.

21           Now they can't get that relief unless the Court

22   essentially undoes the convictions.  Expungement does mean

23   vacating those convictions.  And I think from that perspective

24   this Court doesn't -- does not have jurisdiction over the

25   convictions.

```
 1              THE COURT:  Is it the city's position that the

 2    plaintiffs' ability to challenge the ordinances in any way,

 3    whether it be for 1983 related damages or injunctive relief,

 4    is barred because of some possible opportunity they might have

 5    had at the time of the criminal charges being brought to

 6    challenge the constitutionality at that time, or is it more

 7    narrowly drawn here?

 8              MS. BILYEU:  Judge -- no, Judge, that is the city's

 9    position.  The city's position is that anything that was

10    inextricably intertwined, and it kind of goes a little bit to

11    the res judicata collateral estoppel issues to a certain

12    extent --

13              THE COURT:  Mm-hmm.

14              MS. BILYEU:  -- but any of those issues that were

15    inextricably intertwined are not available at this time.

16    General arguments that may be prospective in nature rather

17    than retrospective in nature would be available to the

18    plaintiffs.

19              So what we're saying is that under _Heck_ --

20              THE COURT:  So if any one of these folks were to

21    take their sleeping bag out and lay it out on the park and

22    invite themselves to be arrested, then at that time they

23    could bring all these claims --

24              MS. BILYEU:  That's correct.

25              THE COURT:  -- as part of the -- or excuse me, part
```

1    of the criminal case?

2             MS. BILYEU:  That's correct, Judge.

3             THE COURT:  All right.  Go ahead.

4             MS. BILYEU:  At least the retrospective ones.

5    Okay?

6             THE COURT:  Do you have any authority -- and if you

7    have and it's in your briefing I'm not remembering it, that

8    -- that would, in similar sort of setting on facts similar to

9    what we have here that the *Rooker-Feldman Doctrine* has been

10   applied so far as you would ask me to apply it here?

11            MS. BILYEU:  Yes, Judge, I do.  And it is -- it is

12   included in one of my footnotes in my briefing.  I have

13   several that -- courts, the Seventh Circuit, for instance, in

14   *Van Harken* said that -- explained that the *Rooker-Feldman*

15   *Doctrine* prevents plaintiffs from seeking refunds of parking

16   fines imposed upon them.

17            *Patrick v. City of Pasco*, which is an eastern --

18   which is a Washington case, Eastern District of Washington,

19   explains that relief from city traffic citations which had

20   resulted in monetary fines via court adjudication was

21   prohibited by *Rooker-Feldman*.

22            THE COURT:  Well no, I'm tracking that.

23            MS. BILYEU:  Yes.

24            THE COURT:  And maybe you're getting to the ones

25   that are more what I'm thinking about.

1          MS. BILYEU:  I'm sorry, Judge.

2          THE COURT:  I thought I was understanding you to

3    say the city is saying they're just stopped at the door here

4    under _Rooker-Feldman_, any of the relief that they would seek

5    in this case is barred.  Is that what you're telling me?  Any

6    sort of ruling from this Court that there's constitutional

7    infirmities in the -- in either the sleeping or the

8    disorderly conduct, or the camping ordinance is -- can't be

9    had because they were criminal charged before and convicted

10   and they didn't say boo about it at that time.  Is that

11   right?

12         MS. BILYEU:  No, sir.  No, Your Honor.

13         THE COURT:  Okay.

14         MS. BILYEU:  What I'm saying is that retrospective

15   relief is unavailable to them.  Anything for damages --

16         THE COURT:  Okay.  All right.

17         MS. BILYEU:  -- any of that is unavailable to them.

18   But as far as prospective relief --

19         THE COURT:  All right.

20         MS. BILYEU:  -- this Court has jurisdiction over

21   those general things, but not if it was inextricably

22   intertwined with those past decisions.

23         THE COURT:  Well, I guess then --

24         MS. BILYEU:  In other words, general --

25         THE COURT:  -- then my question is --

_____
1:09-CV-0540-REB          Bell v. City of Boise        12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890                                              12
(208) 908-7998 - gayle@nwtranscripts.com

 1            MS. BILYEU:  Yes, sir.

 2            THE COURT:  -- what is the city contending is

 3  inextricably intertwined here?

 4            MS. BILYEU:  Okay.

 5            THE COURT:  Did you include in that their request

 6  for prospective injunctive relief here?

 7            MS. BILYEU:  No.

 8            THE COURT:  Okay.

 9            MS. BILYEU:  No, Your Honor.  Prospective injunctive

10  relief would not be --

11            THE COURT:  All right.

12            MS. BILYEU:  -- intertwined with that.  But --

13            THE COURT:  All right.  And I'm understanding your

14  point, and I don't -- I don't think you need to argue that

15  any longer.  Why don't you move to your next argument

16  please.

17            MS. BILYEU:  Thank you, Judge.  I'll move on then

18  to prospective relief, which is what we were just talking

19  about, and why I think that they are not entitled to

20  prospective relief, and that is because I believe that these

21  plaintiffs don't have standing any longer.  They are all

22  sheltered.  They may be homeless, that is true, they are

23  homeless, but unlike the plaintiffs in *Jones* case, these

24  plaintiffs have shelter.  They are no longer living on the

25  street.

1                In *Jones*, skid row in Los Angeles has numerous

2      individuals living on the street, and every one of those

3      plaintiffs would be arrested, taken into custody, released,

4      and back out on the street again.

5                In this case all of the plaintiffs are currently

6      sheltered either at friends' homes, out of state, with their

7      husbands in an apartment, or at Sanctuary.  In fact, one --

8      one of the plaintiffs, and I believe it's Stretch Anderson,

9      has been -- I think it's Anderson --

10               THE COURT:  Well, is this a case --

11               MS. BILYEU:  -- has been at Sanctuary for three

12     years.

13               THE COURT:  -- is this a case then -- is this a

14     case then, Ms. Bilyeu, where you could have a situation where

15     plaintiffs might be -- there might be mootness but it would

16     be -- fall under that doctrine of something being moot but

17     evading review?  In other words, are you telling me that if

18     someone were to be homeless and be in a setting where you

19     would agree there was standing and a suit is filed and a week

20     after suit is filed an opening emerges at one of the local

21     shelters and they go in there, then the case is mooted at

22     that point, even though maybe in a couple months they'd be

23     back out on the street again?

24               MS. BILYEU:  Well, Judge, here's --

25               THE COURT:  I mean that strikes me as a moving

1   target that's hard for the Court to pin down.

2           MS. BILYEU:  Understood, Judge.

3           No, it would not be moot as to their past damages.

4   Okay.  I mean we're setting aside *Rooker-Feldman* right now.

5           THE COURT:  Mm-hmm.

6           MS. BILYEU:  Okay.  No, it would not be moot as to

7   their past damages.  But if they're no longer homeless --

8           THE COURT:  Then how --

9           MS. BILYEU:  -- it's moot.

10          THE COURT:  -- then how -- then how does anyone --

11  how do you challenge the prospective operation of the

12  statute?

13          MS. BILYEU:  Just like *Jones* did.  Just like *Jones*

14  did.  The problem here is it's the wrong set of plaintiffs.

15  If there are any plaintiffs out there that truly can't find

16  shelter, which, you know, there may be, but these eight or

17  seven aren't those plaintiffs.  They have shelter, and in

18  fact, I think it's Anderson said he's been living at

19  Sanctuary every night for three years.  He left one time for,

20  I think, three days to go legitimately camping with some

21  buddies, and that's in the record, but he's been living there

22  for three years.  He's no longer an unsheltered, living on

23  the street, *Jones* plaintiff.

24                  (Pause in the proceedings)

25          MS. BILYEU:  Had to wet my whistle there, Judge.

_____
1:09-CV-0540-REB       Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                   15

 1                And before I get onto the merits of the case,

 2    Judge, I do want to make some clarifications of the record.

 3    In their response brief at page 11, plaintiffs state that

 4    the Boise Community Ombudsman found that the officers were

 5    inadequately trained to deal with problems of Boise's

 6    homeless population.

 7                And, Judge, I'd like to just read for you actually

 8    what the ombudsman states because I don't -- I don't think

 9    that's fair.  I don't think that's a fair argument.

10                In O'Malley declaration, Exhibit 1, at page 43 of

11    the ombudsman's report, what the ombudsman states is:

12                "The practices of the Boise Police Department" --

13           wait a minute.  Let me back up.  Hold on.

14                "This study began as a review of law enforcement

15           practices as they relate to the homeless population in

16           Boise.

17                "The practices of the Boise Police Department were

18           found to be reasonable and adequate."

19                THE COURT:  What page of his report are you at

20    again?

21                MS. BILYEU:  Page 43, Your Honor.  And it's the

22    ombudsman page numbering --

23                THE COURT:  All right.

24                MS. BILYEU:  -- of page 43, so it's actually -- if

25    you're looking at the exhibit pages --

_____
1:09-CV-0540-REB        Bell v. City of Boise     12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                    16

1          THE COURT:  I have -- I have that.

2          MS. BILYEU:  Okay.  Down there under (b)(1)

3   introduction:

4               "The study began as a review of law enforcement

5          practices as they relate to the homeless population.

6          The practices of the Boise Police Department were found

7          to be reasonable and adequate within their mission to

8          enforce quality of life laws and ordinances in the

9          city's parks and downtown core.  What was initially

10         presented is a law enforcement problem, reveals itself

11         to be a problem caused by defaults in the social safety

12         net, rather than a problem caused by defective police

13         policies or practices."

14         So I needed to make it clear that the ombudsman

15   never did make a finding, at least -- at least that I could

16   find, and plaintiffs are more than welcome to point it out

17   differently if they have a different sentence on it, but not

18   that there was actually inadequate training, and certainly

19   not inadequate training as to the ordinances that are at

20   issue, Judge.

21         THE COURT:  Well, as I understood his report, he

22   was saying, among other things, that the police -- there

23   wasn't a very good network of information between the police

24   department and the social service agencies, and it would be

25   good for the police department to have some training so they

1 would know more about those agencies, as well as maybe

2 understanding the nature of the homeless population a little

3 bit better, which would help them with their policing

4 duties.

5          Go ahead, please.

6          MS. BILYEU:  Yes, Judge, which I think is different

7 than a finding of inadequate training though.  It's a

8 suggestion.  It's a mere suggestion, and there is no

9 constitutional right in an ombudsman's suggestion.

10          Moreover, there is substantial -- or there is, in

11 the record, evidence of training for mental illness, which

12 is what a large segment of the population has is -- a large

13 segment of them are mentally ill.  And this comes out in

14 Shuler's deposition, which is the O'Malley Exhibit 32 at page

15 35, lines 17 through 23, and Dotson Exhibit 34, page 19

16 through page 20.

17          Another thing that I'd like to just clear up,

18 Judge, is plaintiffs say that the defendants treat both the

19 disorderly conduct ordinance as well as the camping ordinance

20 the same.  And as part of that proof to that, on response

21 page 19, they say that Officer Shuler said that both

22 ordinances are the same thing and he treats them the same,

23 and those are direct quotes from his -- from his deposition,

24 which is true, that's what he said, but not in that context,

25 Judge.  It's important to take it in context.

1           What Shuler said was he keeps statistics on, you

2    know, what he's cited.  He's a bit anal retentive.  He's one

3    of those police officers, and there aren't many of them, but

4    they like to keep statistics.  And what he said was when

5    he's keeping his statistics he treats the disorderly conduct

6    ordinance and the camping ordinance, he puts his little mark

7    under the same thing, he keeps them under the same.

8           He didn't mean that he treats them out in the

9    field the same.  And I think that the evidence shows that

10   the officers don't treat it the same because there are only

11   three disorderly conduct citations, two of which were both

12   on private property, and those are the one to Brian Carson

13   and Mr. Martin, and Hawkes, who was in a public restroom

14   when the restrooms were closed, so that violated being in a

15   public building without authority.  So none of the

16   disorderly conduct citations actually went to what they're

17   claiming, which is sleeping in public.

18          And as a matter of fact, Judge, as to the

19   disorderly conduct statute, the evidence shows that the

20   police treat disorderly conduct generally only when it is --

21   it's on private property, a person who's asleep on private

22   property without authority of the owner.

23          And that's in the police report, which is Exhibit 4,

24   the 2008 Boise Police Department bike patrol annual report,

25   which indicated that they had given 18 disorderly conducts

1  cites.  And what the reporting person here states is

2  disorderly conduct is used when a subject is on private

3  property without the permission of the owner.  This would

4  usually indicate the subject was sleeping there when the

5  officer found him or her.  Generally that's when they use it.

6  The other time they use it is if they're in a public building

7  without authority.

8          Judge, could I just ask for clarification on the

9  menu?  I think it's keeping track of time.  It says 1:38.

10         THE COURT:  I --

11         MS. BILYEU:  What does that --

12         THE COURT:  You mean on your --

13         MS. BILYEU:  -- 'cause we were told we had 60

14  minutes.

15         THE COURT:  Yeah.  I -- I don't think your screen

16  is keeping time.

17         MS. BILYEU:  Oh okay.

18         LAW CLERK:  I am.

19         THE COURT:  Yeah, Ms. Pfisterer is doing that.

20         LAW CLERK:  Sorry.  Around [unintelligible].

21         MS. BILYEU:  Is what I've been speaking, not what I

22  have left?  Okay.  Thank you, because we'd like to reserve

23  some time for rebuttal as well, about 10 or 15 minutes.

24         Judge, I'll just go right on to the merits of the

25  case, and that is, first of all, I just believe that the

1  plaintiffs have not stated an Eighth Amendment violation.  An

2  Eighth Amendment violation is when you're punished based on

3  the status rather than on your conduct.  And I think here,

4  even if you use the *Jones* case as authority, *Jones* relied on

5  *Powell*.  And actually what it did was it kind of relies on

6  *Powell* in a backwards in that it relies on the dissenting

7  opinion and one concurring opinion, which dealing with that,

8  Judge, is interesting, but I'll deal with it how *Jones* did,

9  and that is relying on those four opinions.

10       But to rely on those four opinions they heavily

11  relied on Justice White.  And it's important to read the

12  *Powell* case carefully because Justice White didn't say, well,

13  it might have been not possible for the drunk individual to

14  not show up in public that day.  It might have been not

15  possible.

16       No.  What White says is it has to be an

17  impossibility for it to be excused; for the conduct to be

18  constitutionally excused.  And here's what he says.  On page

19  -- this is the *Powell*, United States Supreme Court case,

20  392 U.S. 514 at 551, his concurring opinion.  And what he

21  says is:

22       "For some of these alcoholics I would think a

23       showing could be made that resisting drunkenness is

24       impossible and that avoiding public places when

25       intoxicated is also impossible."

1            And he said this can only occur on a record

2   satisfactorily showing that it was not feasible for him to

3   have made arrangements to prevent his being in public when

4   drunk.

5            And what he said, and I think this is really the

6   crux of the White concurring opinion, is that *Powell* made no

7   showing that he was unable to stay off the streets on the

8   night in question -- on the night in question.

9            And Judge, I think when you look at the record you

10  will see that the plaintiffs did not make an attempt to find

11  shelter on the nights in question.  And there is no evidence,

12  like in the LA case, you know, there's a lot of just general

13  evidence in Los Angeles, well, there are more -- there are

14  more homeless than there are beds, but they don't discuss

15  which homeless.  More homeless than beds, if that is going

16  to be the deciding factor, there's probably not a city in

17  the country that can ever cite for this type of an ordinance

18  because there will always be more homeless people than there

19  are beds.  And why is that?  Because homeless counts are

20  done in interesting ways.  There's not one definition of

21  homeless.

22            And this is indicated in the 10 year report, which

23  is part of Scott Muir's affidavit to augment the record on

24  the 10 year report, which was not opposed by opposing

25  counsel.  And what it indicates in there, and I think it's on

1  page 7 or 8, Judge, and I can look for that specifically, but

2  I can't put my fingers on it right this second, is that most

3  of the people that are homeless that are counted in the

4  larger numbers are those that are doubling up with friends.

5  So, I mean if there's people that are doubling up with

6  friends that are counted in the homeless counts, they, by

7  definition, don't need the beds because they have a bed,

8  they have a place to stay.

9          So the real question here is, in my estimation,

10  whether or not shelters are full, whether or not there was

11  availability, whether or not a criminal defendant could have

12  made it to the shelter that night because it was available.

13  And there's been no showing on the record that in the nights

14  in question the shelters were not available.

15          In fact, most of the argument as to shelters, at

16  least by the defendants, is they kind of don't like River of

17  Life 'cause it has too many rules.  It doesn't fit on their

18  pallet very well.  That's not a constitutional argument,

19  that's an argument I just don't like the shelter that's

20  available to me.

21          THE COURT:  Well, Ms. Bilyeu, let me make sure I

22  understand.  Your argument is that there -- the record does

23  not contain any sort of an affirmative statement by the

24  plaintiffs that on any one or more of the nights pertinent

25  to when they were charged that they couldn't get into a

1    shelter that night?

2              MS. BILYEU:  That's correct, Your Honor.

3              THE COURT:  Okay.  That's distinct from whether or

4    not the record, as it currently exists, contains any sort of

5    factual dispute about whether there are more homeless people

6    in need of shelter in the City of Boise at times than there

7    are any given number of shelter beds available.

8              MS. BILYEU:  Right, Judge.  And I think that the

9    number of homeless individuals is a different count than the

10   type of homeless people who actually need the beds.  It's a

11   totally different count.

12             THE COURT:  Okay.  Do you agree that the record as

13   it currently exists before the Court as to whether or not

14   there are sufficient beds to meet the needs of those who

15   might be seeking shelter in the City of Boise, that there's a

16   dispute of fact in the record as to whether or not there are

17   sufficient beds for them?

18             MS. BILYEU:  No, Judge, I don't.  I think --

19             THE COURT:  You think the record is that there

20   always are enough beds?

21             MS. BILYEU:  Judge, yes.

22             THE COURT:  Okay.

23             MS. BILYEU:  I think -- I think the record is that

24   River of Life has never been full.  That's what the record

25   shows.

1          THE COURT:  Okay.

2          MS. BILYEU:  I think the record shows that half of

3   the weeks of a month Fawn Pettet says that half of the time

4   beds are available for men in Sanctuary.

5          THE COURT:  All right.  I -- I'll --

6          MS. BILYEU:  So on the nights in question --

7          THE COURT:  -- I don't need to hear anymore on

8   that.

9          MS. BILYEU:  Yes.  Okay.

10          THE COURT:  I'll hear from -- I'll hear your

11   opposing counsel's view of that.

12          MS. BILYEU:  Thank you for clarifying that.

13          THE COURT:  Go ahead.

14          MS. BILYEU:  Judge, as to the vagueness argument,

15   I think -- really what I think plaintiffs' argument comes

16   down to is not that the language of the ordinance was vague,

17   really what I think their argument comes down to is our facts

18   -- or I should say their facts, you know, the facts that the

19   officer had at the time don't constitute camping.

20          And I really think that that type of a close

21   factual case is not a vagueness argument, but it's an

22   argument regarding the requirement of proof beyond a

23   reasonable doubt.  And that's really what they're arguing.

24   They're saying, hey, I was innocent.  They didn't have enough

25   to convict me.

1           Well, that's the argument that your criminal lawyer

2   and the record shows that they were 99 percent of the time

3   represented by a public defender.  That's what the public

4   defender is to do.

5           THE COURT:  Well, I assume you would agree that

6   someone's not precluded from contesting a charge on both of

7   those counts.  One can say as a matter of law, Your Honor, I

8   think the statute's unconstitutional, it's overly vague.  If

9   you don't agree with me there then I'm going to argue to the

10  fact finder, presumably the jury that there wasn't sufficient

11  proof that I was camping.

12          MS. BILYEU:  Absolutely, Judge.  I think you can

13  make both arguments.  But I think their argument really

14  doesn't fall into the 'it's vague' because the vagueness

15  cases go more to what's subjective, whether or not -- whether

16  or not somebody's conduct is annoying, which is highly

17  subjective, as opposed to a factual case where you would say

18  well, sleeping -- my client's sleeping in a sleeping bag

19  wasn't actually camping.  That's a factual distinction, not

20  a verbal sentence structure distinction.

21          And I'll move on to the right to travel just really

22  -- real quickly, Judge, and this is going to be my last

23  argument before I let Scott take the reins.

24          And I would just say that I think that plaintiffs

25  have failed to articulate or argue that the city has a policy

1   or custom of interfering with the plaintiffs' right to

2   travel.

3           This isn't a benefits case.  There's no residency

4   requirement or anything like that.  This simply isn't a

5   benefit case.  There's no evidence of a policy by a final

6   policy maker that the homeless were being run out of town, or

7   that they were being told that they couldn't go to certain

8   areas.  I just think that they have not met that --

9           THE COURT:  Well, they're certainly told they can't

10  be in the parks at night.  Right?

11          MS. BILYEU:  Absolutely, like every other citizen.

12          THE COURT:  Yeah.  No, I --

13          MS. BILYEU:  Yes.

14          THE COURT:  -- I'm just trying to discern your

15  argument here.  The disorderly conduct ordinance makes

16  sleeping a crime if it's at any public or private setting

17  without permission.  Is that right?

18          MS. BILYEU:  Yes.

19          THE COURT:  Okay.  All right.  The city is saying,

20  at least I gather from Mr. Hall's affidavit, that even though

21  the disorderly conduct ordinance doesn't say except for parks

22  during daylight hours that -- and even though the Parks and

23  Rec Board rules don't say specifically that sleeping is

24  permitted, he's just saying -- doesn't say sleeping is

25  prohibited, and we haven't asked that that be enforced.  Am I

1  getting -- is that my understanding as well?

2          MS. BILYEU:  Yes.  Judge, what the Parks and Rec

3  ordinances do is they -- they try to delineate what's

4  prohibited because it's easier to delineate what's prohibited

5  than everything that would be allowed.

6          THE COURT:  Sure.

7          MS. BILYEU:  Sleeping in the park is allowed.  It's

8  always been allowed since Jim Hall's been there --

9          THE COURT:  Mm-hmm.

10          MS. BILYEU:  -- and Jim Hall's been there for a

11  very, very long time, and even before that I believe it was

12  allowed.

13          THE COURT:  Mm-hmm.

14          MS. BILYEU:  That's never been part of our -- of

15  the city's policy to disallow sleeping in the park.

16          THE COURT:  Yeah.  Would you agree that the effect

17  of those ordinances, and I'm not suggesting I've made my mind

18  up on any of these issues yet, I haven't, but the effect of

19  those two ordinances is, to force people who aren't in the

20  shelters to sleep during the day in the park?

21          MS. BILYEU:  I'm sorry, to -- if --

22          THE COURT:  To sleep -- if they're going to sleep

23  then they need to sleep during the day in the park, but they

24  can't -- but not camping.

25          MS. BILYEU:  You can't camp in the park --

1          THE COURT:  Mm-hmm.

2          MS. BILYEU:  -- but only -- but in the park it's

3     actually -- what it is is you can't erect a tent or a

4     structure in the park for purposes of camping.  You can

5     sleep in the park and do what have you in the park because at

6     night, no matter what you were doing during the daytime, you

7     have to be gone.

8          THE COURT:  Well, your amended ordinance, as I

9     recall -- recall it, says a lot more than just if you're

10    putting a tent up to be camping.

11         MS. BILYEU:  I'm sorry.  In the park's ordinance --

12    in the park's ordinance you could -- you couldn't during

13    the --

14         THE COURT:  Or maybe it's just camping generally.

15    Excuse me.

16         MS. BILYEU:  Yes, camping in -- camping in

17    generally.

18         THE COURT:  Yes.

19         MS. BILYEU:  So let me --

20         THE COURT:  So the up-shoot of what I'm saying is --

21         MS. BILYEU:  Yeah.

22         THE COURT:  -- is it looks to me like the way the

23    ordinances are structured and enforced, the effect of it is

24    is if you do not have a home and you're in the City of Boise

25    you -- your option is to, if you aren't in a shelter, to

1   sleep during the day in a park, in a form that the city

2   wouldn't construe as camping, and then during the  non-

3   daylight hours you just wander around because if you stop at

4   any place, or god forbid you stop at any place and fall

5   asleep, then you're subject to being prosecuted for violation

6   of the disorderly conduct ordinance.

7           MS. BILYEU:  Judge --

8           THE COURT:  Is that a fair assessment of the way

9   those two statutes work?

10          MS. BILYEU:  Not when you read them in conjunction

11  with the police policy.  No, it's not.

12          If you have no place to stay and you're in the City

13  of Boise and the shelters are full, you cannot access a

14  shelter, the police do no enforce those ordinances.  Even at

15  night they're not going to enforce an ordinance.  You can

16  sleep in a sleeping bag with your stuff beside you when the

17  shelters are full.  That's the current policy.

18          Now prior, under the old -- the old way, you are

19  correct, but there's no showing that shelters weren't

20  available.  And there's still no showing actually even to

21  this day that shelter is unavailable.

22          THE COURT:  Okay.

23          MS. BILYEU:  Thank you, Your Honor.

24          THE COURT:  Thank you, Ms. Bilyeu.

25          Mr. Muir.

1              MR. MUIR:  Thank you, Your Honor.

2              As noted previously, I've got a pretty short part

3    here, so I'll get straight to it and we'll reserve the rest

4    of our time for rebuttal.

5              The first issue that I'd like to address is the

6    Boise Police Department was named as a defendant in this

7    action.  The Boise Police Department does not have the

8    capacity to be sued.  They are a department of the city, but

9    as such, they're not a separate entity.

10             We've cited the Court to _Duarte v. City of Nampa_,

11   and I believe that that -- that's exactly what that states.

12             We're saying here the Boise Police Department

13   cannot be a named party.  Plaintiffs in their response seem

14   to indicate well, there's cases out there with Boise Police

15   Department in them, but in all those cases that they've

16   cited it doesn't appear that they were ever a named party in

17   those.

18             The next issue, Your Honor, that I would like to

19   address is that there's no direct cause of action for

20   violations of the Idaho Constitution.  We've cited the Court

21   to _Campbell versus City of Boise_.  This is a local case in

22   front of Judge Winmill and the finding was that the U.S.

23   District Court of Idaho held that Idaho statute serves as a

24   -- no Idaho statute serves a function analogous to that of

25   42, U.S.C., Section 1983, creating a cause of action for

 1   violating the Idaho Constitution.  So it's our contention

 2   that without that enabling statute that there's no direct

 3   cause of action under the Idaho Constitution.

 4           THE COURT:  Do you mean by that there's no --

 5   there's no analogous 1983 claim for damages, or do you -- are

 6   you trying to suggest there's no opportunity for anyone to

 7   ever challenge the constitutionality of a particular city

 8   ordinance under Idaho Constitution?  I assume you aren't

 9   suggesting that.

10           MR. MUIR:  No, I think you're correct, Your Honor.

11           THE COURT:  Okay.

12           MR. MUIR:  It's to damages.  That's what obviously

13   1983 does is create that cause of action for damages.

14           THE COURT:  All right.  Go ahead, please.

15           MR. MUIR:  Okay.  Your Honor, the next argument

16   I'd like to address is as to the collateral estoppel and res

17   judicata, Ms. Bilyeu was on the fringe of that in her

18   _Rooker-Feldman_ arguments.  I think it's a -- it's a pretty

19   similar argument.

20           I find it confusing that plaintiffs are requesting

21   damages for court costs, court fees, and they want an

22   expungement of the record, and at the same time they claim

23   they're not asking that a state court judgment must be

24   vacated.  Well, expungement and reimbursement of costs and

25   fines seem to me to be the exact same thing as vacating a

1   state court judgment.  So that goes to res judicata and

2   collateral estoppel.

3        THE COURT:  But it's almost -- your argument struck

4   me in that regard as almost like you were treating their

5   claim -- plaintiffs' claim in that connection as seeking some

6   -- seeking some sort of return to as if it never happened,

7   which an expungement of the conviction would be akin to, I

8   suppose, if the theory is that if they're seeking an

9   expungement of the underlying judgment that includes the

10  costs and fees, then maybe that's similar and maybe your

11  argument is they have a double dip if that happened and if

12  they were -- they recovered damages.  But, otherwise, it

13  struck me as being kind of classic damages.  This happened,

14  I had to pay this as a result.  It happened wrongfully.

15  You're the party that caused it to happen wrongfully.  I want

16  to recover the damages for what I had to pay or suffer as a

17  result.

18       MR. MUIR:  Yeah.  Your Honor, I see the argument as

19  being that they needed to do that at the time.  They, again,

20  for the most part, were always represented by counsel,

21  usually the public defender.

22       THE COURT:  Yeah.  But you and I both know that in

23  these sorts of cases the likelihood of a constitutional

24  challenge being brought in our criminal justice system at

25  that level in state court.  I mean I appreciate your argument

1   on its theory and I'm considering it on that basis, but, you

2   know, I -- I was a state court district judge for five years

3   and I don't think that happens very often.

4           MR. MUIR:  Well --

5           THE COURT:  Go ahead, Mr. Muir.

6           MR. MUIR:  Yeah.  And I understand where the

7   Court's coming from on that.  But you know, on the other hand

8   we do cite to cases.  You know, *Allen v. McCurry* says that

9   they're going to acknowledge res judicata and collateral

10  estoppel from the state court.

11          So be it the Court might not be along with the

12  argument, but that is what we are claiming the argument to

13  be, that they had the chance at the criminal court -- state

14  court level to make the arguments and they chose to plead

15  guilty and didn't bring up any of those arguments.

16          I think in the response that plaintiffs have made,

17  they cite to a case *Haring v. Prosise* I guess would be how

18  you pronounce it, for this proposition that collateral

19  estoppel isn't going to apply.  Well, in that case you had a

20  drug conviction, pled guilty to a drug conviction but you had

21  a problem in the legality of the search.  So in the 1983

22  action they were arguing about the search.

23          Well, I agree that in that type of situation they

24  didn't have the chance at the criminal court level maybe to

25  -- well, it wasn't argued because they pled guilty.  But when

 1  you're actually arguing over whether or not the statute that

 2  you're pleading guilty to is constitutional or applies to

 3  you, I believe you do have that full opportunity at the state

 4  court level.  Sometimes it doesn't happen, but you have been

 5  totally advised of your rights.  You've had a full and fair

 6  opportunity to litigate it and you chose not to.

 7          And now to go down the line years later and have a

 8  federal court say, well, the state court wasn't right in

 9  accepting your guilty plea to a statute, I -- I don't believe

10  that the case law supports that.

11          THE COURT:  Well, I don't intend -- I can assure

12  you I don't intend to try to substitute my judgment for

13  whatever the district court -- or it would have been the

14  magistrate level in the state court proceedings.  But I am

15  sensitive to the fact that, particularly in the application

16  of _Rooker-Feldman_ and how it applies in all of these things,

17  and without getting bogged down right now into the

18  particulars of the damage claims, I'm sensitive to the fact

19  that the way that the state court system works, with the work

20  load and the number of cases and the nature of cases about

21  the likelihood and opportunity realistically for these sorts

22  of constitutional challenges to be brought on behalf of a

23  homeless person that's charged with violation of one of these

24  ordinances strikes me as being very remote.

25          So -- but let's move on to the next matter, Mr.

1    Muir.  I don't want your --

2              MR. MUIR:  Okay.  And I think in --

3              THE COURT:  -- I don't want to have you waste your

4    time on that.

5              MR. MUIR:  -- you know, *Rooker-Feldman* collateral

6    estoppel distinction as maybe *Rooker-Feldman* is more a

7    jurisdictional argument.

8              That's the issues that I had to argue, Your Honor,

9    so unless you have further questions I'll save the rest of

10   our time for rebuttal.

11             THE COURT:  No.  Thank you, and I appreciate the

12   careful briefing that both you and Ms. Bilyeu have done on

13   this matter.  Thank you very much.

14             MR. MUIR:  Thank you, Your Honor.

15             THE COURT:  All right.  Let's see, how much time

16   will they have for their rebuttal?

17             LAW CLERK:  [unintelligible].

18             THE COURT:  16?  All right.

19             Ms. Sullivan, I'll hear from you, please.

20             MS. SULLIVAN:  Good morning, Your Honor.

21             THE COURT:  Good morning.

22             MS. SULLIVAN:  I think what we just heard from Ms.

23   Bilyeu's argument is a number of material disputed facts here

24   that preclude a grant of summary judgment at this stage.

25             THE COURT:  Well, as you go through all that let's

1  be very careful about the different claims you've raised and

2  the elements of each because part of my responsibility here

3  is to parse out all this stuff, and so I don't want any kind

4  of broad brush approaches to it.  All right?

5          MS. SULLIVAN:  Yes, Your Honor.

6          THE COURT:  Go ahead, please.

7          MS. SULLIVAN:  So with respect to the Eighth

8  Amendment claim, the defendant said that they are not

9  criminalizing sleeping, lying or sitting, and they argue that

10 *Jones* is limited to a statute of that nature, or an ordinance

11 of that nature.

12         That fact is clearly in dispute.  There is a number

13 -- there are a number of pieces of evidence at this point

14 that show that the city issues citations under the camping

15 statute for merely that, merely sleeping, not in connection

16 with any other conduct.

17         There are daily reports from the officers that

18 show that they were targeting sleeping in particular, and

19 that that is the primary conduct that they target when

20 they're enforcing the camping ordinance.

21         They also argue, the city does, that they do not

22 have a policy of citing homeless persons when they have no

23 place to sleep.  Ms. Bilyeu argued that there is evidence

24 that the city does not, in fact, enforce the camping stat --

25 or ordinance when there is insufficient shelter space.  And

1  again, the evidence is contrary to that.

2          The evidence shows that there have been a number of

3  citations where the individuals have indicated to the police

4  that they could not find shelter, they just needed a place to

5  sleep and couldn't find a place to sleep.  A person said he

6  had no place to stay.  They had, you know, done their time at

7  one of the various shelters and had been kicked out, and so

8  therefore were on the street for that reason.  There's a lot

9  of evidence in the record that shows that the city does, in

10  fact, enforce the ordinance when there is unavailable shelter

11  space.

12          They also argue that there's a safe harbor for

13  sleeping in the parks during the day.  Again, that's in

14  dispute.  There is evidence that shows that the city has

15  enforced the ordinance against homeless people sleeping in

16  the parks during the day.

17          A couple of the plaintiffs, in fact, were woken

18  when they were sleeping in the park during the day.  One was

19  issued a citation at 9 o'clock or 9:30 in the morning after

20  the park was open.  And one of the plaintiffs testified that

21  she was repeatedly told that she had to wake up and move

22  along essentially.  So there is a dispute of fact as to

23  whether or not there is this safe harbor that the city

24  claims exists.

25          THE COURT:  I assume that in your response you're

1   going to respond to the arguments about standing that Ms.

2   Bilyeu as made today?

3            MS. SULLIVAN:  Yes, Your Honor.

4            THE COURT:  Okay.

5            MS. SULLIVAN:  And I can address that now if you'd

6   like.

7            Ms. Bilyeu argues that the fact that some of the

8   plaintiffs are sheltered at the moment means that they can't

9   bring these claims for prospective relief.  And the -- there

10  are four of the plaintiffs who are in shelters.  They are

11  living actually in shelters at the moment.  They're still

12  homeless individuals within the federal definition of the

13  term.  They are subject to the rules of the shelters.  They

14  can be sent out at any time.  Not to mention the fact that

15  one of these individuals could leave for the day to go try

16  to find work or actually work and, you know, not get back to

17  the shelter in time to make it in for the night and end up

18  out on the street on that particular day.

19           So the fact that several of them are currently

20  residing or staying at shelters does not -- does not deprive

21  them of their right to challenge the constitutionality of

22  these ordinances -- the ordinances that -- that applied to

23  them.

24           THE COURT:  Why not?

25           MS. SULLIVAN:  Well, there's a real threat that

1  the -- they'll be injured by the police's conduct in enforcing

2  these statutes -- or the ordinances.

3          THE COURT:  How so?

4          MS. SULLIVAN:  As I've explained, they could be out

5  on the street at any point in time because they're not --

6  they don't have permanent homes.  They're in these shelters

7  at the whim of the shelters essentially, and they, you know,

8  can, on any given night not get back to a shelter and be out

9  on the street and then be cited for sleeping in the park

10  during the night, or in the morning essentially is when it

11  typically happens.

12          There's evidence that the defendants have --

13          THE COURT:  So is your argument that it doesn't

14  matter how many shelter beds are available because even if

15  there are enough shelter beds available that something else

16  might happen that would make someone still be out on the

17  street at night?

18          MS. SULLIVAN:  No.  Your Honor, the argument is

19  that if a person -- the fact that a person is in a shelter at

20  the moment does not mean that they don't have standing to

21  challenge the constitutionality of the way the ordinances

22  have been applied to them.

23          The evidence that there's a pattern and practice of

24  enforcing these ordinances against homeless people in

25  particular over the years is one factor that goes to the

_____
1:09-CV-0540-REB        Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                    40

1 realistic threat that they will be injured again.  There's

2 overwhelming evidence that the police have been blatantly

3 violating homeless people's constitutional rights since at

4 least 2007 by enforcing these ordinances against the homeless

5 people when they have nowhere to go and are only sleeping.

6 They're not doing anything more.

7            There's a number of -- there are a number of

8 citations in the record that show that a person just had a

9 blanket or just had a sleeping bag and was not doing anything

10 other than just sleeping and informed the officer that he or

11 she had no place to go, and yet was cited anyway.  So we can

12 expect that the conduct will continue.

13            It's not just one or two officers who have issued

14 these citations.  The evidence shows that the conduct has

15 been condoned by their superiors, including Chief of Police

16 Masterson.

17            There's evidence that the targeting of the homeless

18 individuals has been deliberate.  In May of 2007 there was

19 an email from Thomas Governale who's the superintendent of

20 Parks and Recreation, and he noted that the number of

21 homeless individuals sleeping in the parks had increased, and

22 he recommended that the police make a sweep of the parks in

23 the mornings, or late at night, to get the homeless people

24 out of the parks.

25            And around the same time the Boise Police

 1   Department implemented a new schedule for the bike patrol

 2   officers that would give them the opportunity to, or in fact,

 3   mandate that they go out and sweep -- do a sweep for

 4   sleepers.  The city says that it was very successful because

 5   they increased the number of citations by more than 400

 6   percent between 2006 and 2007.

 7           Additional evidence that shows that the city has

 8   been targeting the homeless population in particular is that

 9   in 2009, after this lawsuit began -- or after this lawsuit

10   was threatened I should say, the police department instructed

11   the officers to temporarily use the disorderly conduct

12   ordinance to cite homeless people who were sleeping in

13   public instead of using the camping ordinance.

14           And it was at that time, around that time when Mr.

15   Martin, who's a plaintiff, was cited for being on -- in an

16   alley close to Sanctuary.  He actually explains that he

17   thought that he could just wait in the alley essentially for

18   Corpus Christi to open up, and he was cited for being in the

19   alley.

20           The record is not clear that that necessarily was

21   a citation on private property, as the defendants argue.  The

22   officer's citation indicated that he thought it might have

23   been on private property.

24           When an individual falls within the meaning of

25   their -- the definition of the term 'a homeless individual,'

1  we believe that there's a real threat that they will continue

2  to be injured by this conduct.

3        And the fact that the city has amended the

4  ordinance and adapted a special order, which you heard a

5  little bit about, has not -- does not make the claims moot

6  and it doesn't eliminate -- doesn't take away the plaintiffs'

7  standing.  The officers' conduct hasn't changed since the

8  ordinance was amended.  And since the special order became

9  effective the record has -- there's evidence in the record

10  that shows that officers admit that their conduct has not

11  changed.  Their enforcement has not changed at all.

12        To the extent that anyone's enforcement of the

13  ordinances has changed, we believe there's evidence that it's

14  because of this lawsuit.  In particular, there's an email --

15  a daily report email from Officer Dotson who says that he

16  found a sleeper early in the morning who was in the gray area,

17  in the sense that he had no tent, he only had a bed roll and

18  was under blankets.  And the officer states that even though

19  it was after sunrise, so it's during the day, the officer

20  states that he told -- the plaintiff told Officer Dotson that

21  he had stayed during the night and so therefore, you know,

22  Officer Dotson's opinion was that this could be a violation

23  of the ordinance.

24        But in his email he stated that in light of recent

25  meetings I chose to warn and educate.  And that was

1    immediately after the plaintiffs began discussing the lawsuit

2    with the defendants.

3         So unless the Court enjoins the defendants from

4    continuing to violate homeless persons' individual rights --

5    or constitutional rights, we believe that the officers will

6    go back -- and we believe there's evidence that the officers

7    will go back to their old ways as soon as the lawsuit is

8    over.

9         With the respect to the right to travel claim,

10   defendants argued to Your Honor this morning that the right

11   to travel -- there's insufficient evidence that the right to

12   travel has been interfered with.  They don't appear to be

13   arguing that the right to travel is not implicated, so it

14   appears to be that the argument is that plaintiffs have not

15   shown sufficient evidence that there's been an interference.

16        Courts have held -- or the Supreme Court has held

17   that depriving an individual of a necessity of life is

18   sufficient to implicate the right to travel.  And we believe

19   it's clear that that -- there's evidence that that's what's

20   going on here, given the evidence that shows that the city is

21   enforcing the ordinance against purely sleeping without

22   really any other conduct.

23        And there's evidence that the city's enforcement

24   discourages the homeless individuals from migrating to or

25   remaining in Boise.  One of the plaintiffs left the city at

1  one point because he was afraid that he would be cited.

2         Another one is currently living outside of Boise

3  but says that she would like to return but she's afraid that

4  she can't return because she doesn't have a permanent home to

5  come to and she's afraid that if she ends up unable to find a

6  shelter she'll be cited.  And other plaintiffs have -- who do

7  still live in the city, have had to leave on certain nights

8  to avoid being cited.

9         THE COURT:  So is it your position then that the

10 camping ordinance is simply unconstitutional in its entirety

11 as violating the constitutional right to travel?  In other

12 words, the city can't criminalize camping of any sort on

13 public property?

14        MS. SULLIVAN:  No, Your Honor, because our argument

15 is that the -- when it's applied to deprive a person of a

16 necessity of life then it's a violation of the right to

17 travel.  And somebody who is sleeping outside because they

18 have no place else to go is exercising or, you know,

19 engaging in a necessity of life.  Whereas a person who has a

20 permanent home and is choosing to go camping in the park at

21 night, you know, I would argue --

22        THE COURT:  Mm-hmm.

23        MS. SULLIVAN:  -- is not necessarily exercising

24 the necessity of life because they could do that at their

25 home.

1          THE COURT:  The city contends you conceded in your

2    briefing that to prove your claims, your Eighth Amendment

3    claims, and then I gather by what you've just described your

4    claim of a violation of the constitutional right to travel,

5    that you have to demonstrate that shelters are unavailable

6    to people who need them.  Is that -- do you agree with

7    that?

8          MS. SULLIVAN:  Well, it depends on -- on what that

9    means really, that the shelters aren't available to people

10   who need them.  Does that mean that there is unavailable --

11         THE COURT:  I'm asking you.

12         MS. SULLIVAN:  Well, no, I know, but I'm

13   responding.  Does it mean that there's unavailable shelter

14   space for the number of individuals who are homeless in

15   Boise, or does it mean that an individual, a particular

16   person has to show on any particular given night that he or

17   she could not find shelter?

18         And we believe that they -- the law that supports

19   the right to travel claim makes it clear that having

20   unavailable shelter space in terms of the numbers is

21   sufficient, and that you don't need to show a specific --

22   for each particular individual plaintiff that he or she was

23   unable to find shelter space on the night in question.

24         THE COURT:  Well, the city contends they have a

25   system in place by which the shelters in the community advise

_____
1:09-CV-0540-REB      Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                    46

 1   the police department on a daily basis as to what their

 2   status is, are they full, are they not full, are they full as

 3   to certain parts of the population, female versus male or

 4   families, and then the city's -- the police department take

 5   that into account then when they're out on patrol.

 6            So if -- if the shelters are saying that we have

 7   room, is it your contention that -- you would agree that

 8   someone who is out in the community on that particular

 9   evening, let's say sleeping in the park after dark, that that

10   person -- there's no constitutional violation if they would

11   be arrested for that --

12            MS. SULLIVAN:  No.  There's a --

13            THE COURT:  -- for violating the ordinance?

14            MS. SULLIVAN:  -- there are a number of problems

15   with the special order that the city has adopted in this

16   protocol that you're describing.  The first is that it relies

17   on the shelters to report when they're full, and the evidence

18   shows that the shelters don't even know what that means.

19   They don't -- they don't know when they're full, they don't

20   know what their capacity is.

21            THE COURT:  Well, what would you -- what would you

22   contend meets that requirement then?  Are you saying that the

23   officers need to go down and physically go in to each of the

24   shelters around town?

25            I mean at some point I have to measure in all of

1 this the city's constitutional authority to exercise police

2 powers and what's some reasonable measure of that against

3 what you argue to me is unconstitutional.  And so far I'm

4 struggling with -- I mean you're taking some shots at it but

5 I'm having trouble figuring out where the reasonableness

6 lies in some of the shots you're taking at what they're

7 doing.

8          MS. SULLIVAN:  Well, Your Honor, there could be a

9 procedure set up such that when a -- the shelters are -- when

10 there -- the number of beds for a particular population of

11 individuals, like men or women, when the number of beds for

12 that particular population of individuals is sufficient to

13 house the number of homeless in that population, that the

14 enforcement of the ordinance might be constitutional in that

15 sense.

16          If, however, there's evidence that the numbers are

17 not sufficient, that there are not sufficient beds for the

18 number of individuals in any given population, we believe

19 that if somebody in that population is out on the street

20 because they have nowhere else to go, that that is a

21 violation of their constitutional rights to --

22          THE COURT:  Well, let's take the record as it

23 exists right now, Ms. Sullivan.  What is your clients'

24 position as to how many beds are needed in the City of Boise

25 for men?

1           MS. SULLIVAN:  For men --

2           THE COURT:  Yes.

3           MS. SULLIVAN:  -- in particular?  Your Honor, I

4    don't have --

5           THE COURT:  My point is is how do you find that --

6    you know, that's -- you're contesting how the city would

7    pinpoint that number.  The city's contesting how you might

8    pinpoint that number.  The very nature of population is that

9    it's constantly changing, and some of -- and I see in some of

10   what I have in my record that there's empirical studies that

11   have been attempted to try to quantify homelessness in terms

12   of a percentage of the population.  So what do you do?  Do

13   you want to use that as the benchmark and say it's 1.1

14   percent of whatever the City of Boise's population is and

15   the City of Boise's population on December 1 is 1,000 people

16   less than it was on November 1 or July 1, that that number

17   goes down and the city police department somehow is supposed

18   to keep a statistician identifying what that is and then go

19   calculate what the number of beds are in the shelter?  Do

20   you understand why that's -- that gets very difficult?

21          MS. SULLIVAN:  I do.  I do, Your Honor.  And that's

22   precisely one of the reasons why summary judgment is

23   inappropriate here because there are complicated factual --

24   it's a factual -- complicated factual question.

25          THE COURT:  Well, I understand that, but -- but

 1  it's not inappropriate, if what you're arguing to me is that

 2  there has to be some sort of statistical model that requires

 3  a daily calculation.  That's simply not sensible.

 4          MS. SULLIVAN:  It's --

 5          THE COURT:  If it's something that there's 100 beds

 6  available in shelters and there's a common understanding

 7  there's 5,000 homeless people, that's something else.  But

 8  what I have here is a record that says that -- that I think

 9  is contested as to whether the shelters always have beds or

10  don't, because I've heard the city's argument that they think

11  it isn't contested, but I think what I see here I think it

12  probably is.

13          But I'm struggling with having you tell me just

14  exactly what it is that you think you have to prove and when

15  it is, and that's my point, is if there are beds available,

16  the shelters say there are beds available, does that mean

17  that the city is free to arrest people who are in violation

18  of the ordinances?

19          MS. SULLIVAN:  Not necessarily, Your Honor, because

20  even if there are a sufficient number of beds, even if,

21  quote, unquote, "beds are available", they may not be

22  available to every homeless person.

23          So for example --

24          THE COURT:  So you've described to me that

25  occasionally there are folks who are mentally ill and have

1  difficulty in a shelter setting.  I understand that.

2          MS. SULLIVAN:  Right.

3          THE COURT:  So --

4          MS. SULLIVAN:  And policies.

5          THE COURT:  So does it mean that as for those

6  persons the ordinances can never ever be enforced against

7  them?

8          MS. SULLIVAN:  Well, it depends on their conduct.

9  And I think that to the extent that they're purely sleeping

10 and not building an encampment or setting up tents or, you

11 know, scattering litter all about, if they're not doing

12 those things and they're purely sleeping on a sleeping -- in

13 a sleeping bag or on a mat because they have no place else to

14 go because the shelters are unavailable to them, then yes, I

15 think the city can't enforce the statute against them for

16 sleeping.

17         To the extent they're engaging in other conduct

18 that's above and beyond sleeping, for example, setting up an

19 encampment, and that's just one example, then I think it's a

20 different story.

21         The problem here, though, Your Honor, is that the

22 evidence shows that the city is enforcing the ordinances

23 against purely sleeping when they know that there is not

24 sufficient available shelter space, whether it's because of

25 the numbers or whether it's because of the policies of these

1  shelters which are perfectly fine.  There's nothing wrong

2  with the policies, it's just that they render the space

3  unavailable for certain populations of people.  Or because

4  they have lice infestations or the flu outbreaks, things

5  like that.

6          The city's enforcing the statute against purely

7  sleeping under those circumstances --

8          THE COURT:  Well, Ms. Sullivan, presumably under

9  the approach that the city has tried to put in place, if a

10 shelter is shut down because there's a lice infestation, then

11 when they advise the police department of the availability of

12 beds they're going to say we have no beds, we have a lice

13 infestation.

14         MS. SULLIVAN:  That's actually not true, Your Honor,

15 that the officers wouldn't necessarily enforce the ordinance

16 because the way the protocol is set up, it doesn't necessarily

17 get notice to the officers.

18         The way it works is that a shelter can, if it wants

19 to, it doesn't have to, but if it wants to it can notify

20 Boise State University that it's full.  Boise State University

21 then will generate a form -- fill out a form and send it to

22 the police department.  It's sent by email.

23         The officers are not encouraged to check their

24 emails before they go out in the field.  They cannot check

25 their emails once they're in the field.  And they have

1  acknowledged in their testimony in this case that they would

2  issue a citation, regardless of whether they know that

3  shelter space is available, based on even the way the

4  protocol is set up.

5        So the protocol does nothing to ensure that the

6  city guarantees or doesn't enforce the statute

7  unconstitutionally against the homeless population.  It just

8  doesn't solve the problem.

9        On *Rooker-Feldman*, Your Honor, it just doesn't

10 apply.  The *Rooker-Feldman Doctrine* precludes a federal court

11 from reviewing a claim that is challenging a state court

12 judgment and seeking to have it overturned or reversed.

13       The cases that in which this doctrine is applied

14 are all cases where an individual sues judges or other

15 administrative tribunals for errors in --

16       THE COURT:  But what authority do I have to expunge

17 a criminal judgment in the Fourth Judicial District State

18 Court of Idaho?

19       MS. SULLIVAN:  Well, as a damage remedy, Your Honor

20 would have that authority.  As you pointed out initially,

21 it's, you know, nothing more than typical damages that are

22 being requested here.

23       We're claiming that the city's conduct has injured

24 the plaintiffs, not that the state court or the judges or any

25 administrative tribunal has injured the plaintiffs.  And

1   that's the distinction that the _Rooker-Feldman Doctrine_

2   makes, particularly in the Ninth Circuit.  The Ninth Circuit

3   has interpreted the doctrine very narrowly and has stated

4   that it truly only applies when a plaintiff is seeking to --

5   is challenging conduct by the state court or its judges or

6   administrative tribunal, so it just doesn't apply here.

7        THE COURT:  Okay.  Do you have any cases in which

8   a federal court has, as part of a decision in a 1983 case

9   challenging the constitutionality of a state, or in this case

10  a city law, that the federal court has ordered, as part of

11  its relief, that a judgment in the state court case, a

12  criminal judgment be expunged?

13       MS. SULLIVAN:  I don't as I'm standing here, Your

14  Honor.

15       THE COURT:  All right.

16       MS. SULLIVAN:  Of course the plaintiffs are seeking

17  other relief.

18       THE COURT:  I understand that.

19       MS. SULLIVAN:  Right.

20       THE COURT:  But you're also seeking that, that's

21  why I'm --

22       MS. SULLIVAN:  That's correct.

23       THE COURT:  Okay.  Go ahead, please.

24       MS. SULLIVAN:  On a vagueness point, defendants

25  argued that the plaintiffs are saying that the defendants

1   basically didn't have enough to convict the plaintiffs

2   because there was not sufficient evidence of camping in any

3   of the instances where the plaintiffs were cited.  That's not

4   the argument.

5          The argument is that the ordinance is vague as

6   applied and that it doesn't clearly set forth standards that

7   ordinary people can understand such that they know what

8   conduct is prohibited.

9          THE COURT:  Is that your -- that's your argument as

10  to the amended camping ordinance as well?

11         MS. SULLIVAN:  Yes, Your Honor.

12         THE COURT:  Okay.  I'd like to hear from you a

13  little bit more on that.

14         MS. SULLIVAN:  Okay.  On the -- the amended

15  ordinance defines camping whereas the prior ordinance did

16  not, or the original ordinance did not, but it defines it as,

17  for example, using public property as a living accommodation,

18  but it doesn't define what that means.  And using it as a

19  sojourn, it doesn't define what that means, and the officers

20  have testified that they don't know what that means.

21         It states that indicia of camping may include the

22  storage of personal belongings.  What does that mean?  Does

23  that mean that if a person has a backpack that that suffices

24  to constitute a violation of the new ordinance or the amended

25  ordinance?

1              I think the common understanding of --

2              THE COURT:  Well, is your point that the camping

3    could just never ever be defined, or that despite the city's

4    attempt to add about forty words, that the definition that

5    they've attached to it remains vague somehow?

6              MS. SULLIVAN:  It's the latter, Your Honor.

7              THE COURT:  Okay.

8              MS. SULLIVAN:  I think it criminalizes conduct that

9    is beyond the common understanding of the terms that they're

10   using to try to define camping, such as the storing of

11   personal belongings, for example.  The common understanding

12   of that phrase is that you are storing something, you're

13   putting it there and then you're leaving.

14             What they're doing is they're enforcing a statute

15   against people who -- homeless people who have a backpack or

16   a bag with them when they have no other place to put that

17   bag or that backpack.

18             So it goes beyond the ordinary understanding of the

19   terms.  And it doesn't provide sufficient guidance to the

20   officers to know when to enforce the statute and when not to.

21   The protocol says -- or the special order says that they, for

22   example, don't -- shouldn't exercise -- or enforce the

23   ordinance against homeless people when there's not -- not

24   available shelter space, but then they don't define what

25   available overnight shelter space means.

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com

1           So those are just some examples of why we don't

2  believe that the ordinance -- the amendment to the ordinance

3  has mooted the plaintiffs' claims.

4           THE COURT:  Well, at what point, Ms. Sullivan,

5  does your argument start to depart from the ordinary

6  situation when any criminal statute can't, allowing for the

7  fact that there -- it can be over broad and it can be vague,

8  but that their -- the great majority of criminal statutes

9  are not and yet they don't purport to define with specificity

10 every particular -- like as if you would turn to the word --

11 a particular word of a statute in the dictionary and make

12 part of the statute the definition that's contained in the

13 dictionary.  At what point do you start to get into that sort

14 of a realm?  I mean there has to be some room for both the

15 public that faces the ordinance and the law enforcement that

16 enforces it to bring to it their common understanding of what

17 it may mean.

18          MS. SULLIVAN:  I think that's right, but I think

19 that's the problem here, and that's why there's a dispute as

20 to the fact as to how these --

21          THE COURT:  All right.

22          MS. SULLIVAN:  -- the ordinances are being

23 applied.

24          THE COURT:  Well, isn't that -- isn't that what

25 the city has attempted to do with -- to try to define camping

 1  a little more precisely so that it -- both the public and

 2  law enforcement will have a better understanding of the

 3  parameters of what's intended by the council when they

 4  passed that ordinance?

 5          MS. SULLIVAN:  I do believe that's what they've

 6  attempted to do, but I don't believe they've gone far

 7  enough --

 8          THE COURT:  Okay.

 9          MS. SULLIVAN:  -- and that's because the officers

10  are testifying that they haven't changed their conduct at

11  all, and they don't know what these terms mean.

12          THE COURT:  Well --

13          MS. SULLIVAN:  They don't know how to enforce it.

14          And one officer testified that he, in some

15  situations, you know, having a tent -- or having a sleeping

16  bag might be enough --

17          THE COURT:  Mm-hmm.

18          MS. SULLIVAN:  -- and others having a sleeping bag

19  might not be enough.  I mean it's arbitrary how they're

20  enforcing the amended ordinance.

21          THE COURT:  Well, there has to be some room for

22  judgment, doesn't there, for law enforcement?

23          MS. SULLIVAN:  Of course, Your Honor, but they

24  also need to have sufficient training and sufficient

25  guidance, and the statute -- the ordinance needs to have

1  sufficiently defined terms such that -- that it's not -- it's

2  not going beyond the ordinary definition of the terms.

3        And then finally with respect to the res judicata

4  and collateral estoppel argument that defendants have

5  asserted, the argument is that because the plaintiffs did not

6  make this constitutional challenge in the state proceedings

7  they are barred from making the challenges now, and that's

8  not what the Supreme Court has held.

9        The *Haring v. Prosise* case make clear that the

10 decision to plead guilty and not challenge the

11 constitutionality of a conviction at the time does not bar a

12 subsequent challenge.  A guilty plea doesn't constitute an

13 admission that the ordinance was enforced constitutionally

14 against you.

15       The attempt to distinguish that case from this

16 case, based on the fact that in that case the challenge was

17 to the search and seizure under the Fourth Amendment versus,

18 in this case, it's to the cruel and unusual punishment of the

19 application in the statute under the Eighth Amendment is a

20 distinction without a difference.  There's no difference.

21 The court held that the failure -- or the pleading guilty

22 does not waive your right to challenge the constitutionality

23 of the enforcement of the ordinance or the conviction down

24 the road.

25       Unless Your Honor has any further questions --

```
 1              THE COURT:  Well, I'm interested in your position
 2  on the state constitutional claims.  Where are we on that?
 3              MS. SULLIVAN:  Just that it applies to prospective
 4  relief.
 5              THE COURT:  All right.  All right, Ms. Sullivan,
 6  thank you.
 7              Ms. Bilyeu.
 8                   (Pause in the proceedings)
 9              THE COURT:  Kira.
10              Just a moment, Ms. Bilyeu.
11              MS. BILYEU:  Thank you.
12                   (Off-record colloquy)
13              THE COURT:  All right.  Ms. Bilyeu, thank you.
14              MS. BILYEU:  Thank you, Judge Bush.
15              Judge, I hesitate for a second just because I don't
16  want to repeat what I said in my brief, but I think just a
17  sentence or two wouldn't be a bad thing at this -- at this
18  juncture.
19              THE COURT:  It's always good to have prior [sic]
20  authorship.  Go ahead, please.
21              MS. BILYEU:  In our brief.  I apologize, Scott.
22              But I think it's important, you know, plaintiffs
23  suggest that the officers are targeting sleepers or sleeping,
24  and sleeping may be an element of camping.  Certainly I know
25  when I go camping, and oftentimes it might include fishing,
```

1  but certainly when I go camping sleeping is an element of my

2  camping.  So I don't think that's off -- out of bounds to

3  include as part of an observation of the totality of the

4  circumstances that perhaps your sleeping overnight could be

5  an element of camping.

6          And moreover, the _Jones_ case -- and this is what

7  I'm saying I'm repeating from our brief, is that the _Jones_

8  case doesn't say sleeping can't be an element if they're

9  including sleeping with other things.  And certainly that's

10  what the officers did in these instances.

11          I'm going to address the standing argument just

12  for a minute because I think that a lot of the standing

13  argument has a lot of 'if this,' 'if that,' and that's

14  precisely what the case law tells us to be wary of.

15          In _Lyons_ the issue was whether or not he might get

16  pulled over again and then put in a choke hold.  It was too

17  iffy.  It was too iffy that he would violate the law and too

18  iffy that the police would put him in a choke hold again.

19  It's the iffiness that we've been warned against as far as

20  standing goes.

21          Whether or not one of these plaintiffs may or may

22  not make it back to a shelter on any given night, that's just

23  iffy.  Not to mention the fact that I think that in our

24  society as a whole, if you can comply with the law it's your

25  responsibility to do so.  If you just can't make it back to a

1   shelter on a given night, that doesn't give you standing here

2   today.

3         Judge, I think that plaintiffs alluded to that the

4   -- that the shelters don't know what they're doing when it

5   comes to telling the City of Boise whether or not they're

6   full at night.  And I think that the real facts of record,

7   there's nothing to that extent as to Boise Rescue Mission.

8   The only thing that's even close to that is Fawn Pettet's

9   affidavit, and she's with the Sanctuary, Your Honor.  And what

10  Fawn Pettet says in paragraph 37 of her affidavit filed by

11  plaintiffs is:

12        "There have been times since the overnight shelter

13        capacity advisory protocol was instituted that Sanctuary

14        was out of beds and floor space but has not called Boise

15        State Dispatch.  This was due to confusion with the

16        procedure for following the protocol and staff not being

17        aware of or knowing when -- staff not being aware or

18        knowing when to call."

19        THE COURT:  Ms. Bilyeu --

20        MS. BILYEU:  Yes.

21        THE COURT:  -- my assumption from what I had read,

22  with references to Boise State Dispatch, was that that was a

23  police department dispatch center --

24        MS. BILYEU:  That's correct.

25        THE COURT:  -- not associated with the University.

1  Is that right?

2          MS. BILYEU:  Well, Your Honor, it is associated

3  with the University from the standpoint we have a contract.

4  Boise Police Department has a contract with the University

5  on their law enforcement.  Ada County dispatch -- and this

6  is all in Sergeant Walker's affidavit.  Ada County dispatch

7  turned us down because they didn't see it as an emergency and

8  that it didn't fit within their core mission statement to put

9  out an advisory such as this to the Boise Police Department,

10  and so we do it through our contract with Boise State,

11  through their dispatch.  If that contract would end up

12  changing at some point in the future, which we don't -- we

13  don't perceive, but if it were --

14          THE COURT:  I'm still confused then.

15          MS. BILYEU:  Okay.

16          THE COURT:  Through -- when you say dispatch,

17  dispatch, and maybe I missed that in that affidavit, has a

18  connotation to me of being a law enforcement centralized

19  information in, information out center.

20          MS. BILYEU:  Yes.

21          THE COURT:  Are you telling me this is an office

22  that is an office of Boise State University, or it is an

23  office of the Boise State Police Department -- or excuse me,

24  Boise Police Department?

25          MS. BILYEU:  My understanding is that it's the

1  Boise City Police Department, but we have a -- an office on

2  Boise State University grounds because we're under contract

3  with them, and it's a separate -- it's a separate dispatch

4  which --

5             THE COURT:  It's like a precinct station.

6             MS. BILYEU:  Yes.

7             THE COURT:  All right.

8             MS. BILYEU:  And they have a separate dispatch

9  ability which enables them to communicate with all Boise

10  police officers.

11            THE COURT:  All right.  Thank you.

12            MS. BILYEU:  In any event, back to Fawn Pettet,

13  Your Honor, whether or not at some point they were confused

14  about that and didn't relay that information to us, hasn't

15  injured these plaintiffs.  There's no constitutional injury

16  as to these plaintiffs as to the confusion.  For them to show

17  that they would have to show what days they didn't -- that

18  they didn't report and to show that it was somehow the City

19  of Boise's fault.

20            They haven't been injured by this.  They haven't

21  been injured by the new policy in any way, shape or form,

22  Judge.  And in fact, what the law says isn't just merely an

23  injury, Judge.  What the law says is, there's no respondeat

24  superior liability.

25            In order to prove a constitutional violation, they

```
 1  have to prove that a city employee violated their rights, that
 2  the city had a policy, and that can be proven in three --
 3  three different ways --
 4          THE COURT:  I understand that, and that's -- and
 5  that's what --
 6          MS. BILYEU:  -- which you don't need to -- yeah, and
 7  I won't go through those.
 8          THE COURT:  -- that's what I'm paying to, Ms.
 9  Bilyeu.
10          MS. BILYEU:  But that the policy amounted to
11  deliberate indifference to the plaintiffs.
12          THE COURT:  Ms. Sullivan in her argument, I
13  inferred from what she said that this information about the
14  status of the homeless shelters goes by email to the officers
15  and that -- I guess what I inferred from her argument was
16  that if the information is coming and goes out while an
17  officer is on his or her shift, the policy is that they're
18  not to check their emails while they're on shift and
19  therefore, if they encounter someone who might be in
20  violation of the camping ordinance but as to which per other
21  provisions of city -- current city policy, they need to know
22  whether or not there are shelter beds available before they
23  might issue a citation.  They can't do so because they're not
24  to check their emails.  What about that?
25          MS. BILYEU:  Thank you, Your Honor.
```

1          Judge, the record shows that the officers do check

2     their emails.  They aren't required to, per se.  I mean it's

3     not something that somebody's going to get fired for if they

4     don't check their emails.  But the policy is is that they do

5     check their emails.  They are encouraged to --

6          THE COURT:  The policy or the practice?

7          MS. BILYEU:  The practice.  Excuse me.  They are

8     encouraged to check their emails.

9          And here's actually how the policy works, Judge.

10    It was arranged so that the shelters would call in at about

11    11:00 p.m. at night because as can be shown from the record,

12    the citations generally occur in the morning, early morning

13    hours.  So the officers who come in in the early morning get

14    that email.  They are aware of the email.  That's when the --

15    that is when the majority of all of these citations occur is

16    between says 5:15 in the a.m. and 10:00 in the a.m.

17         But regardless of that, they have to show that it

18    was -- that it's deliberately indifferent to their

19    constitutional rights, Judge.  And what -- I think what the

20    evidence shows is that --

21         THE COURT:  Well, if their -- if the practice or

22    the policy was that the information went out by email at the

23    beginning -- or at a certain time and officers who were on

24    their shift weren't supposed to check emails and to -- so

25    that they could get such information, then that strikes me

1   as -- and arguably could -- could give rise to that level of

2   deliberate indifference.  It's kind of like well, it's there

3   but we don't want you to check to see if it's there, or

4   actually you're instructed not to check to see if it's

5   there.

6           MS. BILYEU:  Well, that's not what the -- that's

7   not what the record shows, Judge.  And they -- you know, they

8   can say that, but I think when you look at the fine point and

9   you turn to the page where they say it says that, that's not

10  what it says.

11          They call in at 11 o'clock at night.  Dispatch

12  immediately updates the email to say whether or not a shelter

13  is full.  And the officers that come on, generally they come

14  on at 5 o'clock in the morning or 6:00 or 7:00 in the morning,

15  they are aware and they check their emails.

16          THE COURT:  Does my record contain anything about

17  how many -- how many times law enforcement has made a decision

18  not to issue a citation because of information -- and I'm not

19  -- I understand that it -- that from your position it might

20  beg the negative, but because there was information

21  disseminated that the shelter or some portion of the shelter

22  was full?

23          MS. BILYEU:  Judge, I can tell you that because of

24  the lawsuit, the police officers have been wary of citing

25  people because they're afraid that they're going to hook

1   somebody on their constitutional -- they're afraid.  They're

2   afraid.

3           But I can tell you that there has never been, to my

4   knowledge, and I'm trying to keep abreast of all the emails,

5   a night when both Sanctuary and River of Life were full for

6   the same population, not even close.

7           So that's -- that's -- I think that's where the rub

8   is, Judge.  There's -- there hasn't been a constitutional

9   violation because the shelters haven't been full.

10          And I wanted to clarify one thing also.  We don't

11  arrest on the camping ordinance.  We do not arrest.  That is

12  not generally something that is a practice.  We could, but as

13  a practice they don't arrest.  And it makes sense if you

14  think about it.  Most of these officers are bicycle officers.

15  They can't really arrest somebody.

16          But on the occasion that they did arrest, Hawkes,

17  Plaintiff Hawkes asked to be arrested.  Officer Dotson didn't

18  say I'm going to arrest you for this.  She asked to be

19  arrested so she could get in and take care of her other

20  outstanding warrants and blah, blah, blah.  But she had

21  warrants out but he didn't arrest her on that.  She asked to

22  be.

23          And I just wanted to make that clear that -- and

24  that's in Sergeant Walker's affidavit at the very -- I think

25  it's his very last paragraph, maybe just before that, where

1  he makes it explicit to the Court, these aren't -- these

2  aren't citations that we arrest for.  That's not our

3  practice.  And the evidence in the record is the same.

4         As for confusion as to the word 'sojourn,' Judge,

5  the evidence of record shows that there's -- you know, they

6  say well, the officers don't know what that means.  And I

7  don't know that that's here nor there, but in case it is,

8  plaintiffs asked Officer O'Rourke and I think he's the only

9  one that they asked, as far as I know, is there a definition

10 of sojourn.  No he says.  How'd you know that term?  I

11 understand it is a short trip, a short journey.  How would

12 somebody be on a short trip or a short journey if they were

13 in one place?  Well, a short stay during a short trip, if

14 they were staying for a short amount of time.  And that's

15 precisely what sojourn means.  That's precisely what sojourn

16 means.  Sometimes they even use it in the hotel motel

17 industry as a word.  So there's no confusion by the officers

18 on what sojourn means.

19        I think it's very important, Judge, to remember

20 that this is not a class action lawsuit.  These are

21 individual plaintiffs that each have to make their own --

22 that each have to meet their own burden on a constitutional

23 violation.

24        So when sometimes we talk in generalities about

25 well, if a -- if a plaintiff were so mentally ill that they

1  weren't able to stay in the shelter, then that's a violation

2  of their right if they got cited that night.  Well, that may

3  very well be if they can prove that they actually have a

4  doctor who's going to sit on the stand and say this person is

5  mentally ill and does not have the capacity to stay in a

6  shelter.  But that's not these plaintiffs.  They haven't made

7  that showing.  And as --

8          THE COURT:  All right.  You have -- you have a

9  couple of minutes.  You might want to wrap up, please.

10         MS. BILYEU:  Okay.  Thank you, Judge.

11         Judge, just real quickly.  As a matter of fact,

12 Bell says, this is in relation to City Lights.  What Bell

13 says is -- I believe Scott was deposing her:

14         "Did you have the opportunity to continue staying

15     there?

16         Her response on page 38, and this is in the record:

17         "They asked me to -- they asked me if I wanted to

18     come back.  I had several reasons not to."

19         So this isn't a case they were full, couldn't take

20 me, I had my own reasons.

21         As to Hawkes, "I prefer not to stay at the City of

22 Lights."

23         I'm not going to bore you with everybody, but Smith:

24         "River of Life?

25         "No.  I can't stay there.

1          "Why not?"

2          Page 23.

3          "I just can't.  I don't like the place.  I don't

4      like the place."

5          And, Judge, I don't want you to think that the City

6  of Boise is -- has a cold heart towards these people.  The

7  City of Boise doesn't.  The City of Boise had the ombudsman

8  do a report, a 10 year plan in an effort to reduce

9  homelessness, and then the police policy to make sure that in

10 the future if the -- if the shelters are full that we make

11 sure that there's something in place for the future so that

12 people don't get cited for that.

13         So the City of Boise does not have a cold heart.

14 But a constitutional violation cannot rest on I just don't

15 like the place.  That's not our policy, that's the

16 plaintiffs'.

17         Thank you, Judge.

18         THE COURT:  Thank you, Ms. Bilyeu.

19         All right, Ladies and gentlemen, I appreciate the

20 good argument today, as well as the briefing that we're

21 received, which I thought has been very well done.

22         Obviously my task in issuing a decision on these

23 issues will be more than just a sojourn.  But you put it to

24 me quite well and it will be my task, along with Ms.

25 Pfisterer's good help, to sort through it and do the best we

1  can in issuing a decision.

2          So thank you.  I wish you all a happy holidays.

3  Those of you who are here from out of town, welcome, and we

4  hope that you'll shop around for some holiday gifts to take

5  home and drop some money into our community.

6          Very well, anything else to take up today from

7  plaintiffs?

8          MR. BELODOFF:  Your Honor --

9          THE COURT:  Mr. Belodoff.

10          MR. BELODOFF:  -- what were you planning on doing on

11  the motion to strike?

12          THE COURT:  Well, I'd understood that the argument

13  that we had was going to be on those.  Did you not understand

14  that?

15          MR. BELODOFF:  No, I didn't.  But however the

16  Court feels about it.  I mean you seem like the type of judge

17  that really has gone through it and it's pretty well briefed,

18  so --

19          THE COURT:  Well, I'll give you each 10 minutes to

20  argue the motions to strike.  I was wondering why I didn't

21  hear anything, but we may have had some confusions about

22  that.  But that's all I have because I have a noon meeting

23  that I've got to spend a little time getting ready for, so

24  I'm sorry, I should have asked about that at the beginning.

25          Mr. Muir, were you going to argue the motions to

 1  strike?

 2          MR. MUIR:  Yes, I was, Your Honor.

 3          THE COURT:  Okay.  Go ahead, please.

 4          MR. MUIR:  Thank you, Your Honor.  I'm sorry for the

 5  confusion there.

 6          And we have briefed this fairly well, and like I

 7  said, in the proceedings before you, before you've gone

 8  through what we've briefed and I appreciate that, so I am

 9  going to be brief on this.

10          We've specifically set forth in our motion to

11  strike parts of the affidavit of Fawn Pettet that we believe

12  should not -- should be stricken from the record.  I would

13  like to just highlight a couple of them that I think are

14  particularly important.  Paragraphs 29 through 33.

15          This is where Ms. Pettet seems to set forth expert

16  opinions regarding mental health and disabilities.  The city

17  argues that she's never been disclosed as an expert.  Further,

18  there's absolutely no foundation of how she would qualify as

19  an expert on these issues.  So we seek to have that stricken

20  from the record.

21          Again, we go -- a broad thought about the affidavit

22  upon Pettet is that it really -- it really lacks the required

23  relevancy.  It doesn't address availability of shelters as to

24  the specific plaintiffs, and as to the particular dates on

25  which the plaintiffs were cited.

1          We would like stricken the two expert opinions, Dr.

2   Kent's and Dr. Rainford's.  Dr. Kent, he addresses the mental

3   illness, disability, substance abuse issues, et cetera, for

4   the certain portions of the homeless population.  He's not a

5   treating physician for any of the plaintiffs, and he cannot

6   relate any of his opinions to the specific plaintiffs.  We

7   believe he should be stricken.

8          Dr. Rainford is a similar situation.  The

9   plaintiffs have conceded that they're not using Dr.

10  Rainford's calculations as evidence of the number of

11  homeless persons in Boise.  As to the rest of his opinion,

12  it's purported knowledge of the causes of homelessness.

13  This doesn't appear that it would help the trier of fact to

14  understand the evidence or to determine a fact and issue in

15  this case.  We would ask that the remainder of the report

16  also be stricken.

17         There's several comments that are hearsay, Exhibit

18  98, Exhibit 99, Exhibits 127 through 132.  We have made our

19  argument in our briefing about why that is hearsay.

20  Plaintiffs have responded that they believe that they would

21  be present sense impressions, excited utterances or existing

22  state of mind evidence.  I think if the Court takes a look at

23  what those hearsay statements actually are, that they don't

24  meet those exceptions, so we would ask those to be stricken

25  too.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.

3          MS. MALTAS:  Good morning.

4          THE COURT:  Ms. Maltas.

5          MS. MALTAS:  Good morning, Your Honor.  I too will

6   be very brief and just respond to a couple of the points that

7   the city has made.

8          First, in terms of relevance, the city has not made

9   any showing that the affidavit of Fawn Pettet or the expert

10  reports of Doctors Kent and Rainford are not relevant.  In

11  fact in their summary judgment reply defendants asked this

12  Court to grant summary judgment because they say the shelters

13  in Boise are not full.  They cite paragraph 17 of the Pettet

14  affidavit which states that the beds at Sanctuary -- or

15  paragraph 18 of the Pettet affidavit which states that

16  Sanctuary has been at bed capacity in the mens area at least

17  half of every month.  The women's area has been completely

18  full almost every night of the week.

19         At the same time they challenge paragraph 17 of

20  the Pettet affidavit, which speaks of the exact same issue.

21  The beds at Sanctuary are consistently filled and the

22  overflow floor area has to be fully utilized.  On a routine

23  and regular basis there are no beds or floor mats available

24  and persons have to be turned away or referred to other

25  shelters.

1          Defendants simply cannot say that a portion of the

2     Pettet affidavit on the same subject is relevant for their

3     purposes, but that the Court cannot consider it on that

4     issue.

5          Indeed, in terms of the challenged statements, the

6     Pettet affidavit as well as both expert reports, under all

7     of the case law that considers an Eighth Amendment violation

8     to sleeping or camping ordinance, this type of evidence has

9     been deemed relevant and considered by the courts.  The

10    courts consider whether the available of shelter overall for

11    homeless people generally in each city.  They do not limit

12    their consideration of the evidence to specific plaintiffs on

13    specific nights.

14         Additionally, in terms of the Kent and Rainford

15    expert reports, *Jones* relied specifically on a report from

16    the *Institute for the Study of Homelessness and Poverty* that

17    discusses the causes of homelessness and the fact that

18    homelessness is involuntary.

19         The *Pottinger* Court in the Southern District of

20    Florida also found that homelessness was involuntary and

21    relied specifically on an expert report that spoke to that

22    issue.

23         Just one final issue of relevance here in terms of

24    the Kent and Rainford reports, as well as certain statements

25    in the Pettet affidavit.  The courts in the District Court

1    in *Johnson*, as well as the court in *Anderson*, which is the

2    challenge to the Portland camping statute, both considered

3    whether or not the policies of a shelter impact the ability

4    of homeless people to access that shelter.

5         So the statements by Doctors Kent and Rainford that

6    certain homeless people who experience mental illness or

7    physical incapacibility can't access homeless shelters is

8    clearly relevant under that case law, as all -- is all of Ms.

9    Pettet's statements regarding the policies of the Boise

10   Rescue Mission, and how those policies affect whether Boise

11   Rescue Mission can serve certain segments of the homeless

12   population and whether Sanctuary, how that affects Sanctuary's

13   fullness as well.

14        Moving back to the Pettet affidavit just briefly in

15   terms of her lay opinion.  I think that if the Court reads

16   carefully the challenge segments of the Pettet affidavit that

17   defendants have challenged for that purpose, they'll see that

18   a number of the sentences and statements are just facts.

19   They don't set forth any opinion whatsoever.

20        Also, in terms of the statements that might put

21   forth some opinion, I think the law is clear that lay persons

22   have the capacity to opine as to mental illnesses.  I think

23   the reason for this is is because lay persons know what

24   someone who's operating within the norm do.  So it's very

25   easy for a lay person to then opine, and it requires no

1   technical knowledge that someone who is not operating within

2   the norm who has behavior such as the ones Ms. Pettet

3   describes, someone who thinks there are armadillos on the

4   roof, someone who is so afraid of dirt that they just can't

5   function, someone who talks and sneezes involuntarily all

6   night long might be suffering from a mental illness.

7          And it's also within her lay person capacity to

8   opine that that -- those people would do better in a single

9   room occupancy shelter than they would in a crowded shelter.

10  And that those people, when they cannot stay at the shelter,

11  that that's not their choice because she has personal

12  knowledge of people who have been asked to leave Sanctuary

13  for those reasons, and she has personal knowledge of people

14  who just left because they knew they couldn't function in

15  those environments.

16         I think the final point that I would like to make

17  are in the what defendants term to be the imbedded hearsay

18  statement from homeless individuals in the police citations

19  and the police reports.  Defendants are just wrong that

20  803(3), which is a statement of a then existing mental,

21  emotion or physical condition does not cover the statements

22  by the homeless individuals in those documents.

23         According to the express language of the Federal

24  Rules of Civil Procedure, they cover intent, plan and motive.

25  All of the statements that are made by the homeless

_____
1:09-CV-0540-REB      Bell v. City of Boise      12/10/10      **Motions**

NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                    78

 1  individuals go directly to their intent, plan or motive, the

 2  reasons that they're sleeping on the street and what they

 3  would do next.

 4          Additionally, the statements that were made to the

 5  police officers in the citations we would argue are excited

 6  utterances.  The defendants try to say that being awoken

 7  cannot be a stressful condition.  That might be true if

 8  you're in your own bed being awoken by your child, but when

 9  you're sleeping outside in a vulnerable position in the dark,

10  I would say that it's a -- could be a stressful condition to

11  be awoken by a police officer.

12          Finally, should the Court not want to admit any of

13  these statements for the truth of the matter asserted, the

14  Court should definitely admit these statements as to the

15  state of mind of the police officers, the effect that they

16  had on the police officers' state of mind, particularly in

17  terms of the citations.

18          The statements in each of these citations

19  demonstrate that each one of these homeless individuals told

20  the police officer I have nowhere to stay, I have nowhere to

21  go, I did my 17 days of River of Life, I can't go back there.

22  And the police officer did not check, he did not question,

23  he only cited.

24          So thank you, Your Honor.

25          THE COURT:  Thank you.

1          Mr. Muir, did you want to have any rebuttal?

2          MR. MUIR:  No.  Thank you, Your Honor.

3          THE COURT:  All right.  Very well.

4          Thank you again, counsel.  We'll be in recess.

5          ATTORNEYS:  Thank you, Judge.

6          THE CLERK:  All rise.  Court is in recess.

7            PROCEEDINGS CONCLUDED AT 11:33:13 A.M.

8                    *  *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **CERTIFICATION**

I (WE) CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE ELECTRONIC SOUND RECORDING OF THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

**NW TRANSCRIPTS, LLC**
**IDAHO DIVISION**
**P.O. BOX 890**
**NAMPA, IDAHO 83653**
**(208) 908-7998**
**gayle@nwtranscripts.com**

/s/ Gayle M. Lutz
FEDERALLY CERTIFIED MANAGER/OWNER

Kari Riley                                    4/21/11
TRANSCRIBER                                   DATE

1:09-CV-0540-REB        Bell v. City of Boise        12/10/10        **Motions**
NW TRANSCRIPTS, LLC - Idaho Division
P.O. Box 890
Nampa, Idaho 83653-0890
(208) 908-7998 - gayle@nwtranscripts.com                          81