**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT MARTIN; LAWRENCE LEE SMITH; ROBERT ANDERSON; JANET F. BELL; PAMELA S. HAWKES; and BASIL E. HUMPHREY, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF BOISE, *Defendant-Appellee.* | No. 15-35845 <br><br> D.C. No. 1:09-cv-00540-REB <br><br> OPINION |

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Chief Magistrate Judge, Presiding

Argued and Submitted July 13, 2017
Portland, Oregon

Filed September 4, 2018

Before: Marsha S. Berzon, Paul J. Watford,
and John B. Owens, Circuit Judges.

Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Owens

## SUMMARY[*]

### Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment in an action brought by six current or formerly homeless City of Boise residents who alleged that their citations under the City's Camping and Disorderly Conduct Ordinances violated the Eighth Amendment's prohibition on cruel and unusual punishment.

Plaintiffs sought damages for the alleged violations under 42 U.S.C. § 1983. Two plaintiffs also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances. In 2014, after this litigation began, the ordinances were amended to prohibit their enforcement against any homeless person on public property on any night when no shelter had an available overnight space.

The panel first held that two plaintiffs had standing to pursue prospective relief because they demonstrated a genuine issue of material fact as to whether they faced a credible risk of prosecution on a night when they had been denied access to the City's shelters. The panel noted that although the 2014 amendment precluded the City from enforcing the ordinances when shelters were full, individuals could still be turned away for reasons other than shelter capacity, such as for exceeding the shelter's stay limits, or for

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

failing to take part in a shelter's mandatory religious programs.

The panel held that although the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994) and its progeny precluded most — but not all — of the plaintiffs' requests for retrospective relief, the doctrine had no application to plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

Turning to the merits, the panel held that the Cruel and Unusual Punishments Clause of the Eighth Amendment precluded the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter. The panel held that, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.

Concurring in part and dissenting in part, Judge Owens disagreed with the majority's opinion that *Heck v. Humphrey* did not bar plaintiffs' claim for declaratory and injunctive relief. Judge Owens stated that a declaration that the city ordinances are unconstitutional and an injunction against their future enforcement would necessarily demonstrate the invalidity of plaintiffs' prior convictions. Judge Owens otherwise joined the majority in full.

## COUNSEL

Michael E. Bern (argued) and Kimberly Leefatt, Latham & Watkins LLP, Washington, D.C.; Howard A. Belodoff, Idaho Legal Aid Services Inc., Boise, Idaho; Eric Tars, National Law Center on Homelessness & Poverty, Washington, D.C.; Plaintiffs-Appellants.

Brady J. Hall (argued), Michael W. Moore, and Steven R. Kraft, Moore Elia Kraft & Hall LLP, Boise, Idaho; Scott B. Muir, Deputy City Attorney; Robert B. Luce, City Attorney; City Attorney's Office, Boise, Idaho; for Defendant-Appellee.

## OPINION

BERZON, Circuit Judge:

> "The law, in its majestic equality, forbids rich and poor alike to sleep under bridges, to beg in the streets, and to steal their bread."
>
> — Anatole France, *The Red Lily*

We consider whether the Eighth Amendment's prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to. We conclude that it does.

The plaintiffs-appellants are six current or former residents of the City of Boise ("the City"), who are homeless or have recently been homeless. Each plaintiff alleges that,

between 2007 and 2009, he or she was cited by Boise police for violating one or both of two city ordinances. The first, Boise City Code § 9-10-02 (the "Camping Ordinance"), makes it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time." The Camping Ordinance defines "camping" as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id.* The second, Boise City Code § 6-01-05 (the "Disorderly Conduct Ordinance"), bans "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof."

All plaintiffs seek retrospective relief for their previous citations under the ordinances. Two of the plaintiffs, Robert Anderson and Robert Martin, allege that they expect to be cited under the ordinances again in the future and seek declaratory and injunctive relief against future prosecution.

In *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007), a panel of this court concluded that "so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds [in shelters]" for the homeless, Los Angeles could not enforce a similar ordinance against homeless individuals "for involuntarily sitting, lying, and sleeping in public." *Jones* is not binding on us, as there was an underlying settlement between the parties and our opinion was vacated as a result. We agree with *Jones*'s reasoning and central conclusion, however, and so hold that an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to

them. Two of the plaintiffs, we further hold, may be entitled to retrospective and prospective relief for violation of that Eighth Amendment right.

## I. Background

The district court granted summary judgment to the City on all claims. We therefore review the record in the light most favorable to the plaintiffs. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Boise has a significant and increasing homeless population. According to the Point-in-Time Count ("PIT Count") conducted by the Idaho Housing and Finance Association, there were 753 homeless individuals in Ada County — the county of which Boise is the seat — in January 2014, 46 of whom were "unsheltered," or living in places unsuited to human habitation such as parks or sidewalks. In 2016, the last year for which data is available, there were 867 homeless individuals counted in Ada County, 125 of whom were unsheltered.[1] The PIT Count likely underestimates the number of homeless individuals in Ada

---

[1] The United States Department of Housing and Urban Development ("HUD") requires local homeless assistance and prevention networks to conduct an annual count of homeless individuals on one night each January, known as the PIT Count, as a condition of receiving federal funds. State, local, and federal governmental entities, as well as private service providers, rely on the PIT Count as a "critical source of data" on homelessness in the United States. The parties acknowledge that the PIT Count is not always precise. The City's Director of Community Partnerships, Diana Lachiondo, testified that the PIT Count is "not always the . . . best resource for numbers," but also stated that "the point-in-time count is our best snapshot" for counting the number of homeless individuals in a particular region, and that she "cannot give . . . any other number with any kind of confidence."

County.  It is "widely recognized that a one-night point in time count will undercount the homeless population," as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

There are currently three homeless shelters in the City of Boise offering emergency shelter services, all run by private, nonprofit organizations.  As far as the record reveals, these three shelters are the only shelters in Ada County.

One shelter — "Sanctuary" — is operated by Interfaith Sanctuary Housing Services, Inc.  The shelter is open to men, women, and children of all faiths, and does not impose any religious requirements on its residents. Sanctuary has 96 beds reserved for individual men and women, with several additional beds reserved for families.  The shelter uses floor mats when it reaches capacity with beds.

Because of its limited capacity, Sanctuary frequently has to turn away homeless people seeking shelter.  In 2010, Sanctuary reached full capacity in the men's area "at least half of every month," and the women's area reached capacity "almost every night of the week."   In 2014, the shelter reported that it was full for men, women, or both on 38% of nights.  Sanctuary provides beds first to people who spent the previous night at Sanctuary.  At 9:00 pm each night, it allots any remaining beds to those who added their names to the shelter's waiting list.

The other two shelters in Boise are both operated by the Boise Rescue Mission ("BRM"), a Christian nonprofit

Case 1:09-33849-09/04/2018 num 1009981745 DktEntry: 46-1, Page 8 of 38

organization.  One of those shelters, the River of Life Rescue Mission ("River of Life"), is open exclusively to men; the other, the City Light Home for Women and Children ("City Light"), shelters women and children only.

BRM's facilities provide two primary "programs" for the homeless, the Emergency Services Program and the New Life Discipleship Program.[2]  The Emergency Services Program provides temporary shelter, food, and clothing to anyone in need.  Christian religious services are offered to those seeking shelter through the Emergency Services Program.  The shelters display messages and iconography on the walls, and the intake form for emergency shelter guests includes a religious message.[3]

Homeless individuals may check in to either BRM facility between 4:00 and 5:30 pm.  Those who arrive at BRM facilities between 5:30 and 8:00 pm may be denied shelter, depending on the reason for their late arrival; generally, anyone arriving after 8:00 pm is denied shelter.

Except in winter, male guests in the Emergency Services Program may stay at River of Life for up to 17 consecutive nights; women and children in the Emergency Services Program may stay at City Light for up to 30 consecutive

---

[2] The record suggests that BRM provides some limited additional non-emergency shelter programming which, like the Discipleship Program, has overtly religious components.

[3] The intake form states in relevant part that "We are a Gospel Rescue Mission.  Gospel means 'Good News,' and the Good News is that Jesus saves us from sin past, present, and future.  We would like to share the Good News with you.  Have you heard of Jesus? . . . Would you like to know more about him?"

nights.  After the time limit is reached, homeless individuals who do not join the Discipleship Program may not return to a BRM shelter for at least 30 days.[4]  Participants in the Emergency Services Program must return to the shelter every night during the applicable 17-day or 30-day period; if a resident fails to check in to a BRM shelter each night, that resident is prohibited from staying overnight at that shelter for 30 days.  BRM's rules on the length of a person's stay in the Emergency Services Program are suspended during the winter.

The Discipleship Program is an "intensive, Christ-based residential recovery program" of which "[r]eligious study is the very essence."  The record does not indicate any limit to how long a member of the Discipleship Program may stay at a BRM shelter.

The River of Life shelter contains 148 beds for emergency use, along with 40 floor mats for overflow; 78 additional beds serve those in non-emergency shelter programs such as the Discipleship Program.  The City Light shelter has 110 beds for emergency services, as well as 40 floor mats to handle overflow and 38 beds for women in non-emergency shelter programs.  All told, Boise's three homeless shelters contain 354 beds and 92 overflow mats for homeless individuals.

**A.  The Plaintiffs**

Plaintiffs Robert Martin, Robert Anderson, Lawrence Lee Smith, Basil E. Humphrey, Pamela S. Hawkes, and Janet F.

---

[4] The parties dispute the extent to which BRM actually enforces the 17- and 30-day limits.

Bell are all homeless individuals who have lived in or around Boise since at least 2007. Between 2007 and 2009, each plaintiff was convicted at least once of violating the Camping Ordinance, the Disorderly Conduct Ordinance, or both. With one exception, all plaintiffs were sentenced to time served for all convictions; on two occasions, Hawkes was sentenced to one additional day in jail. During the same period, Hawkes was cited, but not convicted, under the Camping Ordinance, and Martin was cited, but not convicted, under the Disorderly Conduct Ordinance.

Plaintiff Robert Anderson currently lives in Boise; he is homeless and has often relied on Boise's shelters for housing. In the summer of 2007, Anderson stayed at River of Life as part of the Emergency Services Program until he reached the shelter's 17-day limit for male guests. Anderson testified that during his 2007 stay at River of Life, he was required to attend chapel services before he was permitted to eat dinner. At the conclusion of his 17-day stay, Anderson declined to enter the Discipleship Program because of his religious beliefs. As Anderson was barred by the shelter's policies from returning to River of Life for 30 days, he slept outside for the next several weeks. On September 1, 2007, Anderson was cited under the Camping Ordinance. He pled guilty to violating the Camping Ordinance and paid a $25 fine; he did not appeal his conviction.

Plaintiff Robert Martin is a former resident of Boise who currently lives in Post Falls, Idaho. Martin returns frequently to Boise to visit his minor son. In March of 2009, Martin was cited under the Camping Ordinance for sleeping outside; he was cited again in 2012 under the same ordinance.

## B. Procedural History

The plaintiffs filed this action in the United States District Court for the District of Idaho in October of 2009. All plaintiffs alleged that their previous citations under the Camping Ordinance and the Disorderly Conduct Ordinance violated the Cruel and Unusual Punishments Clause of the Eighth Amendment, and sought damages for those alleged violations under 42 U.S.C. § 1983. *Cf. Jones*, 444 F.3d at 1138. Anderson and Martin also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances under the same statute and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

After this litigation began, the Boise Police Department promulgated a new "Special Order," effective as of January 1, 2010, that prohibited enforcement of either the Camping Ordinance or the Disorderly Conduct Ordinance against any homeless person on public property on any night when no shelter had "an available overnight space." City police implemented the Special Order through a two-step procedure known as the "Shelter Protocol."

Under the Shelter Protocol, if any shelter in Boise reaches capacity on a given night, that shelter will so notify the police at roughly 11:00 pm. Each shelter has discretion to determine whether it is full, and Boise police have no other mechanism or criteria for gauging whether a shelter is full. Since the Shelter Protocol was adopted, Sanctuary has reported that it was full on almost 40% of nights. Although BRM agreed to the Shelter Protocol, its internal policy is never to turn any person away because of a lack of space, and neither BRM shelter has ever reported that it was full.

If all shelters are full on the same night, police are to refrain from enforcing either ordinance. Presumably because the BRM shelters have not reported full, Boise police continue to issue citations regularly under both ordinances.

In July 2011, the district court granted summary judgment to the City. It held that the plaintiffs' claims for retrospective relief were barred under the *Rooker-Feldman* doctrine and that their claims for prospective relief were mooted by the Special Order and the Shelter Protocol. *Bell v. City of Boise*, 834 F. Supp. 2d 1103 (D. Idaho 2011). On appeal, we reversed and remanded. *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013). We held that the district court erred in dismissing the plaintiffs' claims under the *Rooker-Feldman* doctrine. *Id.* at 897. In so holding, we expressly declined to consider whether the favorable-termination requirement from *Heck v. Humphrey*, 512 U.S. 477 (1994), applied to the plaintiffs' claims for retrospective relief. Instead, we left the issue for the district court on remand. *Bell*, 709 F.3d at 897 n.11.

*Bell* further held that the plaintiffs' claims for prospective relief were not moot. The City had not met its "heavy burden" of demonstrating that the challenged conduct — enforcement of the two ordinances against homeless individuals with no access to shelter — "could not reasonably be expected to recur." *Id.* at 898, 901 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). We emphasized that the Special Order was a statement of administrative policy and so could be amended or reversed at any time by the Boise Chief of Police. *Id.* at 899–900.

Finally, *Bell* rejected the City's argument that the plaintiffs lacked standing to seek prospective relief because they were no longer homeless. *Id.* at 901 & n.12. We noted that, on summary judgment, the plaintiffs "need not establish that they in fact have standing, but only that there is a genuine issue of material fact as to the standing elements." *Id.* (citation omitted).

On remand, the district court again granted summary judgment to the City on the plaintiffs' § 1983 claims. The court observed that *Heck* requires a § 1983 plaintiff seeking damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" to demonstrate that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. According to the district court, "a judgment finding the Ordinances unconstitutional . . . necessarily would imply the invalidity of Plaintiffs' [previous] convictions under those ordinances," and the plaintiffs therefore were required to demonstrate that their convictions or sentences had already been invalidated. As none of the plaintiffs had raised an Eighth Amendment challenge as a defense to criminal prosecution, nor had any plaintiff successfully appealed their conviction, the district court held that all of the plaintiffs' claims for retrospective relief were barred by *Heck*. The district court also rejected as barred by *Heck* the plaintiffs' claim for prospective injunctive relief under § 1983, reasoning that "a ruling in favor of Plaintiffs on even a prospective § 1983 claim would demonstrate the invalidity of any confinement stemming from those convictions."

Case 1:09-cv-00540-REB Document 315-15 filed 01/04/18 Page 14 of 38

14                MARTIN V. CITY OF BOISE

Finally, the district court determined that, although *Heck* did not bar relief under the Declaratory Judgment Act, Martin and Anderson now lack standing to pursue such relief. The linchpin of this holding was that the Camping Ordinance and the Disorderly Conduct Ordinance were both amended in 2014 to codify the Special Order's mandate that "[l]aw enforcement officers shall not enforce [the ordinances] when the individual is on public property and there is no available overnight shelter." Boise City Code §§ 6-01-05, 9-10-02. Because the ordinances, as amended, permitted camping or sleeping in a public place when no shelter space was available, the court held that there was no "credible threat" of future prosecution. "If the Ordinances are not to be enforced when the shelters are full, those Ordinances do not inflict a constitutional injury upon these particular plaintiffs . . . ." The court emphasized that the record "suggests there is no known citation of a homeless individual under the Ordinances for camping or sleeping on public property on any night or morning when he or she was unable to secure shelter due to a lack of shelter capacity" and that "there has not been a single night when all three shelters in Boise called in to report they were simultaneously full for men, women or families."

This appeal followed.

## II. Discussion

## A. Standing

We first consider whether any of the plaintiffs has standing to pursue prospective relief.[5] We conclude that there are sufficient opposing facts in the record to create a genuine issue of material fact as to whether Martin and Anderson face a credible threat of prosecution under one or both ordinances in the future at a time when they are unable to stay at any Boise homeless shelter.[6]

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is *certainly* impending." *Id.* (citation omitted). A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute. "When the plaintiff has alleged an

---

[5] Standing to pursue retrospective relief is not in doubt. The only threshold question affecting the availability of a claim for retrospective relief — a question we address in the next section — is whether such relief is barred by the doctrine established in *Heck*.

[6] Although the SAC is somewhat ambiguous regarding which of the plaintiffs seeks prospective relief, counsel for the plaintiffs made clear at oral argument that only two of the plaintiffs, Martin and Anderson, seek such relief, and the district court considered the standing question with respect to Martin and Anderson only.

intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation and internal quotation marks omitted). To defeat a motion for summary judgment premised on an alleged lack of standing, plaintiffs " need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

In dismissing Martin and Anderson's claims for declaratory relief for lack of standing, the district court emphasized that Boise's ordinances, as amended in 2014, preclude the City from issuing a citation when there is no available space at a shelter, and there is consequently no risk that either Martin or Anderson will be cited under such circumstances in the future. Viewing the record in the light most favorable to the plaintiffs, we cannot agree.

Although the 2014 amendments preclude the City from enforcing the ordinances when there is no room available at any shelter, the record demonstrates that the City is wholly reliant on the shelters to self-report when they are full. It is undisputed that Sanctuary is full as to men on a substantial percentage of nights, perhaps as high as 50%. The City nevertheless emphasizes that since the adoption of the Shelter Protocol in 2010, the BRM facilities, River of Life and City Light, have never reported that they are full, and BRM states that it will never turn people away due to lack space.

Case 1:09-cv-00540-REB Document 315 Filed 09/04/18 Page 17 of 38

The plaintiffs have pointed to substantial evidence in the record, however, indicating that whether or not the BRM facilities are ever full or turn homeless individuals away *for lack of space*, they *do* refuse to shelter homeless people who exhaust the number of days allotted by the facilities. Specifically, the plaintiffs allege, and the City does not dispute, that it is BRM's policy to limit men to 17 consecutive days in the Emergency Services Program, after which they cannot return to River of Life for 30 days; City Light has a similar 30-day limit for women and children. Anderson testified that BRM has enforced this policy against him in the past, forcing him to sleep outdoors.

The plaintiffs have adduced further evidence indicating that River of Life permits individuals to remain at the shelter after 17 days in the Emergency Services Program only on the condition that they become part of the New Life Discipleship program, which has a mandatory religious focus. For example, there is evidence that participants in the New Life Program are not allowed to spend days at Corpus Christi, a local Catholic program, "because it's . . . a different sect." There are also facts in dispute concerning whether the Emergency Services Program itself has a religious component. Although the City argues strenuously that the Emergency Services Program is secular, Anderson testified to the contrary; he stated that he was once required to attend chapel before being permitted to eat dinner at the River of Life shelter. Both Martin and Anderson have objected to the overall religious atmosphere of the River of Life shelter, including the Christian messaging on the shelter's intake form and the Christian iconography on the shelter walls. A city cannot, via the threat of prosecution, coerce an individual to attend religion-based treatment programs consistently with the Establishment Clause of the First Amendment. *Inouye v.*

*Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007).  Yet at the conclusion of a 17-day stay at River of Life, or a 30-day stay at City Light, an individual may be forced to choose between sleeping outside on nights when Sanctuary is full (and risking arrest under the ordinances), or enrolling in BRM programming that is antithetical to his or her religious beliefs.

The 17-day and 30-day limits are not the only BRM policies which functionally limit access to BRM facilities even when space is nominally available.  River of Life also turns individuals away if they voluntarily leave the shelter before the 17-day limit and then attempt to return within 30 days.  An individual who voluntarily leaves a BRM facility for any reason — perhaps because temporary shelter is available at Sanctuary, or with friends or family, or in a hotel — cannot immediately return to the shelter if circumstances change. Moreover, BRM's facilities may deny shelter to any individual who arrives after 5:30 pm, and generally will deny shelter to anyone arriving after 8:00 pm. Sanctuary, however, does not assign beds to persons on its waiting list until 9:00 pm.  Thus, by the time a homeless individual on the Sanctuary waiting list discovers that the shelter has no room available, it may be too late to seek shelter at either BRM facility.

So, even if we credit the City's evidence that BRM's facilities have never been "full," and that the City has never cited any person under the ordinances who could not obtain shelter "due to a lack of shelter capacity," there remains a genuine issue of material fact as to whether homeless individuals in Boise run a credible risk of being issued a citation on a night when Sanctuary is full and they have been denied entry to a BRM facility for reasons other than shelter capacity.  If so, then as a practical matter, no shelter is

available.  We note that despite the Shelter Protocol and the amendments to both ordinances, the City continues regularly to issue citations for violating both ordinances; during the first three months of 2015, the Boise Police Department issued over 175 such citations.

The City argues that Martin faces little risk of prosecution under either ordinance because he has not lived in Boise since 2013.  Martin states, however, that he is still homeless and still visits Boise several times a year to visit his minor son, and that he has continued to seek shelter at Sanctuary and River of Life.  Although Martin may no longer spend enough time in Boise to risk running afoul of BRM's 17-day limit, he testified that he has unsuccessfully sought shelter at River of Life after being placed on Sanctuary's waiting list, only to discover later in the evening that Sanctuary had no available beds.  Should Martin return to Boise to visit his son, there is a reasonable possibility that he might again seek shelter at Sanctuary, only to discover (after BRM has closed for the night) that Sanctuary has no space for him.  Anderson, for his part, continues to live in Boise and states that he remains homeless.

We conclude that both Martin and Anderson have demonstrated a genuine issue of material fact regarding whether they face a credible risk of prosecution under the ordinances in the future on a night when they have been denied access to Boise's homeless shelters; both plaintiffs therefore have standing to seek prospective relief.

## B.  *Heck v. Humphrey*

We turn next to the impact of *Heck v. Humphrey* and its progeny on this case.  With regard to retrospective relief, the

plaintiffs maintain that *Heck* should not bar their claims because, with one exception, all of the plaintiffs were sentenced to time served.[7]  It would therefore have been impossible for the plaintiffs to obtain federal habeas relief, as any petition for a writ of habeas corpus must be filed while the petitioner is "in custody pursuant to the judgment of a State court."  *See* 28 U.S.C. § 2254(a); *Spencer v. Kemna*, 523 U.S. 1, 7, 17–18 (1998).  With regard to prospective relief, the plaintiffs emphasize that they seek only equitable protection against *future* enforcement of an allegedly unconstitutional statute, and not to invalidate any prior conviction under the same statute.  We hold that although the *Heck* line of cases precludes most — but not all — of the plaintiffs' requests for retrospective relief, that doctrine has no application to the plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

## 1.  The *Heck* Doctrine

A long line of Supreme Court case law, beginning with *Preiser v. Rodriguez*, 411 U.S. 475 (1973), holds that a prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his or her confinement, but must instead seek federal habeas corpus relief or analogous state relief.  *Id.* at 477, 500.  *Preiser* considered whether a prison inmate could bring a § 1983 action seeking an injunction to remedy an unconstitutional deprivation of good-time conduct credits.  Observing that habeas corpus is the traditional instrument to obtain release from unlawful

---

[7] Plaintiff Pamela Hawkes was convicted of violating the Camping Ordinance or Disorderly Conduct Ordinance on twelve occasions; although she was usually sentenced to time served, she was twice sentenced to one additional day in jail.

confinement, *Preiser* recognized an implicit exception from § 1983's broad scope for actions that lie "within the core of habeas corpus" — specifically, challenges to the "fact or duration" of confinement. *Id*. at 487, 500. The Supreme Court subsequently held, however, that although *Preiser* barred inmates from obtaining an injunction to restore good-time credits via a § 1983 action, *Preiser* did not "preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the *prospective* enforcement of invalid prison regulations." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (emphasis added).

*Heck* addressed a § 1983 action brought by an inmate seeking compensatory and punitive damages. The inmate alleged that state and county officials had engaged in unlawful investigations and knowing destruction of exculpatory evidence. *Heck*, 512 U.S. at 479. The Court in *Heck* analogized a § 1983 action of this type, which called into question the validity of an underlying conviction, to a cause of action for malicious prosecution, *id*. at 483–84, and went on to hold that, as with a malicious prosecution claim, a plaintiff in such an action must demonstrate a favorable termination of the criminal proceedings before seeking tort relief, *id*. at 486–87. "[T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id*.

*Edwards v. Balisok*, 520 U.S. 641 (1997) extended *Heck*'s holding to claims for declaratory relief. *Id.* at 648. The plaintiff in *Edwards* alleged that he had been deprived of earned good-time credits without due process of law, because the decisionmaker in disciplinary proceedings had concealed exculpatory evidence. Because the plaintiff's claim for declaratory relief was "based on allegations of deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed," *Edwards* held, it was "not cognizable under § 1983." *Id.* *Edwards* went on to hold, however, that a requested injunction requiring prison officials to date-stamp witness statements was not *Heck*-barred, reasoning that a "prayer for such *prospective* relief will not 'necessarily imply' the invalidity of a previous loss of good-time credits, and so may properly be brought under § 1983." *Id.* (emphasis added).

Most recently, *Wilkinson v. Dotson*, 544 U.S. 74 (2005), stated that *Heck* bars § 1983 suits even when the relief sought is prospective injunctive or declaratory relief, "if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82 (emphasis omitted). But *Wilkinson* held that the plaintiffs in that case *could* seek a prospective injunction compelling the state to comply with constitutional requirements in parole proceedings in the future. The Court observed that the prisoners' claims for future relief, "if successful, will not necessarily imply the invalidity of confinement or shorten its duration." *Id.* at 82.

The Supreme Court did not, in these cases or any other, conclusively determine whether *Heck*'s favorable-termination requirement applies to convicts who have no practical opportunity to challenge their conviction or sentence via a

petition for habeas corpus. *See Muhammad v. Close*, 540 U.S. 749, 752 & n.2 (2004). But in *Spencer*, five Justices suggested that *Heck* may not apply in such circumstances. *Spencer*, 523 U.S. at 3.

The petitioner in *Spencer* had filed a federal habeas petition seeking to invalidate an order revoking his parole. While the habeas petition was pending, the petitioner's term of imprisonment expired, and his habeas petition was consequently dismissed as moot. Justice Souter wrote a concurring opinion in which three other Justices joined, addressing the petitioner's argument that if his habeas petition were mooted by his release, any § 1983 action would be barred under *Heck*, yet he would no longer have access to a federal habeas forum to challenge the validity of his parole revocation. *Id*. at 18–19 (Souter, J., concurring). Justice Souter stated that in his view "*Heck* has no such effect," and that "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." *Id*. at 21. Justice Stevens, dissenting, stated that he would have held the habeas petition in *Spencer* not moot, but agreed that "[g]iven the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear . . . that he may bring an action under 42 U.S.C. § 1983." *Id*. at 25 n.8 (Stevens, J., dissenting).

Relying on the concurring and dissenting opinions in *Spencer*, we have held that the "unavailability of a remedy in habeas corpus because of mootness" permitted a plaintiff released from custody to maintain a § 1983 action for damages, "even though success in that action would imply the

invalidity of the disciplinary proceeding that caused revocation of his good-time credits." *Nonnette v. Small*, 316 F.3d 872, 876 (9th Cir. 2002). But we have limited *Nonnette* in recent years. Most notably, we held in *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015), that even where a plaintiff had no practical opportunity to pursue federal habeas relief while detained because of the short duration of his confinement, *Heck* bars a § 1983 action that would imply the invalidity of a prior conviction if the plaintiff could have sought invalidation of the underlying conviction via direct appeal or state post-conviction relief, but did not do so. *Id.* at 1192 & n.12.

## 2. Retrospective Relief

Here, the majority of the plaintiffs' claims for *retrospective* relief are governed squarely by *Lyall.* It is undisputed that all the plaintiffs not only failed to challenge their convictions on direct appeal but expressly waived the right to do so as a condition of their guilty pleas. The plaintiffs have made no showing that any of their convictions were invalidated via state post-conviction relief. We therefore hold that all but two of the plaintiffs' claims for damages are foreclosed under *Lyall.*

Two of the plaintiffs, however, Robert Martin and Pamela Hawkes, also received citations under the ordinances that were dismissed before the state obtained a conviction. Hawkes was cited for violating the Camping Ordinance on July 8, 2007; that violation was dismissed on August 28, 2007. Martin was cited for violating the Disorderly Conduct Ordinance on April 24, 2009; those charges were dismissed on September 9, 2009. With respect to these two incidents, the district court erred in finding that the plaintiffs' Eighth

Amendment challenge was barred by *Heck*. Where there is no "conviction or sentence" that may be undermined by a grant of relief to the plaintiffs, the *Heck* doctrine has no application. 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007).

Relying on *Ingraham v. Wright*, 430 U.S. 651, 664 (1977), the City argues that the Eighth Amendment, and the Cruel and Unusual Punishments Clause in particular, have no application where there has been no conviction. The City's reliance on *Ingraham* is misplaced. As the Supreme Court observed in *Ingraham*, the Cruel and Unusual Punishments Clause not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also "imposes substantive limits on what can be made criminal and punished as such." *Id*. at 667. "This [latter] protection governs the criminal law process as a whole, not only the imposition of punishment postconviction." *Jones*, 444 F.3d at 1128.

*Ingraham* concerned only whether "impositions outside the criminal process" — in that case, the paddling of schoolchildren — "constituted cruel and unusual punishment." 430 U.S. at 667. *Ingraham* did not hold that a plaintiff challenging the state's power to criminalize a particular status or conduct in the first instance, as the plaintiffs in this case do, must first be convicted. If conviction were a prerequisite for such a challenge, "the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing things that under the [Cruel and Unusual Punishments Clause] cannot be subject to the criminal process." *Jones*, 444 F.3d at 1129. For those rare Eighth Amendment

challenges concerning the state's very power to criminalize particular behavior or status, then, a plaintiff need demonstrate only the initiation of the criminal process against him, not a conviction.

### 3.  Prospective Relief

The district court also erred in concluding that the plaintiffs' requests for prospective injunctive relief were barred by *Heck.*  The district court relied entirely on language in *Wilkinson* stating that "a state prisoner's § 1983 action is barred (absent prior invalidation) . . . no matter the relief sought (damages or equitable relief) . . . *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration."  *Wilkinson*, 544 U.S. at 81–82. The district court concluded from this language in *Wilkinson* that a person convicted under an allegedly unconstitutional statute may never challenge the validity or application of that statute after the initial criminal proceeding is complete, even when the relief sought is prospective only and independent of the prior conviction.  The logical extension of the district court's interpretation is that an individual who does not successfully invalidate a first conviction under an unconstitutional statute will have no opportunity to challenge that statute prospectively so as to avoid arrest and conviction for violating that same statute in the future.

Neither *Wilkinson* nor any other case in the *Heck* line supports such a result.  Rather, *Wolff*, *Edwards*, and *Wilkinson* compel the opposite conclusion.

*Wolff* held that although *Preiser* barred a § 1983 action seeking restoration of good-time credits absent a successful challenge in federal habeas proceedings, *Preiser* did not

"preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid . . . regulations." *Wolff*, 418 U.S. at 555. Although *Wolff* was decided before *Heck*, the Court subsequently made clear that *Heck* effected no change in the law in this regard, observing in *Edwards* that "[o]rdinarily, a prayer for . . . prospective [injunctive] relief will not 'necessarily imply' the invalidity of a *previous* loss of good-time credits, and so may properly be brought under § 1983." *Edwards*, 520 U.S. at 648 (emphasis added). Importantly, the Court held in *Edwards* that although the plaintiff could not, consistently with *Heck*, seek a declaratory judgment stating that the procedures employed by state officials that deprived him of good-time credits were unconstitutional, he *could* seek an injunction barring such allegedly unconstitutional procedures in the future. *Id.* Finally, the Court noted in *Wilkinson* that the *Heck* line of cases "has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies *when they seek to invalidate the duration of their confinement*," *Wilkinson*, 544 U.S. at 81 (emphasis added), alluding to an existing confinement, not one yet to come.

The *Heck* doctrine, in other words, serves to ensure the finality and validity of previous convictions, not to insulate future prosecutions from challenge. In context, it is clear that *Wilkinson*'s holding that the *Heck* doctrine bars a § 1983 action "no matter the relief sought (damages or equitable relief) . . . if success in that action would necessarily demonstrate the invalidity of confinement or its duration" applies to equitable relief concerning an existing confinement, not to suits seeking to preclude an unconstitutional confinement in the future, arising from incidents occurring after any prior conviction and stemming

Case 1:09-cv-00540-REB Document 315 Filed 09/04/18 Page 28 of 38

28              MARTIN V. CITY OF BOISE

from a possible later prosecution and conviction. *Id*. at 81–82 (emphasis added). As *Wilkinson* held, "claims for *future* relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration)" are distant from the "core" of habeas corpus with which the *Heck* line of cases is concerned, and are not precluded by the *Heck* doctrine. *Id*. at 82.

In sum, we hold that the majority of the plaintiffs' claims for retrospective relief are barred by *Heck*, but both Martin and Hawkes stated claims for damages to which *Heck* has no application. We further hold that *Heck* has no application to the plaintiffs' requests for prospective injunctive relief.

## C. The Eighth Amendment

At last, we turn to the merits — does the Cruel and Unusual Punishments Clause of the Eighth Amendment preclude the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter? We hold that it does, for essentially the same reasons articulated in the now-vacated *Jones* opinion.

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways." *Ingraham*, 430 U.S. at 667. First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize. *Id.* It is the third limitation that is pertinent here.

"Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Robinson v. California*, 370 U.S. 660, 667 (1962). Cases construing substantive limits as to what the government may criminalize are rare, however, and for good reason — the Cruel and Unusual Punishments Clause's third limitation is "one to be applied sparingly." *Ingraham*, 430 U.S. at 667.

*Robinson*, the seminal case in this branch of Eighth Amendment jurisprudence, held a California statute that "ma[de] the 'status' of narcotic addiction a criminal offense" invalid under the Cruel and Unusual Punishments Clause. 370 U.S. at 666. The California law at issue in *Robinson* was "not one which punishe[d] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration"; it punished addiction itself. *Id*. Recognizing narcotics addiction as an illness or disease — "apparently an illness which may be contracted innocently or involuntarily" — and observing that a "law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment," *Robinson* held the challenged statute a violation of the Eighth Amendment. *Id*. at 666–67.

As *Jones* observed, *Robinson* did not explain at length the principles underpinning its holding. *See Jones*, 444 F.3d at 1133. In *Powell v. Texas*, 392 U.S. 514 (1968), however, the Court elaborated on the principle first articulated in *Robinson*.

*Powell* concerned the constitutionality of a Texas law making public drunkenness a criminal offense. Justice Marshall, writing for a plurality of the Court, distinguished the Texas statute from the law at issue in *Robinson* on the

ground that the Texas statute made criminal not alcoholism but *conduct* — appearing in public while intoxicated. "[A]ppellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in *Robinson*; nor has it attempted to regulate appellant's behavior in the privacy of his own home." *Id*. at 532 (plurality opinion).

The *Powell* plurality opinion went on to interpret *Robinson* as precluding only the criminalization of "status," not of "involuntary" conduct. "The entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some actus reus. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' . . . ." *Id*. at 533.

Four Justices dissented from the Court's holding in *Powell*; Justice White concurred in the result alone. Notably, Justice White noted that many chronic alcoholics are also homeless, and that for those individuals, public drunkenness may be unavoidable as a practical matter. "For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking. . . . For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans

a single act for which they may not be convicted under the Eighth Amendment — the act of getting drunk." *Id*. at 551 (White, J., concurring in the judgment).

The four dissenting Justices adopted a position consistent with that taken by Justice White: that under *Robinson*, "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change," and that the defendant, "once intoxicated, . . . could not prevent himself from appearing in public places." *Id*. at 567 (Fortas, J., dissenting). Thus, five Justices gleaned from *Robinson* the principle that "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Jones*, 444 F.3d at 1135; *see also United States v. Roberston*, 875 F.3d 1281, 1291 (9th Cir. 2017).

This principle compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter. As *Jones* reasoned, "[w]hether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human." *Jones*, 444 F.3d at 1136. Moreover, any "conduct at issue here is involuntary and inseparable from status — they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping." *Id.* As a result, just as the state may not criminalize the state of being "homeless in public places," the state may not "criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets." *Id*. at 1137.

Our holding is a narrow one. Like the *Jones* panel, "we in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id*. at 1138. We hold only that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." *Id*. That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.[8]

We are not alone in reaching this conclusion. As one court has observed, "resisting the need to eat, sleep or engage in other life-sustaining activities is impossible. Avoiding public places when engaging in this otherwise innocent conduct is also impossible. . . . As long as the homeless plaintiffs do not have a single place where they can lawfully be, the challenged ordinances, as applied to them, effectively

---

[8] Naturally, our holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it. Nor do we suggest that a jurisdiction with insufficient shelter can *never* criminalize the act of sleeping outside. Even where shelter is unavailable, an ordinance prohibiting sitting, lying, or sleeping outside at particular times or in particular locations might well be constitutionally permissible. *See Jones*, 444 F.3d at 1123. So, too, might an ordinance barring the obstruction of public rights of way or the erection of certain structures. Whether some other ordinance is consistent with the Eighth Amendment will depend, as here, on whether it punishes a person for lacking the means to live out the "universal and unavoidable consequences of being human" in the way the ordinance prescribes. *Id.* at 1136.

punish them for something for which they may not be convicted under the [E]ighth [A]mendment — sleeping, eating and other innocent conduct." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992); *see also Johnson v. City of Dallas*, 860 F. Supp. 344, 350 (N.D. Tex. 1994) (holding that a "sleeping in public ordinance as applied against the homeless is unconstitutional"), *rev'd on other grounds*, 61 F.3d 442 (5th Cir. 1995).[9]

Here, the two ordinances criminalize the simple act of sleeping outside on public property, whether bare or with a blanket or other basic bedding. The Disorderly Conduct Ordinance, on its face, criminalizes "[o]ccupying, lodging, or sleeping in *any* building, structure or place, whether public or private" without permission. Boise City Code § 6-01-05. Its scope is just as sweeping as the Los Angeles ordinance at issue in *Jones*, which mandated that "[n]o person shall sit, lie or sleep in or upon any street, sidewalk or other public way." 444 F.3d at 1123.

The Camping Ordinance criminalizes using "any of the streets, sidewalks, parks or public places as a camping place

---

[9] In *Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000), the Eleventh Circuit upheld an anti-camping ordinance similar to Boise's against an Eighth Amendment challenge. In *Joel*, however, the defendants presented unrefuted evidence that the homeless shelters in the City of Orlando had never reached capacity and that the plaintiffs had always enjoyed access to shelter space. *Id.* Those unrefuted facts were critical to the court's holding. *Id.* As discussed below, the plaintiffs here have demonstrated a genuine issue of material fact concerning whether they have been denied access to shelter in the past or expect to be so denied in the future. *Joel* therefore does not provide persuasive guidance for this case.

at any time."  Boise City Code § 9-10-02.  The ordinance defines "camping" broadly:

> The term "camp" or "camping" shall mean the use of public property as a temporary or permanent place of dwelling, lodging, or residence, or as a living accommodation at anytime between sunset and sunrise, or as a sojourn. Indicia of camping may include, but are not limited to, storage of personal belongings, using tents or other temporary structures for sleeping or storage of personal belongings, carrying on cooking activities or making any fire in an unauthorized area, or any of these activities in combination with one another or in combination with either sleeping or making preparations to sleep (including the laying down of bedding for the purpose of sleeping).

*Id.*  It appears from the record that the Camping Ordinance is frequently enforced against homeless individuals with some elementary bedding, whether or not any of the other listed indicia of "camping" — the erection of temporary structures, the activity of cooking or making fire, or the storage of personal property — are present.  For example, a Boise police officer testified that he cited plaintiff Pamela Hawkes under the Camping Ordinance for sleeping outside "wrapped in a blanket with her sandals off and next to her," for sleeping in a public restroom "with blankets," and for sleeping in a park "on a blanket, wrapped in blankets on the ground."  The Camping Ordinance therefore can be, and allegedly is, enforced against homeless individuals who take even the most rudimentary precautions to protect themselves from the

elements. We conclude that a municipality cannot criminalize such behavior consistently with the Eighth Amendment when no sleeping space is practically available in any shelter.

## III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court as to the plaintiffs' requests for retrospective relief, except as such claims relate to Hawkes's July 2007 citation under the Camping Ordinance and Martin's April 2009 citation under the Disorderly Conduct Ordinance. We **REVERSE** and **REMAND** with respect to the plaintiffs' requests for prospective relief, both declaratory and injunctive, and to the plaintiffs' claims for retrospective relief insofar as they relate to Hawkes' July 2007 citation or Martin's April 2009 citation.[10]

---

[10] Costs shall be awarded to the plaintiffs.

OWENS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), bars the plaintiffs' 42 U.S.C. § 1983 claims for damages that are based on convictions that have not been challenged on direct appeal or invalidated in state post-conviction relief. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1192 n.12 (9th Cir. 2015).

I also agree that *Heck* and its progeny have no application where there is no "conviction or sentence" that would be undermined by granting a plaintiff's request for relief under § 1983. *Heck*, 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007). I therefore concur in the majority's conclusion that *Heck* does not bar plaintiffs Robert Martin and Pamela Hawkes from seeking retrospective relief for the two instances in which they received citations, but not convictions. I also concur in the majority's Eighth Amendment analysis as to those two claims for retrospective relief.

Where I part ways with the majority is in my understanding of *Heck*'s application to the plaintiffs' claims for declaratory and injunctive relief. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court explained where the *Heck* doctrine stands today:

> [A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action

would necessarily demonstrate the invalidity
of confinement or its duration.

*Id.* at 81–82.  Here, the majority acknowledges this language
in *Wilkinson*, but concludes that *Heck*'s bar on any type of
relief that "would necessarily demonstrate the invalidity of
confinement" does not preclude the prospective claims at
issue.  The majority reasons that the purpose of *Heck* is "to
ensure the finality and validity of previous convictions, not to
insulate future prosecutions from challenge," and so
concludes that the plaintiffs' prospective claims may proceed.
I respectfully disagree.

A declaration that the city ordinances are unconstitutional
and an injunction against their future enforcement necessarily
demonstrate the invalidity of the plaintiffs' prior convictions.
Indeed, any time an individual challenges the
constitutionality of a substantive criminal statute under which
he has been convicted, he asks for a judgment that would
necessarily demonstrate the invalidity of his conviction.  And
though neither the Supreme Court nor this court has squarely
addressed *Heck*'s application to § 1983 claims challenging
the constitutionality of a substantive criminal statute, I
believe *Edwards v. Balisok*, 520 U.S. 641 (1997), makes clear
that *Heck* prohibits such challenges.  In *Edwards*, the
Supreme Court explained that although our court had
recognized that *Heck* barred § 1983 claims challenging the
validity of a prisoner's confinement "as a substantive matter,"
it improperly distinguished as not *Heck*-barred *all* claims
alleging only procedural violations.  520 U.S. at 645.  In
holding that *Heck* also barred those procedural claims that
would necessarily imply the invalidity of a conviction, the
Court did not question our conclusion that claims challenging
a conviction "as a substantive matter" are barred by *Heck*.

*Id.*; *see also Wilkinson*, 544 U.S. at 82 (holding that the plaintiffs' claims could proceed because the relief requested would only "render invalid the state *procedures*" and "a favorable judgment [would] not 'necessarily imply the invalidity of [their] conviction[s] or sentence[s]'" (emphasis added) (quoting *Heck*, 512 U.S. at 487)).

*Edwards* thus leads me to conclude that an individual who was convicted under a criminal statute, but who did not challenge the constitutionality of the statute at the time of his conviction through direct appeal or post-conviction relief, cannot do so in the first instance by seeking declaratory or injunctive relief under § 1983. *See Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1316 n.9 (11th Cir. 2005) (assuming that a §1983 claim challenging "the constitutionality of the ordinance under which [the petitioner was convicted]" would be *Heck*-barred). I therefore would hold that *Heck* bars the plaintiffs' claims for declaratory and injunctive relief.

We are not the first court to struggle applying *Heck* to "real life examples," nor will we be the last. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring) (alterations and internal quotation marks omitted) (explaining that her thoughts on *Heck* had changed since she joined the majority opinion in that case). If the slate were blank, I would agree that the majority's holding as to prospective relief makes good sense. But because I read *Heck* and its progeny differently, I dissent as to that section of the majority's opinion. I otherwise join the majority in full.