**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| ROBERT MARTIN; LAWRENCE LEE SMITH; ROBERT ANDERSON; JANET F. BELL; PAMELA S. HAWKES; and BASIL E. HUMPHREY, *Plaintiffs-Appellants*, <br><br> v. <br><br> CITY OF BOISE, *Defendant-Appellee.* | No. 15-35845 <br><br> D.C. No. 1:09-cv-00540-REB <br><br><br> ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the District of Idaho
Ronald E. Bush, Chief Magistrate Judge, Presiding

Argued and Submitted July 13, 2017
Portland, Oregon

Filed April 1, 2019

Before: Marsha S. Berzon, Paul J. Watford,
and John B. Owens, Circuit Judges.

Order;
Concurrence in Order by Judge Berzon;
Dissent to Order by Judge Milan D. Smith, Jr.;
Dissent to Order by Judge Bennett;
Opinion by Judge Berzon;
Partial Concurrence and Partial Dissent by Judge Owens

## SUMMARY[*]

### Civil Rights

The panel amended its opinion filed September 4, 2018, and reported at 902 F.3d 1031, denied a petition for panel rehearing, denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions shall be entertained.

In the amended opinion, the panel affirmed in part and reversed in part the district court's summary judgment in favor of the City of Boise in an action brought by six current or formerly homeless City of Boise residents who alleged that their citations under the City's Camping and Disorderly Conduct Ordinances violated the Eighth Amendment's prohibition on cruel and unusual punishment.

Plaintiffs sought damages for the alleged violations under 42 U.S.C. § 1983. Two plaintiffs also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances. In 2014, after this litigation began, the ordinances were amended to prohibit their enforcement against any homeless person on public property on any night when no shelter had an available overnight space.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel first held that two plaintiffs had standing to pursue prospective relief because they demonstrated a genuine issue of material fact as to whether they faced a credible risk of prosecution on a night when they had been denied access to the City's shelters. The panel noted that although the 2014 amendment precluded the City from enforcing the ordinances when shelters were full, individuals could still be turned away for reasons other than shelter capacity, such as for exceeding the shelter's stay limits, or for failing to take part in a shelter's mandatory religious programs.

The panel held that although the doctrine set forth in *Heck v. Humphrey*, 512 U.S. 477 (1994), and its progeny precluded most — but not all — of the plaintiffs' requests for retrospective relief, the doctrine had no application to plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

Turning to the merits, the panel held that the Cruel and Unusual Punishments Clause of the Eighth Amendment precluded the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter. The panel held that, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.

Concurring in part and dissenting in part, Judge Owens disagreed with the majority's opinion that *Heck v. Humphrey* did not bar plaintiffs' claim for declaratory and injunctive relief. Judge Owens stated that a declaration that the city ordinances are unconstitutional and an injunction against their future enforcement would necessarily demonstrate the

4                    MARTIN V. CITY OF BOISE

invalidity of plaintiffs' prior convictions.   Judge Owens
otherwise joined the majority in full.

Concurring in the denial of rehearing en banc, Judge
Berzon stated that on the merits, the panel's opinion was
limited and held only that municipal ordinances that
criminalize sleeping, sitting, or lying in *all* public spaces,
when *no* alternative sleeping space is available, violate the
Eighth Amendment.   Judge Berzon further stated that a
photograph featured in Judge M. Smith's dissent from the
denial of rehearing en banc, depicting tents on a Los Angeles
public sidewalk, was not part of the record, was unrelated,
predated the panel's decision and did not serve to illustrate a
concrete effect of the panel's holding.  Judge Berzon stated
that what the pre-*Martin* photograph did demonstrate was that
the ordinances criminalizing sleeping in public places were
never a viable solution to the homelessness problem.

Dissenting from the denial of rehearing en banc, Judge M.
Smith, joined by Judges Callahan, Bea, Ikuta, Bennett and R.
Nelson, stated that the panel severely misconstrued three
areas of binding Supreme Court precedent, and that the
panel's opinion created several splits with other appellate
courts. Judge M. Smith further stated that the panel's holding
has already begun wreaking havoc on local governments,
residents, and businesses throughout the circuit. Judge M.
Smith stated that the panel's reasoning will soon prevent local
governments from enforcing a host of other public health and
safety laws, such as those prohibiting public defecation and
urination, and that the panel's opinion shackles the hands of
public officials trying to redress the serious societal concern
of homelessness.

Dissenting from the denial of rehearing en banc, Judge Bennett, joined by Judges Bea, Ikuta, R. Nelson, and joined by Judge M. Smith as to Part II, stated that the panel's decision, which allows pre-conviction Eighth Amendment challenges, is wholly inconsistent with the text and tradition of the Eighth Amendment.

## COUNSEL

Michael E. Bern (argued) and Kimberly Leefatt, Latham & Watkins LLP, Washington, D.C.; Howard A. Belodoff, Idaho Legal Aid Services Inc., Boise, Idaho; Eric Tars, National Law Center on Homelessness & Poverty, Washington, D.C.; Plaintiffs-Appellants.

Brady J. Hall (argued), Michael W. Moore, and Steven R. Kraft, Moore Elia Kraft & Hall LLP, Boise, Idaho; Scott B. Muir, Deputy City Attorney; Robert B. Luce, City Attorney; City Attorney's Office, Boise, Idaho; for Defendant-Appellee.

## ORDER

The Opinion filed September 4, 2018, and reported at 902 F.3d 1031, is hereby amended. The amended opinion will be filed concurrently with this order.

The panel has unanimously voted to deny the petition for panel rehearing. The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for panel rehearing and the petition for rehearing en banc are **DENIED**.

Future petitions for rehearing or rehearing en banc will not be entertained in this case.

_____

BERZON, Circuit Judge, concurring in the denial of rehearing en banc:

I strongly disfavor this circuit's innovation in en banc procedure—ubiquitous dissents in the denial of rehearing en banc, sometimes accompanied by concurrences in the denial of rehearing en banc. As I have previously explained, dissents in the denial of rehearing en banc, in particular, often engage in a "distorted presentation of the issues in the case, creating the impression of rampant error in the original panel opinion although a majority—often a decisive majority—of the active members of the court . . . perceived no error." *Defs. of Wildlife Ctr. for Biological Diversity v. EPA*, 450 F.3d 394, 402 (9th Cir. 2006) (Berzon, J., concurring in denial of

rehearing en banc); *see also* Marsha S. Berzon, *Dissent, "Dissentals," and Decision Making*, 100 Calif. L. Rev. 1479 (2012). Often times, the dramatic tone of these dissents leads them to read more like petitions for writ of certiorari on steroids, rather than reasoned judicial opinions.

Despite my distaste for these separate writings, I have, on occasion, written concurrences in the denial of rehearing en banc. On those rare occasions, I have addressed arguments raised for the first time during the en banc process, corrected misrepresentations, or highlighted important facets of the case that had yet to be discussed.

This case serves as one of the few occasions in which I feel compelled to write a brief concurrence. I will not address the dissents' challenges to the *Heck v. Humphrey*, 512 U.S. 477 (1994), and Eighth Amendment rulings of *Martin v. City of Boise*, 902 F.3d 1031 (9th Cir. 2018), as the opinion sufficiently rebuts those erroneous arguments. I write only to raise two points.

First, the City of Boise did not initially seek en banc reconsideration of the Eighth Amendment holding. When this court solicited the parties' positions as to whether the Eighth Amendment holding merits en banc review, the City's initial submission, before mildly supporting en banc reconsideration, was that the opinion is quite "narrow" and its "interpretation of the [C]onstitution raises little actual conflict with Boise's Ordinances or [their] enforcement." And the City noted that it viewed prosecution of homeless individuals for sleeping outside as a "last resort," not as a principal weapon in reducing homelessness and its impact on the City.

Case: 25-3056, 05/05/2025, DktEntry: 4.2, Page 8 of 72

The City is quite right about the limited nature of the opinion. On the merits, the opinion holds only that municipal ordinances that criminalize sleeping, sitting, or lying in *all* public spaces, when *no* alternative sleeping space is available, violate the Eighth Amendment. *Martin*, 902 F.3d at 1035. Nothing in the opinion reaches beyond criminalizing the biologically essential need to sleep when there is no available shelter.

Second, Judge M. Smith's dissent features an unattributed color photograph of "a Los Angeles public sidewalk." The photograph depicts several tents lining a street and is presumably designed to demonstrate the purported negative impact of *Martin*. But the photograph fails to fulfill its intended purpose for several reasons.

For starters, the picture is not in the record of this case and is thus inappropriately included in the dissent. It is not the practice of this circuit to include outside-the-record photographs in judicial opinions, especially when such photographs are entirely unrelated to the case. And in this instance, the photograph is entirely unrelated. It depicts a sidewalk in Los Angeles, not a location in the City of Boise, the actual municipality at issue. Nor can the photograph be said to illuminate the impact of *Martin* within this circuit, as it predates our decision and was likely taken in 2017.[1]

---

[1] Although Judge M. Smith does not credit the photograph to any source, an internet search suggests that the original photograph is attributable to Los Angeles County. *See Implementing the Los Angeles County Homelessness Initiative*, L.A. County, http://homeless.lacounty. gov/implementing-the-los-angeles-county-homeless-initiative/ [https://

But even putting aside the use of a pre-*Martin*, outside-the-record photograph from another municipality, the photograph does not serve to illustrate a concrete effect of *Martin*'s holding. The opinion clearly states that it is not outlawing ordinances "barring the obstruction of public rights of way or the erection of certain structures," such as tents, *id.* at 1048 n.8, and that the holding "in no way dictate[s] to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place," *id.* at 1048 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006)).

What the pre-*Martin* photograph *does* demonstrate is that the ordinances criminalizing sleeping in public places were never a viable solution to the homelessness problem. People with no place to live will sleep outside if they have no alternative. Taking them to jail for a few days is both unconstitutional, for the reasons discussed in the opinion, and, in all likelihood, pointless.

The distressing homelessness problem—distressing to the people with nowhere to live as well as to the rest of society—has grown into a crisis for many reasons, among them the cost of housing, the drying up of affordable care for people with mental illness, and the failure to provide adequate treatment for drug addiction. *See, e.g.*, U.S. Interagency Council on Homelessness, *Homelessness in America: Focus on Individual Adults* 5–8 (2018), https://www.usich.gov/resources/?uploads/asset_library/HIA_Individual_Adults.pdf.

---

web.archive.org/web/?20170405225036/homeless.lacounty.gov/implementing-the-los-angeles-county-homeless-initiative/#]; *see also* Los Angeles County (@CountyofLA), Twitter (Nov. 29, 2017, 3:23 PM), https://twitter.com/CountyofLA/status/936012841533894657.

The crisis continued to burgeon while ordinances forbidding sleeping in public were on the books and sometimes enforced. There is no reason to believe that it has grown, and is likely to grow larger, because *Martin* held it unconstitutional to criminalize simply sleeping *somewhere* in public if one has nowhere else to do so.

For the foregoing reasons, I concur in the denial of rehearing en banc.

M. SMITH, Circuit Judge, with whom CALLAHAN, BEA, IKUTA, BENNETT, and R. NELSON, Circuit Judges, join, dissenting from the denial of rehearing en banc:

In one misguided ruling, a three-judge panel of our court badly misconstrued not one or two, but three areas of binding Supreme Court precedent, and crafted a holding that has begun wreaking havoc on local governments, residents, and businesses throughout our circuit.   Under the panel's decision, local governments are forbidden from enforcing laws restricting public sleeping and camping unless they provide shelter for every homeless individual within their jurisdictions.   Moreover, the panel's reasoning will soon prevent local governments from enforcing a host of other public health and safety laws, such as those prohibiting public defecation and urination.   Perhaps most unfortunately, the panel's opinion shackles the hands of public officials trying to redress the serious societal concern of homelessness.[1]

---

[1] With almost 553,000 people who experienced homelessness nationwide on a single night in January 2018, this issue affects communities across our country. U.S. Dep't of Hous. & Urban Dev.,

I respectfully dissent from our court's refusal to correct this holding by rehearing the case en banc.

## I.

The most harmful aspect of the panel's opinion is its misreading of Eighth Amendment precedent. My colleagues cobble together disparate portions of a fragmented Supreme Court opinion to hold that "an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them." *Martin v. City of Boise*, 902 F.3d 1031, 1035 (9th Cir. 2018). That holding is legally and practically ill-conceived, and conflicts with the reasoning of every other appellate court[2] that has considered the issue.

## A.

The panel struggles to paint its holding as a faithful interpretation of the Supreme Court's fragmented opinion in *Powell v. Texas*, 392 U.S. 514 (1968). It fails.

To understand *Powell*, we must begin with the Court's decision in *Robinson v. California*, 370 U.S. 660 (1962). There, the Court addressed a statute that made it a "criminal

---

Office of Cmty. Planning & Dev., The 2018 Annual Homeless Assessment Report (AHAR) to Congress 1 (Dec. 2018), https://www.hudexchange.info/resources/documents/2018-AHAR-Part-1.pdf.

[2] Our court previously adopted the same Eighth Amendment holding as the panel in *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), but that decision was later vacated. 505 F.3d 1006 (9th Cir. 2007).

offense for a person to 'be addicted to the use of narcotics.'"
*Robinson*, 370 U.S. at 660 (quoting Cal. Health & Safety
Code § 11721). The statute allowed defendants to be
convicted so long as they were drug addicts, regardless of
whether they actually used or possessed drugs. *Id.* at 665.
The Court struck down the statute under the Eighth
Amendment, reasoning that because "narcotic addiction is an
illness . . . which may be contracted innocently or
involuntarily . . . a state law which imprisons a person thus
afflicted as criminal, even though he has never touched any
narcotic drug" violates the Eighth Amendment. *Id.* at 667.

A few years later, in *Powell*, the Court addressed the
scope of its holding in *Robinson*. *Powell* concerned the
constitutionality of a Texas law that criminalized public
drunkenness. *Powell*, 392 U.S. at 516. As the panel's
opinion acknowledges, there was no majority in *Powell*. The
four Justices in the plurality interpreted the decision in
*Robinson* as standing for the limited proposition that the
government could not criminalize one's status. *Id.* at 534.
They held that because the Texas statute criminalized conduct
rather than alcoholism, the law was constitutional. *Powell*,
392 U.S. at 532.

The four dissenting Justices in *Powell* read *Robinson*
more broadly: They believed that "criminal penalties may not
be inflicted upon a person for being in a condition he is
powerless to change." *Id.* at 567 (Fortas, J., dissenting).
Although the statute in *Powell* differed from that in *Robinson*
by covering involuntary conduct, the dissent found the same
constitutional defect present in both cases. *Id.* at 567–68.

Justice White concurred in the judgment. He upheld the
defendant's conviction because Powell had not made a

showing that he was unable to stay off the streets on the night he was arrested. *Id.* at 552–53 (White, J., concurring in the result). He wrote that it was "unnecessary to pursue at this point the further definition of the circumstances or the state of intoxication which might bar conviction of a chronic alcoholic for being drunk in a public place." *Id.* at 553.

The panel contends that because Justice White concurred in the judgment alone, the views of the dissenting Justices constitute the holding of *Powell*. *Martin*, 902 F.3d at 1048. That tenuous reasoning—which metamorphosizes the *Powell* dissent into the majority opinion—defies logic.

Because *Powell* was a 4–1–4 decision, the Supreme Court's decision in *Marks v. United States* guides our analysis. 430 U.S. 188 (1977). There, the Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who *concurred* in the judgments on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (plurality opinion)) (emphasis added). When *Marks* is applied to *Powell*, the holding is clear: The defendant's conviction was constitutional because it involved the commission of an act. Nothing more, nothing less.

This is hardly a radical proposition. I am not alone in recognizing that "there is definitely no Supreme Court holding" prohibiting the criminalization of involuntary conduct. *United States v. Moore*, 486 F.2d 1139, 1150 (D.C. Cir. 1973) (en banc). Indeed, in the years since *Powell* was decided, courts—including our own—have routinely upheld state laws that criminalized acts that were allegedly

compelled or involuntary. *See, e.g.*, *United States v. Stenson*, 475 F. App'x 630, 631 (7th Cir. 2012) (holding that it was constitutional for the defendant to be punished for violating the terms of his parole by consuming alcohol because he "was not punished for his status as an alcoholic but for his conduct"); *Joshua v. Adams*, 231 F. App'x 592, 594 (9th Cir. 2007) ("Joshua also contends that the state court ignored his mental illness [schizophrenia], which rendered him unable to control his behavior, and his sentence was actually a penalty for his illness . . . . This contention is without merit because, in contrast to *Robinson*, where a statute specifically criminalized addiction, Joshua was convicted of a criminal offense separate and distinct from his 'status' as a schizophrenic."); *United States v. Benefield*, 889 F.2d 1061, 1064 (11th Cir. 1989) ("The considerations that make any incarceration unconstitutional when a statute punishes a defendant for his status are not applicable when the government seeks to punish a person's actions.").[3]

To be sure, *Marks* is controversial. Last term, the Court agreed to consider whether to abandon the rule *Marks* established (but ultimately resolved the case on other grounds and found it "unnecessary to consider . . . the proper application of *Marks*"). *Hughes v. United States*, 138 S. Ct. 1765, 1772 (2018). At oral argument, the Justices criticized the logical subset rule established by *Marks* for elevating the outlier views of concurring Justices to precedential status.[4]

---

[3] That most of these opinions were unpublished only buttresses my point: It is uncontroversial that *Powell* does not prohibit the criminalization of involuntary conduct.

[4] Transcript of Oral Argument at 14, *Hughes v. United States*, 138 S. Ct. 1765 (2018) (No. 17-155).

The Court also acknowledged that lower courts have inconsistently interpreted the holdings of fractured decisions under *Marks*.[5]

Those criticisms, however, were based on the assumption that *Marks* means what it says and says what it means: Only the views of the Justices concurring in the judgment may be considered in construing the Court's holding. *Marks*, 430 U.S. at 193. The Justices did not even think to consider that *Marks* allows dissenting Justices to create the Court's holding. As a *Marks* scholar has observed, such a method of vote counting "would paradoxically create a precedent that contradicted the judgment in that very case."[6] And yet the panel's opinion flouts that common sense rule to extract from *Powell* a holding that does not exist.

What the panel really does is engage in a predictive model of precedent. The panel opinion implies that if a case like *Powell* were to arise again, a majority of the Court would hold that the criminalization of involuntary conduct violates the Eighth Amendment. Utilizing such reasoning, the panel borrows the Justices' robes and adopts that holding on their behalf.

But the Court has repeatedly discouraged us from making such predictions when construing precedent. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989). And, for good reason. Predictions about how

---

[5] *Id.* at 49.

[6] Richard M. Re, *Beyond the* Marks *Rule*, 132 Harv. L. Rev. (forthcoming 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3090620.

Justices will rule rest on unwarranted speculation about what goes on in their minds.  Such amateur fortunetelling also precludes us from considering new insights on the issues—difficult as they may be in the case of 4–1–4 decisions like *Powell*—that have arisen since the Court's fragmented opinion.  *See E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 135 n.26 (1977) (noting "the wisdom of allowing difficult issues to mature through full consideration by the courts of appeals").

In short, predictions about how the Justices will rule ought not to create precedent.  The panel's Eighth Amendment holding lacks any support in *Robinson* or *Powell*.

## B.

Our panel's opinion also conflicts with the reasoning underlying the decisions of other appellate courts.

The California Supreme Court, in *Tobe v. City of Santa Ana*, rejected the plaintiffs' Eighth Amendment challenge to a city ordinance that banned public camping.  892 P.2d 1145 (1995).  The court reached that conclusion despite evidence that, on any given night, at least 2,500 homeless persons in the city did not have shelter beds available to them.  *Id.* at 1152.  The court sensibly reasoned that because *Powell* was a fragmented opinion, it did not create precedent on "the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' or 'occasioned by a compulsion.'"  *Id.* at 1166 (quoting *Powell*, 392 U.S. at 533).  Our panel—bound by the same Supreme Court precedent—invalidates identical California ordinances

previously upheld by the California Supreme Court.  Both courts cannot be correct.

The California Supreme Court acknowledged that homelessness is a serious societal problem.  It explained, however, that:

> Many of those issues are the result of legislative policy decisions. The arguments of many amici curiae regarding the apparently intractable problem of homelessness and the impact of the Santa Ana ordinance on various groups of homeless persons (e.g., teenagers, families with children, and the mentally ill) should be addressed to the Legislature and the Orange County Board of Supervisors, not the judiciary. Neither the criminal justice system nor the judiciary is equipped to resolve chronic social problems, but criminalizing conduct that is a product of those problems is not for that reason constitutionally impermissible.

*Id.* at 1157 n.12.  By creating new constitutional rights out of whole cloth, my well-meaning, but unelected, colleagues improperly inject themselves into the role of public policymaking.[7]

---

[7] Justice Black has also observed that solutions for challenging social issues should be left to the policymakers:

> I cannot say that the States should be totally barred from one avenue of experimentation, the criminal process, in attempting to find a means to cope with this difficult social problem . . . . [I]t seems to me that the

The reasoning of our panel decision also conflicts with precedents of the Fourth and Eleventh Circuits. In *Manning v. Caldwell*, the Fourth Circuit held that a Virginia statute that criminalized the possession of alcohol did not violate the Eighth Amendment when it punished the involuntary actions of homeless alcoholics. 900 F.3d 139, 153 (4th Cir. 2018), *reh'g en banc granted* 741 F. App'x 937 (4th Cir. 2018).[8] The court rejected the argument that Justice White's opinion in *Powell* "requires this court to hold that Virginia's statutory scheme imposes cruel and unusual punishment because it criminalizes [plaintiffs'] status as homeless alcoholics." *Id.* at 145. The court found that the statute passed constitutional muster because "it is the act of possessing alcohol—not the status of being an alcoholic—that gives rise to criminal sanctions." *Id.* at 147.

Boise's Ordinances at issue in this case are no different: They do not criminalize the status of homelessness, but only the act of camping on public land or occupying public places without permission. *Martin*, 902 F.3d at 1035. The Fourth Circuit correctly recognized that these kinds of laws do not run afoul of *Robinson* and *Powell*.

---

present use of criminal sanctions might possibly be unwise, but I am by no means convinced that any use of criminal sanctions would inevitably be unwise or, above all, that I am qualified in this area to know what is legislatively wise and what is legislatively unwise.

*Powell*, 392 U.S. at 539–40 (Black, J., concurring).

[8] Pursuant to Fourth Circuit Local Rule 35(c), "[g]ranting of rehearing en banc vacates the previous panel judgment and opinion." I mention *Manning*, however, as an illustration of other courts' reasoning on the Eighth Amendment issue.

The Eleventh Circuit has agreed.  In *Joel v. City of Orlando*, the court held that a city ordinance prohibiting sleeping on public property was constitutional.  232 F.3d 1353, 1362 (11th Cir. 2000).  The court rejected the plaintiffs' Eighth Amendment challenge because the ordinance "targets conduct, and does not provide criminal punishment based on a person's status."  *Id*.  The court prudently concluded that "[t]he City is constitutionally allowed to regulate where 'camping' occurs."  *Id.*

We ought to have adopted the sound reasoning of these other courts.  By holding that Boise's enforcement of its Ordinances violates the Eighth Amendment, our panel has needlessly created a split in authority on this straightforward issue.

## C.

One would think our panel's legally incorrect decision would at least foster the common good.  Nothing could be further from the truth.  The panel's decision generates dire practical consequences for the hundreds of local governments within our jurisdiction, and for the millions of people that reside therein.

The panel opinion masquerades its decision as a narrow one by representing that it "in no way dictate[s] to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place."  *Martin*, 902 F.3d at 1048 (quoting *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006)).

That excerpt, however, glosses over the decision's actual holding: "We hold only that . . . as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property." *Id.* Such a holding leaves cities with a Hobson's choice: They must either undertake an overwhelming financial responsibility to provide housing for or count the number of homeless individuals within their jurisdiction every night, or abandon enforcement of a host of laws regulating public health and safety. The Constitution has no such requirement.

\* \* \*

Under the panel's decision, local governments can enforce certain of their public health and safety laws only when homeless individuals have the choice to sleep indoors. That inevitably leads to the question of how local officials ought to know whether that option exists.

The number of homeless individuals within a municipality on any given night is not automatically reported and updated in real time. Instead, volunteers or government employees must painstakingly tally the number of homeless individuals block by block, alley by alley, doorway by doorway. Given the daily fluctuations in the homeless population, the panel's opinion would require this labor-intensive task be done every single day. Yet in massive cities such as Los Angeles, that is simply impossible. Even when thousands of volunteers devote dozens of hours to such "a herculean task," it takes three days to finish counting—and

Case 1:09-cv-00540-REB Document 220-2 Filed 04/01/19 Page 21 of 72

even then "not everybody really gets counted."[9]  Lest one think Los Angeles is unique, our circuit is home to many of the largest homeless populations nationwide.[10]

If cities do manage to cobble together the resources for such a system, what happens if officials (much less volunteers) miss a homeless individual during their daily count and police issue citations under the false impression that the number of shelter beds exceeds the number of homeless people that night?   According to the panel's opinion, that city has violated the Eighth Amendment, thereby potentially leading to lawsuits for significant monetary damages and other relief.

---

[9] Matt Tinoco, *LA Counts Its Homeless, But Counting Everybody Is Virtually Impossible*, LAist (Jan. 22, 2019, 2:08 PM), https://laist.com/2019/01/22/los_angeles_homeless_count_2019_how_v olunteer.php.  The panel conceded the imprecision of such counts in its opinion.  *See Martin*, 902 F.3d at 1036 n.1 (acknowledging that the count of homeless individuals "is not always precise").  But it went on to disregard that fact when tying a city's ability to enforce its laws to these counts.

[10] The U.S. Department of Housing and Urban Development's 2018 Annual Homeless Assessment Report to Congress reveals that municipalities within our circuit have among the highest homeless populations in the country.  In Los Angeles City and County alone, 49,955 people experienced homelessness in 2018. The number was 12,112 people in Seattle and King County, Washington, and 8,576 people in San Diego City and County, California. *See supra* note 1, at 18, 20.  In 2016, Las Vegas had an estimated homeless population of 7,509 individuals, and California's Santa Clara County had 6,556. Joaquin Palomino, *How Many People Live On Our Streets*?, S.F. Chronicle (June 28, 2016), https://projects.sfchronicle.com/sf-homeless/numbers.

And what if local governments (understandably) lack the resources necessary for such a monumental task?[11]   They have no choice but to stop enforcing laws that prohibit public sleeping and camping.[12]   Accordingly, our panel's decision

---

[11] Cities can instead provide sufficient housing for every homeless individual, but the cost would be prohibitively expensive for most local governments.  Los Angeles, for example, would need to spend $403.4 million to house every homeless individual not living in a vehicle.  *See* Los Angeles Homeless Services Authority, Report on Emergency Framework to Homelessness Plan 13 (June 2018), https://assets.documentcloud.org/documents/4550980/LAHSA-Sheltering-Report.pdf.  In San Francisco, building new centers to provide a mere 400 additional shelter spaces was estimated to cost between $10 million and $20 million, and would require $20 million to $30 million to operate each year.  *See* Heather Knight, *A Better Model, A Better Result?*, S.F. Chronicle (June 29, 2016), https://projects.sfchronicle.com/sf-homeless/shelters.  Perhaps these staggering sums are why the panel went out of its way to state that it "in no way dictate[s] to the City that it must provide sufficient shelter for the homeless."  *Martin*, 902 F.3d at 1048.

[12] Indeed, in the few short months since the panel's decision, several cities have thrown up their hands and abandoned any attempt to enforce such laws.  *See, e.g.*, Cynthia Hubert, *Sacramento County Cleared Homeless Camps All Year. Now It Has Stopped Citing Campers*, Sacramento Bee (Sept. 18, 2019, 4:27 PM), https://www.sacbee.com/news/local/homeless/article218605025.html ("Sacramento County park rangers have suddenly stopped issuing citations altogether after a federal court ruling this month."); Michael Ellis Langley, *Policing Homelessness*, Golden State Newspapers (Feb. 22, 2019), http://www.goldenstatenewspapers.com/tracy_press/news/policing-homelessness/article_5fe6a9ca-3642-11e9-9b25-37610ef2dbae.html (Sheriff Pat Withrow stating that, "[a]s far as camping ordinances and things like that, we're probably holding off on [issuing citations] for a while" in light of *Martin v. City of Boise*); Kelsie Morgan, *Moses Lake Sees Spike in Homeless Activity Following 9th Circuit Court Decision*, KXLY (Oct. 2, 2018, 12:50 PM), https://www.kxly.com/news/moses-lake-sees-spike-in-homeless-activity-following-9th-circuit-court-decision/801772571 ("Because the City of Moses Lake does not currently have a homeless shelter, city officials can

effectively allows homeless individuals to sleep and live wherever they wish on most public property. Without an absolute confidence that they can house every homeless individual, city officials will be powerless to assist residents lodging valid complaints about the health and safety of their neighborhoods.[13]

As if the panel's actual holding wasn't concerning enough, the logic of the panel's opinion reaches even further in scope. The opinion reasons that because "resisting the need to . . . engage in [] life-sustaining activities is impossible," punishing the homeless for engaging in those actions in public violates the Eighth Amendment. *Martin*, 902 F.3d at 1048. What else is a life-sustaining activity? Surely bodily functions. By holding that the Eighth Amendment proscribes the criminalization of involuntary conduct, the panel's decision will inevitably result in the

---

no longer penalize people for sleeping in public areas."); Brandon Pho, *Buena Park Residents Express Opposition to Possible Homeless Shelter*, Voice of OC (Feb. 14, 2019), https://voiceofoc.org/2019/02/buena-park-residents-express-opposition-to-possible-homeless-shelter/ (stating that Judge David Carter of the U.S. District Court for the Central District of California has "warn[ed] Orange County cities to get more shelters online or risk the inability the enforce their anti-camping ordinances"); Nick Welsh, *Court Rules to Protect Sleeping in Public: Santa Barbara City Parks Subject of Ongoing Debate*, Santa Barbara Indep. (Oct. 31, 2018), http://www.independent.com/news/2018/oct/31/court-rules-protect-sleeping-public/?jqm ("In the wake of what's known as 'the Boise decision,' Santa Barbara city police found themselves scratching their heads over what they could and could not issue citations for.").

[13] In 2017, for example, San Francisco received 32,272 complaints about homeless encampments to its 311-line. Kevin Fagan, *The Situation On The Streets*, S.F. Chronicle (June 28, 2018), https://projects.sfchronicle.com/sf-homeless/2018-state-of-homelessness.

striking down of laws that prohibit public defecation and urination.[14] The panel's reasoning also casts doubt on public safety laws restricting drug paraphernalia, for the use of hypodermic needles and the like is no less involuntary for the homeless suffering from the scourge of addiction than is their sleeping in public.

It is a timeless adage that states have a "universally acknowledged power and duty to enact and enforce all such laws . . . as may rightly be deemed necessary or expedient for the safety, health, morals, comfort and welfare of its people." *Knoxville Iron Co. v. Harbison*, 183 U.S. 13, 20 (1901) (internal quotations omitted). I fear that the panel's decision will prohibit local governments from fulfilling their duty to enforce an array of public health and safety laws. Halting enforcement of such laws will potentially wreak havoc on our communities.[15] As we have already begun to witness, our neighborhoods will soon feature "[t]ents . . .

---

[14] *See* Heater Knight, *It's No Laughing Matter—SF Forming Poop Patrol to Keep Sidewalks Clean*, S.F. Chronicle (Aug. 14, 2018), https://www.sfchronicle.com/bayarea/heatherknight/article/It-s-no-laughing-matter-SF-forming-Poop-13153517.php.

[15] *See* Anna Gorman and Kaiser Health News, *Medieval Diseases Are Infecting California's Homeless*, The Atlantic (Mar. 8, 2019), https://www.theatlantic.com/health/archive/2019/03/typhus-tuberculosis-medieval-diseases-spreading-homeless/584380/ (describing the recent outbreaks of typhus, Hepatitis A, and shigellosis as "disaster[s] and [a] public-health crisis" and noting that such "diseases spread quickly and widely among people living outside or in shelters").

equipped with mini refrigerators, cupboards, televisions, and heaters, [that] vie with pedestrian traffic" and "human waste appearing on sidewalks and at local playgrounds."**[16]**



*A Los Angeles Public Sidewalk*

## II.

The panel's fanciful merits-determination is accompanied by a no-less-inventive series of procedural rulings. The panel's opinion also misconstrues two other areas of Supreme Court precedent concerning limits on the parties who can

---

**[16]** Scott Johnson and Peter Kiefer, *LA's Battle for Venice Beach: Homeless Surge Puts Hollywood's Progressive Ideals to the Test*, Hollywood Reporter (Jan. 11, 2019, 6:00 AM), https://www.hollywoodreporter.com/features/las-homeless-surge-puts-hollywoods-progressive-ideals-test-1174599.

bring § 1983 challenges for violations of the Eighth Amendment.

**A.**

The panel erred in holding that Robert Martin and Robert Anderson could obtain prospective relief under *Heck v. Humphrey* and its progeny. 512 U.S. 477 (1994). As recognized by Judge Owens's dissent, that conclusion cuts against binding precedent on the issue.

The Supreme Court has stated that *Heck* bars § 1983 claims if success on that claim would "necessarily demonstrate the invalidity of [the plaintiff's] confinement or its duration." *Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005); *see also Edwards v. Balisok*, 520 U.S. 641, 648 (1997) (stating that *Heck* applies to claims for declaratory relief). Martin and Anderson's prospective claims did just that. Those plaintiffs sought a declaration that the Ordinances under which they were convicted are unconstitutional and an injunction against their future enforcement on the grounds of unconstitutionality. It is clear that *Heck* bars these claims because Martin and Anderson necessarily seek to demonstrate the invalidity of their previous convictions.

The panel opinion relies on *Edwards* to argue that *Heck* does not bar plaintiffs' requested relief, but *Edwards* cannot bear the weight the panel puts on it. In *Edwards*, the plaintiff sought an injunction that would require prison officials to date-stamp witness statements at the time received. 520 U.S. at 643. The Court concluded that requiring prison officials to date-stamp witness statements did not necessarily imply the invalidity of previous determinations that the prisoner was

not entitled to good-time credits, and that *Heck*, therefore, did not bar prospective injunctive relief. *Id.* at 648.

Here, in contrast, a declaration that the Ordinances are unconstitutional and an injunction against their future enforcement necessarily demonstrate the invalidity of the plaintiffs' prior convictions. According to data from the U.S. Department of Housing and Urban Development, the number of homeless individuals in Boise exceeded the number of available shelter beds during each of the years that the plaintiffs were cited.[17] Under the panel's holding that "the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property" "as long as there is no option of sleeping indoors," that data necessarily demonstrates the invalidity of the plaintiffs' prior convictions. *Martin*, 902 F.3d at 1048.

**B.**

The panel also erred in holding that Robert Martin and Pamela Hawkes, who were cited but not convicted of violating the Ordinances, had standing to sue under the Eighth Amendment. In so doing, the panel created a circuit split with the Fifth Circuit.

The panel relied on *Ingraham v. Wright*, 430 U.S. 651 (1977), to find that a plaintiff "need demonstrate only the

---

[17] *See* U.S. Dep't of Hous. & Urban Dev., PIT Data Since 2007, https://www.hudexchange.info/resources/documents/2007-2018-PIT-Counts-by-CoC.xlsx; U.S. Dep't of Hous. & Urban Dev., HIC Data Since 2007, https://www.hudexchange.info/resources/documents/2007-2018-HIC-Counts-by-CoC.xlsx. Boise is within Ada County and listed under CoC code ID-500.

initiation of the criminal process against him, not a
conviction," to bring an Eighth Amendment challenge.
*Martin*, 902 F.3d at 1045. The panel cites *Ingraham*'s
observation that the Cruel and Unusual Punishments Clause
circumscribes the criminal process in that "it imposes
substantive limits on what can be made criminal and punished
as such." *Id.* at 1046 (citing *Ingraham*, 430 U.S. at 667).
This reading of *Ingraham*, however, cherry picks isolated
statements from the decision without considering them in
their accurate context. The *Ingraham* Court plainly held that
"Eighth Amendment scrutiny is appropriate only after the
State has complied with the constitutional guarantees
traditionally associated with criminal prosecutions." 430 U.S.
at 671 n.40. And, "the State does not acquire the power to
punish with which the Eighth Amendment is concerned until
*after* it has secured a formal adjudication of guilt." *Id.*
(emphasis added). As the *Ingraham* Court recognized, "[T]he
decisions of [the Supreme] Court construing the proscription
against cruel and unusual punishment confirms that it was
designed to protect those *convicted* of crimes." *Id.* at 664
(emphasis added). Clearly, then, *Ingraham* stands for the
proposition that to challenge a criminal statute as violative of
the Eighth Amendment, the individual must be convicted of
that relevant crime.

The Fifth Circuit recognized this limitation on standing in
*Johnson v. City of Dallas*, 61 F.3d 442 (5th Cir. 1995).
There, the court confronted a similar action brought by
homeless individuals challenging a sleeping in public
ordinance. *Johnson*, 61 F.3d at 443. The court held that the
plaintiffs did not have standing to raise an Eighth
Amendment challenge to the ordinance because although
"numerous tickets ha[d] been issued . . . [there was] no
indication that any Appellees ha[d] been convicted" of

violating the sleeping in public ordinance. *Id.* at 445. The Fifth Circuit explained that *Ingraham* clearly required a plaintiff be convicted under a criminal statute before challenging that statute's validity. *Id.* at 444–45 (citing *Robinson*, 370 U.S. at 663; *Ingraham*, 430 U.S. at 667).

By permitting Martin and Hawkes to maintain their Eighth Amendment challenge, the panel's decision created a circuit split with the Fifth Circuit and took our circuit far afield from "[t]he primary purpose of (the Cruel and Unusual Punishments Clause) . . . [which is] the method or kind of punishment imposed for the violation of criminal statutes." *Ingraham*, 430 U.S. at 667 (quoting *Powell*, 392 U.S. at 531–32.

### III.

None of us is blind to the undeniable suffering that the homeless endure, and I understand the panel's impulse to help such a vulnerable population. But the Eighth Amendment is not a vehicle through which to critique public policy choices or to hamstring a local government's enforcement of its criminal code. The panel's decision, which effectively strikes down the anti-camping and anti-sleeping Ordinances of Boise and that of countless, if not all, cities within our jurisdiction, has no legitimate basis in current law.

I am deeply concerned about the consequences of our panel's unfortunate opinion, and I regret that we did not vote to reconsider this case en banc. I respectfully dissent.

BENNETT, Circuit Judge, with whom BEA, IKUTA, and
R. NELSON, Circuit Judges, join, and with whom
M. SMITH, Circuit Judge, joins as to Part II, dissenting
from the denial of rehearing en banc:

I fully join Judge M. Smith's opinion dissenting from the
denial of rehearing en banc. I write separately to explain that
except in extraordinary circumstances not present in this case,
and based on its text, tradition, and original public meaning,
the Cruel and Unusual Punishments Clause of the Eighth
Amendment does not impose substantive limits on what
conduct a state may criminalize.

I recognize that we are, of course, bound by Supreme
Court precedent holding that the Eighth Amendment
encompasses a limitation "on what can be made criminal and
punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667
(1977) (citing *Robinson v. California*, 370 U.S. 660 (1962)).
However, the *Ingraham* Court specifically "recognized [this]
limitation as one to be applied sparingly." *Id.* As Judge M.
Smith's dissent ably points out, the panel ignored *Ingraham*'s
clear direction that Eighth Amendment scrutiny attaches only
after a criminal conviction. Because the panel's decision,
which allows pre-conviction Eighth Amendment challenges, is
wholly inconsistent with the text and tradition of the Eighth
Amendment, I respectfully dissent from our decision not to
rehear this case en banc.

## I.

The text of the Cruel and Unusual Punishments Clause is
virtually identical to Section 10 of the English Declaration of

Rights of 1689,[1] and there is no question that the drafters of the Eighth Amendment were influenced by the prevailing interpretation of Section 10. *See Solem v. Helm*, 463 U.S. 277, 286 (1983) (observing that one of the themes of the founding era "was that Americans had all the rights of English subjects" and the Framers' "use of the language of the English Bill of Rights is convincing proof that they intended to provide at least the same protection"); *Timbs v. Indiana*, 586 U.S. ___ (2019) (Thomas, J., concurring) ("[T]he text of the Eighth Amendment was 'based directly on . . . the Virginia Declaration of Rights,' which 'adopted verbatim the language of the English Bill of Rights.'" (quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 266 (1989)). Thus, "not only is the original meaning of the 1689 Declaration of Rights relevant, but also the circumstances of its enactment, insofar as they display the particular 'rights of English subjects' it was designed to vindicate." *Harmelin v. Michigan*, 501 U.S. 957, 967 (1991) (Scalia, J., concurring).

Justice Scalia's concurrence in *Harmelin* provides a thorough and well-researched discussion of the original public meaning of the Cruel and Unusual Punishments Clause, including a detailed overview of the history of Section 10 of the English Declaration of Rights. *See id.* at 966–85 (Scalia, J., concurring). Rather than reciting Justice Scalia's *Harmelin* discussion in its entirety, I provide only a broad description of its historical analysis. Although the issue Justice Scalia confronted in *Harmelin* was whether the

---

[1] 1 Wm. & Mary, 2d Sess., ch. 2, 3 Stat. at Large 440, 441 (1689) (Section 10 of the English Declaration of Rights) ("excessive Baile ought not to be required, nor excessive Fines imposed; nor cruell and unusuall Punishments inflicted.").

Framers intended to graft a proportionality requirement on the Eighth Amendment, *see id.* at 976, his opinion's historical exposition is instructive to the issue of what the Eighth Amendment meant when it was written.

The English Declaration of Rights's prohibition on "cruell and unusuall Punishments" is attributed to the arbitrary punishments imposed by the King's Bench following the Monmouth Rebellion in the late 17th century. *Id.* at 967 (Scalia, J., concurring). "Historians have viewed the English provision as a reaction either to the 'Bloody Assize,' the treason trials conducted by Chief Justice Jeffreys in 1685 after the abortive rebellion of the Duke of Monmouth, or to the perjury prosecution of Titus Oates in the same year." *Ingraham*, 430 U.S. at 664 (footnote omitted).

Presiding over a special commission in the wake of the Monmouth Rebellion, Chief Justice Jeffreys imposed "vicious punishments for treason," including "drawing and quartering, burning of women felons, beheading, [and] disemboweling." *Harmelin*, 501 U.S. at 968. In the view of some historians, "the story of The Bloody Assizes . . . helped to place constitutional limitations on the crime of treason and to produce a bar against cruel and unusual Punishments." *Furman v. Georgia*, 408 U.S. 238, 254 (1972) (Douglas, J., concurring).

More recent scholarship suggests that Section 10 of the Declaration of Rights was motivated more by Jeffreys's treatment of Titus Oates, a Protestant cleric and convicted perjurer. In addition to the pillory, the scourge, and life imprisonment, Jeffreys sentenced Oates to be "stript of [his] Canonical Habits." *Harmelin*, 501 U.S. at 970 (Scalia, J., concurring) (quoting Second Trial of Titus Oates, 10 How. St.

Tr. 1227, 1316 (K.B. 1685)). Years after the sentence was carried out, and months after the passage of the Declaration of Rights, the House of Commons passed a bill to annul Oates's sentence. Though the House of Lords never agreed, the Commons issued a report asserting that Oates's sentence was the sort of "cruel and unusual Punishment" that Parliament complained of in the Declaration of Rights. *Harmelin*, 501 U.S. at 972 (citing 10 Journal of the House of Commons 247 (Aug. 2, 1689)). In the view of the Commons and the dissenting Lords, Oates's punishment was "'out of the Judges' Power,' 'contrary to Law and ancient practice,' without 'Precedents' or 'express Law to warrant,' 'unusual,' 'illegal,' or imposed by 'Pretence to a discretionary Power.'" *Id.* at 973 (quoting 1 Journals of the House of Lords 367 (May 31, 1689); 10 Journal of the House of Commons 247 (Aug. 2, 1689)).

Thus, Justice Scalia concluded that the prohibition on "cruell and unusuall punishments" as used in the English Declaration, "was primarily a requirement that judges pronouncing sentence remain within the bounds of common-law tradition." *Harmelin*, 501 U.S. at 974 (Scalia, J., concurring) (citing *Ingraham*, 430 U.S. at 665; 1 J. Chitty, Criminal Law 710–12 (5th Am. ed. 1847); Anthony F. Granucci, *Nor Cruel and Unusual Punishments Inflicted: The Original Meaning*, 57 Calif. L. Rev. 839, 859 (1969)).

But Justice Scalia was careful not to impute the English meaning of "cruell and unusuall" directly to the Framers of our Bill of Rights: "the ultimate question is not what 'cruell and unusuall punishments' meant in the Declaration of Rights, but what its meaning was to the Americans who adopted the Eighth Amendment." *Id.* at 975. "Wrenched out of its common-law context, and applied to the actions of a

legislature . . . the Clause disables the Legislature from authorizing particular forms or 'modes' of punishment—specifically, cruel methods of punishment that are not regularly or customarily employed." *Id.* at 976.

As support for his conclusion that the Framers of the Bill of Rights intended for the Eighth Amendment to reach only certain punishment methods, Justice Scalia looked to "the state ratifying conventions that prompted the Bill of Rights." *Id.* at 979. Patrick Henry, speaking at the Virginia Ratifying convention, "decried the absence of a bill of rights," arguing that "Congress will loose the restriction of not . . . inflicting cruel and unusual punishments. . . . What has distinguished our ancestors?—They would not admit of tortures, or cruel and barbarous punishment." *Id.* at 980 (quoting 3 J. Elliot, Debates on the Federal Constitution 447 (2d ed. 1854)). The Massachusetts Convention likewise heard the objection that, in the absence of a ban on cruel and unusual punishments, "racks and gibbets may be amongst the most mild instruments of [Congress's] discipline." *Id.* at 979 (internal quotation marks omitted) (quoting 2 J. Debates on the Federal Constitution, at 111). These historical sources "confirm[] the view that the cruel and unusual punishments clause was directed at prohibiting certain *methods* of punishment." *Id.* (internal quotation marks omitted) (quoting Granucci, 57 Calif. L. Rev. at 842) (emphasis in *Harmelin*).

In addition, early state court decisions "interpreting state constitutional provisions with identical or more expansive wording (i.e., 'cruel or unusual') concluded that these provisions . . . proscribe[d] . . . only certain modes of punishment." *Id.* at 983; *see also id.* at 982 ("Many other Americans apparently agreed that the Clause only outlawed certain *modes* of punishment.").

In short, when the Framers drafted and the several states ratified the Eighth Amendment, the original public meaning of the Cruel and Unusual Punishments Clause was "to proscribe . . . methods of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). There is simply no indication in the history of the Eighth Amendment that the Cruel and Unusual Punishments Clause was intended to reach the substantive authority of Congress to criminalize acts or status, and certainly not before conviction. Incorporation, of course, extended the reach of the Clause to the States, but worked no change in its meaning.

## II.

The panel here held that "the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter." *Martin v. City of Boise*, 902 F.3d 1031, 1048 (9th Cir. 2018). In so holding, the panel allows challenges asserting this prohibition to be brought in advance of any conviction. That holding, however, has nothing to do with the punishment that the City of Boise imposes for those offenses, and thus nothing to do with the text and tradition of the Eighth Amendment.

The panel pays only the barest attention to the Supreme Court's admonition that the application of the Eighth Amendment to substantive criminal law be "sparing[]," *Martin*, 902 F.3d at 1047 (quoting *Ingraham*, 430 U.S. at 667), and its holding here is dramatic in scope and completely unfaithful to the proper interpretation of the Cruel and Unusual Punishments Clause.

"The primary purpose of (the Cruel and Unusual Punishments Clause) has always been considered, and properly so, to be directed at the method or kind of punishment imposed for the violation of criminal statutes." *Ingraham*, 430 U.S. at 667 (internal quotation marks omitted) (quoting *Powell v. Texas*, 392 U.S. 514, 531–32 (1968)). It should, therefore, be the "rare case" where a court invokes the Eighth Amendment's criminalization component. *Jones v. City of Los Angeles*, 444 F.3d 1118, 1146 (9th Cir. 2006) (Rymer, J., dissenting), *vacated*, 505 F.3d 1006 (9th Cir. 2007).[2] And permitting a pre-conviction challenge to a local ordinance, as the panel does here, is flatly inconsistent with the Cruel and Unusual Punishments Clause's core constitutional function: regulating the *methods* of punishment that may be inflicted upon one convicted of an offense. *Harmelin*, 501 U.S. at 977, 979 (Scalia, J., concurring). As Judge Rymer, dissenting in *Jones*, observed, "the Eighth Amendment's 'protections do not attach until after conviction and sentence.'"[3] 444 F.3d at 1147 (Rymer, J., dissenting)

---

[2] *Jones*, of course, was vacated and lacks precedential value. 505 F.3d 1006 (9th Cir. 2007). But the panel here resuscitated *Jones*'s errant holding, including, apparently, its application of the Cruel and Unusual Punishments Clause in the absence of a criminal conviction. We should have taken this case en banc to correct this misinterpretation of the Eighth Amendment.

[3] We have emphasized the need to proceed cautiously when extending the reach of the Cruel and Unusual Punishments Clause beyond regulation of the methods of punishment that may be inflicted upon conviction for an offense. *See United States v. Ritter*, 752 F.2d 435, 438 (9th Cir. 1985) (repeating *Ingraham*'s direction that "this particular use of the cruel and unusual punishment clause is to be applied sparingly" and noting that *Robinson* represents "the rare type of case in which the clause has been used to limit what may be made criminal"); *see also United States v. Ayala*, 35 F.3d 423, 426 (9th Cir. 1994) (limiting application of *Robinson*

(internal alterations omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989)).[4]

The panel's holding thus permits plaintiffs who have never been convicted of any offense to avail themselves of a constitutional protection that, historically, has been concerned with prohibition of "only certain modes of punishment." *Harmelin*, 501 U.S. at 983; *see also United States v. Quinn*, 123 F.3d 1415, 1425 (11th Cir. 1997) (citing *Harmelin* for the proposition that a "plurality of the Supreme Court . . . has rejected the notion that the Eighth Amendment's protection from cruel and unusual punishment extends to the type of offense for which a sentence is imposed").

Extending the Cruel and Unusual Punishments Clause to encompass pre-conviction challenges to substantive criminal law stretches the Eighth Amendment past its breaking point. I doubt that the drafters of our Bill of Rights, the legislators of the states that ratified it, or the public at the time would ever have imagined that a ban on "cruel and unusual punishments" would permit a plaintiff to challenge a substantive criminal statute or ordinance that he or she had not even been convicted of violating. We should have taken this case en banc to confirm that an Eighth Amendment challenge does not lie in the absence of a punishment following conviction for an offense.

---

to crimes lacking an actus reus). The panel's holding here throws that caution to the wind.

[4] Judge Friendly also expressed "considerable doubt that the cruel and unusual punishment clause is properly applicable at all until after conviction and sentence." *Johnson v. Glick*, 481 F.2d 1028, 1032 (2d Cir. 1973).

\*   \*   \*

At common law and at the founding, a prohibition on "cruel and unusual punishments" was simply that: a limit on the types of punishments that government could inflict following a criminal conviction. The panel strayed far from the text and history of the Cruel and Unusual Punishments Clause in imposing the substantive limits it has on the City of Boise, particularly as to plaintiffs who have not yet even been convicted of an offense. We should have reheard this case en banc, and I respectfully dissent.

---

# OPINION

BERZON, Circuit Judge:

> "The law, in its majestic equality, forbids rich
> and poor alike to sleep under bridges, to beg
> in the streets, and to steal their bread."
>
> — Anatole France, *The Red Lily*

We consider whether the Eighth Amendment's prohibition on cruel and unusual punishment bars a city from prosecuting people criminally for sleeping outside on public property when those people have no home or other shelter to go to. We conclude that it does.

The plaintiffs-appellants are six current or former residents of the City of Boise ("the City"), who are homeless or have recently been homeless. Each plaintiff alleges that, between 2007 and 2009, he or she was cited by Boise police

for violating one or both of two city ordinances.  The first, Boise City Code § 9-10-02 (the "Camping Ordinance"), makes it a misdemeanor to use "any of the streets, sidewalks, parks, or public places as a camping place at any time."  The Camping Ordinance defines "camping" as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence." *Id*.  The second, Boise City Code § 6-01-05 (the "Disorderly Conduct Ordinance"), bans "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof."

All plaintiffs seek retrospective relief for their previous citations under the ordinances.  Two of the plaintiffs, Robert Anderson and Robert Martin, allege that they expect to be cited under the ordinances again in the future and seek declaratory and injunctive relief against future prosecution.

In *Jones v. City of Los Angeles*, 444 F.3d 1118, 1138 (9th Cir. 2006), *vacated*, 505 F.3d 1006 (9th Cir. 2007), a panel of this court concluded that "so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds [in shelters]" for the homeless, Los Angeles could not enforce a similar ordinance against homeless individuals "for involuntarily sitting, lying, and sleeping in public."  *Jones* is not binding on us, as there was an underlying settlement between the parties and our opinion was vacated as a result.  We agree with *Jones*'s reasoning and central conclusion, however, and so hold that an ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them.  Two of the plaintiffs, we further hold, may be entitled

to retrospective and prospective relief for violation of that Eighth Amendment right.

## I. Background

The district court granted summary judgment to the City on all claims.  We therefore review the record in the light most favorable to the plaintiffs.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

Boise has a significant and increasing homeless population.  According to the Point-in-Time Count ("PIT Count") conducted by the Idaho Housing and Finance Association, there were 753 homeless individuals in Ada County — the county of which Boise is the seat — in January 2014, 46 of whom were "unsheltered," or living in places unsuited to human habitation such as parks or sidewalks.  In 2016, the last year for which data is available, there were 867 homeless individuals counted in Ada County, 125 of whom were unsheltered.[1]  The PIT Count likely underestimates the number of homeless individuals in Ada County.  It is "widely recognized that a one-night point in

---

[1] The United States Department of Housing and Urban Development ("HUD") requires local homeless assistance and prevention networks to conduct an annual count of homeless individuals on one night each January, known as the PIT Count, as a condition of receiving federal funds.  State, local, and federal governmental entities, as well as private service providers, rely on the PIT Count as a "critical source of data" on homelessness in the United States.  The parties acknowledge that the PIT Count is not always precise.  The City's Director of Community Partnerships, Diana Lachiondo, testified that the PIT Count is "not always the . . . best resource for numbers," but also stated that "the point-in-time count is our best snapshot" for counting the number of homeless individuals in a particular region, and that she "cannot give . . . any other number with any kind of confidence."

time count will undercount the homeless population," as many homeless individuals may have access to temporary housing on a given night, and as weather conditions may affect the number of available volunteers and the number of homeless people staying at shelters or accessing services on the night of the count.

There are currently three homeless shelters in the City of Boise offering emergency shelter services, all run by private, nonprofit organizations.  As far as the record reveals, these three shelters are the only shelters in Ada County.

One shelter — "Sanctuary" — is operated by Interfaith Sanctuary Housing Services, Inc.  The shelter is open to men, women, and children of all faiths, and does not impose any religious requirements on its residents.  Sanctuary has 96 beds reserved for individual men and women, with several additional beds reserved for families.  The shelter uses floor mats when it reaches capacity with beds.

Because of its limited capacity, Sanctuary frequently has to turn away homeless people seeking shelter.  In 2010, Sanctuary reached full capacity in the men's area "at least half of every month," and the women's area reached capacity "almost every night of the week."  In 2014, the shelter reported that it was full for men, women, or both on 38% of nights.  Sanctuary provides beds first to people who spent the previous night at Sanctuary.  At 9:00 pm each night, it allots any remaining beds to those who added their names to the shelter's waiting list.

The other two shelters in Boise are both operated by the Boise Rescue Mission ("BRM"), a Christian nonprofit organization. One of those shelters, the River of Life Rescue Mission ("River of Life"), is open exclusively to men; the other, the City Light Home for Women and Children ("City Light"), shelters women and children only.

BRM's facilities provide two primary "programs" for the homeless, the Emergency Services Program and the New Life Discipleship Program.[2] The Emergency Services Program provides temporary shelter, food, and clothing to anyone in need. Christian religious services are offered to those seeking shelter through the Emergency Services Program. The shelters display messages and iconography on the walls, and the intake form for emergency shelter guests includes a religious message.[3]

Homeless individuals may check in to either BRM facility between 4:00 and 5:30 pm. Those who arrive at BRM facilities between 5:30 and 8:00 pm may be denied shelter, depending on the reason for their late arrival; generally, anyone arriving after 8:00 pm is denied shelter.

Except in winter, male guests in the Emergency Services Program may stay at River of Life for up to 17 consecutive

---

[2] The record suggests that BRM provides some limited additional non-emergency shelter programming which, like the Discipleship Program, has overtly religious components.

[3] The intake form states in relevant part that "We are a Gospel Rescue Mission. Gospel means 'Good News,' and the Good News is that Jesus saves us from sin past, present, and future. We would like to share the Good News with you. Have you heard of Jesus? . . . Would you like to know more about him?"

nights; women and children in the Emergency Services
Program may stay at City Light for up to 30 consecutive
nights. After the time limit is reached, homeless individuals
who do not join the Discipleship Program may not return to
a BRM shelter for at least 30 days.[4] Participants in the
Emergency Services Program must return to the shelter every
night during the applicable 17-day or 30-day period; if a
resident fails to check in to a BRM shelter each night, that
resident is prohibited from staying overnight at that shelter
for 30 days. BRM's rules on the length of a person's stay in
the Emergency Services Program are suspended during the
winter.

The Discipleship Program is an "intensive, Christ-based
residential recovery program" of which "[r]eligious study is
the very essence." The record does not indicate any limit to
how long a member of the Discipleship Program may stay at
a BRM shelter.

The River of Life shelter contains 148 beds for
emergency use, along with 40 floor mats for overflow;
78 additional beds serve those in non-emergency shelter
programs such as the Discipleship Program. The City Light
shelter has 110 beds for emergency services, as well as
40 floor mats to handle overflow and 38 beds for women in
non-emergency shelter programs. All told, Boise's three
homeless shelters contain 354 beds and 92 overflow mats for
homeless individuals.

---

[4] The parties dispute the extent to which BRM actually enforces the
17- and 30-day limits.

## A.  The Plaintiffs

Plaintiffs Robert Martin, Robert Anderson, Lawrence Lee Smith, Basil E. Humphrey, Pamela S. Hawkes, and Janet F. Bell are all homeless individuals who have lived in or around Boise since at least 2007.  Between 2007 and 2009, each plaintiff was convicted at least once of violating the Camping Ordinance, the Disorderly Conduct Ordinance, or both.  With one exception, all plaintiffs were sentenced to time served for all convictions; on two occasions, Hawkes was sentenced to one additional day in jail.  During the same period, Hawkes was cited, but not convicted, under the Camping Ordinance, and Martin was cited, but not convicted, under the Disorderly Conduct Ordinance.

Plaintiff Robert Anderson currently lives in Boise; he is homeless and has often relied on Boise's shelters for housing. In the summer of 2007, Anderson stayed at River of Life as part of the Emergency Services Program until he reached the shelter's 17-day limit for male guests.  Anderson testified that during his 2007 stay at River of Life, he was required to attend chapel services before he was permitted to eat dinner. At the conclusion of his 17-day stay, Anderson declined to enter the Discipleship Program because of his religious beliefs.  As Anderson was barred by the shelter's policies from returning to River of Life for 30 days, he slept outside for the next several weeks.  On September 1, 2007, Anderson was cited under the Camping Ordinance.  He pled guilty to violating the Camping Ordinance and paid a $25 fine; he did not appeal his conviction.

Plaintiff Robert Martin is a former resident of Boise who currently lives in Post Falls, Idaho.  Martin returns frequently to Boise to visit his minor son.  In March of 2009, Martin was

cited under the Camping Ordinance for sleeping outside; he was cited again in 2012 under the same ordinance.

## B. Procedural History

The plaintiffs filed this action in the United States District Court for the District of Idaho in October of 2009. All plaintiffs alleged that their previous citations under the Camping Ordinance and the Disorderly Conduct Ordinance violated the Cruel and Unusual Punishments Clause of the Eighth Amendment, and sought damages for those alleged violations under 42 U.S.C. § 1983. *Cf. Jones*, 444 F.3d at 1138. Anderson and Martin also sought prospective declaratory and injunctive relief precluding future enforcement of the ordinances under the same statute and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

After this litigation began, the Boise Police Department promulgated a new "Special Order," effective as of January 1, 2010, that prohibited enforcement of either the Camping Ordinance or the Disorderly Conduct Ordinance against any homeless person on public property on any night when no shelter had "an available overnight space." City police implemented the Special Order through a two-step procedure known as the "Shelter Protocol."

Under the Shelter Protocol, if any shelter in Boise reaches capacity on a given night, that shelter will so notify the police at roughly 11:00 pm. Each shelter has discretion to determine whether it is full, and Boise police have no other mechanism or criteria for gauging whether a shelter is full. Since the Shelter Protocol was adopted, Sanctuary has reported that it was full on almost 40% of nights. Although BRM agreed to the Shelter Protocol, its internal policy is never to turn any

person away because of a lack of space, and neither BRM shelter has ever reported that it was full.

If all shelters are full on the same night, police are to refrain from enforcing either ordinance. Presumably because the BRM shelters have not reported full, Boise police continue to issue citations regularly under both ordinances.

In July 2011, the district court granted summary judgment to the City. It held that the plaintiffs' claims for retrospective relief were barred under the *Rooker-Feldman* doctrine and that their claims for prospective relief were mooted by the Special Order and the Shelter Protocol. *Bell v. City of Boise*, 834 F. Supp. 2d 1103 (D. Idaho 2011). On appeal, we reversed and remanded. *Bell v. City of Boise*, 709 F.3d 890, 901 (9th Cir. 2013). We held that the district court erred in dismissing the plaintiffs' claims under the *Rooker-Feldman* doctrine. *Id*. at 897. In so holding, we expressly declined to consider whether the favorable-termination requirement from *Heck v. Humphrey*, 512 U.S. 477 (1994), applied to the plaintiffs' claims for retrospective relief. Instead, we left the issue for the district court on remand. *Bell*, 709 F.3d at 897 n.11.

*Bell* further held that the plaintiffs' claims for prospective relief were not moot. The City had not met its "heavy burden" of demonstrating that the challenged conduct — enforcement of the two ordinances against homeless individuals with no access to shelter — "could not reasonably be expected to recur." *Id*. at 898, 901 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)). We emphasized that the Special Order was a statement of administrative policy and so could be amended

or reversed at any time by the Boise Chief of Police. *Id*. at 899–900.

Finally, *Bell* rejected the City's argument that the plaintiffs lacked standing to seek prospective relief because they were no longer homeless. *Id*. at 901 & n.12. We noted that, on summary judgment, the plaintiffs "need not establish that they in fact have standing, but only that there is a genuine issue of material fact as to the standing elements." *Id*. (citation omitted).

On remand, the district court again granted summary judgment to the City on the plaintiffs' § 1983 claims. The court observed that *Heck* requires a § 1983 plaintiff seeking damages for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid" to demonstrate that "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal . . . or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 486–87. According to the district court, "a judgment finding the Ordinances unconstitutional . . . necessarily would imply the invalidity of Plaintiffs' [previous] convictions under those ordinances," and the plaintiffs therefore were required to demonstrate that their convictions or sentences had already been invalidated. As none of the plaintiffs had raised an Eighth Amendment challenge as a defense to criminal prosecution, nor had any plaintiff successfully appealed their conviction, the district court held that all of the plaintiffs' claims for retrospective relief were barred by *Heck*. The district court also rejected as barred by *Heck* the plaintiffs' claim for prospective injunctive relief under § 1983, reasoning that "a ruling in favor of Plaintiffs on even a

prospective § 1983 claim would demonstrate the invalidity of
any confinement stemming from those convictions."

Finally, the district court determined that, although *Heck*
did not bar relief under the Declaratory Judgment Act, Martin
and Anderson now lack standing to pursue such relief. The
linchpin of this holding was that the Camping Ordinance and
the Disorderly Conduct Ordinance were both amended in
2014 to codify the Special Order's mandate that "[l]aw
enforcement officers shall not enforce [the ordinances] when
the individual is on public property and there is no available
overnight shelter." Boise City Code §§ 6-01-05, 9-10-02.
Because the ordinances, as amended, permitted camping or
sleeping in a public place when no shelter space was
available, the court held that there was no "credible threat" of
future prosecution. "If the Ordinances are not to be enforced
when the shelters are full, those Ordinances do not inflict a
constitutional injury upon these particular plaintiffs . . . ."
The court emphasized that the record "suggests there is no
known citation of a homeless individual under the Ordinances
for camping or sleeping on public property on any night or
morning when he or she was unable to secure shelter due to
a lack of shelter capacity" and that "there has not been a
single night when all three shelters in Boise called in to report
they were simultaneously full for men, women or families."

This appeal followed.

## II. Discussion

### A. Standing

We first consider whether any of the plaintiffs has standing to pursue prospective relief.[5] We conclude that there are sufficient opposing facts in the record to create a genuine issue of material fact as to whether Martin and Anderson face a credible threat of prosecution under one or both ordinances in the future at a time when they are unable to stay at any Boise homeless shelter.[6]

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (citation omitted). "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes — that the injury is *certainly* impending." *Id.* (citation omitted). A plaintiff need not, however, await an arrest or prosecution to have standing to challenge the constitutionality of a criminal statute. "When the plaintiff has alleged an

---

[5] Standing to pursue retrospective relief is not in doubt. The only threshold question affecting the availability of a claim for retrospective relief — a question we address in the next section — is whether such relief is barred by the doctrine established in *Heck*.

[6] Although the SAC is somewhat ambiguous regarding which of the plaintiffs seeks prospective relief, counsel for the plaintiffs made clear at oral argument that only two of the plaintiffs, Martin and Anderson, seek such relief, and the district court considered the standing question with respect to Martin and Anderson only.

intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (citation and internal quotation marks omitted). To defeat a motion for summary judgment premised on an alleged lack of standing, plaintiffs " need not establish that they in fact have standing, but only that there is a genuine question of material fact as to the standing elements." *Cent. Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002).

In dismissing Martin and Anderson's claims for declaratory relief for lack of standing, the district court emphasized that Boise's ordinances, as amended in 2014, preclude the City from issuing a citation when there is no available space at a shelter, and there is consequently no risk that either Martin or Anderson will be cited under such circumstances in the future. Viewing the record in the light most favorable to the plaintiffs, we cannot agree.

Although the 2014 amendments preclude the City from enforcing the ordinances when there is no room available at any shelter, the record demonstrates that the City is wholly reliant on the shelters to self-report when they are full. It is undisputed that Sanctuary is full as to men on a substantial percentage of nights, perhaps as high as 50%. The City nevertheless emphasizes that since the adoption of the Shelter Protocol in 2010, the BRM facilities, River of Life and City Light, have never reported that they are full, and BRM states that it will never turn people away due to lack space.

The plaintiffs have pointed to substantial evidence in the record, however, indicating that whether or not the BRM facilities are ever full or turn homeless individuals away *for lack of space*, they *do* refuse to shelter homeless people who exhaust the number of days allotted by the facilities. Specifically, the plaintiffs allege, and the City does not dispute, that it is BRM's policy to limit men to 17 consecutive days in the Emergency Services Program, after which they cannot return to River of Life for 30 days; City Light has a similar 30-day limit for women and children. Anderson testified that BRM has enforced this policy against him in the past, forcing him to sleep outdoors.

The plaintiffs have adduced further evidence indicating that River of Life permits individuals to remain at the shelter after 17 days in the Emergency Services Program only on the condition that they become part of the New Life Discipleship program, which has a mandatory religious focus. For example, there is evidence that participants in the New Life Program are not allowed to spend days at Corpus Christi, a local Catholic program, "because it's . . . a different sect." There are also facts in dispute concerning whether the Emergency Services Program itself has a religious component. Although the City argues strenuously that the Emergency Services Program is secular, Anderson testified to the contrary; he stated that he was once required to attend chapel before being permitted to eat dinner at the River of Life shelter. Both Martin and Anderson have objected to the overall religious atmosphere of the River of Life shelter, including the Christian messaging on the shelter's intake form and the Christian iconography on the shelter walls. A city cannot, via the threat of prosecution, coerce an individual to attend religion-based treatment programs consistently with the Establishment Clause of the First Amendment. *Inouye v.*

*Kemna*, 504 F.3d 705, 712–13 (9th Cir. 2007). Yet at the conclusion of a 17-day stay at River of Life, or a 30-day stay at City Light, an individual may be forced to choose between sleeping outside on nights when Sanctuary is full (and risking arrest under the ordinances), or enrolling in BRM programming that is antithetical to his or her religious beliefs.

The 17-day and 30-day limits are not the only BRM policies which functionally limit access to BRM facilities even when space is nominally available. River of Life also turns individuals away if they voluntarily leave the shelter before the 17-day limit and then attempt to return within 30 days. An individual who voluntarily leaves a BRM facility for any reason — perhaps because temporary shelter is available at Sanctuary, or with friends or family, or in a hotel — cannot immediately return to the shelter if circumstances change. Moreover, BRM's facilities may deny shelter to any individual who arrives after 5:30 pm, and generally will deny shelter to anyone arriving after 8:00 pm. Sanctuary, however, does not assign beds to persons on its waiting list until 9:00 pm. Thus, by the time a homeless individual on the Sanctuary waiting list discovers that the shelter has no room available, it may be too late to seek shelter at either BRM facility.

So, even if we credit the City's evidence that BRM's facilities have never been "full," and that the City has never cited any person under the ordinances who could not obtain shelter "due to a lack of shelter capacity," there remains a genuine issue of material fact as to whether homeless individuals in Boise run a credible risk of being issued a citation on a night when Sanctuary is full and they have been denied entry to a BRM facility for reasons other than shelter capacity. If so, then as a practical matter, no shelter is

available. We note that despite the Shelter Protocol and the amendments to both ordinances, the City continues regularly to issue citations for violating both ordinances; during the first three months of 2015, the Boise Police Department issued over 175 such citations.

The City argues that Martin faces little risk of prosecution under either ordinance because he has not lived in Boise since 2013. Martin states, however, that he is still homeless and still visits Boise several times a year to visit his minor son, and that he has continued to seek shelter at Sanctuary and River of Life. Although Martin may no longer spend enough time in Boise to risk running afoul of BRM's 17-day limit, he testified that he has unsuccessfully sought shelter at River of Life after being placed on Sanctuary's waiting list, only to discover later in the evening that Sanctuary had no available beds. Should Martin return to Boise to visit his son, there is a reasonable possibility that he might again seek shelter at Sanctuary, only to discover (after BRM has closed for the night) that Sanctuary has no space for him. Anderson, for his part, continues to live in Boise and states that he remains homeless.

We conclude that both Martin and Anderson have demonstrated a genuine issue of material fact regarding whether they face a credible risk of prosecution under the ordinances in the future on a night when they have been denied access to Boise's homeless shelters; both plaintiffs therefore have standing to seek prospective relief.

**B.** *Heck v. Humphrey*

We turn next to the impact of *Heck v. Humphrey* and its progeny on this case. With regard to retrospective relief, the

plaintiffs maintain that *Heck* should not bar their claims because, with one exception, all of the plaintiffs were sentenced to time served.[7]  It would therefore have been impossible for the plaintiffs to obtain federal habeas relief, as any petition for a writ of habeas corpus must be filed while the petitioner is "in custody pursuant to the judgment of a State court."  *See* 28 U.S.C. § 2254(a); *Spencer v. Kemna*, 523 U.S. 1, 7, 17–18 (1998).  With regard to prospective relief, the plaintiffs emphasize that they seek only equitable protection against *future* enforcement of an allegedly unconstitutional statute, and not to invalidate any prior conviction under the same statute.  We hold that although the *Heck* line of cases precludes most — but not all — of the plaintiffs' requests for retrospective relief, that doctrine has no application to the plaintiffs' request for an injunction enjoining prospective enforcement of the ordinances.

### 1.  The *Heck* Doctrine

A long line of Supreme Court case law, beginning with *Preiser v. Rodriguez*, 411 U.S. 475 (1973), holds that a prisoner in state custody cannot use a § 1983 action to challenge the fact or duration of his or her confinement, but must instead seek federal habeas corpus relief or analogous state relief.  *Id.* at 477, 500.  *Preiser* considered whether a prison inmate could bring a § 1983 action seeking an injunction to remedy an unconstitutional deprivation of good-time conduct credits.  Observing that habeas corpus is the traditional instrument to obtain release from unlawful

---

[7] Plaintiff Pamela Hawkes was convicted of violating the Camping Ordinance or Disorderly Conduct Ordinance on twelve occasions; although she was usually sentenced to time served, she was twice sentenced to one additional day in jail.

confinement, *Preiser* recognized an implicit exception from § 1983's broad scope for actions that lie "within the core of habeas corpus" — specifically, challenges to the "fact or duration" of confinement. *Id.* at 487, 500. The Supreme Court subsequently held, however, that although *Preiser* barred inmates from obtaining an injunction to restore good-time credits via a § 1983 action, *Preiser* did not "preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the *prospective* enforcement of invalid prison regulations." *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974) (emphasis added).

*Heck* addressed a § 1983 action brought by an inmate seeking compensatory and punitive damages. The inmate alleged that state and county officials had engaged in unlawful investigations and knowing destruction of exculpatory evidence. *Heck*, 512 U.S. at 479. The Court in *Heck* analogized a § 1983 action of this type, which called into question the validity of an underlying conviction, to a cause of action for malicious prosecution, *id.* at 483–84, and went on to hold that, as with a malicious prosecution claim, a plaintiff in such an action must demonstrate a favorable termination of the criminal proceedings before seeking tort relief, *id.* at 486–87. "[T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.*

*Edwards v. Balisok*, 520 U.S. 641 (1997) extended *Heck*'s holding to claims for declaratory relief. *Id.* at 648. The plaintiff in *Edwards* alleged that he had been deprived of earned good-time credits without due process of law, because the decisionmaker in disciplinary proceedings had concealed exculpatory evidence. Because the plaintiff's claim for declaratory relief was "based on allegations of deceit and bias on the part of the decisionmaker that necessarily imply the invalidity of the punishment imposed," *Edwards* held, it was "not cognizable under § 1983." *Id. Edwards* went on to hold, however, that a requested injunction requiring prison officials to date-stamp witness statements was not *Heck*-barred, reasoning that a "prayer for such *prospective* relief will not 'necessarily imply' the invalidity of a previous loss of good-time credits, and so may properly be brought under § 1983." *Id.* (emphasis added).

Most recently, *Wilkinson v. Dotson*, 544 U.S. 74 (2005), stated that *Heck* bars § 1983 suits even when the relief sought is prospective injunctive or declaratory relief, "if success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Id.* at 81–82 (emphasis omitted). But *Wilkinson* held that the plaintiffs in that case *could* seek a prospective injunction compelling the state to comply with constitutional requirements in parole proceedings in the future. The Court observed that the prisoners' claims for future relief, "if successful, will not necessarily imply the invalidity of confinement or shorten its duration." *Id.* at 82.

The Supreme Court did not, in these cases or any other, conclusively determine whether *Heck*'s favorable-termination requirement applies to convicts who have no practical opportunity to challenge their conviction or sentence via a

petition for habeas corpus. *See Muhammad v. Close*, 540 U.S. 749, 752 & n.2 (2004). But in *Spencer*, five Justices suggested that *Heck* may not apply in such circumstances. *Spencer*, 523 U.S. at 3.

The petitioner in *Spencer* had filed a federal habeas petition seeking to invalidate an order revoking his parole. While the habeas petition was pending, the petitioner's term of imprisonment expired, and his habeas petition was consequently dismissed as moot. Justice Souter wrote a concurring opinion in which three other Justices joined, addressing the petitioner's argument that if his habeas petition were mooted by his release, any § 1983 action would be barred under *Heck*, yet he would no longer have access to a federal habeas forum to challenge the validity of his parole revocation. *Id*. at 18–19 (Souter, J., concurring). Justice Souter stated that in his view "*Heck* has no such effect," and that "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy." *Id*. at 21. Justice Stevens, dissenting, stated that he would have held the habeas petition in *Spencer* not moot, but agreed that "[g]iven the Court's holding that petitioner does not have a remedy under the habeas statute, it is perfectly clear . . . that he may bring an action under 42 U.S.C. § 1983." *Id*. at 25 n.8 (Stevens, J., dissenting).

Relying on the concurring and dissenting opinions in *Spencer*, we have held that the "unavailability of a remedy in habeas corpus because of mootness" permitted a plaintiff released from custody to maintain a § 1983 action for damages, "even though success in that action would imply the

invalidity of the disciplinary proceeding that caused revocation of his good-time credits." *Nonnette v. Small*, 316 F.3d 872, 876 (9th Cir. 2002). But we have limited *Nonnette* in recent years. Most notably, we held in *Lyall v. City of Los Angeles*, 807 F.3d 1178 (9th Cir. 2015), that even where a plaintiff had no practical opportunity to pursue federal habeas relief while detained because of the short duration of his confinement, *Heck* bars a § 1983 action that would imply the invalidity of a prior conviction if the plaintiff could have sought invalidation of the underlying conviction via direct appeal or state post-conviction relief, but did not do so. *Id*. at 1192 & n.12.

## 2. Retrospective Relief

Here, the majority of the plaintiffs' claims for *retrospective* relief are governed squarely by *Lyall.* It is undisputed that all the plaintiffs not only failed to challenge their convictions on direct appeal but expressly waived the right to do so as a condition of their guilty pleas. The plaintiffs have made no showing that any of their convictions were invalidated via state post-conviction relief. We therefore hold that all but two of the plaintiffs' claims for damages are foreclosed under *Lyall.*

Two of the plaintiffs, however, Robert Martin and Pamela Hawkes, also received citations under the ordinances that were dismissed before the state obtained a conviction. Hawkes was cited for violating the Camping Ordinance on July 8, 2007; that violation was dismissed on August 28, 2007. Martin was cited for violating the Disorderly Conduct Ordinance on April 24, 2009; those charges were dismissed on September 9, 2009. The complaint alleges two injuries stemming from these dismissed citations: (1) the continued

inclusion of the citations on plaintiffs' criminal records; and (2) the accumulation of a host of criminal fines and incarceration costs. Plaintiffs seek orders compelling the City to "expunge[] . . . the records of any homeless individuals unlawfully cited or arrested and charged under [the Ordinances]" and "reimburse[] . . . any criminal fines paid . . . [or] costs of incarceration billed."

With respect to these two incidents, the district court erred in finding that the plaintiffs' Eighth Amendment challenge was barred by *Heck*. Where there is no "conviction or sentence" that may be undermined by a grant of relief to the plaintiffs, the *Heck* doctrine has no application. 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007).

Relying on *Ingraham v. Wright*, 430 U.S. 651, 664 (1977), the City argues that the Eighth Amendment, and the Cruel and Unusual Punishments Clause in particular, have no application where there has been no conviction. The City's reliance on *Ingraham* is misplaced. As the Supreme Court observed in *Ingraham*, the Cruel and Unusual Punishments Clause not only limits the types of punishment that may be imposed and prohibits the imposition of punishment grossly disproportionate to the severity of the crime, but also "imposes substantive limits on what can be made criminal and punished as such." *Id*. at 667. "This [latter] protection governs the criminal law process as a whole, not only the imposition of punishment postconviction." *Jones*, 444 F.3d at 1128.

*Ingraham* concerned only whether "impositions outside the criminal process" — in that case, the paddling of schoolchildren — "constituted cruel and unusual

punishment." 430 U.S. at 667. *Ingraham* did not hold that a plaintiff challenging the state's power to criminalize a particular status or conduct in the first instance, as the plaintiffs in this case do, must first be convicted. If conviction were a prerequisite for such a challenge, "the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing things that under the [Cruel and Unusual Punishments Clause] cannot be subject to the criminal process." *Jones*, 444 F.3d at 1129. For those rare Eighth Amendment challenges concerning the state's very power to criminalize particular behavior or status, then, a plaintiff need demonstrate only the initiation of the criminal process against him, not a conviction.

### 3. Prospective Relief

The district court also erred in concluding that the plaintiffs' requests for prospective injunctive relief were barred by *Heck*. The district court relied entirely on language in *Wilkinson* stating that "a state prisoner's § 1983 action is barred (absent prior invalidation) . . . no matter the relief sought (damages or equitable relief) . . . *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration." *Wilkinson*, 544 U.S. at 81–82. The district court concluded from this language in *Wilkinson* that a person convicted under an allegedly unconstitutional statute may never challenge the validity or application of that statute after the initial criminal proceeding is complete, even when the relief sought is prospective only and independent of the prior conviction. The logical extension of the district court's interpretation is that an individual who does not successfully invalidate a first conviction under an unconstitutional statute will have no opportunity to challenge

that statute prospectively so as to avoid arrest and conviction for violating that same statute in the future.

Neither *Wilkinson* nor any other case in the *Heck* line supports such a result. Rather, *Wolff*, *Edwards*, and *Wilkinson* compel the opposite conclusion.

*Wolff* held that although *Preiser* barred a § 1983 action seeking restoration of good-time credits absent a successful challenge in federal habeas proceedings, *Preiser* did not "preclude a litigant with standing from obtaining by way of ancillary relief an otherwise proper injunction enjoining the prospective enforcement of invalid . . . regulations." *Wolff*, 418 U.S. at 555. Although *Wolff* was decided before *Heck*, the Court subsequently made clear that *Heck* effected no change in the law in this regard, observing in *Edwards* that "[o]rdinarily, a prayer for . . . prospective [injunctive] relief will not 'necessarily imply' the invalidity of a *previous* loss of good-time credits, and so may properly be brought under § 1983." *Edwards*, 520 U.S. at 648 (emphasis added). Importantly, the Court held in *Edwards* that although the plaintiff could not, consistently with *Heck*, seek a declaratory judgment stating that the procedures employed by state officials that deprived him of good-time credits were unconstitutional, he *could* seek an injunction barring such allegedly unconstitutional procedures in the future. *Id*. Finally, the Court noted in *Wilkinson* that the *Heck* line of cases "has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies *when they seek to invalidate the duration of their confinement*," *Wilkinson*, 544 U.S. at 81 (emphasis added), alluding to an existing confinement, not one yet to come.

The *Heck* doctrine, in other words, serves to ensure the finality and validity of previous convictions, not to insulate future prosecutions from challenge. In context, it is clear that *Wilkinson*'s holding that the *Heck* doctrine bars a § 1983 action "no matter the relief sought (damages or equitable relief) . . . if success in that action would necessarily demonstrate the invalidity of confinement or its duration" applies to equitable relief concerning an existing confinement, not to suits seeking to preclude an unconstitutional confinement in the future, arising from incidents occurring after any prior conviction and stemming from a possible later prosecution and conviction. *Id*. at 81–82 (emphasis added). As *Wilkinson* held, "claims for *future* relief (which, if successful, will not necessarily imply the invalidity of confinement or shorten its duration)" are distant from the "core" of habeas corpus with which the *Heck* line of cases is concerned, and are not precluded by the *Heck* doctrine. *Id*. at 82.

In sum, we hold that the majority of the plaintiffs' claims for retrospective relief are barred by *Heck*, but both Martin and Hawkes stated claims for damages to which *Heck* has no application. We further hold that *Heck* has no application to the plaintiffs' requests for prospective injunctive relief.

## C. The Eighth Amendment

At last, we turn to the merits — does the Cruel and Unusual Punishments Clause of the Eighth Amendment preclude the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter? We hold that it does, for essentially the same reasons articulated in the now-vacated *Jones* opinion.

The Eighth Amendment states: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. The Cruel and Unusual Punishments Clause "circumscribes the criminal process in three ways." *Ingraham*, 430 U.S. at 667. First, it limits the type of punishment the government may impose; second, it proscribes punishment "grossly disproportionate" to the severity of the crime; and third, it places substantive limits on what the government may criminalize. *Id.* It is the third limitation that is pertinent here.

"Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Robinson v. California*, 370 U.S. 660, 667 (1962). Cases construing substantive limits as to what the government may criminalize are rare, however, and for good reason — the Cruel and Unusual Punishments Clause's third limitation is "one to be applied sparingly." *Ingraham*, 430 U.S. at 667.

*Robinson*, the seminal case in this branch of Eighth Amendment jurisprudence, held a California statute that "ma[de] the 'status' of narcotic addiction a criminal offense" invalid under the Cruel and Unusual Punishments Clause. 370 U.S. at 666. The California law at issue in *Robinson* was "not one which punishe[d] a person for the use of narcotics, for their purchase, sale or possession, or for antisocial or disorderly behavior resulting from their administration"; it punished addiction itself. *Id.* Recognizing narcotics addiction as an illness or disease — "apparently an illness which may be contracted innocently or involuntarily" — and observing that a "law which made a criminal offense of . . . a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment," *Robinson* held

the challenged statute a violation of the Eighth Amendment. *Id*. at 666–67.

As *Jones* observed, *Robinson* did not explain at length the principles underpinning its holding. *See Jones*, 444 F.3d at 1133. In *Powell v. Texas*, 392 U.S. 514 (1968), however, the Court elaborated on the principle first articulated in *Robinson*.

*Powell* concerned the constitutionality of a Texas law making public drunkenness a criminal offense. Justice Marshall, writing for a plurality of the Court, distinguished the Texas statute from the law at issue in *Robinson* on the ground that the Texas statute made criminal not alcoholism but *conduct* — appearing in public while intoxicated. "[A]ppellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in *Robinson*; nor has it attempted to regulate appellant's behavior in the privacy of his own home." *Id*. at 532 (plurality opinion).

The *Powell* plurality opinion went on to interpret *Robinson* as precluding only the criminalization of "status," not of "involuntary" conduct. "The entire thrust of *Robinson*'s interpretation of the Cruel and Unusual Punishment Clause is that criminal penalties may be inflicted only if the accused has committed some act, has engaged in some behavior, which society has an interest in preventing, or perhaps in historical common law terms, has committed some actus reus. It thus does not deal with the question of whether certain conduct cannot constitutionally be punished because it is, in some sense, 'involuntary' . . . ." *Id*. at 533.

Four Justices dissented from the Court's holding in *Powell*; Justice White concurred in the result alone. Notably, Justice White noted that many chronic alcoholics are also homeless, and that for those individuals, public drunkenness may be unavoidable as a practical matter. "For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking. . . . For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment — the act of getting drunk." *Id*. at 551 (White, J., concurring in the judgment).

The four dissenting Justices adopted a position consistent with that taken by Justice White: that under *Robinson*, "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change," and that the defendant, "once intoxicated, . . . could not prevent himself from appearing in public places." *Id*. at 567 (Fortas, J., dissenting). Thus, five Justices gleaned from *Robinson* the principle that "that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Jones*, 444 F.3d at 1135; *see also United States v. Roberston*, 875 F.3d 1281, 1291 (9th Cir. 2017).

This principle compels the conclusion that the Eighth Amendment prohibits the imposition of criminal penalties for sitting, sleeping, or lying outside on public property for homeless individuals who cannot obtain shelter. As *Jones*

reasoned, "[w]hether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human." *Jones*, 444 F.3d at 1136. Moreover, any "conduct at issue here is involuntary and inseparable from status — they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping." *Id.* As a result, just as the state may not criminalize the state of being "homeless in public places," the state may not "criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets." *Id.* at 1137.

Our holding is a narrow one. Like the *Jones* panel, "we in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets . . . at any time and at any place." *Id.* at 1138. We hold only that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." *Id.* That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter.[8]

---

[8] Naturally, our holding does not cover individuals who *do* have access to adequate temporary shelter, whether because they have the means to pay for it or because it is realistically available to them for free, but who choose not to use it. Nor do we suggest that a jurisdiction with insufficient shelter can *never* criminalize the act of sleeping outside. Even where shelter is unavailable, an ordinance prohibiting sitting, lying, or sleeping outside at particular times or in particular locations might well be constitutionally permissible. *See Jones*, 444 F.3d at 1123. So, too, might an ordinance barring the obstruction of public rights of way or the erection

We are not alone in reaching this conclusion. As one court has observed, "resisting the need to eat, sleep or engage in other life-sustaining activities is impossible. Avoiding public places when engaging in this otherwise innocent conduct is also impossible. . . . As long as the homeless plaintiffs do not have a single place where they can lawfully be, the challenged ordinances, as applied to them, effectively punish them for something for which they may not be convicted under the [E]ighth [A]mendment — sleeping, eating and other innocent conduct." *Pottinger v. City of Miami*, 810 F. Supp. 1551, 1565 (S.D. Fla. 1992); *see also Johnson v. City of Dallas*, 860 F. Supp. 344, 350 (N.D. Tex. 1994) (holding that a "sleeping in public ordinance as applied against the homeless is unconstitutional"), *rev'd on other grounds*, 61 F.3d 442 (5th Cir. 1995).[9]

Here, the two ordinances criminalize the simple act of sleeping outside on public property, whether bare or with a

---

of certain structures. Whether some other ordinance is consistent with the Eighth Amendment will depend, as here, on whether it punishes a person for lacking the means to live out the "universal and unavoidable consequences of being human" in the way the ordinance prescribes. *Id.* at 1136.

[9] In *Joel v. City of Orlando*, 232 F.3d 1353, 1362 (11th Cir. 2000), the Eleventh Circuit upheld an anti-camping ordinance similar to Boise's against an Eighth Amendment challenge. In *Joel*, however, the defendants presented unrefuted evidence that the homeless shelters in the City of Orlando had never reached capacity and that the plaintiffs had always enjoyed access to shelter space. *Id.* Those unrefuted facts were critical to the court's holding. *Id.* As discussed below, the plaintiffs here have demonstrated a genuine issue of material fact concerning whether they have been denied access to shelter in the past or expect to be so denied in the future. *Joel* therefore does not provide persuasive guidance for this case.

blanket or other basic bedding.  The Disorderly Conduct
Ordinance, on its face, criminalizes "[o]ccupying, lodging, or
sleeping in *any* building, structure or place, whether public or
private" without permission.  Boise City Code § 6-01-05.  Its
scope is just as sweeping as the Los Angeles ordinance at
issue in *Jones*, which mandated that "[n]o person shall sit, lie
or sleep in or upon any street, sidewalk or other public way."
444 F.3d at 1123.

The Camping Ordinance criminalizes using "any of the
streets, sidewalks, parks or public places as a camping place
at any time."  Boise City Code § 9-10-02.  The ordinance
defines "camping" broadly:

> The term "camp" or "camping" shall mean the
> use of public property as a temporary or
> permanent place of dwelling, lodging, or
> residence, or as a living accommodation at
> anytime between sunset and sunrise, or as a
> sojourn. Indicia of camping may include, but
> are not limited to, storage of personal
> belongings, using tents or other temporary
> structures for sleeping or storage of personal
> belongings, carrying on cooking activities or
> making any fire in an unauthorized area, or
> any of these activities in combination with
> one another or in combination with either
> sleeping or making preparations to sleep
> (including the laying down of bedding for the
> purpose of sleeping).

*Id.* It appears from the record that the Camping Ordinance is
frequently enforced against homeless individuals with some
elementary bedding, whether or not any of the other listed

indicia of "camping" — the erection of temporary structures, the activity of cooking or making fire, or the storage of personal property — are present. For example, a Boise police officer testified that he cited plaintiff Pamela Hawkes under the Camping Ordinance for sleeping outside "wrapped in a blanket with her sandals off and next to her," for sleeping in a public restroom "with blankets," and for sleeping in a park "on a blanket, wrapped in blankets on the ground." The Camping Ordinance therefore can be, and allegedly is, enforced against homeless individuals who take even the most rudimentary precautions to protect themselves from the elements. We conclude that a municipality cannot criminalize such behavior consistently with the Eighth Amendment when no sleeping space is practically available in any shelter.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgment of the district court as to the plaintiffs' requests for retrospective relief, except as such claims relate to Hawkes's July 2007 citation under the Camping Ordinance and Martin's April 2009 citation under the Disorderly Conduct Ordinance. We **REVERSE** and **REMAND** with respect to the plaintiffs' requests for prospective relief, both declaratory and injunctive, and to the plaintiffs' claims for retrospective relief insofar as they relate to Hawkes' July 2007 citation or Martin's April 2009 citation.[10]

---

[10] Costs shall be awarded to the plaintiffs.

OWENS, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), bars the plaintiffs' 42 U.S.C. § 1983 claims for damages that are based on convictions that have not been challenged on direct appeal or invalidated in state post-conviction relief. *See Lyall v. City of Los Angeles*, 807 F.3d 1178, 1192 n.12 (9th Cir. 2015).

I also agree that *Heck* and its progeny have no application where there is no "conviction or sentence" that would be undermined by granting a plaintiff's request for relief under § 1983. *Heck*, 512 U.S. at 486–87; *see also Wallace v. Kato*, 549 U.S. 384, 393 (2007). I therefore concur in the majority's conclusion that *Heck* does not bar plaintiffs Robert Martin and Pamela Hawkes from seeking retrospective relief for the two instances in which they received citations, but not convictions. I also concur in the majority's Eighth Amendment analysis as to those two claims for retrospective relief.

Where I part ways with the majority is in my understanding of *Heck*'s application to the plaintiffs' claims for declaratory and injunctive relief. In *Wilkinson v. Dotson*, 544 U.S. 74 (2005), the Supreme Court explained where the *Heck* doctrine stands today:

> [A] state prisoner's § 1983 action is barred (absent prior invalidation)—no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)—*if* success in that action

would necessarily demonstrate the invalidity
of confinement or its duration.

*Id.* at 81–82. Here, the majority acknowledges this language in *Wilkinson*, but concludes that *Heck*'s bar on any type of relief that "would necessarily demonstrate the invalidity of confinement" does not preclude the prospective claims at issue. The majority reasons that the purpose of *Heck* is "to ensure the finality and validity of previous convictions, not to insulate future prosecutions from challenge," and so concludes that the plaintiffs' prospective claims may proceed. I respectfully disagree.

A declaration that the city ordinances are unconstitutional and an injunction against their future enforcement necessarily demonstrate the invalidity of the plaintiffs' prior convictions. Indeed, any time an individual challenges the constitutionality of a substantive criminal statute under which he has been convicted, he asks for a judgment that would necessarily demonstrate the invalidity of his conviction. And though neither the Supreme Court nor this court has squarely addressed *Heck*'s application to § 1983 claims challenging the constitutionality of a substantive criminal statute, I believe *Edwards v. Balisok*, 520 U.S. 641 (1997), makes clear that *Heck* prohibits such challenges. In *Edwards*, the Supreme Court explained that although our court had recognized that *Heck* barred § 1983 claims challenging the validity of a prisoner's confinement "as a substantive matter," it improperly distinguished as not *Heck*-barred *all* claims alleging only procedural violations. 520 U.S. at 645. In holding that *Heck* also barred those procedural claims that would necessarily imply the invalidity of a conviction, the Court did not question our conclusion that claims challenging a conviction "as a substantive matter" are barred by *Heck*.

*Id.*; *see also Wilkinson*, 544 U.S. at 82 (holding that the plaintiffs' claims could proceed because the relief requested would only "render invalid the state *procedures*" and "a favorable judgment [would] not 'necessarily imply the invalidity of [their] conviction[s] or sentence[s]'" (emphasis added) (quoting *Heck*, 512 U.S. at 487)).

*Edwards* thus leads me to conclude that an individual who was convicted under a criminal statute, but who did not challenge the constitutionality of the statute at the time of his conviction through direct appeal or post-conviction relief, cannot do so in the first instance by seeking declaratory or injunctive relief under § 1983. *See Abusaid v. Hillsborough Cty. Bd. of Cty. Comm'rs*, 405 F.3d 1298, 1316 n.9 (11th Cir. 2005) (assuming that a §1983 claim challenging "the constitutionality of the ordinance under which [the petitioner was convicted]" would be *Heck*-barred). I therefore would hold that *Heck* bars the plaintiffs' claims for declaratory and injunctive relief.

We are not the first court to struggle applying *Heck* to "real life examples," nor will we be the last. *See, e.g.*, *Spencer v. Kemna*, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring) (alterations and internal quotation marks omitted) (explaining that her thoughts on *Heck* had changed since she joined the majority opinion in that case). If the slate were blank, I would agree that the majority's holding as to prospective relief makes good sense. But because I read *Heck* and its progeny differently, I dissent as to that section of the majority's opinion. I otherwise join the majority in full.