Allen M. Gardner, #456723 (DC)
Michael E. Bern, #994791 (DC)
Scott C. Jones, #986308 (DC)
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
Fax: (202) 637-2201
Email: Allen.Gardner@lw.com
Email: Michael.Bern@lw.com
Email: Scott.Jones@lw.com

*Attorneys for Plaintiffs*

Howard A. Belodoff, ISB # 2290
Idaho Legal Aid Services, Inc.
1447 South Tyrell Dr.
Boise, ID 83706
Phone: (208) 807-2323
Fax: (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Eric Tars # 94857 (PA)
National Law Center
  on Homelessness & Poverty
2000 M St., N.W., Suite 210
Washington, DC 20036
Phone: (202) 638-2535
Fax: (202) 628-2737
Email: etars@nlchp.org

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROBERT MARTIN, et al., | ) Case No.  1:09-cv-0540-REB |
| Plaintiffs, | ) **THIRD AMENDED COMPLAINT FOR** |
| v. | ) **DECLARATORY AND INJUNCTIVE** |
| | ) **RELIEF AND MONETARY DAMAGES** |
| CITY OF BOISE, et al., | ) **Eighth Amendment; 42 U.S.C. § 1983; 28** |
| Defendants. | ) **U.S.C. §§ 2201, 2202** |

COME NOW the Plaintiffs Robert Martin, Robert Anderson, and Pamela Hawkes, and for a cause of action against defendants the City of Boise and Michael Masterson, in his official capacity as Interim Chief of Police of the Boise Police Department (hereinafter "Defendants"), hereby state and allege as follows:

**PRELIMINARY STATEMENT**

1.     In Boise, Idaho, hundreds of people experience homelessness on any given night. There are only beds for approximately 450 people in area emergency shelters, a number that is far

**THIRD AMENDED COMPLAINT**

exceeded by the number of individuals experiencing homelessness.  Even when Boise's shelters run out of beds and place mats on every available floor space, they often still do not have enough room to meet the needs of those experiencing homelessness in Boise.

2.      Many of those emergency shelter beds, moreover, are not available for persons with certain disabilities or who run afoul of restrictive shelter policies (such as length of stay limitations).  Some shelters are also overtly religious.

3.      Those individuals who are not able to find shelter have no choice but to sleep in the public places of Boise in violation of laws that prohibit "camping" or sleeping in public places. Boise police officers routinely issue camping citations to persons experiencing homelessness for sleeping, sitting, or talking with friends in public places—activities homeless persons should have the freedom to engage in without fear of police interference.  Boise police officers also issue disorderly conduct citations to persons experiencing homelessness merely for sleeping in discrete public places.  These citations lead to convictions and jail time, which make it more difficult for Boise's homeless population to obtain and keep employment and long-term housing.  Thus, they continue to sleep in public places despite the constant fear of being issued a citation or arrested by police.

4.      This is an action brought by persons who are homeless and who are threatened with citation or arrest under two Boise Municipal Code ordinances: (1) § 7-3A-2(A),[1] which prohibits camping on streets, in parks, or in public places at any time; and (2) § 5-2-3(A),[2] which prohibits sleeping in public as "disorderly conduct" (together, the "Ordinances")  The Defendants have used the Ordinances to cite and arrest individuals who cannot avoid violating these laws because they

---

[1] Formerly § 9-10-02.

[2] Formerly § 6-01-05(A).

**THIRD AMENDED COMPLAINT**

are experiencing homelessness and there is no shelter available to them.  In effect, Defendants have "criminalized" homelessness and these laws violate the protections of the Eighth Amendment of the United States Constitution.

5.      Plaintiffs bring this action for declaratory and injunctive relief and monetary damages pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201, 2202.  Defendants, under color of state law, have on an ongoing basis violated Plaintiffs' rights under the Eighth Amendment to the United States Constitution.  Plaintiffs seek this relief to vindicate their rights under the Eighth Amendment, as applied to the States through the Fourteenth Amendment.

6.      The Eighth Amendment "preclude[s] the enforcement of a [law] prohibiting sleeping outside against homeless individuals with no access to alternative shelter." *Martin v. City of Boise*, 920 F.3d 584, 615 (9th Cir. 2019).  Owing to capacity limits, length of stay limitations, and other policies that limit shelter access for particular individuals, there is a credible risk that shelter may be unavailable to individuals experiencing homelessness in Boise, including Plaintiffs, on a given night.  As the Ordinances are enforced by Defendants, such individuals run a credible risk of being issued a citation despite the unavailability of shelter.

7.      There are substantially more individuals experiencing homelessness in Boise than there are available beds at homeless shelters.  It is therefore impossible for all the people experiencing homelessness in Boise's to obtain shelter on any given night.  Nevertheless, Defendants continue to enforce criminal laws against homeless individuals for sleeping outside. This conduct violates the Eighth Amendment to the United States Constitution, and there is no remaining legal basis to deny Plaintiffs the relief they seek.

**THIRD AMENDED COMPLAINT**

**JURISDICTION AND VENUE**

8.      This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3) and (4), and 1367.  Plaintiffs bring this action under 42 U.S.C. § 1983 to vindicate rights established by the Eighth Amendment of the United States Constitution.  Plaintiffs also seek relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

9.      Venue in this action is proper in the District of Idaho under 28 U.S.C. § 1391(b), as the Defendants are located in the District of Idaho and all the events and/or omissions giving rise to the claims complained of herein have occurred or will occur in the District.

**PLAINTIFFS**

10.     Plaintiff ROBERT ANDERSON is a Boise resident experiencing homelessness. Anderson suffers from various disabilities including bipolar disorder, schizophrenia, PTSD, depression, mixed personality disorder, and anxiety.  Like many other individuals experiencing homelessness, Anderson has cycled in and out of homelessness.  He has been homeless since February 2015.  Anderson has been sleeping in an emergency shelter bed and does not anticipate having other housing in the future.  Anderson received a camping citation on September 1, 2007. He had been staying at the Boise Rescue Mission shelter, but was forced to leave because of the shelter's policy of allowing men to stay for only 17 days at a time unless they enroll in the shelter's religious programming.  He and some other men slept in the foothills, in an area they believed was outside of the Boise city limits.  At approximately 8:00 a.m. the next morning, however, a Boise police officer found them and issued camping citations.  Anderson believes that the officer specifically sought out people experiencing homelessness to whom he could issue citations. Anderson was convicted and served one day incarceration and received a $25.00 fine, which he could not afford to pay.

**THIRD AMENDED COMPLAINT**

11.     Plaintiff ROBERT WILLIAM MARTIN is an individual experiencing homelessness who lives in Idaho and is a former resident of Boise.  Martin identifies as a pagan. Martin has been experiencing homelessness on and off since he was eighteen years old.  Martin suffers from a mental illness and a physical disability, which prevent him from maintaining employment.   He has been prescribed anti-psychotic, anti-depression, and anti-anxiety medications.  In the past, Martin has stayed at the Interfaith Sanctuary shelter with his then-wife and small child, but Interfaith Sanctuary asked Martin and his family to leave because they had too many belongings, mostly consisting of items for their then-toddler.  He tried to stay at the Boise Rescue Mission's River of Life shelter but at one point was told not to return because his insomnia made it difficult for him to wake up at the time the shelter required.  Martin received a camping citation on March 21, 2009.  He was sleeping in the bushes near the I-84 highway not far from the shelter where his then-wife and son were sleeping because he could not stay at any of the shelters in Boise that night.  He told the Boise police officer who cited him that he was unable to stay at a shelter, but the officer issued a citation anyway.  Martin pled guilty because he did not have the funds to hire an attorney and was afraid that challenging the citation would result in additional court costs and incarceration.  Since he received his camping citation, officers have threatened Martin with more camping citations and cited him under other statutes for sleeping in public places.  On April 24, 2009, Martin received a citation for disorderly conduct merely for sleeping outside the Corpus Christi day shelter.  Martin had been wandering around all night looking for a place to sleep because he could not stay at any of the shelters.  At four or five in the morning he decided to sit down by Corpus Christi day shelter and wait for it to open at 7:00 a.m. He dozed off while waiting and received a citation as a result.  That charge was subsequently dismissed on September 9, 2009.  On September 9, 2012, Martin received a camping citation for

5

**THIRD AMENDED COMPLAINT**

sleeping outside the Interfaith Sanctuary shelter.  Upon information and belief, Martin pled guilty because he did not have the funds to hire an attorney and was afraid that challenging the citation would result in additional court costs and incarceration.  Martin's son lives in Boise and, upon information and belief, Martin visits his son regularly for extended periods of time.  Because Martin is experiencing homelessness  and lacks stable housing, he will be forced to sleep outside on any evening when he is in Boise and Boise's shelters are full or otherwise unavailable to him.

12.     Plaintiff PAMELA S. HAWKES was a Boise resident experiencing homelessness. She received eleven different camping citations from Boise police officers in 2006 and 2007.  One citation, issued on July 8, 2007, was dismissed on August 28, 2007.  She also received a disorderly conduct citation on July 24, 2007.  These citations resulted in periods of two to four days of incarceration per citation as well as fines.  She often had no choice but to sleep in public places because she could not find space in Boise shelters.  She left Boise because she feared that Boise police officers would continue to cite and arrest her pursuant to former § 9-10-02, and she did not have the ability to pay more criminal fines.

**DEFENDANTS**

13.     Defendant CITY OF BOISE (hereinafter "City") is a municipal corporation, organized under the laws of the State of Idaho, with the capacity to sue and be sued.  The City is the legal and political governmental entity responsible for the actions of the Boise Police Department, its officials, agents, and employees.  The City is sued in its own right and on the basis of the acts or omissions of its officials, agents, and employees who were following the City's ordinances and policies.

14.     Defendant MICHAEL MASTERSON has been the City's Interim Chief of Police since approximately October 2019.  He was previously the Chief of Police from approximately

**THIRD AMENDED COMPLAINT**

2005 to 2015.  As Interim Chief of Police he is responsible for the administration and operation of the Department, and ultimately, for the enforcement of Boise Municipal Code §§ 7-3A-2(A) and 5-2-3(A).  Under his direction, Boise police officers have issued numerous citations to Plaintiffs for allegedly violating former Sections 9-10-02 and 6-01-05(A) and have threatened Plaintiffs with citations and/or arrest.  Chief Masterson is sued in his official capacity.

**FACTUAL ALLEGATIONS**

    **A.**    **Legal Background**

15.    Boise has two ordinances that criminally punish sleeping outside in public places even with respect to individuals who lack alternative shelter.  The language of both ordinances has changed repeatedly in the past decade.

16.    The first Boise ordinance that criminally punishes sleeping outside is Boise City Code § 5-2-3(A) (formerly § 6-01-05 (2009)) (the "Disorderly Conduct Ordinance").  In 2009, this ordinance banned "[o]ccupying, lodging, or sleeping in any building, structure, or public place, whether public or private . . . without the permission of the owner or person entitled to possession or in control thereof."  Boise City Code § 6-01-05 (2009).

17.    The second Boise ordinance that criminally punishes sleeping outside is Boise City Code § 7-3A-2(A) (formerly § 9-10-02 (2009)) (the "Camping Ordinance").  In 2009, this ordinance banned use of "any of the streets, sidewalks, parks, or public places as a camping place at any time."

18.    In 2009, in response to this litigation, the City amended the Camping Ordinance to define "camping" as "the use of public property as a temporary or permanent place of dwelling, lodging, or residence."  Boise City Code § 9-10-02 (2009).

19.    In 2009 the Department promulgated a "Special Order," effective as of January 1, 2010, that purported to prohibit enforcement of either the Camping Ordinance or the Disorderly

7

**THIRD AMENDED COMPLAINT**

Conduct Ordinance against any person experiencing homelessness on any night when no shelter had "available overnight space."

20.     In 2014 the City expressly codified the Special Order's mandate that "[l]aw enforcement officers shall not enforce [the ordinances] when the individual is on public property and there is no available overnight shelter."   Boise City Code § 5-2-3(B)(1) (formerly § 6-01-05(D) (2014)); *id.* § 7-3A-2(B) (formerly § 9-10-02 (2014)).   "[A]vailable overnight shelter" is defined as a "public or private shelter, with an available overnight space, open to an individual or family unit experiencing homelessness, at no charge."  Shelter *is* "considered available" even if an individual cannot utilize it, provided that the reason the individual cannot utilize it is the individual's "voluntary actions, such as intoxication, drug use, unruly behavior, or violation of shelter rules."

21.     City police implement this enforcement prohibition through a two-step procedure known as the "Shelter Protocol."  Under this protocol, if any shelter in the City reaches capacity on a given night, the shelter is asked to notify the police at roughly 11:00 pm.  If all shelters are full on the same night, police are to refrain from enforcing either ordinance.

22.     Under the Shelter Protocol, shelters have the discretion to determine whether they are full, and whether to report themselves as full.  Although the BRM has exhausted its capacity on certain nights, and/or forced individuals to sleep on the floor in storage rooms on other nights, the BRM has never reported that its shelters are full or that all the beds are full and persons have to sleep on the floor in a dining storage room.

23.     The Shelter Protocol does not account for why shelter might be unavailable on an individual-specific basis, *i.e.*, if an individual cannot access a shelter for the night because he has stayed there in excess of the shelter-imposed maximum on consecutive overnight stays.  For

**THIRD AMENDED COMPLAINT**

instance, the Shelter Protocol does not account for situations in which an individual may be prohibited from staying at a particular shelter, is not allowed to stay due to stay limitations or disabilities, or when an individual objects to a shelter's pervasively religious environment or religious activities.

24.     On information and belief, to the extent that any shelter does not contact the BPD on a given night, the BPD enforces the Ordinances without regard to whether the particular individual at issue may or may not have shelter available to him or her.

**B.     Homelessness in Boise**

25.     Federal law defines a "homeless individual" to include one who lacks a fixed, regular, and adequate night-time residence, or one who resides in a shelter, transitional housing, or a place not ordinarily used for sleeping accommodations, such as streets, automobiles, abandoned buildings, parks or other public spaces.  Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2000).  A homeless child is also an "individual[] who lack[s] a fixed, regular, and adequate nighttime residence."  42 U.S.C. § 11434a(2)(A).

26.     "Point in Time" ("PIT") counts are the primary method of determining the number of homeless individuals in Boise.

27.     The United States Department of Housing and Urban Development requires local homeless assistance and prevention networks to conduct a PIT count one night every January, and PIT counts are regarded as a "critical source of data" on homelessness.  *See Martin v. City of Boise*, 920 F.3d 584, 604 n.1 (9th Cir. 2019).

28.     The PIT count includes a survey of the people experiencing unsheltered homelessness (those residing in places not meant for habitation on the night of the count) and those experiencing sheltered homelessness (those who are inside on the night of the count).

**THIRD AMENDED COMPLAINT**

29.     The City contracted with the Institute for Community Alliances in 2019 to coordinate the PIT Survey for Ada County—the region which includes Boise.  To survey people experiencing unsheltered homelessness, volunteers are recruited and trained to visit known locations where such individuals may be found and to interview them about their arrangement.  As it regards people experiencing homelessness in shelters, relevant homeless service providers conduct a count and provide a number.

30.     The most recent PIT count in Boise City / Ada County identified a total of 713 individuals experiencing homelessness.  61 of those individuals were *unsheltered* on the night of the count.  The remainder of the individuals were sheltered in a variety of places, including Sanctuary and BRM.  *See* https://icalliances.org/2019-bcac-point-in-time-housing-inventory-count.

31.     The PIT count is ultimately always under-inclusive, for multiple reasons.  In past counts, volunteers have dropped out at the last minute, missed training sessions, did not understand how to properly conduct the count, and failed to check locations where homeless individuals were known to frequent or have hidden themselves to avoid police interactions or receiving a citation for sleeping on public property when no alternative shelter is available.

32.     The City police have also, in the past, increased patrols during the PIT survey, likely thwarting participation and scaring those experiencing homelessness into hiding, where they are difficult to identify.  The PIT counts also do not account for the substantial number of people experiencing homelessness who are in jail on the night of the survey.  This number is substantially higher than the number of people experiencing homelessness who are in jail throughout other periods of the year.

**THIRD AMENDED COMPLAINT**

33.     In sum, the real number of individuals experiencing homelessness in Boise is greater—and likely significantly greater—than the number reported on the PIT count.

34.     Boise's homeless population consists of single men and women, couples, and single- and two-parent families with children.  An increasing number of people experiencing homelessness in Boise are military veterans who have returned to the United States after serving several tours of duty in Iraq and Afghanistan.

35.     A substantial number of individuals experiencing homelessness in Boise are also children.  The Boise Independent District has identified between 799 and 990 students as experiencing homelessness over the course of a given school year since 2010, with 836 in 2018-2019, the most recent year for which data is available.   https://www.sde.idaho.gov/federal-programs/homeless/files/general/Homeless-by-District-FY11-19-12-10-2019.xlsx.

36.     Many persons experiencing homelessness in Boise have difficulty maintaining employment because jobs are not available, they lack sufficient skills and education, and/or they have physical or mental disabilities.

37.     Many people experiencing homelessness in Boise, even those who are currently sheltered, are considered chronically homeless.  "Chronically homeless' individuals are those who have been experiencing homelessness for more than a year or who have had at least four episodes of homelessness in the last three years."  *See* 24 C.F.R. § 91.5.

38.     Individuals experiencing homelessness also interact the most with the Boise Police Department.  But, as Boise's *2006 Special Report on Interactions Between the Boise Police Department and the Homeless* ("*Ombudsman Report*") explains, "[p]olice officers are not trained to perform social work functions; yet, persons experiencing homelessness often become the

**THIRD AMENDED COMPLAINT**

responsibility of law enforcement agencies because of the minor misdemeanors they commit."
*Ombudsman Report* at 2.

39.     The Ombudsman Report indicated that members of the Boise Police Department were inadequately trained and prepared to deal with the problems of Boise's homeless population, including mental illness, alcohol or dependence, and lack of shelter and other resources.  *Id.* at 2, 22, 24-25, 44.

### C.     Effect of Enforcement of the Disorderly Conduct and Camping Ordinances

40.     Repeat citations or convictions under the Disorderly Conduct and Camping Ordinances for camping or sleeping in public can have a detrimental effect on an individual's health and his or her ability to find and continue employment, procure and maintain housing, and receive government assistance or benefits.

41.     Defendants' actions pose a health risk to the homeless population of Boise because the constant need to keep moving to avoid citations under these ordinances prevents these individuals from sleeping.  Sleep is a physical and mental necessity for people to properly function. Lack of sleep causes disruptions in cognitive function and exacerbates a myriad of physical and mental health problems.

42.     Individuals experiencing homelessness, like Plaintiffs, typically cannot afford to pay the fines associated with violations of the Disorderly Conduct and Camping Ordinances.

43.     These individuals often do not have a permanent address or telephone, which makes it difficult for them to receive communications from the court.  They also often lack reliable transportation.

44.     If these individuals fail to appear in court, the court will issue a warrant for their arrest.  That warrant can result in additional time in jail and fines for failing to appear.

12

**THIRD AMENDED COMPLAINT**

45.     If these fines are not paid, the homeless individual may be subject to a civil contempt order.  Incarceration is also disruptive and expensive.  And an individual experiencing homelessness can be charged the costs for his or her incarceration.

46.     Individuals experiencing homelessness must disclose criminal convictions, even for minor infractions, on applications for public and private housing.  These convictions become a matter of public record.  As a result, the convictions may cause them to lose the opportunity to obtain permanent public and private housing.  Additionally, an individual may lose a housing placement if he or she is incarcerated.

47.     Conviction and incarceration for camping or sleeping outside can also interfere with the ability to obtain and maintain Social Security disability benefits.  Recipients may not receive benefits for any period in which they are incarcerated.  In addition, those applying for benefits may miss crucial hearings or deadlines while incarcerated, delaying their receipt of much needed income and the ability to access medical care with Medicaid eligibility.

48.     Likewise, individuals must disclose criminal convictions when they apply for employment, and even minor infractions may make a potential employer less likely to hire an applicant.  Missing work due to required court appearances or because of periods of incarceration may lead to the loss of employment and income.

49.     Defendants' policy, custom, and practice of issuing citations to, arresting, and harassing individuals experiencing homelessness like Plaintiffs under the Disorderly Conduct and Camping Ordinances, under the circumstances alleged herein, has the effect of "criminalizing" homelessness.  These measures do not accomplish any significant or legitimate public policy goal.  Instead, they perpetuate the cycle of homelessness by decreasing opportunities for homeless individuals to find housing and gainful employment and to take care of their health needs.

**THIRD AMENDED COMPLAINT**

50.     "[T]he criminalization of homelessness does nothing to address the underlying causes of homelessness and often serves to exacerbate them. . . . It serves only to move people away from services and causes them to acquire a criminal record, thus making it even more difficult for them to obtain employment and housing." *Ombudsman's Report* at 5 (summarizing problems described in The National Coalition for the Homeless and The National Law Center on Homelessness & Poverty, *A Dream Denied: The Criminalization of Homelessness in U.S. Cities* (2006).

51.     The U.S. Interagency Council on Homelessness states, "[c]riminalization undermines real solutions." Moreover, "[i]n addition to violating domestic law, criminalization measures may also violate international human rights law, specifically the Convention Against Torture and International Covenant on Civil and Political Rights." U.S. Interagency Council on Homelessness, *Searching Out Solutions: Constructive Alternatives to the Criminalization of Homelessness* 7, 8 (2012).  Numerous international human rights monitors have condemned the criminalization of homelessness in the U.S. as a violation of our human rights treaty obligations.

52.     And, as the United States has recognized, "[c]riminalizing public sleeping in cities with insufficient housing and support for homeless individuals does not improve public safety outcomes or reduce the factors that contribute to homelessness."  *See* Statement of Interest of the United States at 15, Dkt No. 276.

53.     The U.S. Department of Housing & Urban Development (HUD) likewise recognizes that "criminalization policies further marginalize men and women who are experiencing homelessness, fuel inflammatory attitudes, and may even unduly restrict constitutionally protected liberties and violate our international human rights obligations. Moreover, there is ample evidence that alternatives to criminalization policies can adequately

**THIRD AMENDED COMPLAINT**

balance the needs of all parties." U.S. Dept. of Housing & Urban Development, Decriminalizing Homelessness, https://www.hudexchange.info/homelessness-assistance/alternatives-to-criminalizing-homelessness/ (last visited Mar. 7, 2020). Since 2015, HUD has provided extra points on its grant competitions to applicants who can demonstrate they are implementing specific strategies to end the criminalization of homelessness. *See* U.S. Dept. of Housing & Urban Development, NOTICE OF FUNDING AVAILABILITY FOR THE 2019 CONTINUUM OF CARE PROGRAM COMPETITION, 64 (2019), https://files.hudexchange.info/resources/documents/FY-2019-CoC-Program-Competition-NOFA.pdf

### D. Availability of Shelter

54.     In Boise, the need for shelter space far exceeds the availability of shelter space.

55.     Three shelters provide emergency beds to individuals experiencing homelessness in Boise:  Interfaith Sanctuary ("Sanctuary"), located at 1620 W. River Street in Boise, and two shelters run by Boise Rescue Mission ("BRM"): River of Life (for men), located at 575 S. 13th Street in Boise, and City Light (for women and children), located at 1404 W. Jefferson Street in Boise.

56.     In total, Sanctuary has 164 spots for persons experiencing homelessness:  60 beds are set aside for families, 75 for men, and 22 for women. https://www.idahopress.com/news/local/a-look-inside-boise-s-emergency-shelters-and-how-they/article_480a19a5-a1b6-5cb3-8f37-5c85ec4d9722.html

57.     Sanctuary is routinely full throughout the year and therefore often turns away individuals experiencing homelessness.

58.     BRM has space for approximately 300 people experiencing homelessness.  *See* https://www.idahopress.com/news/local/a-look-inside-boise-s-emergency-shelters-and-how-

**THIRD AMENDED COMPLAINT**

they/article_480a19a5-a1b6-5cb3-8f37-5c85ec4d9722.html (indicating that, combined, BRM and Sanctuary have spots for approximately 450 homeless people).

59.     Within the bounds of certain rules, it is BRM's policy never to turn away individuals experiencing homelessness.  Although it has a limited number of beds or alternative spaces that can be used to provide safe and constitutionally adequate housing, BRM does not report as full under the Department's Shelter Protocol.

60.     BRM has a policy to allow people experiencing homelessness to sleep on the floor if there are no beds available.  Even when there is no available shelter space at BRM for individuals to sleep on beds, BRM will not contact the BPD to report that it is full.

61.     The BPD will enforce the Ordinances on nights when individuals cannot obtain beds at BRM, including on nights where there may not be safe and constitutionally adequate sleeping alternatives available within the shelter.  *See, e.g.*, *Lareau v. Manson*, 651 F.2d 96, 107 (2d Cir. 1981) (forcing individuals to sleep on mattresses on floor "do[es] not provide minimum decent housing" necessary to "pass constitutional muster").

62.     BRM is a corporation "for the worship of God, the teaching and preaching of the Word of God, the winning of people to a personal faith in the Lord Jesus Christ and in the spiritual improvement of mankind."

63.     BRM welcomes visitors with the notification that its "first object is to introduce everyone to our Lord and Savior Jesus Christ" and it offers chapel services, pre-meal prayers and morning devotions at its facilities.

64.     Both of BRM's shelter facilities offer shelter in connection with two distinct programs: (1) The Discipleship Program, and (2) The Emergency Services Program.  The Discipleship Program is an "intensive, Christ-based residential recovery program for people with

16

**THIRD AMENDED COMPLAINT**

chemical dependency or alcoholism" and "is only open to those who are or desire to be of the same faith as the Rescue Mission."

65.     The Emergency Services Program provides a "place of overnight repose and safety for persons whose only alternative is to sleep on the streets . . . or other unsafe places."

66.     BRM's religious mission extends to its homeless shelter activities.  On its shelter intake form it informs the homeless that "the Good News is that Jesus saves us from sin past, present, and future" and that it "would like to share the Good News with" the homeless before asking whether they have "heard of Jesus?"  The form also provides that the homeless will be "expelled from the emergency shelter" if they answer falsely.

67.     BRM offers daily "voluntary spiritual guidance, Christian counseling, and Christian religious services" to participants in the Emergency Services Program.  Even for emergency services program participants, BRM's rules specify that "religious services are encouraged."

68.     Attendance at religious services is required to utilize the Discipleship Program.

69.      Some members of Boise's homeless population, including some Plaintiffs, do not wish to stay in BRM's pervasively religious environment.

70.     BRM's shelters have strict rules limiting the homeless population's ability to effectively seek emergency shelter therein.  At River of Life, men experiencing homelessness are only permitted to stay for 17 consecutive days before being barred from the shelter for a period of *30* days.  At City Light, women and children experiencing homelessness are permitted to stay for 30 consecutive days before facing the same choice.

71.     Individuals experiencing homelessness seeking to stay at the BRM shelters must also comply with many rules or else will be banned or locked out on any given night.  For instance,

**THIRD AMENDED COMPLAINT**

homeless individuals may not stay at the BRM shelters sporadically.  Instead, they must return to the shelter every night if they wish to continue to stay there.

72.     The individual must check in each night between 4 and 5:30pm.  Individuals who check-in after 5:30 may be denied shelter based on the reason for their late arrival and those arriving after 8:00pm are generally denied.  This means that individuals experiencing homelessness who are regularly working off-hour shifts, or who are working on-call or day labor jobs may never be able to obtain shelter.

73.     BRM guests also generally may not receive telephone calls, mail, or visitors.  They may not sleep in their own clothes.

74.     Once an individual checks into a BRM facility, they may not leave the shelter until the following morning.

75.     Shelter spaces in Boise are frequently unavailable to certain subsets of the homeless population.  BRM's River of Life dedicates a certain number of beds to at-risk veterans, a certain number of beds to the shelter's employment and year-long religious-based alcohol and substance abuse programs, and a certain number of beds to the shelter's transitional housing programs.

76.     Sanctuary on a daily basis operates at capacity in the men's and women's dorms and has to use mats on the floor for persons to sleep.  Sanctuary has to turn away up to fifteen (15) persons a night.

77.     There are other shelters in Boise, but they do not accommodate the general homeless population.  The Women's and Children's Alliance provides emergency beds only for female victims of domestic violence and their children.  The Idaho Youth Ranch provides emergency beds only for children who are part of the juvenile justice or child protection system.

**THIRD AMENDED COMPLAINT**

78.     The shelters also have various other restrictions that prevent certain individuals experiencing homelessness from staying in them.  The BRM shelters do not allow couples to stay together.  BRM's City Light has an age cut-off for male children over twelve (12) years old so those children cannot stay with their mothers.  BRM's River of Life does not allow men with children.

79.     Finally, some individuals who are eligible for assistance to secure permanent housing have to wait for long periods of time for such assistance or housing to become available, or cannot receive such assistance at all.  Due to the large demand for rental assistance in the community and a limited amount of funding and federal budget cuts, the Boise City/Ada County Section 8 housing assistance waiting list is closed and is no longer accepting new applicants.  The housing authority "do[es] not know when it will open again." https://bcacha.org/programs/subsidized-housing/housing-choice-voucher-sect-8/

80.     Because of the lack of shelter space and the inability to obtain permanent housing, a large number of individuals who are experiencing homeless in Boise will continue to do so for the foreseeable future. Because of the various restrictions on shelter beds, even if a bed is technically open on a given night, it may not be practically available to a given individual experiencing homelessness.

**E.     Pattern of Enforcement**

81.     At all relevant times, Defendants and their agents acted under color of state law and within the scope of their employment.

82.     The City of Boise, through its Police Department, and the Chief of Police maintain a policy, custom, and practice of enforcing the Disorderly Conduct and Camping Ordinances against homeless individuals in circumstances that violate the Eighth Amendment.

**THIRD AMENDED COMPLAINT**

83.     The *Ombudsman's Report* credited the "consistent effort and pressure" by the Boise Police Department for the elimination of permanent homeless camps: "Through solid effort and real pressure by the Boise Police Department, no established camps exist today along the Greenbelt. . . . At present, it might be possible to find one or two people in the parks at night; but there will be no established camps." *Ombudsman's Report* at 18-19.

84.     Defendants have historically issued citations for sleeping or camping in public most between the months of April and September.

85.     Defendants have given most citations between the hours of 5:30 and 8:30 a.m. when individuals experiencing homelessness who have slept outside the night before wake up and prepare to leave the area.   Boise police officers make a point of checking for individuals experiencing homelessness first thing in the morning and have even opted to start shifts early in order to look for and cite those individuals for violating the camping and disorderly conduct ordinances.   Boise police officers target outdoor areas where individuals experiencing homelessness sleep.

86.     Plaintiffs have each received citations and/or convictions, or threats of citations, for violations of the Disorderly Conduct and Camping Ordinances for sleeping or lying down in public.

87.     On information and belief, Boise police officers, with knowledge that Plaintiffs were experiencing homelessness and had no lawful place to sleep or rest within the City of Boise because of a chronic shortage of shelter beds, have issued citations, arrested, and/or threatened Plaintiffs in an effort to drive them and other individuals experiencing homelessness out of the City of Boise.

**THIRD AMENDED COMPLAINT**

88.     Plaintiffs often had to move constantly all night long, or sleep outside of the Boise city limits to avoid further harassment or citations from police officers.

89.     On information and belief, Interim Chief of Police Masterson and his predecessor are aware that officers in the Boise Police Department unlawfully targeted Boise's homeless population; cited, arrested, or threatened to cite or arrest Plaintiffs and other individuals experiencing homelessness for sleeping in public; and either directed or condoned the behavior of his officers.

90.     The City's *Ombudsman's Report* and other material have documented the City's policy, custom, and practice of criminalizing homelessness and publicized the dramatic increase in camping citations and the "success" of their enforcement efforts.

91.     Local newspaper articles, the *Ombudsman's Report* and Police Department publications have publicized the Boise Police Department's practice of issuing camping citations to individuals experiencing homelessness who have no legal place to sleep or rest in Boise.

92.     City policymakers and other relevant individuals in positions of authority were aware of this practice and, at a minimum, knowingly permitted these actions by Boise police officers.

93.     Defendants have failed to exercise the proper supervision over Boise police officers' interactions with individuals experiencing homelessness and failed to train these officers in how to appropriately and lawfully enforce the Disorderly Conduct and Camping Ordinances.

94.     Defendants' policies and practices have caused Plaintiffs to suffer—and unless enjoined, will continue to cause Plaintiffs to suffer—humiliation; psychological, physical, and emotional suffering; degradation, pain, and injury; financial loss; and loss of privacy and basic constitutional and human rights.

**THIRD AMENDED COMPLAINT**

## FIRST CLAIM FOR RELIEF
### (Violation of the Eighth Amendment to the United States Constitution)

95.　Plaintiffs hereby incorporate all preceding paragraphs as if fully set forth herein.

96.　The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment.  U.S. Const. Amend. 8.

97.　The "Cruel and Unusual Punishments" Clause of the Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such." *Ingraham v. Wright*, 430 U.S. 651, 667-68 (1977).

98.　Laws criminalizing an individual's status, rather than specific conduct, are unconstitutional under the Cruel and Unusual Punishments Clause.  *Robinson v. California*, 370 U.S. 660 (1962).

99.　The Cruel and Unusual Punishments Clause prohibits "the enforcement of a statute prohibiting sleeping outside against homeless individuals with no access to alternative shelter." *Martin v. City of Boise*, 920 F.3d 584, 615 (9th Cir. 2019).

100.　Poverty, unemployment, untreated mental and physical illness, drug and alcohol dependence, and a lack of adequate shelter space often forces Plaintiffs and other individuals experiencing homelessness to sleep in public places in Boise.

101.　There are substantially more persons experiencing homelessness in Boise than there are emergency shelter beds.

102.　Although Plaintiffs are experiencing homelessness and frequently have no way to comply with Boise Municipal Code §§ 5-2-3(A) and 7-3A-2(A) and must sleep outdoors, Defendants have cited, arrested, or threatened Plaintiffs for sitting, lying, or sleeping in public places in Boise despite the unavailability of shelter.  In addition, despite the language of the Ordinances, under the terms of the Shelter Protocol, Defendants continue to enforce Boise

22

**THIRD AMENDED COMPLAINT**

Municipal Code §§ 5-2-3(A) and 7-3A-2(A) in situations in which no shelter is available to a given individual experiencing homelessness, including because of stay limits, family status, gender, working conditions, and/or disability.   In addition, Defendants continue to enforce Boise Municipal Code §§ 5-2-3(A) and 7-3A-2(A) in situations in which an individual's only alternative is to stay in a pervasively religious atmosphere to which they object, or face arrest.

103.    Defendants are punishing Plaintiffs and other homeless individuals based on their status as persons experiencing homelessness.

104.    Plaintiffs Robert Martin and Pamela Hawkes were cited and/or arrested for sitting, lying, or sleeping in public places in Boise despite the unavailability of shelter.

105.    Plaintiffs Robert Martin and Robert Anderson are at risk of being cited, arrested, or threatened for sitting, lying, or sleeping in public places in Boise despite the unavailability of shelter.

106.    Defendants' actions that penalize Plaintiffs for their homeless status constitute cruel and unusual punishment in violation of Plaintiffs' well-established rights under the Eighth Amendment of the United States Constitution as incorporated in, and applied to the states through, the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations asserted herein, Plaintiffs respectfully request relief as follows:

1.    An injunction enjoining Defendants, their officers, employees, assignees, successors, and agents, from enforcing Boise Municipal Code §§ 5-2-3(A) and 7-3A-2(A) and any other law that would impose criminal penalties on homeless individuals for sitting, sleeping, or lying outside on public property while no shelter is available to them;

**THIRD AMENDED COMPLAINT**

2.      A declaration, pursuant to 28 U.S.C. § 2201, that enforcement of Boise Municipal

Code §§ 5-2-3(A) and 7-3A-2(A) violates the Eighth Amendment of the United States Constitution

when applied to homeless individuals for sitting, sleeping, or lying outside on public property

while no shelter is available to them;

3.      Award of damages according to proof under 42 U.S.C. § 1983;

4.      All costs, attorneys' fees, and expenses that Plaintiffs reasonably incur, *see* 42

U.S.C. § 1988; and

5.      Such other and further relief as this Court deems just and proper.


Dated: March 10, 2020

/s/ Michael E. Bern

Howard A. Belodoff, ISB #2290
IDAHO LEGAL AID SERVICES, INC.
1447 South Tyrell Dr.
Boise, ID 83706
Phone: (208) 87-2323
Fax:  (208) 342-2561
Email: howardbelodoff@idaholegalaid.org

Eric Tars # 94857 (PA)
National Law Center
  on Homelessness & Poverty
2000 M St., N.W., Suite 210
Washington, DC 20036
Phone: (202) 638-2535
Fax: (202) 628-2737
Email: etars@nlchp.org

Allen M. Gardner, #456723 (DC)
Michael E. Bern, #994791 (DC)
Scott C. Jones, #986308 (DC)
Latham & Watkins LLP
555 Eleventh Street, N.W., Suite 1000
Washington, DC 20004-1304
Phone: (202) 637-2200
Fax: (202) 637-2201
Email: Allen.Gardner@lw.com

**THIRD AMENDED COMPLAINT**

Email: Michael.Bern@lw.com
Email: Scott.Jones@lw.com

*Attorney for Plaintiffs*

**THIRD AMENDED COMPLAINT**